**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN M. CLARKE, individually, and SSD CLARKE HOLDINGS, INC, | : |
| | : |
| | : |
| Plaintiffs, | : **Civil Action No. 1:22-cv-01917-PKC** |
| | : |
| v. | : |
| | : |
| TRIGO U.S. INC. and TRIGO HOLDINGS S.A.S, | : |
| | : |
| Defendants. | : |

**PLAINTIFFS STEVEN M. CLARKE AND SSD CLARKE HOLDINGS, INC.'S**
**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF LAW ............................................................................................. 1

STATEMENT OF FACTS ............................................................................................. 2

   I.     TRIGO Offers to Buy SMS .................................................................................. 2

   II.    The Purchase and Sale Agreement ..................................................................... 3

   III.   TRIGO Breached the PSA by Requiring SMS to Develop Quality Services ................ 4

   IV.   TRIGO Breached the PSA by Stopping the L3Harris Contract and Slowing Down
         Business Development. ....................................................................................... 5

ARGUMENT ................................................................................................................ 6

   I.     Standard for Motion to Dismiss .......................................................................... 6

   II.    TRIGO violated the PSA by Requiring SMS to Develop Quality Services ...................... 7

     A.   TRIGO Breached Its Promise to Operate SMS Consistent with Past Practice and Not
        Make Changes That Could Hurt Earnings. ......................................................... 8

     B.   TRIGO Decided to Build Out Quality Services ................................................... 9

     C.   TRIGO Is Responsible for Misrepresenting Its Capabilities ............................. 11

     D.   The Court May Reasonably Infer TRIGO Breached 3.4(e)(iii) ..................................... 13

     E.   TRIGO's Argument that the Claims Are Implausible as a Matter of Law Fails .......... 14

   III.   The Amendments to the PSA Are Not a Waiver or Accord and Satisfaction of
         TRIGO's breaches .......................................................................................... 14

   IV.   TRIGO breached the PSA by Deciding to Not Pursue the L3Harris Contract ............ 16

     A.   TRIGO breached at least two of its s other contractual responsibilities ...................... 17

     B.   The Slowdown Claim Is Plausible ................................................................... 17

     C.   The L3Harris Claim Is Provably True ............................................................. 19

   V.   The Claim for Breach of the Implied Covenant Is Not Duplicative ............................. 19

   VI.   TRIGO Holdings Can Be Liable for the Breaches ..................................................... 21

    A.  The Complaint Alleges TRIGO Holdings Is a Party to the Contract .............................. 21

     B.   The Court Has Personal Jurisdiction over TRIGO Holdings ....................................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Arcadia Biosciences, Inc. v. Vilmorin & Cie,*
   356 F. Supp. 3d 379 (S.D.N.Y. 2019) ................................................. 24

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................... 6

*Austin v. Town of Farmington,*
   826 F.3d 622 (2d Cir. 2016) ............................................................ 7

*Battino v. Cornelia Fifth Ave.*, LLC,
   861 F. Supp. 2d 392 (S.D.N.Y. 2012) .............................................. 24

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................... 7

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,*
   757 F.2d 523 (2d Cir.1985) ........................................................... 16

*CCM Rochester, Inc. v. Federated,*
   2014 WL 6674480 (S.D.N.Y. Nov. 25, 2014)..................................... 18

*CCM Rochester, Inc. v. Federated Invs., Inc.,*
   234 F. Supp. 3d 501 (S.D.N.Y. 2017) .............................................. 18

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d Cir. 2002) ............................................................ 3

*Dalton v. Educ. Testing Serv.,*
   87 N.Y.2d 384 (1995).................................................................... 20

*Demetre v. HMS Holdings Corp.,*
   127 A.D.3d 493 (1st Dep't 2015) .................................................... 21

*Dreni v. PrinterOn Am. Corp.,*
   486 F. Supp. 3d 712 (S.D.N.Y. 2020) .............................................. 21

*Forward v. Cont'l Ins. Co.,*
   142 N.Y. 382 (1894)..................................................................... 15

*General America Life Ins. Co. v. Castonguay,*
   984 F.2d 1518 (9th Cir. 1993) ........................................................ 13

*Harris v. Provident Life and Accident. Insurance Company*,
310 F.3d 73 (2d Cir. 2002) ............................................................................... 20

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*,
2021 WL 918556 (S.D.N.Y. Mar. 10, 2021) ................................................... 24

*In re Lehman Bros. Holdings Inc.*,
541 B.R. 551 (S.D.N.Y. 2015) ........................................................................ 15

*Jennings v. Hunt Companies, Inc.*,
367 F.Supp.3d 66 (2019) .................................................................................. 21

*Kass v. Kass*,
91 N.Y.2d 554 (1998) ....................................................................................... 16

*Keene Corp. v. Bogan*,
1990 WL 1864 (S.D.N.Y. Jan. 11, 1990) .......................................... 14, 18, 20

*Lykins v. IMPCO Techs., Inc.*,
2018 WL 3231542 (S.D.N.Y. Mar. 6, 2018) ................................................... 18

*Mersen USA EP Corp. v. TDK Elecs. Inc.*,
2022 WL 902372 (S.D.N.Y. Mar. 28, 2022) ................................................... 24

*Miller v. Mercuria Energy Trading, Inc.*,
291 F. Supp. 3d 509 (S.D.N.Y. 2018) ............................................................. 24

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*,
2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003) ................................................. 24

*O'Tool  v. Genmar Holdings, Inc.*,
387 F. 3d 1188 (10th Cir. 2004) ...................................................................... 18

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
152 F. Supp. 3d 127 (S.D.N.Y. 2016) ............................................................. 15

*Pernet v. Peabody Eng'g Corp.*,
20 A.D.2d 781 (1st Dep't 1964) ...................................................................... 20

*Presnall v. Analogic Corp.*,
2018 WL 4473337 (S.D.N.Y. Sept. 18, 2018) ........................................... 20, 21

*Recticel Foam Corp. v. Bay Indus., Inc.*,
128 F. App'x 798 (2d Cir. 2005) ................................................................ 22, 23

*RUS Inc. v. Bay Industries Inc.*,
   2004 WL 1240578 (May 25, 2004 S.D.N.Y.) ............................................................ 21, 22, 23

*Security Plans, Inc. v. CUNA Mutual Insurance Society*
769 F.3d 807 (2d Cir. 2014) ................................................................................................ 20

*Stahl Mgmt. Corp. v. Conceptions Unlimited*,
   554 F. Supp. 890 (S.D.N.Y. 1983) ...................................................................................... 16

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*,
   742 F.3d 37 (2d Cir. 2014) .................................................................................................... 6

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) .................................................................................................. 7

*Stevens v. Publicis, S.A.*,
   50 A.D.3d 253 (1st Dep't 2008) .......................................................................................... 20

*Structured Cap. Sols., LLC v. Commerzbank AG*,
   177 F. Supp. 3d 816 (S.D.N.Y. 2016) ................................................................................ 15

*TWA Res. v. Complete Prod. Servs., Inc.*,
   2013 WL 1304457 (Del. Sup. Ct. March 28, 2013) ...................................................... 18, 19

*VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*,
   594 F. Supp. 2d 334 (S.D.N.Y. 2008) ................................................................................ 15

*Vista Outdoor Inc. v. Reeves Fam. Tr.*,
   234 F. Supp. 3d 558 (S.D.N.Y. 2017) ................................................................................ 18

*VKK Corp. v. Nat'l Football League*,
   244 F.3d 114 (2d Cir. 2001) ................................................................................................ 15

*Wagner v. JP Morgan Chase Bank*,
   2011 WL 856262 (S.D.N.Y. Mar. 9, 2011) ........................................................ 14, 18, 20

*Warnaco Inc. v. VF Corp.*,
   844 F. Supp. 940 (S.D.N.Y. 1994) ................................................................................ 21, 22

Plaintiffs Steven M. Clarke and SSD Clarke Holdings, Inc. (collectively "Steve") respectfully submit this Memorandum of Law in Opposition to Defendants TRIGO U.S., Inc. and TRIGO Holdings S.A.S's (collectively "TRIGO") motion to dismiss. For the reasons described below, TRIGO's motion should be denied.

## MEMORANDUM OF LAW

This case is about TRIGO's breaches of a contract to buy Steve's company, Supplier Management Solutions LLC ("SMS"), which provided supplier management services to the U.S. defense and aerospace industry. In 2018, TRIGO agreed to buy SMS, through its subsidiary TRIGO U..S., for $59 million and about $20 million in earn-outs based on SMS achieving certain earning goals.  In the purchase contract, TRIGO agreed to protect Steve's right to the earn-outs and also not to interfere in the operation of the business. It breached its promises in several ways.

*First*, after the contract was signed, TRIGO misled certain of SMS's clients by claiming it could provide quality management services to these clients. This laid the foundation for the first breach by placing SMS in a situation where it had to tell the clients that TRIGO had lied, at risk of losing these clients for its own supplier management services or it would have to divert its own resources to develop the quality management services that TRIGO had promised.  TRIGO ordered SMS to develop the quality management services. This change to SMS's business model directly impacted the financial performance of the business and thus Steve's earn-out.

*Second*, in 2020 and 2021, SMS established a plan to secure a contract from L3Harris, one of the country's largest defense contractors. This plan was reflected in budgets, revenue plans, and sales forecasts. SMS was about to finalize the work with L3Harris when TRIGO decided to stop pursuing the contract. TRIGO chose instead to pursue smaller contracts, even though L3Harris's vice president of global operations confirmed that the large project had been set to go forward.

This decision again breached Section 3.4 of the contract, impacted the financial performance of the company and Steve's earn-outs. The Complaint alleges facts supporting these breaches of the contract. However, TRIGO ignores these facts, focusing instead on issues that are irrelevant to the factual allegations. TRIGO argues, for example, that by amending the contract, Steve waived his rights or effected an accord and satisfaction. This ignores the contractual language requiring any waiver to be in writing. It contends that certain of the factual allegations in the Complaint are "provably false," but this sort of contention – with which Steve vehemently disagrees – is not appropriate for a motion to dismiss.

At the end of the day, TRIGO's motion simply fails. Steve has stated plausible breaches of contract, and Defendants' motion should be denied.

## **STATEMENT OF FACTS**

### **I.    TRIGO Offers to Buy SMS**

In 2018, Defendant TRIGO Holdings S.A.S. contacted Steve to assess his interest in selling his business, Supplier Management Solutions, LLC ("SMS"). Complaint (Doc. No. 1) ¶ 32. TRIGO Holdings controls a group of companies typically referred to as the "TRIGO Group." *Id.* ¶ 30. The TRIGO Group includes Defendant TRIGO U.S. *Id.* ¶ 21. Matthieu Rambaud, CEO of the TRIGO Group, and Emmanuel Marquis, Executive Vice President of Aerospace, Defense and Rail, represented the TRIGO Group in the negotiations. *Id.* ¶ 29. Rambaud confirms in his declaration supporting Defendants' motion that he was the CEO of TRIGO Holdings during these negotiations. Rambaud Decl. ¶ 1.

TRIGO initially offered to purchase SMS for $59 million—an offer that Steve rejected. Compl. ¶ 38. In May 2018, TRIGO made a second offer to purchase SMS. *Id.* ¶ 40. The second offer letter states in the first paragraph that "we are pleased to confirm the interest of TRIGO Holdings SAS, head company and 100% shareholder of the TRIGO Group (together "TRIGO") in

acquiring up to 100% of SMS." *See* **Ex. A.** Declaration of Steven Clarke, Ex. 1 at 1. This second offer letter was signed by Rambaud as CEO of the TRIGO Group. In the letter, TRIGO Holdings offered to increase the purchase price by making additional "earn-out" payments if the business met certain growth targets. Compl. ¶ 43.

## II.    The Purchase and Sale Agreement

TRIGO agreed to move forward with the second offer. *Id.* ¶ 47. The earn-out payments would maximize at $20 million, and combined with the approximately $60 million cash price, would meet Steve's selling price of $80 million. *Id.* ¶ 43. Steve expected that SMS to achieve target revenue conditions triggering earn-out based on SMS's organic growth. *Id.* ¶ 53. While Steve believed any business contributed by TRIGO would help, and certainly not hinder SMS's growth, he was not relying on it to meet the targets. *Id.*. Indeed, it was TRIGO that indicated that its quality management services would be a natural fit alongside the business's existing supplier management services and would help Steve achieve the targets. *Id.* ¶ 41. In August 2018, Steve executed a Purchase and Sale Agreement ("PSA") as president of SSD Clarke Holdings, Inc. (then known as Supplier Management Solutions, Inc.) and in his personal capacity.[1] *Id.* ¶ 48. Matthieu Rambaud executed the PSA as President of TRIGO U.S. *Id.*, Clarke Decl., Ex. 2.

To protect Steve's right to the earn-out payments Section 3.4(e) of the PSA limited the way TRIGO could operate SMS. Compl. ¶ 55. The PSA restricted TRIGO's ability to interfere with SMS's operations in several ways. Section 3.4(e) required TRIGO to:

> (i) operate the Company in the ordinary course of business and so as to maintain it
> as a going concern; (ii) operate the Company as a measurable business unit with

---

[1] The PSA and Amendments are attached to the Declaration of Steven Clarke filed in conjunction with this memorandum. *See* Declaration of Steven Clarke ("Clarke Decl."), Exhibits 2-7. Although not filed as exhibits to the Complaint, the PSA and Amendments are integral to the Complaint and the Court may rely on them on a motion to dismiss. On a motion to dismiss, the court may rely on documents attached as exhibits, statements or documents incorporated by reference, and documents that are integral to the complaint because the complaint relies heavily on its terms and effects. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-153 (2d Cir. 2002).

the same perimeter as on the Closing with its own separate chart of accounts; (iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment; (iv) not, except to the extent strictly required under applicable Law, unilaterally intervene with the management of the Company; [. . .] (vii) operate the business of the Company consistent with past practice and not adopt strategic, commercial or financial changes to the way the Company is managed which could have a negative impact on the EBITDA of the Company[.]

PSA, Compl. ¶¶ 55, 118; Clarke Decl., Ex. 2, at 19-20.

## III.    TRIGO Breached the PSA by Requiring SMS to Develop Quality Services

As required by the PSA, Steve and SMS introduced TRIGO to Northrop Grumman, UTC Aerospace Systems, Pratt & Whitney, and Boeing. Compl. ¶¶ 60-70. At these meetings, Matthieu Rambaud and Emmanuel Marquis asserted that TRIGO had significant ability to augment SMS's existing services by adding TRIGO's quality management services. *Id.* ¶¶ 61, 63, 64, 66-70. Rambaud and Marquis presented slide decks showing the worldwide capabilities of TRIGO, including its 1,500 global aerospace employees and its ability to provide Advanced Product Quality Planning. *Id.* ¶ 64-65. Rambaud and Marquis asserted that TRIGO had the ability to provide quality management services to SMS's clients. *Id.* ¶ 66.

After the sale closed, it became apparent that TRIGO could not provide the quality management services that Rambaud and Marquis had touted. *Id.* ¶¶ 76-78. Steve and SMS faced a dilemma: they could tell SMS's customers that TRIGO lied and accept the reputational harm in an industry that depends on honesty and integrity, or they could help TRIGO build the services they had already promised but do so at the expense of SMS's existing line of business. *Id.* ¶ 79.

SMS held a board meeting in February 2019. During the meeting, TRIGO acknowledged that its then-existing "aerospace organization [is] insufficient to support development of innovative quality services in the US." *Id.* ¶ 78. Presented with two options—postponing development of quality services and incurring reputational harm or building out quality services—TRIGO chose

to have SMS build out the quality services. *Id.* ¶ 81; Clarke Decl., Ex. 8. This decision was specifically directed by Rambaud, who was now Steve's boss. *Id.* ¶ 81; Clarke Decl., Ex. 8.

This decision required Steve and the executive team at SMS to devote substantial amounts of time to developing quality management services—time that they could not spend on business development for SMS's traditional line of business. Compl. ¶ 86-88. SMS in fact lost business because its officers could not attend to its existing customers. *Id.* ¶ 87.

TRIGO breached the PSA by requiring SMS to develop quality services that TRIGO could not provide. At a minimum, TRIGO did not operate SMS consistent with past practices and adopted a strategic change to the management of the business that negatively impacted SMS's financial performance. *Id.* ¶ 84-86, 118-120. But for TRIGO's breach, SMS's performance would have triggered the full earn-out payments due to SSD. *Id.* ¶ 120.

## IV.   TRIGO Breached the PSA by Stopping the L3Harris Contract and Slowing Down Business Development.

That was not the end of story. TRIGO and SSD agreed to five written amendments to the PSA, none of which include a waiver of any right under the PSA. *Id.* ¶ 57, 93-96., Clarke Decl., Ex. 3-7. The fifth amendment in December 2020 changed the earn-out formula and the dates on which earn-outs would be paid. Compl. ¶¶ 94-96. Clarke Decl., Ex. 7. It also reiterated TRIGO's obligation to not interfere with SMS's business. Compl. ¶¶ 125-126. Clarke Decl., Ex. 7.

In late 2020, SMS was pursuing significant new contracts for its supplier management services, including a large contract with L3Harris, a defense contractor. Compl. ¶ 98. SMS included this contract in its budget and revenue plan for 2021 and in a sales forecast for 2021. *Id.* ¶¶ 99-100. SMS's 2021 budget estimated that SMS's EBITDA would hit $8,840,000 in 2021 with the L3Harris contract. *Id.* ¶ 98. Thus, in late 2020, SMS had established a strategic plan that included pursuing the contract with L3Harris. In early 2021, Steve transitioned into a consultant

position where he no longer had control over business decisions at SMS, but still helped with business development, including the L3Harris contract.  Clarke Decl. ¶2.

In June 2021, as Clarke and SMS were preparing the final push to secure the L3Harris contract, TRIGO unexpectedly decided to stop pursuing the contract. Compl. ¶¶ 102-103. TRIGO's Vice President of Aerospace and Rail, Emmanuel Marquis, was the primary person who made the decision. *Id*. As a result of this decision, SMS lost significant billings that would have increased SMS's EBITDA for 2021 and triggered additional earn-out payments to SSD. *Id.* ¶ 104.

TRIGO's decision, and the way it was handled internally, caused other turmoil at SMS, including the resignation of SMS's president, Jay Nicholas. *Id.* ¶¶ 104-106. L3Harris' Vice President of Global Operations, Byron Green, reached out to Steve and Nicholas to find out what was happening at SMS. *Id.* ¶ 107. Green told Steve and Nicholas that he had expected the large contract to go forward, confirming that it was not speculative. *Id*. Ultimately, SMS did not enter the large contract with L3Harris. *Id.*  ¶ 109.

Here again, TRIGO directly interfered in SMS's business by deciding to not pursue a contract that had already been approved by SMS's management. *Id.*  ¶¶ 98-100. TRIGO's decision was, at a minimum, a strategic change to the management of SMS that had a negative impact on SMS's financial performance.

## ARGUMENT

### I.   Standard for Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), the Court must accept the Complaint's factual allegations as true and must draw all reasonable inferences in the plaintiff's favor. *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 40 (2d Cir. 2014). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). However, "the plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. Dismissal is only appropriate "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).

**II.      TRIGO violated the PSA by Requiring SMS to Develop Quality Services**

TRIGO breached the PSA by requiring SMS to develop the quality management services that TRIGO told SMS's clients they could obtain immediately.  TRIGO argues that these claims must be dismissed because (a) Steve must allege that TRIGO acted with the intent of sabotaging his earn-out, (b) Steve made the decision about whether to develop a quality management services program, and (c) SMS employees were responsible for any representations about quality management services. TRIGO's arguments fails on each count.

*First*, the PSA restrained TRIGO's operation of SMS in multiple ways, not just from taking actions with the primary purpose of restraining Steve's earnout. The Complaint alleges breaches of those non-intentional promises.

*Second*, the Complaint alleges that TRIGO was responsible for the decision to develop quality management services. TRIGO's arguments to the contrary are a factual dispute.

*Third*, the Complaint alleges that TRIGO's CEO  Matthieu Rambaud and Executive Vice Emmanuel Marquis, made the representations about quality management services, not SMS's employees.  TRIGO's attempt to introduce a contrary factual allegation is not only flawed but inappropriate for a  motion to dismiss and should be stricken or disregarded.

Finally, the Complaint alleges sufficient facts to infer that, in addition to breaching its other promises, TRIGO did intend to impair Steve's ability to achieve his earn-out.

### A.      TRIGO Breached Its Promise to Operate SMS Consistent with Past Practice and Not Make Changes That Could Hurt Earnings.

In its brief, TRIGO refers to Section 3.4(e)(iii) – the provision requiring TRIGO to operate SMS "in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment." Defs.' Br. ("Br.") 13 (arguing TRIGO did not breach 3.4(e)(iii)); 19 (arguing a breach of 3.4 requires a showing of intentional conduct). TRIGO argues that the Complaint fails because there is no allegation that TRIGO misled SMS's customers for the purpose of reducing or eliminating the earn-out. But TRIGO overlooks its other contractual obligations under Section 3.4(e). Irrespective of whether subsection (iii) only prohibited actions taken with such a primary purpose, subsection (vii), for example, required TRIGO to operate the company consistent with past practice and not make any strategic, commercial, or financial changes to the management of the business that could reduce the EBITDA of the company. It does not contain any intent requirement.

In requiring SMS to build a quality management services program, TRIGO violated its promise to operate the business consistent with past practice. That line of business did not previously exist at SMS, and it was something that Steve had specifically avoided pursuing. Compl. ¶ 42. It was also a strategic, commercial, and financial change that would directly reduce SMS's earnings. As the Complaint details, SMS had to build an infrastructure from the ground up. *Id.* at ¶¶ 82-83. It was not simply a choice about which sort of business to pursue. Rather, TRIGO committed SMS to hiring and training new employees and to developing quality a quality manual, procedures and protocols, processes, work instructions, training materials and job descriptions. *Id.* All of this negatively affected SMS earnings. *Id.* at ¶¶ 86-87. TRIGO breached subsection (vii) by deciding that SMS should build out the quality services that TRIGO could not provide.

TRIGO attempts to suggest that even if Steve had to devote such resources to building a quality management services program, it must not have been a problem because "by 2019, SMS had already developed a sufficient quality management infrastructure to secure three separate contacts for such services which admittedly increased SMS's billings." Br. 17. TRIGO has misstated the Complaint. It does state that SMS secured three contracts for quality services in 2019. Compl. ¶ 90. However, it does not state the size of these contracts, when the contracts actually were to start, or when revenues began... Rather, the Complaint states that despite having to commit time and resources to developing a quality management program, SMS's weekly billings grew to $625,000 by the end of 2019. *Id.* at ¶ 88. SMS would have met the earnings target necessary for Clarke to achieve his earn-out had SMS not had to change paths. *Id.* at ¶¶ 86-88. The PSA imposed obligations on TRIGO beyond its promise to refrain from taking any action with the primary purpose of reducing or eliminating the earn-outs, and the Complaint contains sufficient detailed facts to show TRIGO breached its covenant in Section 3.4(e)(vii) to operate SMS consistent with past practice and not undertake any strategic, commercial, and financial change that would directly reduce SMS's earnings. [2]

### B.    TRIGO Decided to Build Out Quality Services

TRIGO bizarrely argues that "Clarke was the victim of his own decision about the time and resources to devote to building SMS's quality management infrastructure or, indeed, to build it at all." Br. 16. But this decision was made by TRIGO and by Matthieu Rambaud specifically. As alleged in the Complaint, the SMS board met in February 2019 to discuss these issues, and after the meeting, and afterward TRIGO acknowledged that its current "US aerospace organization [is] insufficient to support development of innovative quality services in the US." Compl. ¶ 78. This statement is drawn directly from Rambaud's minutes for the board meeting. Clarke Decl..,

---

[2] TRIGO may have also breached subsections (i), (ii), and (iv) of this section, depending on how the terms are interpreted. This is, of course, an appropriate subject of discovery.

Ex. 8. Plaintiffs further relied on this document in drafting the Complaint. Rambaud's board minutes lay out the two options discussed at the board meeting and described in the Complaint. Clarke Decl.Ex. 9; Compl. ¶ 79. One option, postponing the development of quality services, entailed "reputation risk with existing SMS clients to which quality services have already been pitched." Clarke Decl. Ex. 8; Compl. ¶ 79. The second option, building out the quality services, avoided the reputation risk, but required a significant investment and entailed execution risk, as described in the Complaint. Clarke Decl., Ex. 8; Compl. ¶ 79. Rambaud's minutes then further state that Rambaud – not Steve – would decide the two options. Clarke Decl. Ex. 8; Compl. ¶ 81.

TRIGO urges the Court to dismiss the Complaint as implausible, calling t this dilemma identified in the Complaint an "obviously artificial self-serving litigation posture." Br. 16. The board minutes demonstrate this was the actual problem faced by SMS. The minutes also show TRIGO was responsible, first for telling SMS's clients that TRIGO could do something it couldn't, and second for forcing SMS to change its business model.[3]  TRIGO's decision breached Section 3.4(e)(vii), which required TRIGO to operate SMS consistent with past practice and not make strategic or commercial decisions that could negatively impact SMS's EBITDA.

TRIGO also argues that it makes no sense to devote time and effort to building out the quality services that SMS did not previously provide to the neglect of existing services and contracts. Br. at 16. But this is explained in the Complaint and in Rambaud's meeting minutes—there was significant reputational risk involved in backing away from TRIGO's representations. Clarke Decl., Ex. 8; Compl. ¶ 79. And indeed, TRIGO decided to avoid that reputational risk.

---

[3] Matthieu Rambaud submitted a declaration in support of Defendants' motion to dismiss and his emails are clearly accessible to him. It is therefore troubling for TRIGO to assert that this is an "artificial self-serving litigation posture" and represent that Clarke was responsible for this decision when TRIGO knew it made the decision. Similarly concerning is TRIGO's argument that it made no sense for Steve to build out the quality management services. When TRIGO itself was concerned about the significant reputational risk involved in backing away from its representations.

### C.    TRIGO Is Responsible for Misrepresenting Its Capabilities

Next TRIGO also attempts to shift the blame for its misrepresentations to Steve by asserting that it did not unilaterally promote its quality management services. Br. 16. But the Complaint clearly alleges that, at TRIGO's request, Steve and SMS arranged for TRIGO to attend meetings with Clarke or other officers from SMS. Compl. ¶ 60. These meetings were required by the PSA and set up "to present the Purchaser" to Lockheed Martin, Pratt & Whitney, Northrop Grumman, and UTC.[4]  PSA Sec. 7.9. Even if the meetings were in part to maintain customer relationships, the Complaint alleges the purpose of these meetings was to inform the clients that SMS would be able to offer TRIGO's quality management services. Compl. ¶¶ 61-, 62, 63, 64. Contrary to TRIGO's argument, the slide decks that TRIGO submitted as exhibits support these allegations in the Complaint.

TRIGO attempts to shift the responsibility by asserting that SMS created the slide decks used during the presentations. Br. 16-17. Whether or not the referenced slide decks are integral to the Complaint, the emails that TRIGO also submitted are not, and Steve respectfully ask the Court to strike or disregard them. But even if it does not, the emails show that TRIGO Vice President Emmanuel Marquis provided notes on the presentation to Pratt & Whitney, that he approved the Pratt & Whitney slide deck, and that he revised slides in the Boeing presentation. *See* Rambaud Decl., Ex. D at 4 (Marquis providing notes and writing "I'm fine with your two slides."); Ex. E. (Marquis writing "Here are the revised slides for Boeing).

Moreover, each of the decks submitted by TRIGO contains information taken directly or substantially from the slide deck that TRIGO provided to Clarke in February 2018 when it first offered to purchase SMS.[5] For example, the ninth page of Northrop Grumman slide deck is titled

---

[4] TRIGO quotes this section of the PSA but ignore this language in the PSA and assert the meetings were "simply to maintain customer relationships."

[5] Plaintiffs relied on this document in drafting the Complaint.

"Trigo Overview – Key Figures" and significantly replicates the ninth slide in the February 2018 presentation that TRIGO made to SMS. Clarke Decl., Ex. 9. The tenth slide of the Northrop Grumman deck nearly duplicates the thirteenth slide in the deck presented to Steve in February 2018. Thus, it is no surprise for an SMS employee to write "Matthieu/Emmanuel – Your slides are 8, 9, 10, and 20," Rambaud Decl. Ex. C, since the ninth and tenth slides were created by TRIGO. and Rambaud and Marquis would present those slides at the meeting. At most, these documents show that SMS employees assisted TRIGO's officers in creating the presentations, but any further explanation would require testimony from the persons involved. It is illogical for TRIGO to argue that SMS is responsible when Rambaud and Emmanuel attended the meetings to present these slides. The Complaint clearly alleges that Rambaud and Marquis told these customers that they would be able to get quality management services.  Compl. ¶ 66.

TRIGO also misunderstands the Complaint in arguing that the provision of quality management services to SMS's clients was not part of the PSA. Br. at 15-16.

Section 3.4(a) of the PSA clearly provides:

> Any aerospace service activities of Purchaser and its Affiliates in the US will be included in the 2018 Normative EBITDA and 2019 Normative EBITDA; provided, however, (i) no customer contracts of Purchaser or its Affiliates entered into with US customers prior to Closing that have profitability margins of zero (0)% or less will be included, and (ii) with regards to the 2018 Normative EBITDA, the profitable contracts of the Purchaser's US aerospace activities will be included on a pro rata basis for the period from Closing to, and including, December 31, 2018.

Here the PSA provided that TRIGO's aerospace quality management contracts in the U.S. would be included in the Earn-Out calculations for 2018 and 2019 if the contracts were profitable. This section of the PSA was forward looking—requiring the inclusion of TRIGO contracts in 2019— and only makes sense if TRIGO were providing those services outside of SMS rather than through SMS. Thus, as alleged in the Complaint, the earn-out structure assumed that TRIGO could provide quality management services in the U.S. and that SMS would not need to devote resources to

12

building that business from scratch. Compl. ¶ 80. Moreover, as discussed above, the entire point of making presentations to SMS's clients was to introduce TRIGO to them, and any resulting contracts would have been included in the EBITDA to calculate Steve's earn-out.[6]

Ultimately, the Complaint alleges that SMS was on track to meet the financial targets required to trigger the earn-outs before TRIGO's interference in the business. Clarke and SSD expected to meet the EBITDA targets established in the PSA based on SMS's organic growth alone, and the addition of TRIGO's contracts was intended to be benefit, not burden, SMS. Compl. ¶¶ 52-53. The time and effort that Steve and SMS spent developing quality management services reduced SMS's ability to secure additional contracts for its traditional supplier management services, hindering SMS's ability to achieve the earning that would trigger the earn-outs. *Id.* ¶ 86. SMS lost business because of the work involved. *Id.* ¶ 87.

### D. The Court May Reasonably Infer TRIGO Breached 3.4(e)(iii)

While the Complaint contains substantial factual allegations regarding TRIGO's breach of Section 3.4(e)(vii), the Court can reasonably infer from factual allegations in the Complaint that TRIGO also breached 3.4(e)(iii). The Complaint alleges that TRIGO misrepresented its capabilities to SMS's customers and indeed to Steve as well. Compl. ¶¶ 60-70; ¶¶ 34-38, 60-70. The Complaint alleges that TRIGO offered to purchase SMS for $59 million and offered the $20 million earn-outs only after Steve rejected their initial offer. *Id.* ¶¶ 39, 43-47. The Court can reasonably infer that TRIGO sought to acquire SMS for $59 million. The Court can further infer that TRIGO acted in bad faith by promising something it could not provide and that it knew SMS would have to build the quality services line of business. And the Court can infer that TRIGO

---

[6] TRIGO's assertion that COVID and the Boeing 737 Max groundings are a more plausible explanation for SMS's failure to meet its targets is not credible, COVID took hold in March of 2020, more than a year after TRIGO had acquired SMS and after SMS had built the quality services line of business. Boeing, on the other hand, was not an SMS customer in 2018 or 2019. TRIGO disclaims reliance on Covid and the 737 Max, Br.15, n. 8, perhaps because TRIGO also knows that these are not plausible explanations.

repeated the misrepresentations it made to Steve in front of SMS's clients to ensure that Steve closed the deal. On these facts, the Complaint alleges a breach of Section 3.4(e)(iii).

E.    **TRIGO's Argument that the Claims Are Implausible as a Matter of Law Fails**

TRIGO argues that the breaches of the PSA are "inherently implausible." Br. at 13-15. In making this argument, TRIGO did not cite any case decided on a motion to dismiss saying that the breach of an express provision of a contract is implausible as a matter of law. Nor did they cite any case decided on a motion to dismiss saying that an implied covenant claim is implausible as a matter of law. Rather, they rely on implied covenant cases decided on summary judgment and ask the court to find that earn-out claims based on express provisions should be dismissed because those summary judgment cases were not proven. *See* Br. at 14-15 (quoting *Keene Corp. v. Bogan*, 1990 WL 1864, at \*16 (S.D.N.Y. Jan. 11, 1990) and *Wagner v. JP Morgan Chase Bank*, 2011 WL 856262, at \*5–6 (S.D.N.Y. Mar. 9, 2011)).[7] This argument must fail. On a motion to dismiss, the court determines if complaint contains sufficient factual material to allow the court to reasonably infer that the defendant was responsible for the alleged misconduct. The Complaint and documents integral to the Complaint pass this test.

III.   **The Amendments to the PSA Are Not A Waiver or Accord and Satisfaction of TRIGO's Breaches**

TRIGO argues that the amendments to the PSA "supersede and preclude any claims based on alleged breaches that preceded them," and operate either as a waiver or as an accord and satisfaction for TRIGO's breach. Defs.'s Resp. 17-19. This is incorrect. This argument ignores the no-waiver clause in the PSA. Section 12.6 reads:

> No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision (whether or not similar). No waiver will be binding unless executed in writing by the Party to be bound by the waiver. A Party's failure or delay in exercising any right under this Agreement will not operate as a waiver of

---

[7] As discussed below, Defendants are also incorrect in asserting that contract provisions here are "identical, in substance" to the implied covenant. *See* Defs.' Resp 14.

that right. A single or partial exercise of any right will not preclude a Party from
any other or further exercise of that right or the exercise of any other right.

PSA at 67-68. Thus, the PSA itself requires any waiver to be in writing and bars waivers based on
delay or failure to exercise a right. Such no-waiver clauses are valid in New York. *Structured Cap.
Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 825 (S.D.N.Y. 2016) (stating "No-waiver
clauses are enforceable under New York law."); *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F.
Supp. 3d 127, 137 (S.D.N.Y. 2016) (same).

       None of the amendments to the PSA contain any language stating the Steve Clarke or SSD
is waiving any breach of the PSA. Rather, each amendment states that "except as expressly set
forth herein, the Original Agreement shall continue unmodified and in full force and effect." *See*
First through Fifth Amendments, Section.2.1, Clarke Decl., Exs. 2-6. These amendments had the
limited effect of changing the timing and the manner of calculating of the earn-outs. But the
amendments also make clear there was no waiver of Steve' rights.

       TRIGO cites several cases to show that there are different ways in which a party can waive
a breach of a contract. Br. 17-18. For example, TRIGO cites a 128-year-old case suggesting that a
party can waive conditions for the payment of insurance premiums before entering a contract. Br.
17 (citing *Forward v. Cont'l Ins. Co.*, 142 N.Y. 382, 386 (1894)). TRIGO also argues that a party
may ratify a contract and that accepting benefits of a contract can constitute a waiver. Br. 17-18.[8]
But again, the PSA says that any waiver must be in writing and cannot be based on delay or failure
to exercise a right. In *Stuctured Cap.*, the court found that no waiver had been affected because the
no-waiver clause required waivers to be in writing. 177 F.Supp.3d at 825. There was no waiver
here given the similar no-waiver clause.

---

[8] *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551 (S.D.N.Y. 2015) involved a contractual clause that waived
certain defenses. *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122-23 (2d Cir. 2001) involved a
question of whether a contract induced by duress can be ratified. *VCG Special Opportunities Master Fund
Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334 (S.D.N.Y. 2008) does not involve a no-waiver clause. These
cases are inapposite.

Finally, Trigo's argument that the amendments were an accord and satisfaction fails. Defendants cite *Stahl Mgmt. Corp. v. Conceptions Unlimited*, 554 F. Supp. 890, 893 (S.D.N.Y. 1983), but that case states "[t]o establish an accord and satisfaction, there must be an intention to discharge the old obligation when the new one has been performed." 554 F. Supp. at 893. There is nothing in the amendments or the Complaint suggesting Steve intended to discharge the old obligations—all the amendments did was change the timing and calculation of the earn-out.[9]

## IV.    TRIGO breached the PSA by Deciding to Not Pursue the L3Harris Contract

TRIGO breached the PSA by requiring SMS to slow down business development in 2021 after the company, having diverted time and resources to develop a quality management infrastructure, was again positioned to generate the earnings that would have required payment of Steve's earnout. In its motion to dismiss, TRIGO contends that this claim is implausible as a matter of law because (a) there is no showing of intentional conduct aimed at subverting the earn-out, (b) it is inherently implausible that a buyer would purposefully lose money or good will to prevent an earnout, and (c) Steve/s claim is provable false. As with TRIGO's discussion of its breaches beginning in 2019, TRIGO's arguments fails on each count.

First, as the Complaint alleges, TRIGO's slowdown violated its promise to operate the company consistent with past practice, which does not require a showing of intentional conduct, but it also alleges sufficient factual allegations to infer it also sought to  prevent the earn-out.

Second, there is nothing inherently implausible about a buyer taking steps to prevent an earnout by slowing down business, particularly when the economic calculus favors such action.

Third, Steve's claim is provably true, contrary to TRIGO's improper attempt to submit evidence outside the scope of this motion.

---

[9] Defendants also rely on *Kass v. Kass*, 91 N.Y.2d 554 (1998) and *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985). Br. at 18. Neither involves an accord and satisfaction.

### A.       TRIGO breached at least two of its s other contractual responsibilities

The Complaint plausibly alleges that TRIGO breached the PSA by deciding to not pursue the L3Harris contract and slow down other business development. Again, TRIGO's argument addresses only Section 3.4(e)(iii) of the PSA and ignores its other contractual obligation in subsection (e)(vii) operate the company consistent with past practice and not adopt strategic changes to the business that could negatively impact the EBITDA. This is what TRIGO did when it decided to not pursue the L3Harris contract in favor of smaller contracts it hoped would grow over time. Compl. ¶¶ 102-105. The slowdown, which was not limited to the L3Harris, was not in keeping with the company's budget, revenue forecasts, and past practices, and represented a strategic change. *See id.* ¶¶ 98, 99, 109, 127. Irrespective of its intent, TRIGO's slowdown order breached its promise in Section 3.4(e)(vii).

The facts alleged in the Complaint are also sufficient for the Court to infer reasonably that TRIGO ordered the slowdown because it feared, but for the slowdown, that it would have to pay Steve the remainder of his earn-out. Namely, there was an existing plan to go after the L3Harris contract. *Id.* ¶¶ 98-100. This contract was large enough that it would have triggered additional earn-out payments from TRIGO. *Id.* ¶¶ 98, 104. When it came time to finalize the contract, TRIGO decided to stop pursuing it. *Id.* ¶ 103.  TRIGO also ordered a general slowdown just to be sure. *Id.* ¶ 109. The Court can infer from these facts that TRIGO stopped pursuing the contract for the purpose of reducing the earn-out, thus

### B.       The Slowdown Claim Is Plausible

The slowdown was also quite plausible.  Businesses often will breach a contractual promise when it makes financial senses to do so, and this concept of "efficient breach" has been a staple of the law for more than fifty years. *See, e.g.,, Gen. Am. Life Ins. Co. v. Castonguay*, 984 F.2d 1518, 1523 n.7 (9th Cir. 1993), (citing to Richard A. Posner, Economic Analysis of Law 108–09 (3d ed.

1986) and noting that it may be in a party's "best interest to breach and pay the piper rather than incur the cost associated with avoiding a breach"); *Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC*, 431 F. Suppl. 3d 176, 273 (S.D. NY 2019) (affirming the modern theory of "efficient breach"). If the cost of paying the earn-out exceeded the cost of a, hopefully temporary, slowdown of business, including some financial calculation of the probability and cost of possible litigation, then a business would be remiss in not breaching its contract.

TRIGO argues again that Steve's slowdown claim, with respect to the breach of subsection 3.4(e)(iii), is "implausible as a matter of law," Br. 19.  But TRIGO is relying on implied covenant cases decided on summary judgment. *See* Br. 19 (citing *Lykins v. IMPCO Techs., Inc.*, 2018 WL 3231542, at *10 (S.D.N.Y. Mar. 6, 2018); *CCM Rochester, Inc. v. Federated Invs., Inc.*, 234 F. Supp. 3d 501, 509 (S.D.N.Y. 2017); *Vista Outdoor Inc. v. Reeves Fam. Tr.*, 234 F. Supp. 3d 558, 571 (S.D.N.Y. 2017), aff'd 725 F. App'x 17 (2d Cir. 2018); *Wagner*, 2011 WL 856262, at *5–6; *Keene*, 1990 WL 1864, at *16.). These cases do not provide a basis for dismissing the Complaint since it must be evaluated on its own allegations and documents properly considered by the Court.

Nor would it be true that no claim for breach of contract where the plaintiff asserts the defendant took some action to avoid paying an earnout can ever survive a motion to dismiss or a motion for summary judgment.  In *CCM*, the Court had previously denied the defendants' motion to dismiss and sustained the plaintiffs breach of the covenant of good faith and fair dealing claim, stating that "CCM adequately alleged a breach of contract claim based on allegations that Federated's acts and omissions during the Earnout Period were intentionally undertaken to harm CCM's Earnout Payments." *CCM Rochester, Inc. v. Federated Invs.*, 2014 WL 6674480, at *8 (S.D.N.Y. Nov. 25, 2014). *See, also O'Tool v. Genmar Holdings, Inc.*, 387 F. 3d 1188, 1197 (10th Cir. 2004) (affirming a finding that the buyer of a company intentionally stifled sales to prevent the buyer from obtaining his earn-out); *TWA Res. v. Complete Prod. Servs., Inc.*, No. N11C–08–

100, 2013 WL 1304457 at * 10 (Del. Sup. Ct. March 28, 2013) (denying summary judgment and leaving the issue of whether defendant intentionally frustrated the earn-out to jurors).

The Complaint pleads sufficient facts to show that TRIGO breached the PSA by intentionally slowing down business just as SMS was positioned for success, and there are, as noted above, sufficient facts to show that this decision violated both subsections (iii) and (vii).

## C.      The L3Harris Claim Is Provably True

TRIGO argues the L3Harris claim is "provably false." Br. 20. TRIGO should have answered so that the parties could develop the facts and subject this contention to proof. Instead TRIGO again submitted documents outside the Complaint, an email exchange between Clarke and Rambaud. Rambaud Decl., Ex. F. Steve respectfully asks the Court to strike or disregard this email.

Should the Court consider it, Steve asks the Court for leave to amend or submit additional evidence, such as a Master Service Agreement in September 2020 between L3Harris and SMS. This agreement essentially allowed any L3Harris division to issue a purchase order for SMS' services. Clarke Decl. ¶¶ 8-9. No substantive further negotiation was needed. If the outgoing CEO did not want the project to start under his watch, the incoming CEO did, and Steve will be able to submit additional evidence that the  incoming CEO intended to do so prior to TRIGO's slow down. As Defendant's Exhibit F notes, L3Harris's president was "all in" on the contract with SMS, and other presidents from L3Harris were ready to award the contracts totaling about $8 million a year.

The Complaint alleges as much. *See* Compl. ¶¶ 100, 102. After TRIGO decided to stop pursuing the contract, L3Harris's Vice President of Global Operations and told Steve that he had expected the contract to go forward. *Id.*  ¶ 107.

## V.      The Claim for Breach of the Implied Covenant Is Not Duplicative

TRIGO argues that the claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of the claims for breach of the express contract

provisions. Br. 21. However, the PSA's provisions are not identical to the implied covenant.

Section 3.4(e)(iii) requiring TRIGO to "refrain from taking any action with *the primary purpose* of reducing or eliminating the Earn-Out Payment" is narrower than the implied covenant of good faith and fair dealing. The implied covenant can be breached where the defendant acted "arbitrarily or irrationally." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (stating the implied covenant "includes a promise not to act arbitrarily or irrationally in the exercise of discretion"). *Security Plans, Inc., v CUNA Mutual Insurance Society* on which TRIGO relies, recognized that "all contracts that confer discretion include an implied promise that neither party will 'act arbitrarily or irrationally' in exercising that discretion." 769 F.3d 807, 810 (2d Cir.2014) (quoting *Dalton*). The implied covenant can also be breached where a party acted with "reckless or neglectful disregard of plaintiff's contract rights as to justify an inference of bad faith." *Stevens v. Publicis, S.A.*, 50 A.D.3d 253, 255 (1st Dep't 2008) (quoting *Pernet v. Peabody Eng'g Corp.*, 20 A.D.2d 781, 782 (1st Dep't 1964)). In *Wagner*, on which TRIGO also relies, the court wrote the standard for the implied covenant is "not satisfied by policies that are 'misguided or ignorant or even merely negligent.'" 2011 WL 856262, at *4. Here the Court was quoting *Keene*, 1990 WL 1864 at *16, and in *Keene*, the court distinguished actions that are merely negligent from actions taken "in such reckless or neglectful disregard of plaintiff's contract rights as to justify an inference of bad faith." 1990 WL 1864, at *15 (quoting *Pernet*, 20 A.D.2d at 782). In short, both *Sec. Plans* and *Wagner* recognize that the implied covenant can be breached when a party's actions are not purposeful. Defendants' argument that Section 3.4(e)(iii) of the PSA "is identical, in substance," to the implied covenant is wrong.

Courts generally dismiss implied covenant claims based on the same facts and the same damages as claims for breach of an express provision. *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *Presnall* v. Analogic Corp.,  2018 WL 4473337, at *11 (S.D.N.Y.

Sept. 18, 2018). In *Presnall*, this Court dismissed the implied covenant claim "[b]ecause both the breach of contract claim and the implied duty claim assert that Analogic intentionally obstructed Oncura's business and did so for the purpose of precluding earn-out payments." *Id.* at *11. Here, the Complaint does not allege the implied covenant was breached by TRIGO's intentional conduct. The two claims are distinguished by TRIGO's state of mind. Accordingly, the implied covenant claim is not duplicative of the express breach and should not be dismissed. *See Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 730 (S.D.N.Y. 2020) (finding implied covenant claim not duplicative where defendant may have technically complied with the contract); *Demetre v. HMS Holdings Corp.*, 127 A.D.3d 493, 494 (1st Dep't 2015) (declining to dismiss implied covenant claim as duplicative when it  the express provisions could be found inapplicable).

## VI.    TRIGO Holdings Can Be Liable for the Breaches

### A.    The Complaint Alleges TRIGO Holdings Is a Party to the Contract

TRIGO recognizes that a non-signatory parent corporation may be liable for its subsidiaries' breach of contract when the parent has manifested an intent to be bound. Br. 8 (quoting *RUS Inc. v. Bay Industries Inc.*, 2004 WL 1240578, *20 (May 25, 2004 S.D.N.Y.)). However, TRIGO asserts that TRIGO Holdings cannot be liable because the Complaint does not use the words "unequivocal intent to be bound." *See* Br. 8. TRIGO is demanding the exact sort of conclusory allegations that are not permitted. The Complaint and documents that can be considered in this motion show TRIGO Holdings' intent to be bound by this contract.

First, a parent corporation's intent to be bound can be inferred from the parent's participation in the negotiation of the contract. *Jennings v. Hunt Companies, Inc.*, 367 F.Supp.3d 66 (2019) (denying motion to dismiss non-signatory parent corporation that participated in negotiations); *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994) (denying motion to dismiss parent corporation that was not a signatory to a contract).This is a straightforward

application of basic contract law that a person becomes a party to a contract when they intend to be bound by it. *RUS Inc. v. Bay Industries Inc.*, 2004 WL 1240578, *20 (finding that parent corporation was liable for breach of contract because it intended to be bound by the contract).

*Warnaco* is illustrative. The plaintiff in *Warnaco* sued for breach of an agreement terminating licenses to manufacture underwear for sale in Europe. 844 F. Supp. at 944-945. The termination agreement was between Warnaco, the plaintiff, and Vivesa, a Spanish company. *Id*. A second defendant, Lee Bell, by separate letter, indicated that it intended to be bound by the termination agreement. *Id*. The Court found that Lee Bell's parent company, VF, was also bound by the termination agreement, despite not being a signatory, because the "factual allegations of the Complaint sufficiently allege that the negotiations leading up to the signing of the Termination Agreement indicate an intent by VF to be bound by it." 844 F. Supp. at 946. The Court denied VF's motion to dismiss the breach of contract claims against it. *Id*. at 947. (TRIGO attempts to distinguish the cases in Steve's pre-motion letter but has ignored *Warnaco*.)

*RUS Inc.,* on which TRIGO relies, shows that claims against non-signatory parent companies not only survive motions to dismiss but can also be proven at trial. In *RUS Inc.*, the plaintiff alleged that the defendants, SAC and its parent, Bay Industries, breached a contract for the purchase of a business by not closing. 2004 WL 1240578 at *11. SAC was the only signatory to the contract and Bay Industries argued that it could not be liable for the failure to close. *Id*. at *12-13. After a bench trial with an advisory jury, the Court found that Bay Industries was liable because participated in the contract's negotiation. *Id*. at * 20. Specifically, the court noted that Bay's representatives introduced Bay as the prospective purchaser, they represented that the company would be "joining the Bay family of companies," and held themselves out as employees and officers of Bay." *Id*. The Second Circuit affirmed on the ground that Bay manifested its intent to be bound. *Recticel Foam Corp. v. Bay Indus., Inc.*, 128 F. App'x 798, 799 (2d Cir. 2005).

22

Steve alleged similar facts in the Complaint. The Complaint alleges that TRIGO made its second offer to Steve via a May 2018 letter that Rambaud signed on behalf of the TRIGO Group. Compl. ¶ 40. The TRIGO Group is the name TRIGO uses for its affiliated companies under TRIGO Holdings S.A.S.  Compl. ¶ 30. Rambaud is the CEO of TRIGO Group and chairman of TRIGO Holdings S.A.S.[10] Compl. ¶¶ 29, 30. The Offer Letter itself states that Rambaud was "pleased to confirm the interest of TRIGO Holdings S.A.S., head company and 100% shareholder of the TRIGO Group, [] in acquiring up to 100% of SMS." Clarke Decl., Ex. 1. The Complaint further alleges that the slide decks used to make presentations to UTC and Boeing included representations that SMS was "A TRIGO Company."[11] Compl. ¶ 65. The Complaint alleges that Defendants flew Clarke and other people from SMS to France to meet with TRIGO's management and introduce SMS to TRIGO's customers in France. Compl. ¶¶ 72, 74. Thus, here, as in *RUS*, the individuals who negotiated the contract on behalf of the TRIGO  represented that TRIGO Holdings S.A.S. would be the purchaser, they held themselves out as representatives of the group controlled by TRIGO Holdings, and they represented that SMS would be part of that group. Facts like these permitted the Court in *RUS Inc.* to find the non-signatory parent company was liable for breach of contract, and they are more than sufficient to allow the Court to infer Holdings' intent to be bound.

The parol evidence rule and the merger clause in the PSA are not sufficient to bar Steve's claims in the face of the allegations showing TRIGO Holdings' participation in the negotiation of the contract. When the defendants in *Rus Inc.* appealed their case, they also argued that the parol evidence rule and the contract's integration clause barred liability against Bay Industries. *See* Brief and Special Appendix for Defendants-Appellants, *Recticel Foam Corp. v. Bay Indus., Inc.*, 2004 WL 3758292 (C.A.2). The Second Circuit rejected these arguments and affirmed the judgment.

---

[10] Rambaud also affirms in his declaration that he was the CEO of TRIGO Holdings S.A.S. during the negotiation of the PSA. *See* Rambaud Decl., ¶ 1.

[11] TRIGO submitted these presentations in the motion to dismiss. Rambaud Decl., Exs. C-E.

128 F. App'x at 799. Thus, neither the parol evidence rule nor the integration clause in the PSA should bar this court finding that TRIGO Holdings S.A.S. has manifested an intent to be bound by the PSA and may be liable for the breach.

**B.    The Court Has Personal Jurisdiction over TRIGO Holdings**

The above analysis further shows that this Court has personal jurisdiction over TRIGO Holdings. As a party to the contract, TRIGO Holdings has consented to personal jurisdiction in the Southern District of New York in Section 12.13 of the PSA. *See HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *9 (S.D.N.Y. Mar. 10, 2021) (stating non-signatory found to be bound to contract should also be bound by forum selection clause).

Contrary to TRIGO's argument Holdings could have, and should have, foreseen that it would be bound.  *See* Br. at 12 (quoting *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 523 (S.D.N.Y. 2018)). At each step, Holdings' CEO and Vice President were deeply involved. They negotiated the contract, they made presentations to customers, they made the decisions to develop quality services and to stop the L3Harris contract. Rambaud and Marquis's knowledge of these facts is certainly attributable to TRIGO Holdings, even if they had other roles at TRIGO U.S. *See Battino v. Cornelia Fifth Ave.*, LLC, 861 F. Supp. 2d 392, 405 (S.D.N.Y. 2012) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation."). Indeed, in *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*, 2003 WL 22882137, at *5 (S.D.N.Y. Dec. 4, 2003), the Court found that a forum selection clause similar to the one at issue here bound a corporate officer and the Court had jurisdiction over her. The Court similarly has jurisdiction over TRIGO Holdings here.[12]

---

[12] Trigo argues that it is "doubtful" that a forum selection clause can create minimum contacts supporting jurisdiction over a non-signatory and cites three case. Br. 13 (citing *Mersen USA EP Corp. v. TDK Elecs. Inc.*, 2022 WL 902372 (S.D.N.Y. Mar. 28, 2022); *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556 (S.D.N.Y. Mar. 10, 2021); *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379 (S.D.N.Y. 2019)). However, as noted in *HSM Holdings*, the Second Circuit has not addressed this issue, and it appears that only three judges in this district have questioned the "closely related" test. 2021 WL 918556 at *9.

**CONCLUSION**

For the foregoing reasons, TRIGO's motion to dismiss should be denied in its entirety.

**DATED:**  Phoenix, Arizona     **RESPECTFULLY SUBMITTED**
      June 29, 2022

               **WILENCHIK & BARTNESS**

               */s/ Dennis I. Wilenchik*
               Dennis I. Wilenchik, Esq.
               William M. Horne, Esq.
               The Wilenchik & Bartness Building
               2810 North Third Street
               Phoenix, Arizona 85004
               (602)606-2810
               admin@wb-law.com
               diw@wb-law.com
               williamh@wb-law.com

               **AMINI LLC**

               Bijan Amini, Esq.
               Lita Beth Wright, Esq.
               Reece Dameron, Esq.
               131 West 35th Street, 12th Floor
               New York, New York 10001
               (212) 490-4700
               bamini@aminillc.com
               lbwright@aminillc.com
               rdameron@aminillc.com