# EXHIBIT A



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN M. CLARKE, individually, and SSD CLARKE HOLDINGS, INC, | : |
| | : |
| | : |
| Plaintiffs, | : **Civil Action No. 1-22-cv-01917-PKC** |
| | : |
| v. | : |
| | : |
| TRIGO U.S. INC. and TRIGO HOLDINGS S.A.S, | : |
| | : |
| Defendants. | : |

## DECLARATION OF STEVEN M. CLARKE

I, Steven M. Clarke, declare under the penalties for perjury that:

1.  I am an adult competent to testify in the following matters based on my personal knowledge.

2.  I am the founder, former president and chief executive officer of Supplier Management Solutions, LLC ("SMS"), which is a plaintiff in this matter.

3.  I continued to be the chief executive officer until 2021 when I was only offered a consulting position.

4.  Exhibit 1 is a true and accurate copy of the Purchase and Sale Agreement that we executed on August 10, 2018. Exhibits 2, 3, 4, 5, and 6 are true and accurate copies of subsequent Amendments to the Purchase and Sale Agreement.

5.  Exhibit 7, is a true and accurate copy of the letter from TRIGO GROUP Chief Executive Officer Matthieu Rambaud, outlining TRIGO Holding SAS's interest on behalf of the TRIGO GROUP to buy SMS.

6.  Exhibit 8 is a true and accurate copy of the slide presentation about TRIGO's capabilities that TRIGO presented to SMS about February 2018.

7. Exhibit 9 is a true and accurate copy of TRIGO's minutes from the board meeting, which Rambaud sent me on Feb. 28, 2019.

8. In 2020, in connection with a planned five-year project worth about $8 million a year, SMS and one of its customers, L3Harris Technologies, Inc., signed a Master Service Agreement.

9. This agreement would allow any L3Harris division, without further substantive negotiation, to issue a purchase order for SMS's services during the course of the project.

**I AFFIRM, UNDER THE PENALTIES OF PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.**

JUNE 29 2022
Date

Steven M. Clarke

2

# EXHIBIT 1



*Execution Version*

PURCHASE AND SALE AGREEMENT

by and among

SUPPLIER MANAGEMENT SOLUTIONS, INC.

and

CORBEL STRUCTURED EQUITY PARTNERS, L.P.

and

CORBEL STRUCTURED EQUITY PARTNERS PARALLEL, L.P.

and

CORBEL SMS, L.P.

and

CORBEL INTERNATIONAL A, LLC

and

MR. STEVEN M. CLARKE

and

TRIGO U.S., INC.

Dated as of August 10, 2018

**ARTICLE 1 INTERPRETATION** ....................................................................................................1
Section 1.1    Defined Terms...........................................................................................................1
Section 1.2    Gender and Number...................................................................................................13
Section 1.3    Headings. ...................................................................................................................13
Section 1.4    Currency.....................................................................................................................14
Section 1.5    Certain Phrases. .........................................................................................................14
Section 1.6    Accounting Terms......................................................................................................14
Section 1.7    Schedules and Disclosure Letter. ..............................................................................14
Section 1.8    References to Persons and Agreements. .....................................................................14
Section 1.9    Laws, Permits, Consents and Other Documents. .......................................................15
Section 1.10   Non-Business Days. ...................................................................................................15

**ARTICLE 2 PURCHASE AND SALE** ...........................................................................................15
Section 2.1    Purchase and Sale......................................................................................................15

**ARTICLE 3 PURCHASE PRICE** ...................................................................................................15
Section 3.1    Purchase Price; Payment of the Purchase Price. ......................................................15
Section 3.2    Entire Consideration. .................................................................................................16
Section 3.3    Adjustment to Purchase Price. ...................................................................................16
Section 3.4    Earn-Out Payment. ....................................................................................................18
Section 3.5    Withholding ...............................................................................................................20
Section 3.6    Purchase Price Allocation. .........................................................................................20
Section 3.7    Pay-Out Letters .........................................................................................................21
Section 3.8    Reimbursement of Billing Shortfall. .........................................................................21

**ARTICLE 4 CLOSING** .....................................................................................................................22
Section 4.1    Closing. ......................................................................................................................22
Section 4.2    Electronic Closing and Mutual Assistance. ...............................................................22
Section 4.3    Closing Deliverables by Purchaser. ...........................................................................22
Section 4.4    Closing Deliverables by Sellers. ................................................................................23

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLERS**..................................24
Section 5.1    Representations and Warranties Relating to the Sellers............................................24
Section 5.2    Representations and Warranties Relating to the Company. .......................................26

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER**...........................42
Section 6.1    Representations and Warranties of Purchaser............................................................42

**ARTICLE 7 COVENANTS** ...............................................................................................................45
Section 7.1    Access to Information.................................................................................................45
Section 7.2    Conduct of Business Pending the Closing. ...............................................................45
Section 7.3    Expenses. ...................................................................................................................47
Section 7.4    Tax Matters. ...............................................................................................................47
Section 7.5    Confidentiality Agreement.........................................................................................50
Section 7.6    Exclusivity; Non-Solicitation. ...................................................................................51
Section 7.7    Non-Competition and Non-Solicitation .....................................................................51
Section 7.8    Further Assurances. ....................................................................................................51
Section 7.9    Third Party Consents; Customer Meetings. ...............................................................52
Section 7.10   Termination of Certain Arrangements. ......................................................................52
Section 7.11   Purchaser R&W Insurance Policy..............................................................................52
Section 7.12   Property Transfer. ......................................................................................................53
Section 7.13   Irvine Lease...............................................................................................................53

**ARTICLE 8 SPECIFIED CONDITIONS** ........................................................................................53
Section 8.1    Conditions to the Obligations of Purchaser and Sellers. ............................................53
Section 8.2    Conditions to the Obligations of Purchaser. ............................................................53
Section 8.3    Conditions to the Obligations of Sellers. .................................................................54

**ARTICLE 9 INDEMNIFICATION** ..............................................................................................55
Section 9.1    Liability for Representations, Warranties and Covenants. ........................................55
Section 9.2    Indemnification in Favor of Purchaser. ....................................................................55
Section 9.3    Indemnification in Favor of Sellers. .........................................................................56
Section 9.4    Limitations. ...............................................................................................................56
Section 9.5    Notification. ..............................................................................................................57
Section 9.6    Direct Claims. ...........................................................................................................58
Section 9.7    Procedure for Third Party Claims. ............................................................................58
Section 9.8    Exclusion of Other Remedies. ..................................................................................60
Section 9.9    One Recovery. ...........................................................................................................61
Section 9.10    Duty to Mitigate. ......................................................................................................61
Section 9.11    R&W Insurance Policy. .............................................................................................61
Section 9.12    Adjustment to Purchase Price. ..................................................................................62

**ARTICLE 10 POST-CLOSING COVENANTS** .............................................................................62
Section 10.1    Confidentiality. ........................................................................................................62
Section 10.2    Access to Records after Closing. ..............................................................................63
Section 10.3    Directors' and Officers' Indemnification and Exculpation. .......................................64
Section 10.4    Car Lease. .................................................................................................................64

**ARTICLE 11 TERMINATION** ....................................................................................................65
Section 11.1    Grounds for Termination. .........................................................................................65

**ARTICLE 12 MISCELLANEOUS** ..............................................................................................66
Section 12.1    Notices. .....................................................................................................................66
Section 12.2    Time of the Essence. .................................................................................................67
Section 12.3    Announcements. ........................................................................................................67
Section 12.4    Third Party Beneficiaries. .........................................................................................67
Section 12.5    Amendments. ............................................................................................................67
Section 12.6    Waiver. ......................................................................................................................67
Section 12.7    Entire Agreement. .....................................................................................................68
Section 12.8    Successors and Assigns. ............................................................................................68
Section 12.9    Specific Performance. ...............................................................................................68
Section 12.10    Setoff Right. .............................................................................................................68
Section 12.11    Consent. ....................................................................................................................69
Section 12.12    Severability. ..............................................................................................................69
Section 12.13    Governing Law. ........................................................................................................69
Section 12.14    Dispute Resolution. ..................................................................................................69
Section 12.15    Waiver of Jury Trial. .................................................................................................69
Section 12.16    Legal Representation. ................................................................................................70
Section 12.17    Counterparts. .............................................................................................................71

-iii-

SCHEDULES AND EXHIBITS

SCHEDULES:

| | |
|---|---|
| Schedule A | Disclosure Letter |

EXHIBITS:

| | |
|---|---|
| Exhibit A | Form of Clarke Employment Agreement |
| Exhibit B | Illustrative Example of Current Assets of the Company |
| Exhibit C | Illustrative Example of Current Liabilities of the Company |
| Exhibit D | Illustrative Example of Calculation of Normative EBITDA |
| Exhibit E | Wire Transfer Information of SMS Inc. and Corbel |
| Exhibits F | Form of Termination of LLC Agreement |
| Exhibit G | Form of Resignation |
| Exhibit H | Terms of Temecula Lease and Lake Havasu City Lease |
| Exhibit I | Illustrative Example of Calculation of Weekly Billing |
| Exhibit J | Target Working Capital |

LEGAL_1:50312829.15

62TJ-274876

INDEX OF DEFINED TERMS

Page

Acquisition Engagement........................................................................................................1, 70
Affiliate ........................................................................................................................................2
Agreement..............................................................................................................................1, 2
Allocation Schedule ...........................................................................................................2, 21
Ancillary Agreements.................................................................................................................2
Announcement....................................................................................................................2, 67
Applicable Information.....................................................................................................2, 32
Arbiter..................................................................................................................................2, 17
Average Weekly Billing ..........................................................................................................16
Average Weekly Billing at Closing...........................................................................................2
Average Weekly Billing Post-Closing .....................................................................................2
Billing Shortfall...........................................................................................................................3
**Business** ..................................................................................................................................1, 3
Business Confidential Information......................................................................................3, 63
Business Day................................................................................................................................3
Cap......................................................................................................................................3, 57
Cash...............................................................................................................................................3
CFIUS............................................................................................................................................3
CFIUS Approval ..........................................................................................................................3
Change of Control .......................................................................................................................3
**Clarke** ........................................................................................................................................1, 3
Clarke Employment Agreement................................................................................................3
Closing..................................................................................................................................3, 22
Closing Cash .......................................................................................................................3, 16
Closing Date.........................................................................................................................3, 22
Closing Date Amount .........................................................................................................3, 16
Closing Debt .......................................................................................................................3, 16
Closing Net Working Capital ...........................................................................................3, 16
Closing Payment .........................................................................................................................4
Closing Transaction Expenses..........................................................................................4, 17
Code ..............................................................................................................................................4
Company ...............................................................................................................................1, 4
Confidentiality Agreement.................................................................................................4, 50
Consent.........................................................................................................................................4
Contract........................................................................................................................................4
Corbel...........................................................................................................................................4
**Corbel 1** ..................................................................................................................................1, 4
**Corbel 2** ..................................................................................................................................1, 4
**Corbel 3** ..................................................................................................................................1, 4
**Corbel 4** ..................................................................................................................................1, 4
Corbel Credit Agreement...........................................................................................................4
Corbel Debt.................................................................................................................................4

Corbel Equity Amount ................................................................................................................4
Corbel Units ................................................................................................................................1, 4
Covered Employee ......................................................................................................................4, 51
Covered Persons .........................................................................................................................4, 64
Credit Agreements .....................................................................................................................4, 21
Current Assets ............................................................................................................................4
Current Liabilities ......................................................................................................................5
Damages .....................................................................................................................................5
DDTC ..........................................................................................................................................5
DDTC Notification .....................................................................................................................5
Debt .............................................................................................................................................5
**December 2017 Audited Balance Sheet** .................................................................................6, 33
Deductible ..................................................................................................................................6, 57
Direct Claim ...............................................................................................................................6
Disclosure Letter ........................................................................................................................6
Earn-Out Certificate ..................................................................................................................6, 19
Earn-Out Dispute Notice ..........................................................................................................6, 19
Earn-Out Payment .....................................................................................................................6, 18
Earn-Out Payment 1 ..................................................................................................................6, 18
Earn-Out Payment 2 ..................................................................................................................6, 18
EBITDA ......................................................................................................................................6
Employee ....................................................................................................................................6
Employee Plans ..........................................................................................................................6
**Enterprise Funding Promissory Note** ....................................................................................6
Environmental Laws ..................................................................................................................7
Equity Interests ..........................................................................................................................7
ERISA .........................................................................................................................................7
Estimated Cash ..........................................................................................................................7, 16
Estimated Closing Adjustment Amount ..................................................................................7, 16
Estimated Closing Statement ....................................................................................................7, 16
Estimated Debt ..........................................................................................................................7, 16
Estimated Net Working Capital ...............................................................................................7, 16
Estimated Transaction Expenses ..............................................................................................7, 16
Factoring Agreement .................................................................................................................7
Final Closing Adjustment Amount ..........................................................................................7, 17
Final Earn-Out Certificate ........................................................................................................7, 19
Final Post-Closing Statement ...................................................................................................7, 17
Financial Statements ..................................................................................................................7, 33
**First Citizens Promissory Note** ..............................................................................................7
**Fraud** .......................................................................................................................................7
Fundamental Representations ...................................................................................................7, 55
GAAP ..........................................................................................................................................7
Governmental Entity .................................................................................................................7
IFRS .............................................................................................................................................8
Indemnified Party ......................................................................................................................8
Indemnified Person ...................................................................................................................8
Indemnifying Party ....................................................................................................................8

Insurance Policies...................................................................................................8, 38
Intellectual Property.....................................................................................................8
Intellectual Property Contracts...................................................................................8, 32
Interim Financial Statements......................................................................................8, 33
Interim Period...............................................................................................................8
Irvine Lease...................................................................................................................8
Key Customers...........................................................................................................8, 41
Knowledge of the Sellers...............................................................................................8
Lake Havasu City Lease............................................................................................8, 53
Laws..............................................................................................................................8
Leased Properties..........................................................................................................9
Leases............................................................................................................................9
Legal Proceeding..........................................................................................................9
Lien................................................................................................................................9
Material Adverse Effect................................................................................................9
Material Contracts.....................................................................................................9, 30
Member..........................................................................................................................9
Mohave **Promissory Note**.........................................................................................9
Net Working Capital.....................................................................................................9
New Assignment...........................................................................................................9
New Car Lease..........................................................................................................10, 64
Normative EBITDA.....................................................................................................10
Objections Notice.....................................................................................................10, 21
Old Car Lease...........................................................................................................10, 64
Open Source Software..............................................................................................10, 33
Organizational Documents...........................................................................................10
Outside Date.............................................................................................................10, 65
Owned IP..................................................................................................................10, 32
Parties.............................................................................................................................1
Party..........................................................................................................................1, 10
Pay-Out Letters........................................................................................................10, 21
Permit...........................................................................................................................10
Permitted Liens.............................................................................................................10
Person...........................................................................................................................11
Post-Closing Balance Sheet.....................................................................................11, 16
Post-Closing Statement............................................................................................11, 16
Pre-Closing Taxable Period.........................................................................................11
Properties..................................................................................................................11, 53
Property Transfer......................................................................................................11, 53
Purchase Price..........................................................................................................11, 15
Purchase Price Adjustment......................................................................................11, 18
Purchased Equity Interests.........................................................................................1, 11
Purchaser........................................................................................................................1
Purchaser.......................................................................................................................11
Purchaser Financial Statements...............................................................................11, 44
Purchaser Fundamental Representations..................................................................11, 55
Purchaser Indemnified Parties....................................................................................11

Purchaser R&W Insurance Policy ........................................................................................................ 11
Purchaser R&W Insurance Premium ................................................................................................. 11
Purchaser R&W Insurer ....................................................................................................................... 11
Reference Balance Sheet .................................................................................................................. 11, 33
Reference Balance Sheet Date ........................................................................................................... 11
Represented Parties ......................................................................................................................... 12, 70
Response Period ................................................................................................................................. 12, 21
Securities Act ...................................................................................................................................... 12, 44
Seller Tax Claim ................................................................................................................................. 12, 48
Seller Tax Returns .............................................................................................................................. 12, 47
Sellers ....................................................................................................................................................... 1, 12
Sellers' Confidential Information ..................................................................................................... 12, 63
Sellers' Indemnified Parties ................................................................................................................... 12
SMRH ................................................................................................................................................... 12, 70
**SMS Inc.** ............................................................................................................................................... 1, 12
SMS LLC .................................................................................................................................................. 1, 12
SMS Property Leases .............................................................................................................................. 12
SMS Units ............................................................................................................................................... 1, 12
Software ...................................................................................................................................................... 12
Straddle Taxable Period ..................................................................................................................... 12, 47
Target Working Capital ............................................................................................................................ 12
Tax Claim .............................................................................................................................................. 12, 48
Tax Returns ............................................................................................................................................... 12
Taxes ........................................................................................................................................................... 12
Temecula Lease .................................................................................................................................. 12, 53
Third Party Claim ..................................................................................................................................... 13
Transaction Expenses ............................................................................................................................. 13
Transfer Taxes ..................................................................................................................................... 13, 49
Treasury Regulations ............................................................................................................................... 13
Trigo Holding ...................................................................................................................................... 13, 44
UBS Line of Credit .................................................................................................................................. 13
Uninsured Breach ..................................................................................................................................... 13
US .............................................................................................................................................................. 13
Weekly Billing ............................................................................................................................................ 3
Workers' Compensation Assessments ............................................................................................. 13, 36

PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (together with the Disclosure Letter and all exhibits and schedules hereto, this "Agreement") is made and entered into as of August 10, 2018, by and among Supplier Management Solutions, Inc. ("SMS Inc.") , a Nevada corporation, Corbel Structured Equity Partners, L.P. ("Corbel 1"), a California limited partnership, Corbel Structured Equity Partners Parallel, L.P. ("Corbel 2"), a California limited partnership, Corbel SMS, L.P. ("Corbel 3"), a California limited partnership, Corbel International A, LLC ("Corbel 4" and, together with SMS Inc., Corbel 1, Corbel 2 and Corbel 3, the "Sellers"), Mr. Steven M. Clarke, a US citizen residing at 4104 Trimaran Drive, Lake Havasu City, Arizona 86406 ("Clarke") and TRIGO U.S., Inc., a Delaware corporation existing and organized under the laws of the State of Delaware, registered with the Division of Corporations of the Delaware Secretary of State Office under file number 0121412-8, having its registered office at 50459 Central Industrial Drive, Shelby Township, Michigan 48315 (the "Purchaser"). The Sellers, Clarke and the Purchaser shall each individually be referred to herein as a "Party" and collectively as the "Parties."

RECITALS

WHEREAS, Supplier Management Solutions, LLC, a California limited liability corporation ("SMS LLC" or the "Company") is engaged in the business of providing supplier management services to prime and tier-1/tier-2 manufacturers in the aerospace and defense industry as it relates to supplier performance (the "Business");

WHEREAS, SMS Inc. owns 7,250 Class A units of SMS LLC (the "SMS Units");

WHEREAS, Corbel 1 owns 199.4205 class B units, Corbel 2 owns 1,735.7898 class B units, Corbel 3 owns 1,222.2222 class B units and Corbel 4 owns 32.5675 class B units of SMS LLC (collectively, the "Corbel Units" and, together with the SMS Units, the "Purchased Equity Interests");

WHEREAS, the Purchaser wishes to acquire all of the issued and outstanding Purchased Equity Interests, and to do so, the Purchaser is prepared to purchase pursuant to this Agreement all of the Purchased Equity Interests on the terms and conditions hereinafter set forth; and

WHEREAS, the Sellers and the Purchaser desire to make certain representations, warranties, covenants and agreements in connection with this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, agree as follows:

ARTICLE 1

INTERPRETATION

Section 1.1      Defined Terms.

As used in this Agreement, the following terms have the following meanings:

"Acquisition Engagement" has the meaning specified in Section 12.16.

-1-

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with, such other Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement" has the meaning specified in the preamble.

"Allocation Schedule" has the meaning specified in Section 3.6(b).

"Ancillary Agreements" means, collectively, (i) the Clarke Employment Agreement, (ii) each SMS Property Lease, and (iii) those agreements to be entered into at the Closing between the Purchaser or any of the Purchaser's Affiliates, on the one hand, and any of the Sellers or any Affiliate of any of the Sellers, on the other hand.

"Announcement" has the meaning specified in Section 12.3.

"Applicable Information" has the meaning specified in Section 5.2(k)(iv).

"Arbiter" has the meaning specified in Section 3.3(d).

"Average Weekly Billing at Closing" means the average amount in dollars invoiced to customers of the Business for services rendered (minus applicable sales taxes) during each of the four (4) complete weeks immediately preceding the Closing Date. For illustration purposes, the average amount in dollars invoiced to customers of the Business for services rendered (minus applicable sales taxes) during each of the four (4) complete weeks immediately preceding the date hereof is set forth on Exhibit I. For purposes of this Agreement if the Average Weekly Billing at Closing otherwise totals at least USD430,000, Average Weekly Billing at Closing shall then, and only then, take into account each New Assignment entered into during the applicable four-week period, in an amount equal to the projected amount of revenue from such New Assignment (minus projected applicable sales taxes) during the first twelve (12) months for which services are rendered to such New Assignment (determined in good faith pursuant to the Contract with such New Assignment) divided by fifty-two (52). For illustration purposes, the Weekly Billing as of the date hereof is set forth on Exhibit I.

"Average Weekly Billing Post-Closing" means the average amount in dollars invoiced to customers of the Business for services rendered (minus applicable sales taxes) during each four complete and consecutive weeks during the period from the Closing to December 31, 2018. For illustration purposes, the average amount in dollars invoiced to customers of the Business for services rendered (minus applicable sales taxes) during each of the four (4) complete weeks immediately preceding the date hereof is set forth on Exhibit I. For purposes of this Agreement if the Average Weekly Billing Post-Closing otherwise totals at least USD430,000, Average Weekly Billing Post-Closing shall then, and only then, take into account each New Assignment entered into during the applicable post-Closing period, in an amount equal to the projected amount of revenue from such New Assignment (minus projected applicable sales taxes) during the first twelve (12) months for which services are rendered to such New Assignment (determined in good faith pursuant to the Contract with such New Assignment) divided by fifty-two (52). For illustration purposes, the Weekly Billing as of the date hereof is set forth on Exhibit I.

LEGAL_1:50312829.17

62TJ-274876

"Billing Shortfall" means, if the Average Weekly Billing at Closing is less than USD450,000, the result of the difference between USD450,000 and the Average Weekly Billing at Closing multiplied by 22.37%, multiplied by 11.2, multiplied by 52.

"Business" has the meaning specified in the recitals.

"Business Confidential Information" has the meaning specified in Section 10.1(c).

"Business Day" means any day of the year, other than a Saturday, Sunday or any day on which banks in Los Angeles, California or Toronto, Ontario are authorized or required by Law to close.

"Cap" has the meaning specified in Section 9.4(b).

"Cash" means cash and cash equivalents of the Company, as defined in accordance with GAAP, excluding (i) amounts of checks or drafts in transit and (ii) cash in escrow accounts or which is otherwise subject to any other contractual or legal restriction that impairs the ability of the owner of such cash to freely transfer or use such cash for any lawful purpose.

"CFIUS" means the Committee on Foreign Investment in the United States.

"CFIUS Approval" means (i) notification issued by CFIUS that it has determined that (A) the transactions contemplated by this Agreement do not fall within the jurisdiction for review under Exon-Florio/FINSA, (B) it has concluded its review under Exon-Florio/FINSA and has determined not to conduct an investigation or (C) if an investigation is conducted, that the US Government will not take action to prevent the consummation of the transactions contemplated by this Agreement or (ii) the President of the United States does not take action to block or prevent the consummation of transactions contemplated by this Agreement and the applicable time period for such action under Exon-Florio/FINSA shall have expired (the notification described in (i) or event described in (ii) above).

"Change of Control" means any transaction or series of related transactions involving (i) the sale of all or substantially all the assets of the Company; or (ii) the sale, assignment or other transfer of equity interests in the Company (by sale, merger, consolidation, reorganization or otherwise)  representing more than fifty percent (50%) of all of the equity interests in the Company to any Person or Persons other than an Affiliate of Purchaser.

"Clarke" has the meaning specified in the preamble.

"Clarke Employment Agreement" means the employment agreement to be entered into at the Closing between the Purchaser (or an entity designated by the Purchaser) and Clarke in the form of Exhibit A.

"Closing" has the meaning specified in Section 4.1.

"Closing Cash" has the meaning specified in Section 3.3(b).

"Closing Date" has the meaning specified in Section 4.1.

"Closing Date Amount" has the meaning specified in Section 3.1(b).

"Closing Debt" has the meaning specified in Section 3.3(b).

"Closing Net Working Capital" has the meaning specified in Section 3.3(b).

"Closing Payment" has the meaning specified in Section 3.1(a).

"Closing Transaction Expenses" has the meaning specified in Section 3.3(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the recitals.

"Confidentiality Agreement" has the meaning specified in Section 7.5.

"Consent" means, without duplication, any consent, approval, clearance, compliance, exemption, authorization, permit, order, waiver, license, filing, registration, declaration, designation, homologation, notice or qualification of or with any Person, whether or not a Governmental Entity.

"Contract" means any binding agreement, contract, instrument, note, bond, mortgage, indenture, deed of trust or license.

"Corbel 1" has the meaning specified in the preamble.

"Corbel 2" has the meaning specified in the preamble.

"Corbel 3" has the meaning specified in the preamble.

"Corbel 4" has the meaning specified in the preamble.

"Corbel" means, collectively, Corbel 1, 2, 3 and 4.

"Corbel Credit Agreement" means the credit agreement dated May 14, 2014 among SMS Inc., SMS, LLC (as outlined therein), Corbel 1, Corbel 2 and any of their designated Affiliates (as defined therein).

"Corbel Debt" means the amount of indebtedness for borrowed money (including unpaid principal (USD10,000,000 as of the date hereof) and accrued but unpaid interest then owed to Corbel or their applicable Affiliates in their respective capacities as lenders to the Company) and all other costs and expenses owed to Corbel or their applicable Affiliates in their respective capacities as lenders to the Company, in each case to the extent outstanding as of the Closing Date.

"Corbel Equity Amount" has the meaning specified in Section 3.1(a).

"Corbel Units" has the meaning specified in the recitals.

"Covered Employee" has the meaning specified in Section 7.7(b).

"Covered Persons" has the meaning specified in Section 10.3(a).

"Credit Agreements" has the meaning specified in Section 3.7.

"Current Assets" means the aggregated consolidated amount of all current assets of the Company, without duplication, as determined in accordance with GAAP and the Company's historic practices, policies and methodologies, to the extent consistent with GAAP, including accounts receivable (excluding credits due to customers for overpayments or refunds due), prepaid expenses and other current assets of the Company, consistent with the illustrative example set forth on Exhibit B.  Notwithstanding the

-4-

foregoing and for the avoidance of doubt, Current Assets excludes Cash, income Tax recoverable, and amounts due from related parties.

"Current Liabilities" means the aggregated consolidated amount of all current liabilities of the Company, without duplication, as determined in accordance with GAAP and the Company's historic practices, policies and methodologies, to the extent consistent with GAAP, including accounts payable, payroll liabilities and accrued expenses and other current liabilities of the Company, consistent with the illustrative example set forth on Exhibit C.  Notwithstanding the foregoing and for the avoidance of doubt, Current Liabilities excludes the current portion of Debt, deferred revenue, management fees payable, amounts due to related parties and any deferred Tax liabilities.

"Damages" means any losses, liabilities, damages (excluding punitive or exemplary damages other than punitive or exemplary damages awarded pursuant to a final and non-appealable court decision in the context of a Third Party Claim), refunds, restitutions, fines, re-imbursements, costs and out-of-pocket expenses (including out-of-pocket costs and expenses of implementing systems changes, monitoring, audits or other measures required to remediate a breach of representation, warranty, covenant or agreement), including reasonable legal fees and expenses, whether resulting from a claim, investigation or Legal Proceeding that is instituted or asserted by a third party, including a Governmental Entity. The foregoing is not intended to limit the survival periods contained in the Purchaser R&W Insurance Policy.

"DDTC" means the United States Department of State Directorate of Defense Trade Controls.

"DDTC Notification" means the written notification to the Directorate of Defense Trade Controls required under 22 C.F.R. §129.8(e) to be submitted by an ITAR registrant (the Seller) at least sixty (60) days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any parent, subsidiary, or other affiliate listed and covered in its ITAR Statement of Registration.

"Debt" of any Person means, without duplication, (a) all liabilities which, in accordance with GAAP, have been or should be recorded on the balance sheet of that Person as indebtedness for borrowed money, including all accrued and unpaid interest, all fees, premiums, prepayment penalties, breakage costs, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or accruals incurred in the ordinary course of business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person as lessee under leases which, in accordance with GAAP, have been or should be recorded on the balance sheet of that Person as capital leases or are financing or so-called "synthetic" lease transactions, (e) all obligations of such Person, actual or contingent, primary, secondary, matured or unmatured, under, by reason of or otherwise in respect of, any bankers' acceptance or letter of credit, (f) all obligations payable, actual or contingent, primary, secondary, matured or unmatured, under, by reason of or otherwise in respect of any sale of promissory notes, sale of accounts, factoring, securitization or discounting arrangement to the extent recourse to such Person or any subsidiary of it exists to recover such obligations payable, (g) all obligations under any repurchase transaction or reverse repurchase transaction, (h) all liabilities of such Person to deliver securities shorted by such Person, (i) obligations with respect to derivative financial instruments, interest rate swaps, collars, caps, hedging and other derivative and similar arrangements, (j) any bonus or other payment which becomes payable by the Company as a result of the execution, delivery or consummation of the transactions contemplated by this Agreement (without regard to when any such bonus or payment is due) (k) other debt-like items listed on Exhibit C, and (l) all obligations of others of the nature referred to in clauses (a) through (l) above guaranteed or counter-indemnified directly or indirectly in any manner by such Person or for which that Person is otherwise liable; provided, however, that any liability or obligation referenced above that is included in the

calculation of Net Working Capital shall not be included in Debt.  For the avoidance of doubt, Debt shall include the Corbel Debt.

"December 2017 Audited Balance Sheet" has the meaning specified in <u>Section 5.2(n)</u>.

"Deductible" has the meaning specified in <u>Section 9.4(b)</u>.

"Direct Claim" means any cause, matter, thing, act, omission or state of facts not involving a Third Party Claim which entitles an Indemnified Person to make a claim for indemnification under this Agreement.

"Disclosure Letter" means the disclosure letter dated the date of this Agreement and delivered by the Sellers to the Purchaser with this Agreement.

"Earn-Out Certificate" has the meaning specified in <u>Section 3.4(b)</u>.

"Earn-Out Dispute Notice" has the meaning specified in <u>Section 3.4(c)</u>.

"Earn-Out Payment" has the meaning specified in <u>Section 3.4(a)</u>.

"Earn-Out Payment 1" has the meaning specified in <u>Section 3.4(a)(i)</u>.

"Earn-Out Payment 2" has the meaning specified in <u>Section 3.4(a)(ii)</u>.

"EBITDA" means the aggregated annual net income of the Company, determined in accordance with GAAP and the same accounting methods, policies, practices and procedures, with consistent classifications and estimation methodologies, as were used in the preparation of the Interim Financial Statements (to the extent consistent with GAAP), excluding income taxes, interest expenses and incomes and depreciation and amortization.

"Employee" means any individual employed by the Company, including any such employee on disability (long-term or short-term), workers' compensation or parental or other statutory or approved leave of absence.

"Employee Plans" means all the employee benefit, fringe benefit, supplemental unemployment benefit, bonus, deferred compensation, incentive, profit sharing, termination, severance, change of control, employment, retention, pension, retirement, savings, stock option, stock purchase, stock appreciation, health, welfare, medical, dental, disability, accidental death and dismemberment, life insurance, salary continuation, mortgage assistance, employee loan, employee assistance and similar agreements, plans, programs, arrangements or practices relating to the current or former directors, officers or employees of the Company maintained, sponsored or funded by the Company or in respect of which the Company is obligated to contribute or have any liability, as the case may be, whether written or oral, funded or unfunded, insured or self-insured, registered or unregistered; provided that no such plans, programmes, arrangements or practices established or sponsored by a Governmental Entity shall be deemed "Employee Plans".

"Enterprise Funding Promissory Note" means the promissory note dated March 1, 2011 between SMS, LLC and Enterprise Funding Corporation.

"Environmental Laws" means all applicable Laws and agreements with Governmental Entities and all other statutory requirements relating to public health or the protection of the environment, to the extent applicable to the Company.

"Equity Interests" means any capital stock of a corporation, any partnership interest, any limited liability company interest and any other equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974 (US).

"Estimated Cash" has the meaning specified in Section 3.3(a).

"Estimated Closing Adjustment Amount" has the meaning specified in Section 3.3(a).

"Estimated Debt" has the meaning specified in Section 3.3(a).

"Estimated Closing Statement" has the meaning specified in Section 3.3(a).

"Estimated Net Working Capital" has the meaning specified in Section 3.3(a).

"Estimated Transaction Expenses" has the meaning specified in Section 3.3(a).

"Factoring Agreement" means the factoring agreement dated February 9, 2016 between the Company and AmeriFactors Financial Group, LLC.

"Final Earn-Out Certificate" has the meaning specified in Section 3.4(c).

"Final Closing Adjustment Amount" has the meaning specified in Section 3.3(e).

"Final Post-Closing Statement" has the meaning specified in Section 3.3(e).

"Financial Statements" has the meaning specified in Section 5.2(n)(i).

"First Citizens Promissory Note" means the promissory note dated September 6, 2013 between SMS, LLC and First Citizens Bank & Trust Company.

"Fraud" means an act, committed with intent to deceive a Party, and to induce it to act or refrain from acting and requires (a) a false representation or warranty of material fact made in Article 5 or Article 6; (b) knowledge by the Party making such representation or warranty that such representation or warranty is false; (c) an intention to induce the Party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (d) the recipient reasonably relied on such representation and warranty; and (e) causing such Party to suffer damage by reason of such reliance.

"Fundamental Representations" has the meaning specified in Section 9.1(a)(i).

"GAAP" means accounting principles generally accepted in the US.

"Governmental Entity" means (a) any international, multinational, national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, commission, commissioner, board, bureau, tribunal, agency or instrumentality, domestic or foreign, (b) any subdivision or authority of any of the above, (c) any stock exchange and (d) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the above.

"IFRS" means the International Financial Reporting Standards (IFRSs) as issued by the International Accounting Standards Board (IASB), International Accounting Standards (IASs) as issued by the IASB's predecessor, the Board of the International Accounting Standards Committee, and adopted by the IASB upon its inception, and interpretations developed by the IFRS Interpretations Committee (previously named the International Financial Reporting Interpretations Committee (IFRIC)) or its predecessor, the Standing Interpretations Committee (SIC).

"Indemnified Party" has the meaning specified in Section 10.1(a).

"Indemnified Person" means a Person with indemnification rights or benefits under Section 9.2 or Section 9.3, or otherwise under this Agreement.

"Indemnifying Party" means a Party against which a claim may be made for indemnification under this Agreement, including pursuant to Article 9.

"Insurance Policies" has the meaning specified in Section 5.2(u).

"Intellectual Property" means any and all of the following existing anywhere in the world: (a) rights in inventions, discoveries, improvements, patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (b) rights in works of authorship, copyrights, copyright registrations and applications for copyright registration; (c) trade names, business names, corporate names, domain names, website names and world wide web addresses, social media identifiers, trademarks and service marks, trade dress and logos, together with any registrations and applications related thereto, and the goodwill associated with any of the foregoing; (d) all rights in trade secrets; (e) other intellectual property rights in technology, formulae, algorithms, processes, techniques, ideas, know-how, creations, images, logos, and graphics; and (f) rights in proprietary Software.

"Intellectual Property Contracts" has the meaning specified in Section 5.2(k)(i).

"Interim Financial Statements" has the meaning specified in Section 5.2(n)(i).

"Interim Period" means the period beginning on the date hereof and ending at the Closing.

"Irvine Lease" means that certain lease agreement, dated February 16, 2018, by and between The Irvine Company LLC, as landlord, and the Company, as tenant, for the premises located at 4675 MacArthur Court, Suite No. 1150, Newport Beach, California.

"Key Customers" has the meaning specified in Section 5.2(x).

"Knowledge of the Sellers" means the actual knowledge (following reasonable inquiry of their direct reports) of Clarke and Kathy Buie.

"Lake Havasu City Lease" has the meaning specified in Section 7.12.

"Laws" means any and all applicable (a) laws, constitutions, treaties, statutes, codes, ordinances, orders, decrees, rules, regulations and by-laws, (b) judgments, orders, writs, injunctions, decisions, awards and directives of any Governmental Entity and (c) policies, guidelines, notices and protocols, to the extent that they have the force of law, in each case binding on or affecting the Person referred to in the context in which the word is used.

-8-

"Leased Properties" means the lands and premises listed and described in <u>Section 5.2(i)</u> of the Disclosure Letter.

"Leases" means the leases of the Leased Properties described in <u>Section 5.2(i)</u> of the Disclosure Letter.

"Legal Proceeding" means any action, suit, proceeding, arbitration, claim or demand brought, conducted or heard at Law or in equity by or before any Governmental Entity.

"Lien" means any mortgage, charge, pledge, hypothecation, security interest, assignment, lien (statutory or otherwise), easement, title retention agreement or arrangement, conditional sale, deemed or statutory trust, restrictive covenant or other encumbrance of any nature which, in substance, secures payment or performance of an obligation.

"Material Adverse Effect" means any circumstance, change, effect, event, occurrence, state of facts or development that, when considered either individually or in the aggregate, (a) has had, or would be reasonably expected to have, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or results of operations of the Company, except to the extent that the material adverse effect results from or is caused by (i) worldwide, national or local conditions or circumstances whether they are economic, financial, political, regulatory or otherwise, including war, armed hostilities, acts of terrorism, emergencies, crises and natural disasters, (ii) changes in any Laws or GAAP or interpretations of them that apply to the Company, (iii) changes in the markets or industry in which the Company operates, (iv) the breach by Purchaser of this Agreement, (v) the effects of the actions or omissions under this Agreement of the Company or any Seller under this Agreement that are taken with the consent of Purchaser, or not taken because Purchaser did not give its consent, in connection with the transactions contemplated hereby, (vi) the negotiation, announcement, pendency or consummation of this Agreement and the transactions contemplated hereby, including the identity of, or the effect of any fact or circumstance relating to, Purchaser or any of its Affiliates or any communication by Purchaser or any of its Affiliates regarding plans, proposals or projections with respect to the Company, (vii) any item set forth in the Disclosure Letter, (viii) any failure (in and of itself) by the Company to meet any projections or forecasts of earnings, claims paid or loss reserves or (ix) any matter, event or circumstance which is cured prior to Closing, except to the extent that, in the cases of clauses (i), (ii) (iii) and (v) above, such effects have a disproportionate impact on the Company when compared to other companies in the industry in which the Company operates or (b) would reasonably be expected to prevent the Sellers from consummating the transactions contemplated by this Agreement.

"Material Contracts" has the meaning specified in <u>Section 5.2(j)(i)</u>.

"Member"means each Person holding Equity Interests in the Company, and specifically each Person that owns the Corbel Units and the SMS Units.

"Mohave Promissory Note" means the promissory note dated September 21, 2012 between SMS, LLC and Mohave State Bank.

"Net Working Capital" shall mean Current Assets <u>minus</u> Current Liabilities.

"New Assignment" means each new assignment of work by a customer of the Company (either by the add-on of resources to an existing Contract with a current customer or a new executed Contract with a current or new customer) as of the Applicable Measurement Date that has not been reflected in an invoice by the Company as of the Applicable Measurement Date, provided that any such new assignment of work contemplates a period of service of at least six (6) months.

"Normative EBITDA" means the aggregated EBITDA of the Company <u>minus</u> non-recurring & non-operating income and expenses included in such EBITDA, provided that the following items shall not be included as expenses in the calculation of Normative EBITDA: (i) any expenses to finance or otherwise incurred in connection with the transactions contemplated by this Agreement; (ii) any losses of a Purchaser Indemnified Party as to which a claim is made under this Agreement and as to which such Purchaser Indemnified Party is paid or reimbursed (by indemnity, recovery of insurance proceeds, contribution or otherwise); and (iii) to the extent that Company employees are provided with employee benefits available to employees of Purchaser or its Affiliates instead of or in addition to those currently provided to such Company employees, any additional costs associated with such employee benefits; In addition, to the extent any allocation of overhead from Purchaser to the Company does not reduce costs incurred by the Company on a dollar-for-dollar basis, any increase beyond expenses actually replaced shall not be included in the calculation of Normative EBITDA.   An illustrative example of the calculation of Normative EBITDA for the twelve month period ended December 31, 2017 is attached hereto as <u>Exhibit D</u>.

"New Car Lease" has the meaning specified in <u>Section 10.4</u>.

"Objections Notice" has the meaning specified in <u>Section 3.6(b)</u>.

"Old Car Lease" has the meaning specified in <u>Section 10.4</u>.

"Open Source Software" has the meaning specified in <u>Section 5.2(l)(ii)</u>.

"Organizational Documents" means, with respect to any entity, the certificate of incorporation or formation, the articles of incorporation, notice of articles, by-laws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement or other similar organizational documents of such entity.

"Outside Date" has the meaning specified in <u>Section 11.1(a)(i)</u>.

"Owned IP" has the meaning specified in <u>Section 5.2(l)(i)</u>.

"Party" has the meaning specified in the preamble.

"Pay-Out Letters" has the meaning specified in <u>Section 3.7</u>.

"Permit" means any approval, consent, waiver, exemption, franchise, order, permit, authorization, certification or license of, required, granted or issued by a Governmental Entity.

"Permitted Liens" means (a) Liens for Taxes not yet due and delinquent as of the Closing Date or that are being contested in good faith by appropriate proceedings, and for which adequate reserves have been established in the Financial Statements, (b) easements, rights-of-way, reservations, restrictions, encroachments and minor imperfections or irregularities of title affecting real property which do not, individually or in the aggregate, materially interfere with the conduct of the business of the Company, (c) Liens created by the act or omission of Purchaser, (d) inchoate or statutory Liens of contractors, subcontractors, mechanics, workers, suppliers, materialmen, carriers and others in respect of the construction, maintenance, repair or operation of the assets of the Company for amounts which are not yet due and delinquent, (e) zoning, building and other generally applicable land-use restrictions, (f) any other Liens created or permitted with the written consent of Purchaser in its sole discretion, (g) any Lien in favour of Corbel securing the Corbel Credit Agreement, which Liens shall be released and discharged within two (2) Business Days of the Closing Date, (h) deposits or pledges to secure the payment of

workers' compensation, unemployment insurance, social security benefits or obligations arising under similar Laws, or to secure the performance of public or statutory obligations, surety or appeal bonds, and other obligations of a like nature, (i) Liens created by this Agreement or any of the Ancillary Agreements, or in connection with the transactions contemplated hereby by Purchaser, and (j) Liens listed on <u>Section 1.1(a)</u> of the Disclosure Letter.

"Person" means a natural person, partnership, limited partnership, limited liability partnership, corporation, limited liability company, unlimited liability company, joint stock company, trust, unincorporated association or organization, voluntary association, joint venture or any other entity or Governmental Entity, whether acting in an individual, fiduciary or other capacity, and pronouns have a similarly extended meaning.

"Post-Closing Balance Sheet" has the meaning specified in <u>Section 3.3(b)</u>.

"Post-Closing Statement" has the meaning specified in <u>Section 3.3(b)</u>.

"Pre-Closing Taxable Period" means any taxable period ending on or before the Closing Date.

"Properties " has the meaning specified in <u>Section 7.12</u>.

"Property Transfer" has the meaning specified in <u>Section 7.12</u>.

"Purchase Price" has the meaning specified in <u>Section 3.1(a)</u>.

"Purchase Price Adjustment" has the meaning specified in <u>Section 3.3(f)</u>.

"Purchased Equity Interests" has the meaning specified in the recitals.

"Purchaser" has the meaning specified in the preamble.

"Purchaser Financial Statements" has the meaning specified in <u>Section 6.1(k)</u>.

"Purchaser Fundamental Representations" has the meaning specified in <u>Section 9.1(a)(i)</u>.

"Purchaser Indemnified Parties" means (1) the Purchaser, (2) its Affiliates, (3) their respective directors, officers, employees and agents and (4) their respective heirs, executors, successors and assigns. For the avoidance of doubt, after Closing, the term Purchaser Indemnified Parties shall include the Company.

"Purchaser R&W Insurance Policy" means the representation and warranty insurance policy in the amount of USD6,000,000 issued to the Purchaser by the Purchaser R&W Insurer in connection with the transactions contemplated by this Agreement as of the date hereof.

"Purchaser R&W Insurance Premium" means USD199,000, representing the amounts payable by the Purchaser in relation to obtaining the Purchaser R&W Insurance Policy (including premiums, broker fees and other out-of-pocket costs).

"Purchaser R&W Insurer" means AIG.

"Reference Balance Sheet" has the meaning specified in <u>Section 5.2(n)(i)</u>.

"Reference Balance Sheet Date" has the meaning specified in <u>Section 5.2(n)(i)</u>.

-11-

"Represented Parties" has the meaning specified in <u>Section 12.16</u>.

"Response Period" has the meaning specified in <u>Section 3.6(b)</u>.

"Securities Act" has the meaning specified in <u>Section 6.1(i)(i)</u>.

"Seller Tax Claim" has the meaning specified in <u>Section 7.4(c)</u>.

"Seller Tax Returns" has the meaning specified in <u>Section 7.4(a)(i)</u>.

"Sellers" has the meaning specified in the preamble.

"Sellers' Confidential Information" has the meaning specified in <u>Section 10.2(c)</u>.

"Sellers' Indemnified Parties" means (1) each of the Sellers, (2) their Affiliates, (3) their respective directors, officers, employees and agents, and (4) their respective heirs, executors, successors and assigns.

"SMRH" has the meaning specified in <u>Section 12.16</u>.

"SMS Inc." has the meaning specified in the recitals.

"SMS LLC" has the meaning specified in the recitals.

"SMS Property Leases" means the Temecula Lease and the Lake Havasu City Lease.

"SMS Units" has the meaning specified in the recitals.

"Software" means computer programs and other software, including all electronic data processing systems, program specifications, source code, object code, functional specifications, operating manuals and training manuals and other documentation associated with the foregoing.

"Straddle Taxable Period" has the meaning specified in <u>Section 7.4(a)</u>.

"Target Working Capital" means the result in dollars of the Average Weekly Billing at Closing <u>divided by</u> seven (7) <u>multiplied by</u> fifty (50). For illustration purposes, see the table attached as <u>Exhibit J</u>.

"Tax Claim" has the meaning specified in <u>Section 7.4(c)</u>.

"Tax Returns" means any and all returns, reports, declarations, estimates, claims for refund, elections, notices, forms, designations, filings and statements filed or required to be filed in respect of Taxes, including any schedule or attachment thereto, and including any amendments thereof.

"Taxes" means (a) any and all taxes, duties, fees, excises, premiums, assessments, imposts, levies and other charges or assessments of any kind whatsoever imposed by any Governmental Entity, and (b) all interest, penalties, fines, additions or other additional amounts imposed by any Governmental Entity on or in respect of amounts of the type described in clause (a) above or this clause (b), regardless of whether such Taxes are disputed or not.

"Temecula Lease" has the meaning specified in <u>Section 7.12</u>.

LEGAL_1:50312829.17

62TJ-274876

"Third Party Claim" means any claim or Legal Proceeding that is instituted or asserted by a third party, including a Governmental Entity, against an Indemnified Person which entitles the Indemnified Person to make a claim for indemnification under this Agreement.

"Transaction Expenses" means, to the extent unpaid at the Closing and without duplication of any element of the Purchase Price adjusted pursuant to Section 3.3(a), all costs, fees and expenses incurred in connection with the negotiation, execution and delivery of this Agreement or the consummation of the transactions contemplated hereunder to the extent such costs, fees and expenses are payable or reimbursable by the Company or SMS Inc., with respect to the following: (i) all brokerage fees, commissions, finders' fees or financial advisory fees, (ii) the fees and expenses of all legal counsel, accountants, consultants, data room providers and other experts and advisors so incurred, (iii) employee bonuses/retention payments and any other change-of-control payments triggered by the transactions contemplated hereby (notwithstanding any requirement to provide continued services following the Closing), and the employer's portion of any payroll taxes in respect thereof, and (iv) all fees associated with the CFIUS Notice, DDTC Notification and all reasonable fees associated with obtaining the Consents as contemplated by Section 7.9(a).  In addition to the foregoing, Transaction Expenses shall include the out-of-pocket legal fees and expenses of Corbel incurred in connection with the negotiation, execution and delivery of this Agreement or the consummation of the transactions contemplated hereunder, in an amount not to exceed USD60,000, which shall be payable directly to Corbel in accordance with Section 3.1(c) and Section 4.3(a) below. Transaction Expenses shall not include any legal fees of Purchaser associated with the CFIUS Notice.

"Transfer Taxes" has the meaning specified in Section 7.4(f).

"Treasury Regulations" means the regulations promulgated under the Code by the US Department of the Treasury, as amended.

"Trigo Holding" has the meaning specified in Section 6.1(k).

"UBS Line of Credit" means the credit line agreement dated September 26, 2016 between SMS, LLC and UBS Credit Corp.

"Uninsured Breach" means any breach of any of the representations or warranties of the Sellers (whether relating to the Sellers or the Company) in this Agreement with respect to which the Purchaser R&W Insurer shall not be liable as a result of the exclusions expressly set forth in the Purchaser R&W Insurance Policy and made available to the Sellers prior to the execution of this Agreement.

"US" means the United States of America.

"Workers' Compensation Assessments" has the meaning specified in Section 5.2(s)(vi).

Section 1.2      Gender and Number.

Any reference in this Agreement to gender includes all genders.  Words importing the singular number only include the plural and vice versa.

Section 1.3      Headings.

The provision of a Table of Contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and do not affect the interpretation of this Agreement.

Section 1.4     Currency.

All references in this Agreement to USD, dollars, or to $ are expressed in United States currency unless otherwise specifically indicated.

Section 1.5     Certain Phrases.

In this Agreement, unless otherwise specified or dictated by the context, (a) the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation", (b) references to "or" shall be deemed to be disjunctive but not necessarily exclusive (i.e., "or" shall be interpreted to mean "and/or" rather than "either/or"), (c) the words "hereof", "herein", "hereunder," "hereby" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and (d) the phrase "the aggregate of", "the total of", "the sum of", or a phrase of similar meaning means "the aggregate (or total or sum), without duplication, of." Unless otherwise specified or dictated by the context, references herein to a specific Article, Section, Exhibit, Annex or Schedule shall refer respectively to the specified Article, Section, Exhibit, Annex or Schedule of this Agreement.

Section 1.6     Accounting Terms.

Unless otherwise expressly set forth herein, all accounting terms not specifically defined in this Agreement are to be interpreted in accordance with GAAP.

Section 1.7     Schedules and Disclosure Letter.

(a)     The schedules attached to this Agreement and the Disclosure Letter form an integral part of this Agreement for all purposes of it.

(b)     The purpose of the Disclosure Letter is to set out the qualifications, exceptions and other information called for in this Agreement. The Parties acknowledge and agree that the Disclosure Letter and the information and disclosures contained in it do not constitute or imply, and will not be construed as:

(i)     any representation, warranty, covenant or agreement which is not expressly set out in this Agreement;

(ii)     an admission of any liability or obligation of Sellers or the Company;

(iii)     an admission that the information is material; or

(iv)     a standard of materiality, a standard for what is or is not in the ordinary course of business, or any other standard contrary to the standards contained in the Agreement.

(c)     The Disclosure Letter is subject to the confidentiality provisions of this Agreement.

Section 1.8     References to Persons and Agreements.

Any reference in this Agreement to a Person includes its successors and permitted assigns. Except as otherwise provided in this Agreement, the term "Agreement" and any reference to this Agreement or any other agreement or document includes, and is a reference to, this Agreement or such

-14-

other agreement or document as it may have been or may from time to time be amended, restated, replaced, supplemented or novated and includes all schedules, exhibits and other attachments to it.

Section 1.9    Laws, Permits, Consents and Other Documents.

Except as otherwise provided in this Agreement, any reference in this Agreement to any given Law, Permit, Consent, agreement or document refers to such Law, Permit, Consent, agreement or document and all rules and regulations made under it, as in effect at the date hereof and the Closing Date.

Section 1.10    Non-Business Days.

Whenever payments are to be made, notices are to be given or actions are to be taken on a day which is not a Business Day, such payment shall be made, such notice shall be given or such action shall be taken on or not later than the next succeeding Business Day.

ARTICLE 2

PURCHASE AND SALE

Section 2.1    Purchase and Sale.

(a)    At the Closing, subject to the terms and conditions of this Agreement, SMS Inc. shall sell, transfer and deliver to the Purchaser, and the Purchaser shall purchase and accept from SMS Inc., all of SMS Inc.'s right, title and interest in and to the SMS Units, free and clear of all Liens.

(b)    At the Closing, subject to the terms and conditions of this Agreement, Corbel shall sell, transfer and deliver to the Purchaser, and the Purchaser shall purchase and accept from Corbel, all of Corbel's right, title and interest in and to the Corbel Units, free and clear of all Liens.

ARTICLE 3

PURCHASE PRICE

Section 3.1    Purchase Price; Payment of the Purchase Price.

(a)    Subject to the terms and conditions of this Agreement, in consideration of the Purchased Equity Interests, the aggregate price to be paid by the Purchaser to the Sellers shall be: USD58,500,000 (the "Purchase Price"), (i) subject to adjustment as of the Closing in accordance with Section 3.3(a), (ii) subject to adjustment after the Closing in accordance with Section 3.3(f), and (iii) plus the Earn-Out Payment, if any.  The Purchase Price shall be allocated among the Sellers as follows: USD9,500,000 to Corbel and the remainder of the Purchase Price to SMS Inc.; provided, however, that in the event the Company chooses to defer any portion of the quarterly interest payment payable to Corbel for the quarter ending September 30, 2018 under the Corbel Credit Agreement, the portion of the Purchase Price allocable to Corbel shall instead be USD10,000,000. The portion of the Purchase Price allocated to Corbel is referred to herein as the "Corbel Equity Amount."  For the avoidance of doubt, any adjustments to the Purchase Price set forth in Section 3.3(a) and Section 3.3(f) will be paid by or paid to SMS Inc. and the Earn-Out Payment, if any, will be payable solely to SMS Inc.

(b)    At the Closing, the Purchaser shall pay an amount (the "Closing Date Amount") equal to (i) the Purchase Price, (ii) plus or minus the Estimated Closing Adjustment Amount as determined in accordance with Section 3.3(a), and (iii) minus 50% of the Purchaser R&W Insurance Premium, by wire transfer of immediately available funds to one or more bank account(s) to be designated in writing by the Sellers to the Purchaser not less than three (3) Business Days prior to the Closing Date.

(c)    At the Closing, on behalf of the Company, the Purchaser shall pay to each Person identified in the Estimated Closing Statement an amount, in immediately available funds, sufficient to pay the Transaction Expenses due to such Person as shall be provided in the Estimated Closing Statement, each such amount to be paid by wire transfer, to the applicable accounts designated in writing by the Sellers in the Estimated Closing Statement.

Section 3.2    Entire Consideration.

Each Seller acknowledges and agrees that the consideration to be received by such Seller pursuant to this Article 3 constitutes all of the consideration entitled to be received by such Seller for the sale and transfer to the Purchaser of such Seller's Purchased Equity Interests, as applicable, irrespective of any provisions in the Organizational Documents of the Company or any other Contract governing the Equity Interests of the Company.

Section 3.3    Adjustment to Purchase Price.

(a)    At least three (3) Business Days prior to the Closing Date, SMS Inc. shall cause the Company to prepare and deliver to the Purchaser (i) a statement (the "Estimated Closing Statement") including the Company's good faith estimate of (except with respect to the Average Weekly Billing at Closing, which shall not be an estimate but the result of a calculation based on amounts invoiced to customers of the Business for services rendered, and evidence satisfactory to the Purchaser in support thereof shall be provided by SMS Inc. to the Purchaser) (A) the Net Working Capital (the "Estimated Net Working Capital"), (B) the amount equal to any Cash, (the "Estimated Cash", (C) the amount equal to the Debt of the Company (the "Estimated Debt"), (D) the Average Weekly Billing at Closing and (E) the amount equal to any Transaction Expenses (the "Estimated Transaction Expenses") along with an indication of the Person to whom such expense is owed and, to the extent such Transaction Expenses are to be paid at the Closing in accordance with Section 3.1(g), wire transfer information or payment instructions for any such Person and (ii) reasonable supporting documentation.  For purposes of this Agreement, "Estimated Closing Adjustment Amount" shall mean an amount equal to the Estimated Net Working Capital, minus the Target Working Capital, plus an amount equal to the Estimated Cash, minus an amount equal to the Estimated Debt, minus an amount equal to the Billing Shortfall, if any, minus an amount equal to the Estimated Transaction Expenses. If the Estimated Closing Adjustment Amount is a positive number, the Closing Date Amount shall be increased by the amount of the Estimated Closing Adjustment Amount on a dollar-for-dollar basis pursuant to Section 3.1(b)(ii).  If the Estimated Closing Adjustment Amount is a negative number, the Closing Date Amount shall be reduced by the amount of the Estimated Closing Adjustment Amount on a dollar-for-dollar basis pursuant to Section 3.1(a)(ii).

(b)    As soon as reasonably practicable after the Closing Date (but not later than sixty (60) days thereafter), the Purchaser will prepare and deliver to SMS Inc. a statement (the "Post-Closing Statement") including the consolidated post-closing balance sheet of the Company as of the opening of business on the Closing Date (the "Post-Closing Balance Sheet") and (i) the Net Working Capital (the "Closing Net Working Capital"), (ii) the amount equal to any Cash, (the "Closing Cash"), (iii) the amount equal to the Debt of the Company (the "Closing Debt") and (iv) the amount equal to any Transaction

-16-

Expenses (the "Closing Transaction Expenses"). The Post-Closing Balance Sheet shall be prepared in accordance with GAAP and the historical practices, policies and methodologies used by the Company (to the extent not inconsistent with GAAP). In preparation of the Post-Closing Statement, the Purchaser and its representatives may make inquiry of SMS Inc. and its representatives and shall have reasonable access, during normal business hours and upon reasonable notice, to all relevant work papers, schedules, memoranda, and other documents prepared by SMS Inc. relating to the Estimated Closing Statement within SMS Inc.'s possession.

(c)     SMS Inc. may review the Post-Closing Statement and may make inquiry of the Purchaser and their representatives and shall have reasonable access, during normal business hours and upon reasonable notice, to all relevant work papers, schedules, memoranda, and other documents prepared by the Purchaser relating to the Post-Closing Statement within the Purchaser's possession. The Post-Closing Statement shall be binding and conclusive upon SMS Inc. unless SMS Inc. shall have notified Purchaser in writing of any objections thereto in good faith consistent with the provisions of this Section 3.3(c) within forty-five (45) calendar days after the delivery of the Post-Closing Statement to SMS Inc. The written notice delivered by SMS Inc. to the Purchaser under this Section 3.3(c) shall specify in reasonable detail each item on the Post-Closing Statement that SMS Inc. disputes, a summary of the reasons for such dispute and SMS Inc.'s calculation of each such item. Any item not included as disputed in such notice shall be deemed accepted by SMS Inc.

(d)     Disputes between the Purchaser and SMS Inc. relating to the Post-Closing Statement that cannot be resolved by Purchaser and SMS Inc. within fifteen (15) Business Days after receipt by Purchaser of the notice referred to in Section 3.3(c) may be referred thereafter for decision at the insistence of either Purchaser or SMS Inc. to Deloitte or any nationally recognized independent accounting firm selected jointly by the Purchaser and SMS Inc. (the "Arbiter"). Promptly after its acceptance of its appointment as Arbiter, the Arbiter shall determine, based solely on presentations by the Purchaser and SMS Inc. and not by independent review, those items in dispute on the Post-Closing Statement and shall render a written report as to the resolution of each dispute and the resulting calculation of the Final Closing Adjustment Amount; provided that any such determination of an item in dispute shall be neither lower nor higher than the amounts specified by SMS Inc.'s and the Purchaser's respective written notices. The Arbiter shall have exclusive jurisdiction over, and resort to the Arbiter as provided in this Section 3.3(d) shall be the sole recourse and remedy of the Parties against one another or any other Person with respect to, any disputes arising out of or relating to the Post-Closing Statement and shall be enforceable in a court of law. The fee of the Arbiter shall be borne fifty percent (50%) by SMS Inc. and fifty percent (50%) by the Purchaser.

(e)     The Post-Closing Statement shall become final and binding upon the Purchaser and SMS Inc. upon the earliest of (i) the failure by SMS Inc. to object thereto within the period permitted under, and otherwise in accordance with the requirements of, Section 3.3(c), (ii) the written agreement between Purchaser and SMS Inc. with respect thereto and (iii) the decision by the Arbiter with respect to disputes under Section 3.3(d). The Post-Closing Statement, as deemed to be agreed pursuant to clause (i) above, or as adjusted pursuant to the written agreement of the Purchaser and SMS Inc. or the decision of the Arbiter, when final and binding, is referred to herein as the "Final Post-Closing Statement." The "Final Closing Adjustment Amount" determined using the Final Post-Closing Statement, shall mean an amount equal to the Closing Net Working Capital, minus the Target Working Capital, plus an amount equal to the Closing Cash, minus an amount equal to the Closing Debt, minus an amount equal to the Closing Transaction Expenses.

(f)     As soon as practicable (but not more than five (5) Business Days) after the final determination of the Final Post-Closing Statement in accordance with Section 3.3(e) the Purchase Price shall be either (1) decreased by the amount, if any, by which the Final Closing Adjustment Amount is less

-17-

than the Estimated Closing Adjustment Amount, or (2) increased by the amount, if any, by which the Final Closing Adjustment Amount is greater than the Estimated Closing Adjustment Amount. Any adjustment to the Closing Date Amount provided for in this <u>Section 3.3(f)</u> is referred to as the "Purchase Price Adjustment."

(g) If the Final Closing Adjustment Amount is greater than the Estimated Closing Adjustment Amount, the Purchaser shall, within five (5) Business Days after the Final Closing Adjustment Amount is determined and the Final Post-Closing Statement becomes final and binding, make or cause to be made, payment to SMS Inc. by wire transfer to a bank account designated in writing at least three (3) Business Days prior thereto by SMS Inc. in immediately available funds of the net amount of such Purchase Price Adjustment. If the Final Closing Adjustment Amount is less than the Estimated Closing Adjustment Amount, SMS Inc. shall, within five (5) Business Days after the Final Closing Adjustment Amount is determined and the Final Post-Closing Statement becomes final and binding, make or cause to be made, payment to the Purchaser by wire transfer to a bank account designated in writing at least three (3) Business Days prior thereto by the Purchaser in immediately available funds of the net amount of such Purchase Price Adjustment.

(h) Payments made under <u>Section 3.3(g)</u> shall be adjustments to the Purchase Price for all purposes. Notwithstanding the foregoing provision, or anything contained in this <u>Section 3.3</u>, there shall be no adjustments (either reductions or increases) to the portion of the Purchase Price payable to Corbel for the Corbel Units under <u>Section 3.3</u> of this Agreement.

Section 3.4 Earn-Out Payment.

(a) Principle.

(i) The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the fiscal year ending December 31, 2018 an aggregate cash performance amount (the "Earn-Out Payment 1") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD7,500,000:

$$\text{Earn-Out Payment 1} = (7.5 / 0.4) \text{ X } (2018 \text{ Normative EBITDA} - \text{USD5,400,000})$$

(ii) The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to Clarke for the fiscal year ending December 31, 2019 an aggregate cash performance amount (the "Earn-Out Payment 2" and, collectively with the Earn-Out Payment 1, the "Earn-Out Payment") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD20,000,000:

$$\text{Earn-Out Payment 2} = ((20 / 3.4) \text{ X } (2019 \text{ Normative EBITDA} - \text{USD5,400,000})) - \text{Earn-Out Payment 1}$$

Any aerospace service activities of Purchaser and its Affiliates in the US will be included in the 2018 Normative EBITDA and 2019 Normative EBITDA; <u>provided</u>, <u>however</u>, (i) no customer contracts of Purchaser or its Affiliates entered into with US customers prior to Closing that have profitability margins of zero (0)% or less will be included, and (ii) with regards to the 2018 Normative EBITDA, the profitable contracts of the Purchaser's US aerospace activities will be included on a pro rata basis for the period from Closing to, and including, December 31, 2018.

For purposes of the above calculation, "2018 Normative EBITDA" means Normative EBITDA for the twelve month period ending December 31, 2018 and "2019 Normative EBITDA" means Normative EBITDA for the twelve month period ending December 31, 2019.

(b)     Earn-Out Statements.  Within ten (10) Business Days of completion of the Company's audited financial statements for each of the fiscal years ending December 31, 2018 and December 31, 2019, respectively, and in any event no later than March 31, 2019 and March 31, 2020, respectively, the Purchaser shall deliver to Clarke (i) the unaudited corporate financial statements of the Company for the fiscal year ending December 31, 2018 and December 31, 2019, respectively, and (ii) a statement setting forth the 2018 Normative EBITDA and 2019 Normative EBITDA, respectively, and the resulting Earn-Out Payment 1 and Earn-Out Payment 2, respectively, if any, due and payable (the "Earn-Out Certificate").  Upon delivery of an Earn-Out Certificate by the Purchaser, the Purchaser shall cause the Company to provide Clarke and his Representatives with reasonable access, during normal business hours, to the Company's auditor and accounting and other personnel and to the books and records of the Company, as the case may be, and any other document or information (including documents and information relating to the Purchaser, its Affiliates and/or their successors and assigns) reasonably requested by Clarke and/or his Representatives to verify the accuracy of the Earn-Out Certificate.

(c)     Dispute Resolution.  The applicable Earn-Out Certificate (and the proposed determination of the 2018 Normative EBITDA or 2019 Normative EBITDA reflected thereon, as applicable, and of the resulting Earn-Out Payment amount) will be final, conclusive and binding on the Parties with regards to Earn-Out Payment 1 or Earn-Out Payment 2, as the case may be (and referred to herein as the "Final Earn-Out Certificate"), unless Clarke provides a written notice (the "Earn-Out Dispute Notice") to the Purchaser no later than the fifteenth (15th) Business Day after delivery to Clarke of the applicable Earn-Out Certificate.  Any Earn-Out Dispute Notice must set forth in reasonable detail (i) any item on the applicable Earn-Out Certificate which Clarke believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) Clarke's alternative calculation of 2018 Normative EBITDA and 2019 Normative EBITDA, as applicable, and any Earn-Out Payment resulting thereof.  Any item or amount to which no dispute is raised in the Earn-Out Dispute Notice will be final, conclusive and binding on the Parties on such fifteenth (15th) Business Day.  Any Earn-Out Dispute Notice must specify, with reasonable particularity, all facts that form the basis of such disagreements.  The Purchaser and Clarke will attempt to resolve the matters raised in an Earn-Out Dispute Notice in good faith.  If the Purchaser and Clarke reach a resolution with respect to such matters, then the Earn-Out Certificate, as modified by such resolution, shall be deemed the "Final Earn-Out Certificate." Fifteen (15) Business Days after delivery of any Earn-Out Dispute Notice (or such longer period as may be mutually agreed in writing by Clarke and the Purchaser), either the Purchaser or Clarke may provide written notice to the other that it elects to submit the disputed items to the Arbiter, which resolution shall be final and binding on the Parties and shall be deemed the "Final Earn-Out Certificate." The Arbiter shall be instructed to resolve the dispute within fifteen (15) Business Days after the item has been referred to it.  The costs, fees, and expenses of the Arbiter shall be borne equally by the Purchaser and Clarke.

(d)     Payment.  If any Earn-Out Payment is determined to be payable pursuant to the Final Earn-Out Certificate, then the Purchaser shall, within five (5) Business Days of the determination of the Final Earn-Out Certificate, pay such amount to Clarke's accounts set forth in Exhibit E, by wire transfer of immediately available funds.

(e)     Operation of the Business.  Until expiration of the Earn-Out period (or payment in full of the maximum Earn-Out Payment, if earlier), the Purchaser shall: (i) operate the Company in the

ordinary course of business and so as to maintain it as a going concern; (ii) operate the Company as a measurable business unit with the same perimeter as on the Closing with its own separate chart of accounts; (iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment; (iv) not, except to the extent strictly required under applicable Law, unilaterally intervene with the management of the Company; (v) not cause the Company to enter into voluntary liquidation; (vi) operate the Company as a separate entity, owned directly or indirectly by Purchaser; (vii) operate the business of the Company consistent with past practice and not adopt strategic, commercial or financial changes to the way the Company is managed which could have a negative impact on the EBITDA of the Company; and (viii) maintain complete and accurate books and records of the Company on a stand-alone basis adequate in all material respects to permit an audit of the Company as a stand-alone business.  Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, in the event that (i) the Company or Purchaser undergoes a transaction during the Earn-Out period which results in a Change of Control of the Company or (ii) Clarke is terminated without Cause (as defined in the Clarke Employment Agreement) or leaves with Good Reason (as defined in the Clarke Employment Agreement), then the maximum amount of each of Earn-Out Payment 1 and Earn-Out Payment 2 (to the extent previously unpaid) shall automatically and without any further action of any Party or any other Person become due and payable to SMS Inc. and Purchaser shall, within five (5) Business Days thereof, pay such amount SMS Inc.'s account set forth in Exhibit D, by wire transfer of immediately available funds.

Section 3.5       Withholding

The Purchaser shall be entitled to deduct and withhold from any amount payable under this Agreement (including, for the avoidance of doubt, any Earn-Out Payments) any withholding of Taxes or other similar amounts required under applicable Tax Law to be deducted and withheld.  Before making any such deduction or withholding, (other than any withholding required pursuant to Section 1445 or 1446 of the Code as a result of a failure by Sellers to deliver the certificates contemplated in Section 4.4(d) and Section 4.4(e) of this Agreement), the Purchaser shall give the Sellers notice of the intention to make such deduction or withholding, as soon as reasonably practicable prior to the time such deduction or withholding, is otherwise required, in order for the Seller to attempt to obtain reduction of or relief from such deduction or withholding in accordance with applicable Laws.  To the extent such amounts are so deducted or withheld, and paid to the applicable Government Entity, such amounts will be treated for all purposes of this Agreement as having been paid to the person in respect of which such withholding relates.

Section 3.6       Purchase Price Allocation.

(a)       In accordance with Revenue Ruling 99-6, Situation 2, the Purchase Price (and any capitalized costs) and the assumed liabilities (if any) shall be allocated among the assets of the Company and other relevant items (if any) in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder pursuant to the procedure provided in Section 3.6(b) below, which allocation shall be binding upon the Purchaser and Sellers. The Purchaser, the Sellers and the Company shall report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Allocation Schedule (defined below), as finally determined. The Parties shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as the other parties may reasonably request to prepare such allocation. None of the Purchaser, the Sellers, nor the Company shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable Law or a good faith resolution of a Tax Claim.

-20-

(b)      Within sixty (60) days after the Closing Date, the Purchaser shall prepare and deliver to SMS Inc. a schedule (an "Allocation Schedule") allocating the Purchase Price (and any capitalized costs) and the assumed liabilities (if any) among the assets of the Company and other relevant items (if any), in such amounts reasonably determined by the Purchaser to be consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate). SMS Inc. shall have a period of ten (10) business days after the delivery of the Allocation Schedule (the "Response Period") to present in writing to the Purchaser notice of any objections the Sellers may have to the allocations set forth therein (the "Objections Notice"). Unless SMS Inc. timely objects, such Allocation Schedule shall be binding on the parties without further adjustment, absent manifest error. If SMS Inc. shall raise any objections within the Response Period, the Purchaser and the Sellers shall negotiate in good faith and use their reasonable best efforts to resolve such dispute. If the Parties fail to agree within fifteen (15) days after the delivery of the Objections Notice, such dispute shall be resolved by the Arbiter in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provision of state, local or non-US law, as appropriate), which resolution shall be final and binding on the Parties.  The Arbiter shall resolve the dispute within thirty (30) days after the item has been referred to it.  The costs, fees, and expenses of the Arbiter shall be borne equally by the Purchaser and the Sellers.  Notwithstanding the foregoing, no amounts shall be allocated to any covenant not to compete.

Section 3.7      Pay-Out Letters

SMS Inc. shall deliver to the Purchaser at least three (3) Business Days prior to the Closing, the pay-out letters (the "Pay-Out Letters) in form and substance reasonably satisfactory to the Purchaser addressed to the Company from and signed by each of Corbel, First Citizens Bank & Trust Company, Enterprise Funding Corporation, Mohave State Bank and UBS Credit Corp. The Pay-Out Letters will set out the aggregate amounts of principal and interest of each of the Corbel Credit Agreement, First Citizens Promissory Note, Enterprise Funding Promissory Note, Mohave Promissory Note and UBS Line of Credit (collectively, the "Credit Agreements" "Credit Agreements") and all other amounts owing under same by the Company, as of the Closing Date, to same and indicate relevant wire transfer instructions. Pursuant to the Pay-Out Letters, each of Corbel, First Citizens Bank & Trust Company, Enterprise Funding Corporation, Mohave State Bank and UBS Credit Corp. will terminate their respective Credit Agreements and all other documents, agreements and instruments entered into in connection therewith, and agree (a) that as of the Closing, all Liens on the securities securing obligations under the Credit Agreements or such other document, agreement or instrument and assets of the Company that exist for their benefit shall be, automatically and without further action by any Person, terminated and released and all Debt owing thereunder shall be deemed to have been satisfied and paid in full, upon their receipt of payment of the aggregate amount stipulated in the Pay-Out Letters and (b) to deliver all termination statements or other documents, agreements or instruments of termination as the Company may reasonably request to effectuate such terminations and releases.

Section 3.8      Reimbursement of Billing Shortfall.

In the event that the Billing Shortfall is deducted from the Purchase Price at Closing, and, following the Closing, the Company achieves Average Weekly Billing Post-Closing of USD$450,000 or higher, Purchaser shall pay to SMS Inc. the amount of the Billing Shortfall that was deducted from the Purchase Price at Closing.  Purchaser shall make, or cause to made, such payment to SMS Inc. within five (5) Business Days after the Company achieves such Average Weekly Billing Post-Closing by wire transfer in immediately available funds to the account indicated in Exhibit E.  The Parties agree to treat any amounts payable pursuant to this Section 3.8 as an adjustment to the Purchase Price.

ARTICLE 4

CLOSING

Section 4.1       Closing.

Subject to the terms and conditions hereof, the closing of the transactions contemplated hereby (the "Closing") shall take place (a) electronically: on the fifth (5th) Business Day following the satisfaction or waiver of all conditions to the Closing set forth in Article 8 (other than those conditions that by their nature are to be satisfied at the Closing but subject to the fulfillment or waiver in writing of those conditions); or (b) at such other time and place as the Sellers and the Purchaser may mutually agree in writing.  The date on which the Closing occurs is called the "Closing Date", and the Closing shall be effective for all purposes as of 11:59:59 p.m. Eastern time on the Closing Date.

Section 4.2       Electronic Closing and Mutual Assistance.

Except in the case of documents that are specified as being recordable in form (for which originally signed copies must be delivered), the Closing may occur by facsimile or electronic transmission exchange of portable document format "pdf" executed documents or signature pages followed by the exchange of originals as soon thereafter as practicable.  Each of Sellers and Purchaser shall further deliver such other evidence, instruments, documents and certificates required to be delivered by such Parties pursuant to this Article 4.

Section 4.3       Closing Deliverables by Purchaser.

At the Closing, the Purchaser shall deliver to the Sellers, as applicable, the following, each in form and substance reasonably satisfactory to the Sellers:

(a)       pay to Corbel the Corbel Equity Amount for the Corbel Units and the Transaction Expenses of Corbel, by wire transfer or immediately available funds to the account indicated in Exhibit E;

(b)       pay to Corbel pursuant to the Corbel Credit Agreement the Corbel Debt amount, by wire transfer or immediately available funds to the account indicated in the Corbel Pay-Out Letter;

(c)       at the direction of the Company, pay the amount payable to each of First Citizens Bank & Trust Company, Enterprise Funding Corporation, Mohave State Bank and UBS Credit Corp. pursuant to the applicable Credit Agreements (which amount shall be the amount set forth in the respective Pay-Out Letters) by wire transfer of immediately available funds to the accounts indicated in the respective Pay-Out Letters;

(d)       pay to SMS Inc. for the SMS Units an amount equal to the Closing Date Amount, minus the amount paid to Corbel pursuant to Section 4.3(a), by wire transfer or immediately available funds to the account indicated in Exhibit E;

(e)       a duly executed counterpart of each of the Ancillary Agreements to which Purchaser or any of its Affiliates are a party; and

(f)       the certificate to be delivered pursuant to Section 8.3(c) and any other documents required for Closing under Section 8.3.

Section 4.4        Closing Deliverables by Sellers.

At the Closing, Sellers shall deliver to Purchaser or such of its Affiliates as Purchaser shall direct in writing in advance the following, each in form and substance reasonably satisfactory to Purchaser:

(a)        such reasonable documents or evidence reasonably requested by Purchaser to evidence the transfer to Purchaser of good and marketable title in and to the Purchased Equity Interests;

(b)        a duly executed counterpart of each of the Ancillary Agreements to which any of Sellers or any of their Affiliates is a party;

(c)        resignation letters from each of the officers and managers of the Company, as requested in writing by the Purchaser at least two (2) Business Days prior to the Closing Date, in the form attached hereto as Exhibit G;

(d)        from each Seller (or, if a Seller is disregarded for US federal income tax purposes, from that Seller's regarded owner for US federal income tax purposes), a duly executed certificate meeting the requirements of Section 1.1445-2(b)(2) of the Treasury Regulations;

(e)        a duly executed affidavit from each Seller (or, if a Seller is disregarded for US federal income tax purposes, from that Seller's regarded owner for US federal income tax purposes) providing that it is not a foreign person, as that term is used in Section 1446(f)(2)(A) of the Code, and in a form prescribed by Section 6 of IRS Notice 2018-29 and reasonably satisfactory to the Purchaser;

(f)        from each Seller and Clarke, a properly completed and duly executed IRS Form W-9 or the appropriate IRS Form W-8, as applicable;

(g)        evidence of the termination of the limited liability company agreement of the Company and a release from each Member in favor of the Company thereunder, in each case, in substantially the form attached hereto as Exhibit F, effective as of the Closing;

(h)        evidence of the termination or transfer, as applicable, of the Irvine Lease;

(i)        copies of the CFIUS Approval (if provided in written form) and DDTC Notification; and

(j)        the certificate to be delivered pursuant to Section 8.2(c) and any other documents required for Closing under Section 8.2.

LEGAL_1:50312829.17

62TJ-274876

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF SELLERS

Section 5.1        Representations and Warranties Relating to the Sellers.

The Sellers represent and warrant on a several (but not joint) basis (and, for greater certainty, (i) Corbel is liable on a joint and several basis only amongst each Corbel entity and (ii) Clarke is solely liable with respect to SMS Inc.), to and for the benefit of the Purchaser, as of the date hereof and as of the Closing Date (except to the extent any of such representations and warranties refer expressly to only one of such dates or refer specifically to another date, in which case such representations and warranties are made as of such date), as follows (except as set forth in the corresponding section of the Disclosure Letter or in any other section of the Disclosure Letter if the application of the disclosure to the first section is reasonably apparent):

(a)        Execution and Delivery; Valid and Binding Agreements.  This Agreement and each other agreement, document or instrument referred to in or contemplated by this Agreement to be executed by each Seller, including the Ancillary Agreements, have been or, as of the Closing, will be duly executed and delivered by each Seller, and assuming that this Agreement and any other agreement, document or instrument referred to in or contemplated by this Agreement and the Ancillary Agreements have been duly executed and delivered by the other parties hereto and thereto, constitute, or, when executed by the other parties hereto and thereto, will constitute, valid and binding agreements of each Seller, enforceable against each Seller in accordance with their terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other Laws from time to time in effect relating to creditors' rights and remedies generally and general principles of equity.

(b)        Organization.  As applicable, each Seller is duly formed, validly existing and in good standing (to the extent that the applicable jurisdiction recognizes the concept (or similar concept) of good standing) under the Laws of the jurisdiction of its formation or incorporation.  Each Seller is duly qualified to do business and is in good standing in each jurisdiction in which the ownership of its assets or the nature of its business makes such qualification necessary, except where the failure to be so qualified or in good standing does not have a Material Adverse Effect. All necessary actions, conditions and things have been taken, fulfilled and done in order to enable such Seller to enter into, perform and comply with its obligations hereunder.

(c)        Authorization.  Each Seller has the right, power, capacity and authority to perform its obligations under this Agreement and under any other agreement, document or instrument referred to in, or contemplated by this Agreement, including the Ancillary Agreements, in each case to which such Seller is or will be a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  All actions or proceedings to be taken by or on the part of each Corbel entity to authorize and permit the execution and delivery by such Seller of this Agreement, the Ancillary Agreements and the instruments required to be executed and delivered by them pursuant hereto, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby, (including all right,

-24-

power, capacity and authority to sell, transfer, convey and surrender its respective Purchased Equity Interests provided for by this Agreement) has been duly authorized by all necessary action on the part of such Seller.

(d)     Non-Contravention; No Consents or Approvals.  Except as set forth in Section 5.1(d) of the Disclosure Letter, neither: (1) the execution, delivery or performance of this Agreement or any of the other agreements, documents or instruments referred to in this Agreement, including the Ancillary Agreements; nor (2) any of the transactions contemplated by this Agreement or any such other agreement, document or instrument, will (with or without notice or lapse of time):

(i)     contravene, conflict with or result in a violation of: (x) any of the provisions of any Organizational Documents of each Seller; or (y) any resolution adopted by the equity holders or board of directors (or similar body) of such Sellers;

(ii)     contravene, conflict with or result in a violation of, or give any Governmental Entity or other Person the right to challenge any of the transactions contemplated by this Agreement or to exercise any remedy or obtain any relief under, any Law or any order, writ, injunction, judgment or decree to which such Seller is subject; or

(iii)     materially contravene, conflict with or result in a material violation or material breach of, or result in a default under, any Material Contract to which such Seller is a party or by which such Seller is bound.

Except for the CFIUS Notice and the DDTC Notification and otherwise where the failure to do so would have a Material Adverse Effect, such Seller is not (and will not be) required to make any filing with, or to obtain any consent from, any Person in connection with: (x) the performance of this Agreement or any of the other agreements, documents or instruments referred to in this Agreement, including the Ancillary Agreements; or (y) any of the transactions contemplated by this Agreement or by any of the other agreements, documents or instruments referred to in this Agreement.

(e)     Title and Ownership.  The Sellers are the registered and beneficial owners of the Purchased Equity Interests set forth as being owned by such Sellers on Section 5.2(b) of the Disclosure Letter and have good, valid and marketable title to such Purchased Equity Interests, free and clear of all Liens.  The Sellers are not a party to any option, warrant, purchase right or other Contract that could require such Sellers to sell, transfer or otherwise dispose of any Purchased Equity Interests owned by them respectively (other than this Agreement).  Other than as contemplated by this Agreement and the Organizational Documents of the Company, the Sellers are not a party to any voting, repurchase, redemption, sale transfer or other acquisition or disposition, trust, proxy or other agreement or understanding with respect to the voting of any Purchased Equity Interests owned by them respectively.

(f)     Brokers.  Except as described in Section 5.1(f) of the Disclosure Letter, no broker, agent, other intermediary or Person is entitled to any fee, commission or other remuneration, including finder's fees, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of such Seller or an Affiliate, and the Company has no obligations with respect thereto.

(g)     No Legal Proceedings.  There is no pending Legal Proceeding against each Seller or involving such Seller or any of its properties or assets and, to the Knowledge of the such Seller, no Person has threatened to commence any such Legal Proceeding, in each case that challenges, or that, individually or in the aggregate has had or would be reasonably expected to have the effect of preventing, materially delaying or making illegal, the entry into, performance of, compliance with and enforcement of any of the material obligations of such Seller under this Agreement or the ability of such Seller to consummate the transactions hereunder.

Section 5.2     Representations and Warranties Relating to the Company.

Clarke and SMS Inc., on a joint and several basis, hereby represent and warrant, for and on behalf of the Company, to and for the benefit of the Purchaser, as of the date hereof and as of the Closing Date (except to the extent any of such representations and warranties refer expressly to only one of such dates or refer specifically to another date, in which case such representations and warranties are made as of such date), as follows (except as set forth in the corresponding section of the Disclosure Letter or in any other section of the Disclosure Letter if the application of the disclosure to the first section is reasonably apparent):

Existence and Capitalization

(a)     Formation and Qualification.

(i)     The Company is duly formed, validly existing and in good standing (to the extent that the applicable jurisdiction recognizes the concept (or similar concept) of good standing) under the Laws of its jurisdiction of incorporation or formation and has the power to own, lease and operate its properties and carry on its business as now conducted.  The Company is duly qualified to do business and is in good standing in each jurisdiction in which the ownership of its assets or the nature of its businesses makes such qualification necessary, except where the failure to be so qualified or in good standing does not have a Material Adverse Effect.

(ii)     The Sellers have made available to the Purchaser true, correct and complete copies of the Organizational Documents of the Company in each case as amended through, and in full force and effect as of, the date of this Agreement.

(iii)     The copies of the minute books of the Company made available to the Purchaser contain true and complete records of minutes of all meetings of the members and managers of the Company and all actions by written consent without a meeting of the members and managers of the Company, and any committees thereof.

(b)     Capitalization.

(i)     The percentage of issued and outstanding Equity Interests owned in the Company as of the Closing is set forth in Section 5.2(b)(i) of the Disclosure Letter.  As of the Closing, the Purchased Equity Interests will be the only Equity Interests (or any securities convertible or exchangeable into, or exercisable for, Equity Interests) of the Company issued and outstanding.  All of the issued and outstanding Purchased Equity Interests are duly authorized,

validly issued, fully paid and non-assessable and are not subject to or issued in violation of any purchase option, call option, right of first refusal, right of first offer, pre-emptive rights, subscription right or any similar right created by statute, the Organizational Documents of the Company, or any agreement to which the Company is a party or by which it is bound.

(ii)     As of the date of this Agreement, the Purchased Equity Interests constitute the only securities, options, warrants, calls, rights, Contracts, commitments, agreements, instruments, arrangements, understandings, obligations or undertakings of any kind to which the Company is a party or by which it is bound obligating the Company to issue, deliver or sell, or cause to be issued, delivered or sold, additional Equity Interests, voting debt or other voting securities of the Company.  As of the Closing, there will be no outstanding or authorized options, convertible securities, warrants, subscriptions or other rights, agreements, arrangements or commitments of any character relating to the Company, or to the sale, disposition, transfer, issuance or voting of, or the granting of rights to acquire, any Equity Interest in the Company, or any securities convertible or exchangeable into or evidencing the right to subscribe for or purchase any Equity Interests in the Company.

(iii)    There are no obligations, contingent or otherwise, of the Company to repurchase, redeem or otherwise acquire any Equity Interests, or to purchase, redeem or otherwise acquire Equity Interests of any other Person.  There are no (a) voting trusts, irrevocable proxies or other Contracts or understandings to which any of Sellers is a party or is bound with respect to the voting or consent of any Equity Interests of the Company or (b) agreements to which the Company is a party relating to the registration, sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag along" rights) of any Equity Interest in the Company.

(iv)    The Company does not own and, as of the Closing, will not own, directly or indirectly, any Equity Interest of any Person or have any direct or indirect ownership interest in any business.

<u>General Matters Relating to the Company</u>

(c)     No Conflict.  Except as disclosed in <u>Section 5.2(c)</u> of the Disclosure Letter, the execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby:

(i)     do not constitute or result in a violation or breach of, or conflict with, or allow any Person to exercise any rights under, any of the terms or provisions of its Organizational Documents;

(ii)    do not constitute or result in a breach of, give rise to a right of termination, amendment, acceleration, cancellation or modification (including third party payment obligations) or require consent of or notice to a third party pursuant to any Material Contract, except any such items that individually or in the aggregate (A) has not, and would not reasonably be expected to be, material to the Company and (B) would not prevent the

performance of this Agreement or the Ancillary Agreements and/or the consummation of the transactions contemplated hereby or thereby;

        (iii)     do not result in a breach of, or cause the termination or revocation of, any Permit held by the Company that is material to the operation of the businesses of the Company; and

        (iv)     do not result in the imposition or creation of any Lien (other than Permitted Liens) on the assets of the Company or the violation of any Law, order, writ, injunction or decree by the Company, except any such items that individually or in the aggregate (A) have not been and would not reasonably be expected to be material to the Company and (B) would not prevent the performance of this Agreement or the Ancillary Agreements and/or the consummation of the transactions contemplated hereby or thereby.

        (d)     Required Consents.  Except for the CFIUS Notice and the DDTC Notification, no filing with, notice to, or Consent of, any Governmental Entity is required on the part of the Company as a condition to the lawful completion of the transactions contemplated hereby or by the Ancillary Agreements.

        (e)     Ordinary Course; No Material Adverse Effect; and Absence of Certain Developments.  Except as disclosed in <u>Section 5.2(e)</u> of the Disclosure Letter, (x) since the Reference Balance Sheet Date through the date hereof, the Company has conducted its business in the ordinary course, (y) since the Reference Balance Sheet Date, no event has occurred, and no circumstance exists which has had a Material Adverse Effect and (z) since the Reference Balance Sheet Date through the date hereof, the Company has not:

        (i)     acquired (by merger, consolidation, acquisition of equity interests, or otherwise), leased any assets in excess of USD25,000 individually or USD75,000 in the aggregate;

        (ii)     merged or consolidated with any other Person or acquired all or substantially all of the assets of any other Person or entered into any joint venture, partnership or similar venture with any other Person;

        (iii)     declared, set aside, or paid any distribution with respect to its equity interests or repurchase any of its equity interests;

        (iv)     (A) changed any material Tax or accounting methods, except as required by a change in GAAP or applicable Law, or except as it relates to non-cash accounting adjustments related to options accounting or adjustments related to the valuation of intangible assets which are completed annually at year-end, or (B) made, revoked or amended any material Tax election;

        (v)     placed any Lien on any of the Purchased Equity Interests or any assets that are material to the business of the Company (other than Permitted Liens); made any capital expenditures in excess of USD25,000 individually or USD75,000 in the aggregate or commitments therefore;

        (vi)     made any loan to any other Person;

(vii)    (A) granted any increases in the compensation of any of its directors, executive officers or employees or than in the ordinary course of business, (B) granted or increased any severance, change in control, termination or similar compensation or benefits payable to any director, officer or employee, (C) accelerated the time of payment or vesting of, or the lapsing of restrictions with respect to, or fund or otherwise secure the payment of, any compensation or benefits under any Employee Plan other than as required in accordance with the terms of each such Employee Plan, (D) entered into, terminated or materially amended any Employee Plan (or any plan, program, agreement, or arrangement that would constitute an Employee Plan if in effect on the date hereof);

(viii)    settled or compromised any material claim or Legal Proceeding whether brought by or against the Company; or

(ix)    allowed to lapse any material insurance policy.

(f)    Compliance with Laws.  Except as otherwise set forth in Section 5.2(f) of the Disclosure Letter, the Company is conducting, and since December 31, 2017 has conducted, its business and operations in compliance in all material respects with all applicable Laws.  Since January 1, 2017, except as otherwise set forth in Section 5.2(f) of the Disclosure Letter, the Company (i) has not received any written communication (or, to the Knowledge of the Sellers, any other communication) from any Governmental Entity or other Person alleging noncompliance with any applicable Law or (ii) has not made any mandatory or voluntary disclosure, with respect to any actual, potential or alleged violation in any material respect of any Law by any stockholder, partner, member or other equity holder, director, manager, officer, employee or agent or concerning actual or alleged fraud.  Since January 1, 2017, the Company has not, nor any officer, director, or employee of the Company or any of their respective agents or representatives is or has otherwise been in violation of any applicable anti-bribery, anti-corruption or similar Laws, including the U.S.  Foreign Corrupt Practices Act of 1977 (15 U.S.  Code Section 78dd-1, *et seq.*), except as would not reasonably be expected to be material to the Company.  Except as otherwise set forth in Section 5.2(f) of the Disclosure Letter, to the Knowledge of the Sellers, there is no investigation, proceeding or disciplinary action pending, or, to the Knowledge of the Sellers, threatened in writing, against the Company by a Governmental Entity.

(g)    Permits.  The Company has all material Permits which are necessary for it to conduct its business as presently conducted, and all such Permits are set forth in Section 5.2(g) of the Disclosure Letter.  Such Permits are valid, subsisting and are being fully complied with and there are no outstanding material defaults or breaches under them on the part of the Company.

(h)    Assets.

(i)    The Company owns its assets free and clear of all Liens, except for Permitted Liens.  Since the Reference Balance Sheet Date, the Company has not sold or otherwise disposed of any tangible assets that are material to the business of the Company.  No Person has any contractual right or privilege for the purchase or other acquisition from the Company of any tangible assets that are material to the business of the Company.

(ii)    The assets owned or leased by the Company, in the aggregate, constitute all of the assets (whether tangible or intangible, including Contracts, Permits and Intellectual

Property) necessary and sufficient for the Purchaser to conduct the business in all material respects as conducted by the Company prior to the Closing.

(i)     Real Property.  Except as disclosed in <u>Section 5.2(i)</u> of the Disclosure Letter, the Company is not the owner of, or subject to, any agreement, right of first refusal, right of first option or option to own, any real property or any interest in any real property.  The Company is not party to, or under any agreement to become a party to, any lease with respect to real property other than the Leases and Leased Properties described in <u>Section 5.2(i)</u> of the Disclosure Letter.  The Company is in sole possession of the Leased Property demised under such Lease.  Each of the Leases is in full force and effect, and there are no outstanding defaults or breaches under any of them (and no event has occurred under any of the Leases which, with the giving of notice or the passage of time, or both, would constitute a material default or breach under any of the Leases) on the part of the Company or, to the Knowledge of the Sellers, any other party.

(j)     Material Contracts.

(i)     <u>Section 5.2(j)</u> of the Disclosure Letter sets forth a list of all of the following contracts to which the Company is a party or by which it or any of its assets or properties are bound as of the date hereof (collectively, the "Material Contracts"):

(1)     each Contract (A) which contains covenants that prohibit the Company from competing in any business or with any Person in any geographic area, or from selling, supplying or distributing any material service or product, (B) which contains covenants that prohibit the Company from soliciting customers, (C) which contains covenants that prohibit the Company from soliciting employees in a way that would reasonably be expected to be material to the Company, other than commitments with contractors in the ordinary course of business not to solicit the employees of such contractors that are hired on a contract basis, (D) under which the Company (x) is obligated to purchase or otherwise obtain any product or service exclusively from a single Person, or (y) is obligated to sell any product or service exclusively to a single Person, (E) which contains any minimum level of service, or any similar commitment of the Company, or (F) which contains any other restriction that materially impairs the ability of the Company to freely conduct the business of the Company;

(2)     each customer Contract that provides for any "most favored nation" or other similar pricing practice;

(3)     each Contract required to be set forth on <u>Section 5.2(c)</u> of the Disclosure Letter;

(4)     each Contract with an Affiliate of the Company;

(5)     each Contract relating to the provisions of any material services by the Company;

(6)     each Contract under which the Company is either the lessor or lessee of tangible real or personal property which involves the expected annual rental or similar receipts or payments of more than USD25,000 in the current year or any subsequent year, including the Leases;

(7)      each guarantee of payment or collection by the Company of the Debts or obligations of customers, suppliers, officers, directors, employees, Affiliates or other third party (other than endorsements for the purpose of collection in the ordinary course of business);

(8)      each Contract providing for the sharing of any profits entered into by the Company;

(9)      each indenture, mortgage, credit agreement, promissory note, loan agreement, letter of credit or other Contract or instrument (A) under which the Company has incurred, or any instrument evidencing or securing, any Debt to any Person or (B) providing for the creation of any Lien upon any of the material assets of the Company;

(10)     each Contract with any labor union or association representing an employee of the Company;

(11)     each Contract for the employment of any director or officer and each Contract for any other Person on a full-time, part-time, consulting or other basis providing annual base salary in excess of USD50,000;

(12)     each Contract providing for the indemnification by the Company of any Person that would reasonably be expected to be material to the Company;

(13)     each Contract with a Key Customer; and

(14)     each other Contract that involves the expenditure of USD50,000 or more during any twelve month period or, if terminated, would result in a Material Adverse Effect.

(ii)      Each Material Contract is in full force and effect as of the date hereof and, with respect to the Company, is binding and enforceable against the Company, except as such enforceability may be limited by bankruptcy, insolvency, reorganization and other laws affecting creditors generally and by general principles of equity (whether in a proceeding at law or in equity). Except as set forth in Section 5.2(j)(A) of the Disclosure Letter, (A) neither the Company nor, to the Knowledge of the Sellers, any other party to such Material Contract is in material breach or material default of such Material Contract and (B) no event has occurred that with notice or lapse of time would reasonably be expected to constitute a material breach or material default under a Material Contract by the Company, or, to the Knowledge of the Sellers, by any other party to such Material Contract, or would permit the modification, premature termination, cancellation or acceleration of the performance of the obligation of such Material Contract by an other party thereto.  The Company has not received, since January 1, 2018 through the date hereof, (i) any notice in writing of claim of default under any Material Contract, (ii) except as set forth in Section 5.2(j) of the Disclosure Letter, any notice in writing of any intention to terminate, not renew any material Contract or (iii) any written challenge of the validity or enforceability of any Material Contract. On or prior to the date hereof, true and complete copies of each Material Contract have been made available to the Purchaser together with all material amendments, waivers or changes thereto.

(iii)     Since the date a Material Contract has been entered into, neither the Company nor the Sellers have received a notice in writing or has otherwise been informed in writing of changes in the terms or conditions of any such Material Contract, including with

LEGAL_1:50312829.17

62TJ-274876

respect to pricing, scope of service and exclusivity, which could have a materially negative effect on the revenues or profitability generated from such a Material Contract.

(iv)    To the Knowledge of the Sellers, no Key Customer has expressed any intention in writing to materially change the terms and volume upon which it conducts business with the Company, in such a way which would have, or could reasonably be expected to have, a material negative impact on the revenue and profit margins when compared to the results presented in the Financial Statements.

(k)    Intellectual Property.

(i)    Section 5.2(k)(i) of the Disclosure Letter lists (A) all Intellectual Property owned by the Company that has been registered with (or for which applications for registration have been filed and are currently pending) any Governmental Entity, together with, as applicable, the jurisdiction where the application or registration is located (or, for domain names, the applicable registrar), the registration or application number, and the filing, issuance, registration or grant date, as applicable (together with all other Intellectual Property owned by the Company that is material to the business of the Company, collectively the "Owned IP"); and (B) all material Contracts, leases and instruments pursuant to which (1) the Company has granted to any Person, any license, right or interest in or to any Owned IP, or (2) the Company has been granted any license (including software-as-a-service agreements but excluding licenses for commercial off-the-shelf software), right or interest in any Intellectual Property that is not Owned IP and is used by the Company in connection with, and is material to, the business of the Company as currently conducted (the "Intellectual Property Contracts").

(ii)    The Company has taken commercially reasonable measures to protect its rights in and to the Owned IP. Except as set forth in Section 5.2(k)(ii) of the Disclosure Letter, the Company is not a party to or bound by any Contract, decree, order or judgment or instrument that materially limits or impairs their ability to use, sell, transfer, assign, license or convey any Owned IP. The Owned IP that is registered with a Governmental Entity is not subject to any material unpaid fees (including maintenance fees) or taxes, and, to the Knowledge of the Sellers, was validly issued or registered, as applicable, and is subsisting. The Company is the exclusive beneficial and record (if applicable) owner of each item of Owned IP free and clear of all Liens other than Permitted Liens.

(iii)    To the Knowledge of the Sellers, the operation of the business as currently conducted by the Company does not infringe upon or otherwise violate the Intellectual Property of any Person.

(iv)    The Company has taken commercially reasonable measures to protect any material trade secrets or confidential information of third parties provided to or maintained, stored or transmitted by the Company with respect to which the Company is required to take such protective measures pursuant to a Contract or applicable Laws (such confidential information, the "Applicable Information"). To the Knowledge of the Sellers, no Person has gained unauthorized access to or misappropriated Applicable Information (including any Person having an obligation

to maintain such Applicable Information in confidence for the Company or by logical or physical intrusion of the information technology systems of the Company).

    (l)    Software.

    (i)    <u>Section 5.2(l)(i)</u> of the Disclosure Letter lists all Software (other than commercial off-the-shelf software) used by the Company in connection with, and that is material to, its business as currently conducted.

    (ii)    Except as set forth in <u>Section 5.2(l)(ii)</u> of the Disclosure Letter, the Company has not incorporated or used in the delivery of any product or service that is licensed, sold or distributed to customers by the Company any Software that is distributed under a "free" or "open source" license as defined by the Free Software Foundation (http://www.gnu.org/philosophy/free-sw.html) or Open Source Initiative (http://www.opensource.org/osd.html) (collectively, "Open Source Software") in any manner that would (i) require the disclosure or distribution in source code form of any Software that is Owned IP, (ii) require the licensing of any Software that is Owned IP for the purpose of making derivative works, (iii) impose any restriction on the consideration to be charged for the distribution of Software that is Owned IP, or (iv) create, or purport to create, obligations for the Company (or, following Closing, for the Purchaser) with respect to such Software or grant, or purport to grant, to any third party, any rights or immunities under such Software. The Company has not materially breached any license applicable to Open Source Software.

    (m)    Data Protection.  To the Knowledge of the Sellers: (i) there has been no material loss, Damage, or unauthorized access, use, modification, or breach of security of personally identifiable information maintained by or on behalf of the Company; and (ii) within the last three (3) years, no Person has commenced any Legal Proceeding with respect to loss, Damage, or unauthorized access, use, modification, or breach of security of personally identifiable information maintained by or on behalf of the Company, or with respect to any applicable data protection Laws, including to the extent applicable CAN-SPAM Act of 2003 (United States).

Financial Matters

    (n)    Financial Statements.

    (i)    Attached to <u>Section 5.2(n)</u> of the Disclosure Letter are the following financial statements (the "Financial Statements"): (A) the audited consolidated balance sheet of the Company as of December 31, 2017 (the "December 2017 Audited Balance Sheet") and December 31, 2016, and the related audited consolidated statements of operations, changes in shareholders' deficit and cash flows for the twelve (12) months ended December 31, 2017, and (B) the unaudited balance sheet of the Company as of the Reference Balance Sheet Date (the "Reference Balance Sheet "), and the related unaudited statement of operations for the five (5) months ended as of the Reference Balance Sheet Date (the financial statements described in this clause (B), the "Interim Financial Statements"). For the purposes of this Agreement, "Reference Balance Sheet Date" shall mean May 31, 2018.  The Financial Statements: (i) have been prepared

as of the dates and for the periods indicated in accordance with GAAP (except as set forth in Section 5.2(n) of the Disclosure Letter with respect to the Interim Financial Statements); (ii) have been derived from the books and records of the Company (which books and records have been maintained in material compliance with applicable accounting requirements); and (iii) present fairly in all material respects the financial condition and results of operations of the Company as of the times and for the periods referred to therein, subject in the case of the Interim Financial Statements, to (x) normal year-end adjustments and (y) the other adjustments set forth in Section 5.2(n) of the Disclosure Letter

(ii)     The Company's accounts receivable (A) arise from bona fide transactions in the ordinary course of business, (B) represent monies due for goods sold and delivered or services rendered in the ordinary course of business, and (C) to the Knowledge of the Company are not subject to refunds or other adjustments or to any defenses, or rights of set-off, other than in the ordinary course of business consistent with past practice (or as reserved against on the Financial Statements).

(iii)     The Company maintains proper and adequate internal accounting controls which provide reasonable assurance that: transactions are (A) executed with management's authorization and (B) recorded as necessary to permit preparation of the Financial Statements and to maintain accountability for the assets of the Company.

(o)     No Liabilities.

(i)     Except as disclosed in Section 5.2(o) of the Disclosure Letter, the Company does not have any liabilities of the type required to be reflected as liabilities on a balance sheet prepared in accordance with GAAP, except for (i) liabilities reflected or reserved against in the Reference Balance Sheet, (ii) current liabilities incurred since the Reference Balance Sheet Date, which liabilities are in the ordinary course of the business of the Company, (iii) the matters disclosed in or arising out of matters set forth on the Disclosure Letter, (iv) executory liabilities under Contracts,  and (v) liabilities and obligations incurred in connection with this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby.

(p)     Debt, Guarantees.

(i)     Since the Reference Balance Sheet Date, the Company has not incurred any Debt or increased the amount of Debt owing by it or made any loan or advance to any other Person, or assumed, guaranteed or otherwise become liable with respect to the liabilities or obligations of any Person, except in the ordinary course of the business.

(ii)     As of the Closing, after giving effect to the transactions contemplated by this Agreement and the Ancillary Agreements, (A) none of the Purchased Equity Interests will be subject to any Liens or adverse claims and (B) none of the assets of the Company will be subject to any Liens or adverse claims, other than Permitted Liens, in each case arising from the actions of the Company or Sellers.

(iii)     Each Contract that is a loan, guarantee of Debt or credit agreement, note, bond, mortgage, indenture or other binding commitment for Debt of the Company for borrowed money is set forth in <u>Section 5.2(p)(iii)</u> of the Disclosure Letter.

(q)     Bank Accounts.  <u>Section 5.2(q)</u> of the Disclosure Letter is a correct and complete list showing the name of each bank with which the Company has an account or safe deposit box and the names of all Persons authorized to draw on the account or to have access to the safety deposit box.

<u>Particular Matters Relating to the Company</u>

(r)     Environmental Matters.

(i)     The Company is in compliance in all material respects with all applicable Environmental Laws.  To the Knowledge of the Sellers, there are no contaminants located in the ground or in groundwater under any of the Leased Properties, except for contaminants in concentrations which (A) do not exceed applicable cleanup or response thresholds or (B) are not material to the Company.

(ii)     The Company has not been required by any Governmental Entity to alter any of the Leased Properties in a material way in order to be in compliance with Environmental Laws, or to perform any environmental closure, decommissioning, rehabilitation, restoration or post-remedial investigations, on, about, or in connection with any such property.

(iii)     <u>Section 5.2(r)</u> of the Disclosure Letter lists all reports and documents relating to the environmental matters affecting the business of the Company or any of the Leased Properties which are in the possession or under the control of the Company. Copies of all such reports and documents have been provided to the Purchaser.

(s)     Employees.

(i)     There is no material unfair labor practice, complaint, grievance, arbitration proceeding or other similarly material Legal Proceeding in progress or, to the Knowledge of the Sellers, threatened against the Company.  During the last two (2) years, the Company has not effectuated a "plant closing" or a "mass layoff" (as such terms are defined in the federal Worker Adjustment and Retraining Notification Act).

(ii)     (A)     The Company is not now and has never been a party to or subject to or affected by any collective bargaining agreements which could affect the Employees or the business currently being carried on by the Company, (B) no trade union, council of trade unions, employee bargaining agency or affiliated bargaining agent holds bargaining rights with respect to any of the Employees of the Company by way of certification, interim certification, voluntary recognition, or successor rights, or through any related or associated activities or businesses under common control of direction of the Company, (C) to the Knowledge of the Sellers, no trade union, council of trade unions, employee bargaining agency or affiliated bargaining agent has applied or threatened to apply to be certified as the bargaining agent of any Employees of the Company and (D) to the Knowledge of the Sellers there are no ongoing union

-35-

certification drives or pending proceedings for certifying a union to represent Employees of or contractors to the Company.

(iii)     Section 5.2(s)(iii) of the Disclosure Letter contains as of the date of this Agreement (A) a correct and complete list of all the Employees of the Company whether actively at work or not, showing without names or employee numbers, their salaries, wage rates, bonus eligibility, positions, status as full-time or part-time employees, length of service vacation pay and entitlements, unpaid leave and benefits to which such Employees are entitled, including any benefits or payments which will arise as a result of the consummation of the Agreement and, for those Employees off on a leave of absence on the date hereof, the type of leave they are off on, any benefits to which such Employees are entitled to while off on leave and their anticipated return to work date, (B) a list of all retired or former Employees of the Company who are entitled to benefits (including salary continuation benefits) from the Company containing, without names or employee numbers, a description of the nature of such benefits, (C) a correct and complete list of all contractors that are providing services to the Company setting out the names of all contractors of the Company and whether the contractors are providing services pursuant to a written agreement and (D) a correct and complete list of the retention payments included in the Transaction Expenses set forth on the Estimated Closing Statement and the Employee or other Person to whom each is applicable.

(iv)     Except as disclosed in Section 5.2(s)(iv) of the Disclosure Letter, (A) no Employee has any agreement as to the length of notice or severance payment required to terminate his or her employment, other than arising from applicable Law for the employment of an employee without an agreement as to notice and severance, (B) to the Knowledge of Company, the Company is in compliance with all applicable pay equity legislation in all material respects, and (C) since the Reference Balance Sheet Date, the Company has not materially increased the compensation paid or payable to any Employees.

(v)     All inspection reports under applicable legislation dealing with the health or safety of Employees of the Company received by the Company over the past three (3) years have been provided to the Purchaser and are listed in Section 5.2(s)(v) of the Disclosure Letter. There are no outstanding inspection orders and no pending or, to the Knowledge of Sellers, threatened charges made under any occupational health and safety Laws relating to the Company. There have been no fatal or critical accidents within the last three (3) years which would reasonably be expected to lead to charges under applicable occupational health and safety Laws.

(vi)     The Company has provided the Purchaser with all written notices of assessment, provisional assessment, reassessment, supplementary assessment, penalty assessment or increased assessment (collectively, "Workers' Compensation Assessments") or any other written communications related thereto which the Company has received from any workers' compensation or workplace safety and insurance board or similar authorities in each case within the past two (2) years and there are no Workers' Compensation Assessments which are unpaid on the date hereof or which will be unpaid at the Closing Date.  To the Knowledge of Company, the Company's accident cost experience is such that there are no pending or possible Workers' Compensation Assessments and there are no claims or potential claims which may adversely affect the Company's accident cost experience.

(vii)      Section 5.2(s)(vii) of the Disclosure Letter sets out a true, correct and complete list, as of the date of this Agreement, of all Employees of the Company who since January 1, 2018 have given notice, verbally or in writing, of their intent to retire or otherwise resign their employment and the amount of the Company's liabilities in respect of each such Employee.

(t)      Employee Plans.

(i)      Section 5.2(t)(i) of the Disclosure Letter lists all material written Employee Plans.  The Company has made available to the Purchaser (or will make available within seven (7) days following the date hereof) a true and complete copy of each material written Employee Plan, including any amendments thereto (together with any prior amendments and past versions of such documents that continue to be relevant with respect to any employees or former employees of the Company), and a true and complete copy of the following items (in each case, only if applicable) (A) each trust or other funding arrangement, (B) each summary plan description or equivalent and summary of material modifications, (C) the three most recently filed annual reports on the IRS form 5500; (D) the most recent financial statements and actuarial or other valuation reports prepared with respect thereto, and (E) the most recently received IRS determination or opinion letter.

(ii)      The Company does not sponsor or participate in (or has not in the past six (6) years sponsored or participated in) a "defined benefit plan" as defined in Section 3(35) of ERISA, including any "pension plan" within the meaning of Section 3(2) of ERISA that is subject to Section 412 of the Code, or contribute to (or has in the past six (6) years contributed to) a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA.

(iii)      All Employee Plans have been in all material respects established, registered, and administered in compliance with all Laws, the terms of the Employee Plan and any associated funding arrangement.

(iv)      Each Employee Plan that is intended to be tax-qualified under Section 401(a) of the Code has received a determination or opinion letter from the Internal Revenue Service that the form of such plan is tax-qualified, and, to the Knowledge of the Sellers, no event has occurred that is reasonably likely to result in the disqualification of such plan thereunder.

(v)      The Company has made all contributions and paid all premiums in respect of each Employee Plan in a timely fashion in accordance with the terms of each Employee Plan and applicable Laws.

(vi)      The Company does not have any Contracts, plans or commitments, whether legally binding or not, to create any additional Employee Plan, or any plan, agreement or arrangement that would be an Employee Plan if adopted, or to modify any existing material Employee Plan, except as required by applicable Law.  To the Knowledge of the Sellers, no oral or written commitments have been made by the Company that would restrict the Company or, after the consummation of the transactions contemplated hereby, the Purchaser, from amending or

-37-

terminating an Employee Plan in accordance with its terms and applicable Law, subject to the Laws of constructive dismissal.

(vii)    None of the Employee Plans nor any of their respective associated funding arrangements requires or permits a retroactive increase in premiums or payments.

(viii)    Each Employee Plan that is a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1) of the Code) has been maintained and operated since January 1, 2005 in good faith compliance with Section 409A of the Code and all applicable Internal Revenue Service guidance promulgated thereunder so as to avoid any Tax, penalty or interest under Section 409A of the Code and, as to any such plan in existence prior to January 1, 2005, has not been "materially modified" (within the meaning of Internal Revenue Service Notice 2005-1) at any time after October 3, 2004 or has been amended in a manner that conforms with the requirements of Section 409A of the Code, and (B) since January 1, 2009, been in documentary and operational compliance with Section 409A of the Code and all applicable Internal Revenue Service guidance promulgated thereunder, except where such noncompliance or non-exemption is not reasonably expected to result in material liability to the Company or its respective Employees.

(ix)    Except as set forth in Section 5.2(t)(ix) of the Disclosure Letter, the consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (A) entitle any current or former employee or officer of the Company to severance pay, unemployment compensation or any other payment under any Employee Plan, except as expressly provided in this Agreement, (B) accelerate the time of payment or vesting, or increase the amount of compensation due any such employee or officer under any Employee Plan, or (C) require any funding or securing of benefits under any Employee Plan.    None of the Employee Plans in effect immediately prior to the Closing will result individually or in the aggregate (including as a result of this Agreement or the transactions contemplated hereby) in the payment to any Employee of the Company of any "excess parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state, local or non-US law), which will cause the loss of any deduction of Taxes for which the Parties are otherwise eligible.

(u)    Insurance.    Section 5.2(u) of the Disclosure Letter lists the insurance policies which are maintained by or on behalf of the Company setting out, in respect of each policy, the type of policy, the name of insurer, the coverage allowance, the expiration date, the annual premium and any pending claims (collectively, the "Insurance Policies").    Each Insurance Policy is in full force and effect and the Company is not in material default with respect to its obligations under such insurance policies or has failed to give any notice or to present any material claim under such insurance policy in a due and timely fashion.    To the Knowledge of the Sellers, there is no (a) threatened in writing termination of or threatened in writing material premium increase with respect to, any of such Insurance Policies, other than increases in connection with the Company's annual renewal process and (b) material claim pending regarding the Company under any of such policies as to which coverage has been denied or disputed by the underwriters of such policies.

(v)     Litigation.  Except as described in <u>Section 5.2(v)</u> of the Disclosure Letter, (i) there are no, and since January 1, 2016 there have not been any, Legal Proceedings pending, or, to the Knowledge of the Sellers, threatened, by or against the Company which, if determined adversely to any of them, individually or in the aggregate, would have a material impact on the Company or which would prohibit, restrict or seek to enjoin the transactions contemplated hereby and (ii) the Company is not subject to any judgment, order or decree of any court or other Government Entity.

(w)     Taxes.

(i)     The Company has, in accordance with applicable Law, withheld, reported and remitted to the appropriate Governmental Entity within the time prescribed under applicable Law all Taxes required to be withheld from any payment made to any employee, independent contractor or any other third party, including sales, transfer, use customs, goods and services and other Taxes which are due and payable by them.

(ii)     The Company has made full and adequate provision in the books and records for all Taxes which are not yet due and payable, but which relate to periods ending prior to the date hereof. The Company has filed or caused to be filed all income and other Tax Returns which are required to be filed by it and all such Tax Returns are true, correct, and complete in all material respects and has delivered to Purchaser all such Tax Returns for taxable periods ended on or after December 31, 2014.  The Company has paid all Taxes (whether or not such Taxes are shown as due and payable on any Tax Return) and such payments have been made within the time required by applicable Law (after giving effect to any valid extensions of time in which to make such filings).  There are no outstanding agreements, arrangements, waivers or objections extending the statutory period or providing for an extension of time with respect to the assessment or reassessment of any Taxes or the filing of any Tax Return by, or any payment of Taxes by, the Company and the Company has not requested such an extension.

(iii)     There are no Liens on any of the assets of the Company relating or attributable to Taxes other than Permitted Liens.

(iv)     There are no ongoing, pending or threatened audits, investigations, disputes, inquiries, enquiries, examinations or other administrative or Legal Proceedings with respect to the liability of the Company for any Taxes, and the Company has not received any written notice from, any Governmental Entity with respect to the liability of Company for any Taxes (including Taxing jurisdictions where the Company has not filed Tax Returns).

(v)     From the date of its formation until April 30, 2013, the Company was at all times validly treated as an S corporation within the meaning of Section 1361(a) of the Code. SMS Inc. filed a Qualified Subchapter S Subsidiary Election with respect to the Company on IRS Form 8869, effective May 1, 2013, and from that day until May 12, 2014, the Company was treated as a qualified subchapter S subsidiary (within the meaning of Section 1361(b)(3) of the Code) until it was converted into a limited liability company under state law conversion statutes effective as of May 12, 2014, at which time it ceased to be a qualified subchapter S subsidiary but

continued to be treated as a disregarded entity for US federal income tax purposes until May 13, 2014.

(vi)     For all taxable years (or portions thereof) since May 13, 2014, the Company has been treated as a partnership for US federal income Tax purposes and for purposes of the Tax Law of any US state in which the Company has a taxable presence or other nexus sufficient to cause income of the Company to be subject to income, franchise, gross receipts, or comparable Tax in such states. The Company has never made an entity classification election pursuant to Treasury Regulation §301.7701-3(c).

(vii)    The Company is not party to or bound by any Tax allocation or sharing agreement. The Company is not a party to any agreement or arrangement with any Governmental Entity regarding any tax holidays or tax incentives that will be binding on or could affect the Tax liability of the Company in a taxable period ending after the Closing Date.

(viii)   The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of: (i) an adjustment under Section 481(a) of the Code (or any corresponding or similar provision of state, local or foreign Law) by reason of a change in method of accounting made prior to the Closing Date; (ii) a "closing agreement" described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Law) executed on or prior to the Closing Date; (iii) an installment sale or open transaction disposition made on or prior to the Closing Date; (iv) an election under Section 108(i) of the Code made on or prior to the Closing Date; (v) any prepaid amount received on or prior to the Closing Date; or (vi) a reserve, deduction, election or Tax credit.

(ix)     The Company (A) has not been included in any "unitary" or "combined" income Tax Return, (B) has not been a Seller of an affiliated group filing a consolidated US federal income Tax Return or (C) has no liability for the Taxes of any Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local, or foreign Law), as a transferee or successor, by Contract or otherwise.

(x)      The Company has not engaged in a trade or business, had a permanent establishment (within the meaning of an applicable Tax treaty or convention between the US and such non-U.S. country), or otherwise been subject to taxation in any country other than the US.

(xi)     The Company has not engaged in any "reportable transaction" within the meaning of Section 1.6011-4 of the Treasury Regulations (or any similar provision of state, local or foreign Law).

(xii)    No claim has been made by any Governmental Entity in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation in that jurisdiction.

(xiii)   None of the Sellers or the Company have made a request for an advance tax ruling, request for technical advice, request for a change of any method of accounting, or any

-40-

other similar request that is in progress or pending with any Governmental Entity with respect to Taxes.

        (xiv)    Since the Reference Balance Sheet Date through the date hereof, the Company has not (A) changed any Tax or accounting methods, except as required by a change in applicable Law or (B) revoked or amended any Tax election.

        (xv)    The unpaid Taxes of the Company (A) did not, as of the Reference Balance Sheet Date, exceed the reserve for Tax liability set forth on the face of the Reference Balance Sheet and (B) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company in filing its Tax Returns. Since the Reference Balance Sheet Date, the Company has not incurred any liability for Taxes arising from extraordinary gains or losses, as that term is used in GAAP, outside of the ordinary course of business consistent with past custom and practice.

        (xvi)    The Company is not a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of any amount that will not be fully deductible as a result of Section 162(m) of the Code (or any corresponding provision of state, local, or non-US Tax law)

        (xvii)    The Company has never held or been the beneficial owner, directly or indirectly, of a United States real property interest within the meaning of Section 897(c)(1) of the Code.

        (xviii)    The Purchased Equity Interests constitute all of the equity interests in the Company for U.S. federal income tax purposes.

        (x)    Customers. Section 5.2(x)(i)(A) of the Disclosure Letter sets forth a list of the five (5) most significant customers of the Company (the "Key Customers"), based on invoice billings during the twenty-four (24) month period ended December 31, 2017. Section 5.2(x)(i)(B) of the Disclosure Letter sets forth, without identifying any Key Customer by name, a table containing the billings for the twenty-four (24) months ended December 31, 2017 for such Key Customer, the expiration date of the Contract with such Key Customer.

        (y)    Affiliated Transactions.  Except as set forth in Section 5.2(y) of the Disclosure Letter, no officer, director, partner, Affiliate of the Company, the Sellers, or any individual in such officer's or director's immediate family or any Person controlled by such officer, director or security holder is a party to any Contract, or has any arrangement, with the Company (other than an employment Contract) or has any interest in any assets, property or rights (tangible or intangible) used by the Company, or, to the Knowledge of the Sellers, is an officer, director, employee or consultant of any Person that is a competitor, lessor, lessee, customer, vendor, reseller or distributor of the Company.

        (z)    Brokers.  No broker, agent, other intermediary, or Person is entitled to any finder's fee, brokerage commission or similar remuneration, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of any of the Sellers or any of their respective Affiliates.

ARTICLE 6

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Section 6.1        Representations and Warranties of Purchaser.

The Purchaser hereby represents and warrants, to and for the benefit of the Sellers, as of the date hereof and as of the Closing Date (except to the extent any of such representations and warranties refer expressly to only one of such dates or refer specifically to another date, in which case such representations and warranties are made as of such date), as follows:

(a)        Execution and Delivery; Valid and Binding Agreements.  This Agreement and each other agreement, document or instrument referred to in or contemplated by this Agreement to be executed by the Purchaser, including the Ancillary Agreements, have been, or as of the Closing, will be, duly executed and delivered by the Purchaser, and assuming that this Agreement and any other agreement, document or instrument referred to in or contemplated by this Agreement, including the Ancillary Agreements, have been duly executed and delivered by the other parties hereto and thereto, constitute, or, when executed by the other parties hereto and thereto, will constitute, valid and binding agreements of the Purchaser, enforceable against the Purchaser in accordance with their terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other Laws from time to time in effect relating to creditors' rights and remedies generally and general principles of equity.

(b)        Organization.  Purchaser is duly formed, validly existing and in good standing (to the extent that the applicable jurisdiction recognizes the concept (or similar concept) of good standing) under the laws of the jurisdiction of their incorporation.  All necessary actions, conditions and things have been taken, fulfilled and done in order to enable Purchaser to enter into, perform and comply with its obligations hereunder.

(c)        Authorization.  The Purchaser has the absolute and unrestricted right, power, capacity and authority to perform their obligations under this Agreement and under any other agreement, document or instrument referred to in, or contemplated by, this Agreement, in each case to which the Purchaser are or will be a party and to perform their obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  All actions or proceedings to be taken by or on the part of the Purchaser to authorize and permit the execution and delivery by the Purchaser of this Agreement, the Ancillary Agreements and the instruments required to be executed and delivered by them pursuant hereto, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the transactions contemplated hereby and thereby (including all right, power, capacity and authority to pay the Purchase Price as provided for by this Agreement) has been duly authorized by all necessary action on the part of the Purchaser.

(d)        Non-Contravention; No Consents or Approvals.  Neither: (1) the execution, delivery or performance of this Agreement or any of the other agreements, documents or instruments referred to in this Agreement; nor (2) any of the transactions contemplated by this Agreement or any such other agreement, document or instrument, will (with or without notice or lapse of time):

-42-

(i)      contravene, conflict with or result in a violation of: (i) any of the provisions of any Organizational Documents of the Purchaser; or (ii) any resolution adopted by the equity holders or board of directors (or similar body) of Purchaser;

(ii)     contravene, conflict with or result in a violation of, or give any Governmental Entity or other Person the right to challenge any of the transactions contemplated by this Agreement or to exercise any remedy or obtain any relief under, any Law a or any order, writ, inunction, judgment or decree to which the Purchaser is subject; or

(iii)    materially contravene, conflict with or result in a violation or breach of, or result in a default under, any provision of any contract to which Purchaser is a party or by which the Purchaser is bound.

Except for the CFIUS Approval and the DDTC Notice, the Purchaser is not (and will not be) required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with: (i) the performance of this Agreement or any of the other agreements, documents or instruments referred to in this Agreement including the Ancillary Agreements; or (ii) any of the transactions contemplated by this Agreement or by any of the other agreements, documents or instruments referred to in this Agreement including the Ancillary Agreements.

(e)      Due Diligence by the Purchaser.  The Purchaser acknowledges that it has conducted to its satisfaction an independent investigation of the business, operations, assets, liabilities and financial condition of the Company, and in making the determination to proceed with the transactions contemplated hereby, has relied solely on the results of its own independent investigation and the representations and warranties in Article 5. Purchaser acknowledges that none of the Sellers, the Company, any of their Affiliates or any representatives of any of the foregoing has made (and Purchaser and its Affiliates hereby disclaim reliance on) any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company or its business or asset, except as expressly set forth in Article 5 and qualified by the Disclosure Letter. Notwithstanding anything to the contrary of this Section 6.1(e), the foregoing shall not limit any remedies available to the Purchaser in connection with a breach of any provision of this Agreement.

(f)      Purchase Price.  At the Closing, the Purchaser shall have all funds and means on hand necessary to pay the Purchase Price and consummate the transactions contemplated hereby as of the Closing.  Purchaser acknowledges that the obligations of Purchaser under this Agreement are not contingent upon or subject to any conditions regarding Purchaser's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the transactions contemplated hereby.

(g)      Brokers.  No broker, agent, other intermediary, or Person is entitled to any fee, commission or other remuneration, including finder's fees, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser or any of its Affiliates.

(h)      No Legal Proceedings.  There is no pending Legal Proceeding against the Purchaser, and, to the Purchaser's knowledge, no Person has threatened to commence any such Legal Proceeding, in each case that challenges, or that, individually or in the aggregate, has had or would be

reasonably expected to have the effect of preventing, materially delaying or making illegal, the entry into, performance of, compliance with and enforcement of any of the material obligations of the Purchaser under this Agreement or the ability of the Purchaser to consummate the transactions contemplated hereby.

(i)     Investment Representations.

(i)     Purchaser is acquiring the Purchased Equity Interests solely for investment purposes and not with a view to, or for sale in connection with, any distribution thereof in violation of any Law (including the Securities Act of 1933 (the "Securities Act")), and Purchaser is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

(ii)     Purchaser acknowledges the Purchased Equity Interests are not registered under the Securities Act or any other applicable securities or "blue-sky" Laws, and that the Purchased Equity Interests may not be transferred or sold except pursuant to the registration provisions of such Securities Act or pursuant to an applicable exemption therefrom and pursuant to any other applicable securities or "blue-sky" Laws.

(iii)     There are no existing Contracts pursuant to which Purchaser will divest or otherwise dispose of the Purchased Equity Interests or the assets of or equity in, or by any other manner, the Company.

(j)     Restriction on Business Activities.  To the Knowledge of the Purchaser, there is no agreement, understanding, judgment, injunction, order or decree binding upon Purchaser or any Affiliate thereof which has or could reasonably be expected to have the effect of prohibiting or impairing any business practice of the  Company as contemplated by this Agreement or the conduct of business by the Company as currently conducted or as proposed to be conducted by the Parties following the Closing as contemplated by this Agreement.

(k)     Financial Statements.  The Purchaser has made available to SMS Inc. the following financial statements (the "Purchaser Financial Statements") the audited consolidated balance sheet of Trigo Holding S.A.S., the ultimate parent company of the Purchaser (collectively with the subsidiaries, "Trigo Holding "), as of December 31, 2017, and the related audited consolidated statements of income, members or shareholders equity and cash flows for the nineteen (19) months ended December 31, 2017.  The Purchaser Financial Statements: (i) have been prepared as of the dates and for the periods indicated in accordance with IFRS; (ii) have been derived from the books and records of Trigo Holding (which books and records have been maintained in material compliance with applicable accounting requirements); and (iii) present fairly in all material respects the financial condition and results of operations of Trigo Holding as of the times and for the periods referred to therein. Since December 31, 2017, no event has occurred, and circumstance exists, which has had a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or results of operations of the Purchaser.

ARTICLE 7

COVENANTS

Section 7.1        Access to Information.

During the Interim Period, Clarke shall provide the Purchaser with (i) information as to the business of the Company and its operations as reasonably requested by the Purchaser and to the extent such information is readily available or could be obtained without any material interference with the operations of the Company, and (ii) with Clarke's consent, not to be unreasonably withheld, reasonable access, during normal business hours and upon reasonable notice, to senior management, legal advisors and accountants, offices, properties, books and records, Contracts of the Business of the Company in connection with the transition of ownership of the Company to the Purchaser to the extent such access does not materially interfere with the operations of the Company.

Section 7.2        Conduct of Business Pending the Closing.

(a)        During the Interim Period, Clarke shall cause the Company to conduct its business in the ordinary course, and to use commercially reasonable efforts to preserve intact, maintain and protect its business and assets, retain the services of their current officers and senior employees, except if the Purchaser shall have consented in writing (which consent shall not be unreasonably withheld, conditioned or delayed).  Without limiting the generality of the foregoing, during the Interim Period, except (v) in connection with the Property Transfer and the Irvine Lease, (w) as detailed on Section 7.2 of the Disclosure Letter, (x) as otherwise expressly contemplated by this Agreement or (y) as required by any applicable Law, or (z) as consented to by the Purchaser, (which consent shall not be unreasonably withheld, conditioned or delayed), Clarke shall not, and shall cause the Company not to:

(i)        acquire (including by acquisition of equity interests or otherwise), sell, dispose of or lease any assets in excess of USD25,000 individually or USD50,000;

(ii)        fail to maintain its existence or merge or consolidate with any other Person or acquire all or substantially all of the assets of any other Person or enter into any joint venture, partnership or similar venture with any other Person;

(iii)        liquidate, dissolve, reorganize, recapitalize or otherwise wind up the Company;

(iv)        grant, issue, sell, or otherwise dispose of any of its Equity Interests, including granting options, warrants or other rights to acquire such Equity Interests or making any redemption or purchase of any of its Equity Interests;

(v)        declare, set aside, or pay any distribution with respect to its Equity Interests or repurchase any of its Equity Interests (other than tax distributions);

(vi)        amend or modify its Organizational Documents;

(vii)        create, incur, assume, guarantee or otherwise become liable with respect to any Debt in a way which would reasonably be expected to adversely affect title to any of the Purchased Equity Interests;

(viii)    settle or compromise any pending or threatened Legal Proceeding, whether brought by or against the Company;

(ix)    enter into, assign, terminate, amend or waive any material term under, any Material Contract or any other Contract that would be a Material Contract if it had been entered into on or prior to the date of this Agreement or that is entered into with a customer other than in the ordinary course of business and on terms and conditions which are consistent with past practice, in particular with regards to the expected profit margins to be generated from any such contract;

(x)    (A) change any material Tax or accounting methods, except as required by a change in GAAP or applicable Law and with advance notice to the Purchaser, except as it relates to non cash accounting adjustments related to options accounting, (B) make, revoke or amend any material Tax election, (C) enter into any closing agreement, (D) settle or compromise any Tax liability, (E) make or surrender any right to claim a refund of Taxes, (F) consent to any waiver or extension of the statute of limitations applicable to any Taxes or any Tax Return or (G) amend any Tax Returns;

(xi)    manage the payment of accounts payable or the collection of any notes or accounts receivable in a manner that is materially inconsistent with the past practices of the Company, or make any other material changes to any existing cash management, underwriting, inventory management or credit, collection or payment policies, customer deposits, procedures or practices with respect to billing, invoicing, accounts receivable or accounts payable;

(xii)    place any Lien on any of the Purchased Equity Interests or any assets that are material to the business of the Company other than Permitted Liens;

(xiii)    (A) grant any increases in the compensation of any of its directors, executive officers or employees, except as required under Employee Plans (as in existence on the date hereof) or for increases in the compensation of employees with total annual base salary not in excess of USD50,000 in the ordinary course of business consistent with past practice; or, except as required by this Agreement, as required by applicable Law, or as required under Employee Plans (as in existence on the date hereof), (B) grant or increase any severance, change in control, termination or similar compensation or benefits payable to any director, officer or employee, (C) accelerate the time of payment or vesting of, or the lapsing of restrictions with respect to, or fund or otherwise secure the payment of, any compensation or benefits under any Employee Plan other than as required in accordance with the terms of each such Employee Plan, (D) enter into, terminate or materially amend any Employee Plan (or any plan, program, agreement, or arrangement that would constitute an Employee Plan if in effect on the date hereof), or (E) hire any person to be employed by, or engage any person to be independent contractor of, the Company or terminate the employment of any employee or independent contractor of the Company, provided, however, that (i) any employee or independent contractor of the Company may be terminated in the ordinary course of business or as a result of willful misconduct, gross negligence or Fraud and for acts or omissions that could otherwise adversely impact the reputation of the Company, or (ii) any employee or independent contractor of the Company may be hired in the ordinary course of business on terms and conditions consistent with past practice;

(xiv)    make any capital expenditures except in the ordinary course of business;

(xv)    make any investment in, or any loan to, any other Person, except in the ordinary course of business;

-46-

(xvi)    make any loan to or enter into any material transaction with any of its directors or officers;

(xvii)    enter into a new line of business from the business currently conducted by the Company and business currently proposed to be conducted by the Company;

(xviii)    allow to lapse any material insurance policy; or

(xix)    agree, resolve or commit to do any of the foregoing.

Section 7.3    Expenses.

Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each Party will pay its own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of this Agreement and the transactions contemplated hereby.

Section 7.4    Tax Matters.

(a)    Tax Returns.

(i)    SMS Inc. shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company that relate solely to Pre-Closing Taxable Periods and that are required to be filed after the Closing Date ("Seller Tax Returns" ).  Such SMS Inc. Tax Returns shall be prepared in a manner consistent with past practice, unless otherwise required by applicable Law.  To the maximum extent permitted by applicable Law (including through the potential use of the safe harbor procedures of IRS Revenue Procedure 2011-29 with respect to any applicable success-based fees), SMS Inc. and the Purchaser agree to take the position that any deductions attributable to the payment or accrual of the Transaction Expenses shall be treated as attributable to any Pre-Closing Taxable Period (or, if applicable, the portion of a Straddle Taxable Period ending on the Closing Date) and shall not be treated or reported as income Tax deductions for a taxable period beginning after the Closing Date.  SMS Inc. shall provide the Purchaser with a draft of any Seller Tax Return at least twenty (20) days prior to the date that such return is required to be filed with the applicable Taxing authority and shall consider in good faith and incorporate all reasonable comments received from the Purchaser and the Purchaser shall timely file any such Tax Return after such reasonable comments have been incorporated.

(ii)    The Purchaser shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company that are filed after the Closing Date (other than Seller Tax Returns).  Any such Tax Returns that cover a taxable period beginning before the Closing Date and ending after the Closing Date (a "Straddle Taxable Period" ) shall be prepared in a manner consistent with past practice, unless otherwise required by applicable Law.  The Purchaser shall permit SMS Inc. to review and comment on each such Tax Return described in the preceding sentence prior to filing and shall consider in good faith and incorporate all reasonable comments received from SMS Inc.

(b)    SMS Inc. shall be responsible for and shall indemnify Purchaser and its Affiliates against any and all Damages resulting from (i) Taxes with respect to the Company that are attributable to a Pre-Closing Taxable Period or to that portion of a Straddle Taxable Period that ends on (and including) the Closing Date, in each case to the extent that such Tax exceeds the amount (if any) reflected as a liability for such Tax in the balance sheet contained in the Final Post-Closing Statement and that is taken

into account in determining Purchase Price, and (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company (or any predecessor of the Company) is or was a member on or prior to the Closing Date, including pursuant to Section 1.1502-6 of the Treasury Regulations or any analogous or similar state, local, or non-US law or regulation.  Within five (5) Business Days prior to the due date for the payment of any such Tax described above in this paragraph, if the amount of such Tax for which SMS Inc. is responsible exceeds the amount reflected as a current liability for such Tax in the balance sheet contained in the Final Post-Closing Statement and that is taken into account in determining Purchase Price, then SMS Inc. shall pay to the Purchaser an amount equal to such excess. With respect to any Straddle Taxable Period, the amount of Taxes allocable to the portion of the Straddle Taxable Period ending on the Closing Date shall be deemed to be: (i) in the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of calendar days in the Straddle Taxable Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Taxable Period and (ii) in the case of Taxes not described in clause (i) (such as franchise Taxes, Taxes that are based upon or related to income or receipts (however denominated), based upon occupancy or imposed in connection with any sale or other transfer or assignment of any type of property), the amount of any such Taxes shall be determined as if such taxable period ended as of the close of business on the Closing Date.

(c)       From and after the Closing Date, SMS Inc., on the one hand, and the Purchaser, on the other hand, shall give written notice within thirty (30) days to the other Party of its receipt of any notice of deficiency, proposed adjustment, action, arbitration, assessment, audit or proposed audit, claim, controversy, dispute, examination, hearing, inquiry, or administrative or judicial proceeding, or other Legal Proceeding relating to Taxes or Tax Returns of the Company (each, a "Tax Claim" ) which could reasonably be expected to affect the liability of such other Party for Taxes pursuant to this Agreement; provided that the failure or delay to give such notice shall not relieve the other party of any of its obligations under this Agreement, except to the extent that the other Party is actually and materially prejudiced thereby.  The Purchaser shall have the right, at its sole cost and expense, to initiate and control the prosecution, settlement, compromise or resolution of any Tax Claim; provided, however, that if the resolution of any Tax Claim relating primarily to a Pre-Closing Taxable Period could reasonably be expected to give rise to a material liability for Taxes of SMS Inc. pursuant to this Agreement (any such Tax Claim, a "Seller Tax Claim" ), the Purchaser shall offer SMS Inc. the right to defend or prosecute and the right to control, at SMS Inc.'s sole cost and expense, any such Tax Claim by all appropriate proceedings; provided, further that (i) SMS Inc. shall defend or prosecute the Tax Claim diligently and in good faith; (ii) SMS Inc. shall not, without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, enter into any compromise or settlement of such Tax Claim; (iii) SMS Inc. shall inform the Purchaser of all material developments and events relating to such Tax Claim (including providing to Purchaser copies of relevant portions of all written materials relating to such Tax Claim); (iv) the Purchaser and SMS Inc. shall cooperate with each other and each other's representatives in good faith in order to contest effectively such Tax Claim; (v) the Purchaser or its authorized representative shall be entitled, at the expense of the Purchaser, to attend and participate in all conferences, meetings and proceedings relating to such Tax Claim; and (vi) if the Purchaser reasonably withholds consent to a compromise or settlement pursuant to clause (ii) above, then the Purchaser shall be entitled to assume the defense or prosecution of such Tax Claim; provided, that, except in the case where Purchaser reasonably withholds consent on the basis that such compromise or settlement disproportionately impacts the Purchaser in a taxable period that ends after the Closing Date, SMS Inc.'s liability shall not exceed that of the proposed settlement.  Notwithstanding any other provision in this Agreement, SMS Inc. shall not be entitled to defend, prosecute, or control any Tax Claim if (A) such Tax Claim arises in connection with any criminal proceeding, action, indictment, criminal allegation or criminal investigation of the Purchaser or its affiliates; (B) the Purchaser is advised in

writing by outside counsel chosen by it that there are one or more legal or equitable defenses available to the Purchaser that SMS Inc. cannot assert on behalf of the Purchaser; or (C) it is reasonably likely that the Losses arising or resulting from such Tax Claim will exceed amounts recoverable under the Purchaser R&W Insurance Policy.  The Purchaser shall have the right to control all Tax Claims (other than Seller Tax Claims); provided, that, where a Tax Claim could reasonably be expected to affect the liability of SMS Inc. for Taxes pursuant to this Agreement, (A) the Purchaser shall defend or prosecute the Tax Claim diligently and in good faith, (B) the Purchaser shall inform SMS Inc. of all material developments and events relating to such Tax Claim (including providing to SMS, Inc. copies of relevant portions of all written materials relating to such Tax Claim), in each case, with respect to any issues in such Tax Claim for which SMS Inc. will have liability pursuant to this Agreement, (C) the Purchaser and SMS Inc. shall cooperate with each other and each other's representatives in good faith in order to contest effectively such Tax Claim, (D) SMS Inc. or its authorized representatives shall be entitled, at its expense, to attend and participate in all conferences, meetings and proceedings with respect to any issues in such Tax Claim for which SMS Inc. could reasonably be expected to have liability pursuant to this Agreement, and (E) the Purchaser shall not, without the prior written consent of SMS Inc., which consent shall not be unreasonably withheld, conditioned or delayed, enter into any compromise or settlement of any issues in such Tax Claim for which SMS Inc. would be responsible. To the extent of any conflict between this Section 7.4(c) and Section 9.7, this Section 7.4(c) shall govern with respect to any Tax Claims.

(d)    SMS Inc. and the Purchaser shall cooperate in good faith, and shall cause their respective Affiliates, officers, employees, agents, auditors and other representatives to cooperate in good faith in connection with (i) the preparation and filing of all Tax Returns relating to the Company, (ii) the determination of SMS Inc., the Purchaser or their respective Affiliates, as the case may be, of any liability for any Taxes relating to the Company, (iii) any audit, dispute or other examination or assessment by any Tax authority with respect to such Taxes, or (iv) any Legal Proceeding relating to liability for such Taxes. SMS Inc. and the Purchaser shall cooperate in the conduct of any audit or other proceedings involving the Company for any Tax purposes including providing any and all documents requested by a Tax authority to the other Party at least ten (10) Business Days prior to the due date of such request, and each shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 7.4.  SMS Inc. and Purchaser agree that, in the case of any US federal income Tax Claim that relates to (i) a taxable year of the Company (or portion thereof) that ends on or before the Closing Date and begins on or after January 1, 2018, and (ii) is subject to the partnership audit rules enacted in the US pursuant to the Bipartisan Budget Act of 2015, then at the request of Purchaser, to the extent permitted by applicable Law, the Company shall make a timely election under Section 6226(a) of the Code with respect to such Tax Claim, which election shall be promptly and fully joined and consented to by SMS Inc. (and SMS Inc. and the Purchaser agree to make any corresponding election that may be available under applicable state, local, and non-US Tax Law).

(e)    All transfer, documentary, sales, use, real property, stamp, registration and other similar Taxes, fees and costs (including any associated penalties and interest) (the "Transfer Taxes" ) incurred in connection with this Agreement, if any, shall be borne one-half by SMS Inc. on the one hand and one-half by the Purchaser on the other hand.  Except as otherwise required by applicable Law, the Purchaser shall timely file all necessary Tax Returns and other documentation with respect to any such Transfer Taxes.   Notwithstanding the foregoing, any Transfer Taxes incurred in connection with the transfer of property contemplated in Section 7.12 hereof shall be paid entirely by SMS Inc.

(f)    Notwithstanding anything to the contrary in this Agreement or in any other Contract to the contrary, all liabilities or obligations between SMS Inc. or any of their respective Affiliates (other than the companies), on the one hand, and the Company, on the other hand, under any Tax allocation, Tax sharing, Tax indemnity or other similar Contracts to which the Company is a party

shall be terminated as of the Closing Date and, after the Closing Date, the Company shall not be bound thereby or have any liability to SMS Inc. thereunder.

(g)     The Purchaser and SMS Inc. agree to treat the purchase and sale of the Purchased Equity Interests as a transaction governed by Revenue Ruling 99-6, Situation 2 for US federal income Tax purposes (and for purposes of any applicable US state Tax Law).

(h)     Notwithstanding anything to the contrary in this Agreement, in the event of any conflict between this <u>Section 7.4</u> and <u>Article 9</u>, the provision of this <u>Section 7.4</u> (and not those of <u>Article 9</u>) shall govern matters relating to Taxes.

(i)     Any credits, refunds and other recoveries of any Taxes actually realized by the Purchaser prior to the third anniversary of the Closing Date and which are directly related to Pre-Closing Taxable Periods or to that portion of a Straddle Taxable Period that ends on (and including) the Closing Date shall be paid by Purchaser to SMS Inc. promptly upon any credit thereof to, or receipt or recovery thereof by, the Purchaser, the Company or any of their Affiliates, in each case net of (i) any Taxes and (ii) any reasonable out-of-pocket expenses that the Purchaser, the Company or any of their Affiliates incur with respect to obtaining such refund, credit or other recovery.

(j)     Notwithstanding anything herein to the contrary, (i) the Purchaser shall not, except to the extent otherwise required by Law, file any amended Tax Returns of the Company for any Pre-Closing Taxable Period without first obtaining the consent of SMS Inc., which consent shall not be unreasonably withheld, conditioned, or delayed, and (ii) the Purchaser shall, at the sole cost and expense of SMS Inc., assist SMS Inc. in filing any amended Tax Returns for any Pre-Closing Taxable Period that is reasonably requested by SMS Inc. in writing within three (3) years of the Closing Date, which such returns shall be subject to the Purchaser's reasonable consent, not to be unreasonably withheld, conditioned, or delayed (it being understood that Purchaser shall not be required to cooperate in filing any such amended Tax Return if doing so would (i) be inconsistent with applicable Law, and/or (ii) result in an adverse Tax effect to Purchaser or the Company after the Closing Date).

Section 7.5     Confidentiality Agreement.

The Purchaser shall treat, and shall cause its Affiliates and representatives to treat, all non-public information obtained in connection with this Agreement and the transactions contemplated hereby as confidential in accordance with the terms of the Confidentiality Agreement, dated as of February 21, 2018, by and between the Company and TRIGO Group (the "Confidentiality Agreement").  In the event of a conflict or inconsistency between the terms of this Agreement and the Confidentiality Agreement, the terms of this Agreement will govern.   The terms of the Confidentiality Agreement are hereby incorporated by reference and shall continue in full force and effect until the Closing, at which time such Confidentiality Agreement shall terminate.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms. Notwithstanding the foregoing or anything to the contrary in this Agreement or the Confidentiality Agreement, the Parties (and each Affiliate and Person acting on behalf of any Party) agree that each Party (and each employee, representative, and other agent of such Party) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure (as such terms are used in the regulations issued under Section 6011 of the Code) of the transactions contemplated by this Agreement. This authorization is not intended to permit disclosure of any other information including without limitation (A) any portion of any materials to the extent not related to the transaction's tax treatment or tax structure, (B) the identities of participants or potential participants, (C) the existence or status of any negotiations, (D) any pricing or financial information (except to the extent such pricing or financial

information is related to the transaction's tax treatment or tax structure), or (E) any other term or detail not relevant to the transaction's tax treatment or tax structure.

Section 7.6     Exclusivity; Non-Solicitation.

Each of the Sellers shall cause its Affiliates, partners, directors, officers, employees, investment bankers and other representatives to, immediately cease any discussions or negotiations with any third party, other than the Purchaser and its Affiliates and representatives, with respect to the sale of the Company or any material portion of the assets or equity thereof.  From and after the date of this Agreement until the earlier to occur of the Closing Date or the date this Agreement is terminated in accordance with Article 11, each of the Sellers shall not, and shall cause its Affiliates, directors, officers, employees, investment bankers and other representatives not to, (i) solicit, initiate or knowingly encourage, or take any other action designed to facilitate, including by making available confidential information, any inquiry or the making or submission of any inquiry, proposal, indication of interest or offer to sell the Company, or any material portion of the assets or equity thereof or (ii) enter into any agreement with respect to any of the foregoing.  The Sellers shall provide prompt written notice to the Purchaser of receipt by any of the Sellers or any of their Affiliates of any written proposal to purchase the Company or any material portion of the assets or equity thereof.

Section 7.7     Non-Competition and Non-Solicitation

In consideration of the benefits of this Agreement to the Sellers and in order to induce the Purchaser to enter into this Agreement, Clarke hereby covenants and agrees with the Purchaser that Clarke shall not, directly or indirectly, and shall not suffer or permit its Affiliates, directly or indirectly, to:

(a)     for a period of four (4) years from the Closing Date own, manage, operate, join, control or lend money to, or participate in the ownership, management, operation or control of or lending of money to any person that is engaged in a business that competes with the Business anywhere in the US. This covenant shall not be breached, however, by (i) the ownership by Clarke or any of his Affiliates of two percent (2%) or less of any class of publicly traded securities of a Person that is engaged in an activity otherwise prohibited by this covenant or (ii) the employment of Clarke by the Purchaser (or an entity directed by the Purchaser) after the Closing; and

(b)     for a period of four (4) years from the Closing Date, offer employment to, or solicit for employment, or hire any employee, officer or director of the Company (each, a "Covered Employee"); provided that the foregoing covenant will not be considered to be breached by general solicitations of employment (including advertisements and other published media), general mandates delivered to recruitment or staffing consultants or by the solicitation or hiring of any such Covered Employee who initiates contact with Clarke or who has been terminated from employment by the Company, the Purchaser or any of its other Affiliates at least thirty (30) days prior to such solicitation or hiring.

Section 7.8     Further Assurances.

Each Party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.  Each Party shall (or, if appropriate, cause its applicable Affiliates to), at the request of any other Party, at any time following the Closing Date, execute and deliver to the requesting Party such further instruments as may be reasonably necessary in order to carry out the purposes of this Agreement.

Section 7.9       Third Party Consents; Customer Meetings.

(a)       The Company has submitted the DDTC Notification, a copy of which has been made available to Purchaser.  Clarke shall, or shall cause the Company to, use reasonable best efforts to obtain, in consultation with Purchaser, Consents from each of United Technologies Corporation and Triumph Group, Inc., it being understood that such obligations to obtain such Consents shall be deemed to encompass an obligation to pay all reasonable fees incurred by the Company associated with obtaining such Consents. Clarke shall keep the Purchaser reasonably apprised of the status of obtaining such Consents. The Purchaser shall have the right to consult with Clarke and the Company in connection with their efforts to obtain such Consents.  Each of the Consents will be in written form reasonably acceptable to Purchaser.

(b)       The Company shall organize a meeting as soon as possible following the date hereof but in any event prior to the Closing Date to present the Purchaser to each of Lockheed Martin Aeronautics Company, Pratt & Whitney, Northrop Grumman Systems Corporation, United Technologies Corporation, Triumph of SMS Inc. or Clark Groupe Inc. and any other key customers of the Company reasonably requested by Purchaser, to assist the Purchaser to maintain after the Closing Date the relationship between the Company and each of such customers under terms and conditions similar to the terms and conditions existing as at the date hereof between such customers and the Company.

(c)       Purchaser and Sellers agree to fully cooperate in order to obtain the CFIUS Approval.

Section 7.10      Termination of Certain Arrangements.

Prior to the Closing, the Sellers shall cause the Company to terminate, settle, eliminate and release (by way of capital contribution, cash settlement or as otherwise mutually agreed among the Parties) all intercompany loans, Contracts, arrangements, commitments, receivables, payables, claims, demands and rights between any of Sellers or their respective Affiliates, on the one hand, and the Company, on the other hand, such that, following such action, the Company is not subject to any ongoing obligations thereunder. For the avoidance of doubt, any Tax that arises out of any such termination shall be included in a Tax period occurring prior to the Closing.  The Sellers shall be responsible for paying any Taxes related to or incurred in connection with such payoff, including withholding tax, associated with payment of the inter-company account balances under the applicable federal, state or international Law.

Section 7.11      Purchaser R&W Insurance Policy.

The Purchaser has bound the draft Purchaser R&W Insurance Policy as of the date hereof. The Parties shall use reasonable best efforts to take all actions necessary to complete the applicable conditions in the conditional binder (other than the condition that Closing has occurred, to which this sentence does not apply) to the Purchaser R&W Insurance Policy within the times set forth therein in order to maintain the Purchaser R&W Insurance Policy in full force and effect. Following the final issuance of the Purchaser R&W Insurance Policy, the Purchaser agrees to use reasonable best efforts to keep the Purchaser R&W Insurance Policy in full force and effect for the policy period set forth therein. Upon its final issuance, the Purchaser shall deliver the Purchaser R&W Insurance Policy. The Parties acknowledge that the Purchaser obtaining the Purchaser R&W Insurance Policy is a material inducement to the Sellers entering into the transactions contemplated by this Agreement and the Ancillary Agreements, and the Seller is relying on the Purchaser's covenants and obligations set forth in this Section 7.11. The Purchaser R&W Insurance Policy may not be amended by the Purchaser in any manner that is adverse to the Sellers in any material respect without the Sellers' prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), and the subrogation provisions

therein may not be amended in any manner that is adverse to the Sellers without Sellers' prior written consent (which consent shall be in the sole and absolute discretion of the Sellers).

Section 7.12     Property Transfer.

The Company owns the following two properties: (i) the property located at 27476 and 27482 Via Industria, Temecula, California and (ii) the property located at 3129 Maricopa Avenue, Lake Havasu City, Arizona (collectively, the "Properties" ).  At or prior to the Closing, the Company shall transfer ownership of each Property to SMS Inc. (the "Property Transfer").  At the Closing, SMS Inc. and the Company shall enter into a lease agreement for the property located at 27476 and 27482 Via Industria, Temecula, California reflecting the terms set forth on Exhibit H in form and substance to be agreed between the Purchaser and SMS Inc., acting reasonably (the "Temecula Lease"), and a lease agreement for the property located at 3129 Maricopa Avenue, Lake Havasu City, Arizona reflecting the terms set forth on Exhibit H in form and substance to be agreed between the Purchaser and SMS Inc., acting reasonably (the "Lake Havasu City Lease").  SMS Inc. and Clarke, jointly and severally, shall hold harmless and indemnify the Purchaser and the Company from and against any Damages which are directly or indirectly suffered or incurred by Purchaser or the Company arising from the Property Transfer.

Section 7.13     Irvine Lease.

Prior to Closing, Clarke or SMS Inc. shall ensure that the Irvine Lease has been terminated or transferred to SMS Inc. or another Person identified by Clarke.  All costs and expenses incurred in connection with such termination or transfer shall be considered Transaction Expenses for purposes of this Agreement.

ARTICLE 8

SPECIFIED CONDITIONS

Section 8.1     Conditions to the Obligations of Purchaser and Sellers.

The obligations of Purchaser and Sellers to effect the Closing are subject to the satisfaction (or written waiver to the extent permitted by Law) prior to or at the Closing of the following conditions:

(a)     the Parties will have obtained CFIUS Approval and completed the DDTC Notice process as described herein; and

(b)     no order or injunction issued by a Governmental Entity with jurisdiction over the Purchaser or the Sellers shall be in effect prohibiting the transactions contemplated hereby.

Section 8.2     Conditions to the Obligations of Purchaser.

The obligation of the Purchaser to effect the Closing is subject to the satisfaction (or written waiver to the extent permitted by Law) prior to or at the Closing of the following conditions:

(a)     (i) the representations and warranties of the Sellers set forth in Article 5 (other than the Fundamental Representations) and excluding, for the purposes of this Section 8.2(a)(i) only, all qualifications as to materiality, including Material Adverse Effect, shall be true and correct in all respects as of the date hereof and on and as of the Closing Date as though made on and as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date, except, in each case, to the extent that any such failures to be true and correct,

whether individually or in the aggregate, would not constitute a Material Adverse Effect; (ii) the Fundamental Representations (other than Section 5.2(b) (Capitalization)) shall be true and correct in all respects on and as of the Closing Date as though made on and as of such date or, in the case of Fundamental Representation made as of a specified date earlier than the Closing Date, on and as of such earlier date; and (iii) the representations and warranties set forth in Section 5.2(b) (Capitalization) shall be true and correct except for *de minimis* inaccuracies on and as of the Closing Date as though made on and as of such date;

(b)      each of the covenants and agreements of the Sellers to be performed on or prior to the Closing shall have been duly performed in all material respects;

(c)      the Purchaser shall have received a certificate, signed by the Sellers and dated the Closing Date, to the effect that the conditions set forth in Section 8.2(a) and Section 8.2(b) have been satisfied;

(d)      the Company shall have delivered evidence of the termination of the Factoring Agreement and the discharge of any Lien relating thereto;

(e)      the Sellers shall have delivered the Pay-Out Letters in accordance with Section 3.7; and

(f)      the Sellers shall have delivered the items set forth in Section 4.4.

Section 8.3      Conditions to the Obligations of Sellers.

The obligation of the Sellers to effect the Closing is subject to the satisfaction (or waiver to the extent permitted by Law) prior to or at the Closing of the following conditions:

(a)      the representations and warranties of the Purchaser set forth in Article 6 hereof excluding, for the purposes of this Section 8.3(a) only, all qualifications as to materiality shall be true and correct in all respects as of the date hereof and on and as of the Closing Date as though made on and as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date, except, in each case, to the extent that any such failures to be true and correct, whether individually or in the aggregate, would not materially adversely affect Purchaser's ability to consummate the transactions contemplated hereby;

(b)      each of the covenants and agreements of the Purchaser to be performed on or prior to the Closing shall have been duly performed in all material respects;

(c)      the Sellers shall have received a certificate, signed by a duly authorized officer of each Purchaser, and dated the Closing Date, to the effect that the conditions set forth in Section 8.3(a) and Section 8.3(b) have been satisfied;

(d)      the Purchaser shall have entered into a Purchaser R&W Insurance Policy and shall have provided the Sellers with a duly executed bound copy of the Purchaser R&W Insurance Policy; and

(e)      the Purchaser shall have delivered the items set forth in Section 4.3.

ARTICLE 9

INDEMNIFICATION

Section 9.1        Liability for Representations, Warranties and Covenants.

(a)        The representations and warranties contained in this Agreement shall survive and continue in full force and effect for a period of twelve (12) months after the Closing Date, except that:

(i)        the representations and warranties of the Sellers set out in <u>Section 5.1(a)</u>, <u>Section 5.1(b)</u>, <u>Section 5.1(c)</u>, <u>Section 5.1(e)</u>, <u>Section 5.1(f)</u> and <u>Section 5.2(a)</u>, <u>Section 5.2(b)</u> and <u>Section 5.2(z)</u> (the "Fundamental Representations") and the representations and warranties of Purchaser set out in <u>Section 6.1(a)</u>, <u>Section 6.1(b)</u>, <u>Section 6.1(c)</u>, <u>Section 6.1(g)</u> (the "Purchaser Fundamental Representations") shall survive and continue in full force and effect through the expiration of the applicable statute of limitations; and

(ii)        the representations and warranties set out in <u>Section 5.2(w)</u> shall survive and continue in full force and effect through the sixtieth (60th) day following the expiration of the applicable statute of limitations.

(b)        All covenants and agreements contained herein which by their terms are to be performed, in whole or in part, or which prohibit actions subsequent to the Closing Date shall survive the Closing in accordance with their terms.  All other covenants and agreements contained herein shall survive the Closing for a period of six (6) months.

<u>Article 9</u> is not intended to limit the survival periods contained in the Purchaser R&W Insurance Policy.

Section 9.2        Indemnification in Favor of Purchaser.

From and after the Closing Date (but subject to <u>Section 9.1</u>):

(a)        Each of the Corbel entities, jointly and severally, shall hold harmless and indemnify the Purchaser Indemnified Parties from and against, and shall compensate and reimburse the Purchaser Indemnified Parties for, any Damages which are directly or indirectly suffered or incurred by the Purchaser Indemnified Parties or to which the Purchaser Indemnified Parties may otherwise directly or directly become subject (regardless of whether or not such Damages relate to any Third Party Claim) and which arise directly or indirectly from or as a result of or are directly or directly connected with:

(i)        any inaccuracy in or breach of any representation or warranty made in <u>Section 5.1</u> and which relates to a Corbel entity as applicable, without regard to any materiality or Material Adverse Effect qualifiers; and

(ii)        any breach of their respective covenants or obligations set forth in this Agreement.

(b)        SMS Inc. and Clarke, jointly and severally, shall hold harmless and indemnify the Purchaser Indemnified Parties from and against, and shall compensate and reimburse the Purchaser Indemnified Parties for, any Damages which are directly or indirectly suffered or incurred by the Purchaser Indemnified Parties or to which the Purchaser Indemnified Parties may otherwise directly or

directly become subject (regardless of whether or not such Damages relate to any Third Party Claim) and which arise directly or indirectly from or as a result of or are directly or directly connected with:

(i)     any inaccuracy in or breach of any representation or warranty made in Section 5.1 and which relates to SMS Inc. or Section 5.2 without regard to any materiality or Material Adverse Effect qualifiers (except as set forth in Section 5.2(e)(y), Section (j)(i)(14) and Section (n)(i)(iii));

(ii)    any breach of any covenant or obligation of the Sellers set forth in this Agreement;

(iii)   any Debt or Transaction Expenses, in each case to the extent not included in the calculation of, or taken into account in determining, the Closing Debt or the Closing Transaction Expenses;

(iv)   any and all Taxes (or the non-payment thereof) of the Company with respect to any period ending on or before the Closing Date or the portion of any Straddle Taxable Period that ends on the Closing Date, and any obligations to indemnify or otherwise assume or succeed to any Tax liability of any other person;

(v)    any and all claims from Steven P. Haskett or any of his Affiliates;

(vi)   the Property Transfer;

(vii)  the termination or transfer of the Irvine Lease as set forth in Section 7.13 and any and all claims with respect to, or arising from the Irvine Lease; and

(viii) any and all costs, payments or expenses pursuant to or under the New Car Lease except as provided under Section 10.4 and the termination or transfer of the New Car Lease;

provided, that notwithstanding the fact that any Purchaser Indemnified Party may have the right to assert claims for indemnification under or in respect of more than one provision of this Agreement or another agreement entered in connection herewith in respect of any fact, event, condition or circumstance, no Purchaser Indemnified Party shall be entitled to recover the amount of any Damages suffered by such Purchaser Indemnified Party more than once under all such agreements in respect of such fact, event, condition or circumstance.

Section 9.3     Indemnification in Favor of Sellers.

From and after the Closing Date (but subject to Section 9.1), the Purchaser shall hold harmless and indemnify the Sellers' Indemnified Parties from and against, and shall compensate and reimburse the Sellers for, any Damages which are directly or indirectly suffered or incurred by the Sellers' Indemnified Parties or to which Sellers' Indemnified Parties may otherwise directly or indirectly become subject (regardless of whether or not such Damages relate to any Third Party Claim) and which arise directly or indirectly from or as a result of, or are directly or indirectly connected with: (i) any inaccuracy in or breach of any representation or warranty made in Article 6; and (ii) any breach of any covenant or obligation of the Purchaser set forth in this Agreement.

Section 9.4     Limitations.

(a)     Neither the Purchaser nor the Sellers shall have any obligation or liability for indemnification or otherwise with respect to any representation or warranty made by such Party in this Agreement after the end of the applicable time period specified in <u>Section 9.1</u>, except for claims that either the Purchaser or the Sellers, as applicable, have been notified of prior to the end of the applicable time period in accordance with <u>Section 9.5</u>.

(b)     The Sellers, collectively, shall not have any obligation to make any payment in respect of Damages with respect to the matters described in <u>Section 9.2</u> or <u>Section 9.3</u>, as applicable, until the total of all Damages with respect to such matters exceeds USD292,500 (the "Deductible"), and then only for the amount by which such Damages exceed the Deductible and up to a maximum amount payable by the Sellers of USD292,500 (the "Cap").

(c)     The limitations set forth in <u>Section 9.4(b)</u> shall not apply: (i) in the case of Fraud; (ii) to inaccuracies in or breaches of any of the Fundamental Representations; (iii) to inaccuracies in or breaches of any of the representations or warranties set forth in <u>Section 5.2(w)</u>; (iv) to breaches of covenants or obligations under this Agreement; (v) to any Debt or Transaction Expenses, in each case to the extent not included in the calculation of, or taken into account in determining, the Closing Debt or Closing Transaction Expenses; or (vi) any claim under <u>Section 9.2(b)(iv)</u>, <u>Section 9.2(b)(v)</u>, <u>Section 9.2(b)(vi)</u>, <u>Section 9.2(b)(vii)</u> or <u>Section 9.2(b)(viii)</u>.

(d)     Notwithstanding anything in this Agreement or in any Ancillary Agreement to the contrary, in no event shall any Seller be liable for any Damages (whether resulting from a Third Party Claim or otherwise) in connection with this Agreement (including under <u>Section 9.2</u> and <u>Section 7.4(c)</u>) or the Ancillary Agreements, either individually or in the aggregate, in excess of the portion of the Purchase Price actually received by such Seller, except in the case of Fraud by such Seller. Notwithstanding anything in this Agreement or in any Ancillary Agreement to the contrary, in no event shall the Purchaser be liable for any Damages (whether resulting from a Third Party Claim or otherwise) in connection with this Agreement (including under <u>Section 9.3</u>) and the Ancillary Agreements, either individually or in the aggregate, in excess of the Purchase Price, except in the case of Fraud by Purchaser.

(e)     No Seller shall have any liability pursuant to <u>Section 9.2</u> with respect to Damages to the extent such Damages are reserved or accrued for (whether in whole or in part) in the Financial Statements and are taken into account in determining Purchase Price.

Section 9.5     Notification.

(a)     If a Third Party Claim is instituted or asserted against an Indemnified Person, the Indemnified Person will promptly notify the Indemnifying Party in writing of the Third Party Claim.  The notice must specify in reasonable detail, the identity of the Person making the Third Party Claim and, to the extent known, the nature of the Damages and the estimated amount needed to investigate, defend, remedy or address the Third Party Claim.

(b)     If an Indemnified Person becomes aware of a Direct Claim, the Indemnified Person will promptly notify the Indemnifying Party in writing of the Direct Claim.  The notice must specify in reasonable detail, the identity of the Person making the Direct Claim and, to the extent known, the nature of the Damages and the estimated amount needed to investigate, defend, remedy or address the Direct Claim.

(c)     Notice to an Indemnifying Party under this <u>Section 9.5</u> of a Direct Claim or a Third Party Claim constitutes assertion of a claim for indemnification against the Indemnifying Party

under this Agreement. Upon receipt of such notice, the provisions of <u>Section 9.6</u> will apply to any Direct Claim, and the provisions of <u>Section 9.7</u> will apply to any Third Party Claim.

(d)     Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 9.5</u> shall not apply to claims relating to Taxes, which shall be governed by <u>Section 7.4(d)</u>.

Section 9.6     Direct Claims.

(a)     Following receipt of notice of a Direct Claim, the Indemnifying Party has thirty (30) days to investigate the Direct Claim and respond in writing. For purposes of the investigation, the Indemnified Person shall make available to the Indemnifying Party the information relied upon by the Indemnified Person to substantiate the Direct Claim, together with such other information as the Indemnifying Party may reasonably request.

(b)     If the Indemnifying Party disputes the validity or amount of the Direct Claim, the Indemnifying Party shall provide written notice of the dispute to the Indemnified Person within the thirty (30) day period specified in <u>Section 9.6(a)</u>. The dispute notice must describe in reasonable detail the nature of the Indemnifying Party's dispute. During the thirty (30) day period immediately following receipt of a dispute notice by the Indemnified Person, the Indemnifying Party and the Indemnified Person shall attempt in good faith to resolve the dispute. If the Indemnifying Party and the Indemnified Person fail to resolve the dispute within that thirty (30) day time period, the Indemnified Person is free to pursue all rights and remedies available to it, subject only to this Agreement. If the Indemnifying Party fails to respond in writing to the Direct Claim within the thirty (30) day period specified in <u>Section 9.6(a)</u>, the Indemnifying Party is deemed to have irrevocably agreed to the validity and amount of the Direct Claim. The Indemnifying Party shall promptly, but in any event within five (5) Business Days of the final and non-appealable determination of the amount of any Direct Claim, pay in full the amount of the Direct Claim to the Indemnified Person.

(c)     Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 9.6</u> shall not apply to claims relating to Taxes which shall be governed by <u>Section 7.4(d)</u>.

Section 9.7     Procedure for Third Party Claims.

(a)     Upon receiving notice of a Third Party Claim, the Indemnifying Party may participate in the investigation and defense of the Third Party Claim and may also elect to assume the investigation and defense of the Third Party Claim, subject to the limitations set forth below.

(b)     In order to assume the investigation and defense of a Third Party Claim, the Indemnifying Party must give the Indemnified Person written notice of its election within sixty (60) days of the Indemnifying Party's receipt of notice of the Third Party Claim. The Party controlling the defense of the Third Party Claim shall select counsel that is reasonably satisfactory to the Indemnified Person or the Indemnifying Party, as applicable.

(c)     If the Indemnifying Party assumes the investigation and defense of a Third Party Claim:

(i)     the Indemnifying Party will pay for all costs and expenses of the investigation and defense of the Third Party Claim except that, subject to <u>Section 9.7(c)(iv)</u>, the Indemnifying Party will not, so long as it diligently conducts such defense, be liable to the Indemnified Person for any fees of other counsel or any other expenses with respect to the defense of the Third Party Claim, incurred by the Indemnified Person after the date the

-58-

Indemnifying Party validly exercised its right to assume the investigation and defense of the Third Party Claim;

(ii)     the Indemnifying Party will reimburse the Indemnified Person for all costs and expenses incurred by the Indemnified Person in connection with the investigation and defense of the Third Party Claim prior to the date the Indemnifying Party validly exercised its right to assume the investigation and defense of the Third Party Claim; and

(iii)     the Indemnified Person shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense. Notwithstanding the foregoing, in the event the Indemnified Person shall have reasonably concluded based on opinion from outside counsel that representation of both parties by the same counsel would be inappropriate due to actual conflict of interests between them, then the Indemnified Person shall have the right to participate (but not control) the defense of any such Third Party Claim with separate counsel and the Indemnifying Party shall pay all of the reasonable fees and expenses of a single separate counsel representing the Indemnified Person.

(d)     If the Indemnified Person controls the defense of the Third Party Claim, the Indemnified Person may not compromise or settle the Third Party Claim without the consent of the Indemnifying Party (which consent may not be unreasonably withheld or delayed); provided, however, such consent of the Indemnifying Party shall be required only to the extent such compromise or settlement calls for the payment of no more in the aggregate than the maximum amount the Indemnifying Party is required to pay to such Indemnified Person pursuant to this Agreement. The Indemnifying Party may participate in, but not assume the defense of, a Third Party Claim without the written consent (which may not be unreasonably withheld or delayed) of the Indemnified Person if (i) the Third Party Claim seeks an injunction or other equitable relief against the Indemnified Person, or (ii) the Third Party Claim relates to or otherwise arises in connection with any criminal or regulatory enforcement Legal Proceeding, and in each such circumstance, the Indemnified Person shall have the right to defend, at the expense of the Indemnifying Party (subject to the limitations on liability set forth herein), any such Third Party Claim.

(e)     In the event that the Indemnified Person controls the defense of any Third Party Claim, including in connection with the matters set forth in clauses (i) through (iii) of Section 9.7(d), the Indemnified Person shall be required to take all reasonable steps necessary to diligently conduct such defense, to consult with the Indemnifying Party regarding the defense of such Third Party Claim and to promptly provide the Indemnifying Party and its counsel with copies of all correspondence, filings and other communications with respect to such Third Party Claim.  If after assuming the defense of a Third Party Claim, the Indemnified Person fails to take all reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) days after receiving written notice from the Indemnifying Party to the effect that the Indemnified Person has so failed, the Indemnifying Party shall have the right but not the obligation to assume the defense of such Third Party Claim without waiving any rights it may have to contest its obligation to indemnify the Indemnified Person under this Agreement for Damages arising out of such Third Party Claim.

(f)     The Indemnifying Party will not be permitted to compromise or settle or to cause a compromise or settlement of a Third Party Claim without the prior written consent of the Indemnified Person, which consent may not be unreasonably withheld or delayed, unless:

(i)     the terms of the compromise or settlement require only the payment of money for which the Indemnified Person is entitled to full indemnification under this Agreement

LEGAL_1:50312829.17

62TJ-274876

and provides for a full, general and unconditional release of the Indemnified Person from all liabilities arising out of or relating to the Third Party Claim; and

(ii)    the Indemnified Person is not required to admit any wrongdoing, take or refrain from taking any action, and such compromise and settlement involves no finding of any violation of Law or the rights of any Person.

(g)    Subject to reasonable confidentiality undertakings, the Indemnified Person and the Indemnifying Party agree to keep the other fully informed of the status of any Third Party Claim and any related proceedings; provided, that neither the Indemnified Person nor the Indemnifying Party shall be obligated to provide information if it reasonably determines that doing so may, based on the advice of outside counsel and after giving due consideration to the possible establishment of a common interest, joint defense or similar agreement between the parties, jeopardize the protection of the attorney-client privilege.  If the Indemnifying Party assumes the investigation and defense of a Third Party Claim, the Indemnified Person will, at the request and expense of the Indemnifying Party, use its reasonable efforts to make available to the Indemnifying Party, on a timely basis, those employees whose assistance, testimony or presence is necessary to assist the Indemnifying Party in investigating and defending the Third Party Claim, and the Indemnifying Party shall reasonably cooperate to limit material interference with the operations of the Indemnified Person and its Affiliates. Subject to reasonable confidentiality undertakings, the Indemnified Person shall, at the request and expense of the Indemnifying Party, make available to the Indemnifying Party, or its representatives, on a timely basis all documents, records and other materials in the possession, control or power of the Indemnified Person, reasonably required by the Indemnifying Party for its use solely in defending any Third Party Claim of which it has elected to assume the investigation and defense; provided, that the Indemnified Person shall not be obligated to provide information if it reasonably determines that doing so may, based on the advice of outside counsel and after giving due consideration to the possible establishment of a common interest, joint defense or similar agreement between the parties, jeopardize the protection of the attorney-client privilege.  The Indemnified Person and the Indemnifying Party shall cooperate with each other on a timely basis in the defense of any Third Party Claim.  If the Indemnified Person investigates and defends a Third Party Claim, the Indemnifying Party will use its reasonable efforts to make available to the Indemnified Person, on a timely basis, those employees whose assistance, testimony or presence is necessary to assist the Indemnified Person in investigating and defending the Third Party Claim.  The Indemnifying Party shall, at its own expense, make available to the Indemnified Person, or its representatives, on a timely basis all documents, records and other materials in the possession, control or power of the Indemnifying Party, reasonably required by the Indemnified Person for its use solely in defending any Third Party Claim.

(h)    The Indemnifying Party shall promptly, but in any event within five (5) Business Days of the final and non-appealable determination of the amount of any Third Party Claim, pay in full the amount of the Third Party Claim to the Indemnified Person to the extent such claim is indemnifiable hereunder and subject to the limitations on liability set forth herein.

(i)    Notwithstanding anything to the contrary in this Agreement, the provisions of this Section 9.7 shall not apply to claims relating to Taxes which shall be governed by Section 7.4(d).

Section 9.8    Exclusion of Other Remedies.

Except in the case of Fraud or as provided in this Section 9.8, the indemnities provided in Section 7.4(c), Section 9.2 and Section 9.3 constitute the only remedy of Purchaser Indemnified Parties or Sellers' Indemnified Parties in the event of any breach of a representation, warranty, covenant or agreement contained in this Agreement.  The Parties acknowledge that the failure to comply with a covenant or obligation contained in this Agreement may give rise to irreparable injury to a Party

-60-

inadequately compensable in damages.  Accordingly, a Party may enforce the performance of such a covenant or obligation by injunction or specific performance upon application to a court of competent jurisdiction without proof of actual damage (and without requirement of posting a bond or other security).

Section 9.9       One Recovery.

An Indemnified Person is not entitled to double recovery for any claims even though they may have resulted from the breach, inaccuracy or failure to perform of more than one of the representations, warranties, covenants and obligations of the Indemnifying Party in this Agreement.  No Party has any liability or obligation with respect to any claim for indemnification to the extent that such matter was reflected as an adjustment to the Purchase Price pursuant to Section 3.3.

Section 9.10      Duty to Mitigate.

Nothing in this Agreement in any way restricts or limits the general obligation at Law of an Indemnified Person to mitigate any loss which it may suffer or incur by reason of the breach, inaccuracy or failure to perform of any representation, warranty, covenant or obligation of the Indemnifying Party under this Agreement. If any claim can be reduced by any recovery, settlement or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other Person, the Indemnified Person shall take all appropriate steps to enforce such recovery, settlement or payment and the amount of any Damages of the Indemnified Person will be reduced by the amount of insurance proceeds actually recoverable by the Indemnified Person. The amount of any claim for which indemnification is provided under Section 9.2 or Section 9.3 shall be net of an amount equal to any Tax benefit actually realized by the Indemnified Person or its Affiliates in connection therewith in the taxable period of the claim or in the next succeeding taxable period.  Upon making any payment to an Indemnified Person for any indemnification claim pursuant to this Article 9, the Indemnifying Person shall be subrogated, to the extent of such payment, to any rights which the Indemnified Person may have against any third parties with respect to the subject matter underlying such indemnification claim and the Indemnified Person shall assign any such rights to the Indemnifying Person.

Section 9.11      R&W Insurance Policy.

Purchaser has obtained the R&W Insurance Policy for the benefit of Purchaser in connection with any Damages that any Purchaser Indemnified Parties may incur with respect to the breach of or inaccuracy of the representations and warranties made by Sellers in this Agreement and the other matters set forth therein.  Purchaser has paid or will pay any and all fees associated with maintaining the R&W Insurance Policy.   Notwithstanding any provision in this Agreement to the contrary, Purchaser acknowledges and agrees that: (i) the Sellers shall not be required to pay the Purchaser Indemnified Parties any amounts with respect to Damages in excess of the Cap (taking into account the Deductible) by reason of any indemnification claim pursuant to Section 9.2(a) and Section 9.2(b), other than as set forth in Section 9.4(c), and (ii) accordingly once Sellers in the aggregate have paid the Purchaser Indemnified Parties Damages up to the Cap (taking into account the Deductible) the sole recourse and remedy of the Purchaser Indemnified Parties for indemnification pursuant to Section 9.2(a) and Section 9.2(b), except for the matters to which the Cap will not apply as set forth in Section 9.4(c), shall be made against and, to the extent of, the R&W Insurance Policy. The Purchaser Indemnified Parties expressly waive the right to recover any amount outside of or in excess the R&W Insurance Policy and the Cap (taking into account the Deductible) for any Losses arising under Section 9.2(a) or Section 9.2(b), except for the matters to which the Cap will not apply as set forth in Section 9.4(c).  The foregoing restrictions shall be in addition to, and not in limitation of, any further limitation of liability that might otherwise apply (whether by reason of a Purchaser Indemnified Party's waiver, relinquishment or release of any applicable rights or otherwise).  NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY,

PURCHASER, ON BEHALF OF ITSELF AND THE OTHER PURCHASER INDEMNIFIED PARTIES, ACKNOWLEDGES AND AGREES THAT THE FOREGOING SHALL CONTINUE TO APPLY IF (i) THE R&W INSURANCE POLICY IS REVOKED, CANCELLED OR MODIFIED, OR EXPIRES, IN ANY MANNER; (ii) ANY CLAIM MADE AGAINST THE R&W INSURANCE POLICY IS DENIED BY THE INSURER; OR (iii) ALL AMOUNTS PERMITTED TO BE RECOVERED AGAINST THE R&W INSURANCE POLICY HAVE BEEN RECOVERED.

Section 9.12     Adjustment to Purchase Price.

The Parties agree to treat any amounts payable pursuant to this Article 9 or Section 7.4 as an adjustment to the Purchase Price for all Tax purposes.

ARTICLE 10

POST-CLOSING COVENANTS

Section 10.1     Confidentiality.

(a)     From and after the Closing, the Purchaser shall, and shall cause its Affiliates and their and its Affiliates' representatives to (i) maintain the confidentiality of, (ii) not disclose to any other Person (other than Purchaser's Affiliates or related Persons and their respective advisors), and (iii) not use, any Sellers' Confidential Information, except that Purchaser or its Affiliates may disclose the Sellers' Confidential Information (A) to the extent required by Law, in any report, statement, testimony or other submission to any Governmental Entity having jurisdiction over Purchaser or its Affiliates, as applicable, (B) as may be reasonably necessary or advisable in connection with any Tax Returns, accounting records, financial reporting obligations or any audit or (C) in order to comply with any Law applicable to the Purchaser or its Affiliates, as applicable, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the Purchaser or its Affiliates, as applicable, in the course of any claim, investigation or Legal Proceeding.  If the Purchaser or any of its Affiliates becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar judicial or administrative process to disclose any Sellers' Confidential Information, the Purchaser shall provide the Sellers with prompt prior written notice of such requirement and, to the extent reasonably practicable, cooperate with the Sellers (at the Sellers' expense) to obtain a protective order or similar remedy to cause such Sellers' Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege.  In the event that such protective order or other similar remedy is not obtained, the Purchaser or its applicable Affiliates shall furnish only that portion of the Sellers' Confidential Information that has been legally compelled and shall exercise its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded to such disclosed Sellers' Confidential Information.  The Purchaser hereby agrees, and shall cause its Affiliates and its Affiliates' representatives, to protect the Sellers' Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized disclosure of the Sellers' Confidential Information as the Purchaser or its applicable Affiliates use to protect their own confidential information of a like nature.

(b)     From and after the Closing, the Sellers shall, and shall cause their Affiliates and their and their representatives to (i) maintain the confidentiality of, (ii) not disclose to any other Person (other than Sellers' Affiliates or related Persons and their respective advisors), and (iii) not use, any Business Confidential Information, except that the Sellers and their Affiliates may disclose Business Confidential Information (A) to the extent required by Law, in any report, statement, testimony or other submission to any Governmental Entity having jurisdiction over the Sellers or their Affiliates, as applicable, (B) as may be reasonably necessary or advisable in connection with any Tax Returns,

-62-

accounting records, financial reporting obligations or any audit or (C) in order to comply with any Law applicable to Seller or their Affiliates, as applicable, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the Sellers or their Affiliates, as applicable, in the course of any claim, investigation or Legal Proceeding.  If the Sellers or any of their Affiliates becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar judicial or administrative process to disclose any Business Confidential Information, the Sellers shall provide the Purchaser with prompt prior written notice of such requirement and, to the extent reasonably practicable, cooperate with the Purchaser and the Purchaser's Affiliates (at the Purchaser's expense) to obtain a protective order or similar remedy to cause Business Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege.  In the event that such protective order or other similar remedy is not obtained, the Sellers or their applicable Affiliates shall furnish only that portion of Business Confidential Information that has been legally compelled and shall exercise its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded to such disclosed Business Confidential Information.  The Sellers hereby agree and shall cause their Affiliates and their and their representatives, to protect the Business Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized disclosure of Business Confidential Information as the Sellers or their applicable Affiliates use to protect their own confidential information of a like nature.

(c)        "Sellers' Confidential Information" means all non-public information relating to the Sellers and their Affiliates, other than Business Confidential Information, made available to the Purchaser or its Affiliates prior to the Closing by the Sellers or their Affiliates or their respective representatives (including information disclosed in the course of negotiation of this Agreement), except that "Sellers' Confidential Information" shall not include information which (i) is or becomes generally available to the public (other than as a result of its disclosure in violation of the paragraphs above), (ii) was already known to the Purchaser or its Affiliates (other than by previous disclosure by the Sellers or their Affiliates or their respective representatives) as of the date hereof and not subject to any duty of confidentiality to the Sellers or their Affiliates, (iii) is independently developed by the Purchaser or its Affiliates without reference to any Sellers' Confidential Information or (iv) after the Closing Date, is lawfully made available or known to the Purchaser or its Affiliates by a Person not subject to any duty of confidentiality to the Sellers or their Affiliates or their respective representatives. "Business Confidential Information" means all non-public information relating to the business of the Company, except that "Business Confidential Information" shall not include information which (1) is or becomes generally available to the public (other than as a result of its disclosure in violation of the paragraphs above), (2) is independently developed by the Sellers or their Affiliates without reference to any Business Confidential Information, or (3) after the Closing Date, is lawfully made available or known to the Sellers or their Affiliates by a Person not subject to any duty of confidentiality to the Purchaser or its Affiliates or its representatives.

Section 10.2        Access to Records after Closing.

(a)        For a period of two (2) years after the Closing Date, each Seller and its representatives shall have reasonable access to all of the books and records of the Company, to the extent that such access may reasonably be required in connection with matters relating to or affected by the operations of the Company prior to the Closing Date, including the preparation of the Seller's financial reports or Seller Tax Returns, any Seller Tax Claims, the defense or prosecution of Legal Proceedings, and any other reasonable need of the Seller to consult such books and records.  Such access shall be afforded by Purchaser upon receipt of reasonable advance notice and during normal business hours.  If any such books or records, or any other documents which the Sellers have the right to have access to pursuant to this Section 10.2(a) are produced by Purchaser or the Company, or any of their respective Affiliates, to an actual or potentially adverse party (e.g., in litigation or in connection with a government

investigation), Purchaser shall endeavor to immediately make all such books, records and/or documents produced available for inspection and copying by the Sellers concurrently with the production of such books, records and/or documents.  In addition, if Purchaser or the Company, or any of their respective Affiliates, shall desire to dispose of any of such books or records prior to the expiration of such two (2) year period, Purchaser shall, prior to such disposition, give the Sellers a reasonable opportunity to segregate and remove such books and records as the Sellers may select. For the avoidance of doubt, the access of each Seller and its representatives shall only extend beyond such two (2) year period in the event that the Company, Clarke or a Seller is audited for Tax purposes by a Governmental Entity.

(b)     Purchaser shall provide to any Seller so requesting (at such Seller's expense), reasonable assistance by providing employees of the Company to act as witnesses and preparing documents, reports and other information requested by such Seller in support of the activities described in Section 10.2(a).

Section 10.3     Directors' and Officers' Indemnification and Exculpation.

(a)     Purchaser agrees that all rights to indemnification and exculpation for acts or omissions occurring prior to the Closing now existing in favor of the current or former managers or officers (or persons holding similar positions) of the Company who have the right to indemnification or exculpation by the Company (collectively, the "Covered Persons") as provided in its Organizational Documents of the Company, indemnity or indemnification agreements, as provided under Law or as provided pursuant to a resolution of the Company shall survive the transactions contemplated hereby and shall continue in full force and effect in accordance with their terms for a period of not less than six (6) years from the Closing.  Without limiting the foregoing, for a period of not less than six (6) years from the Closing, Purchaser shall not, and shall not permit the Company to, amend, modify or terminate any Organizational Document of the Company, Contract or resolution regarding or related to such indemnification matters.

(b)     The provisions of this Section 10.3 are (i) intended to be for the benefit of, and shall be enforceable by, each Covered Person and each other Person entitled to indemnification or coverage under a policy referenced in this Section 10.3, and each such Person's heirs, legatees, representatives, successors and assigns, it being expressly agreed that such Persons shall be third party beneficiaries of this Section 10.3, and (ii) in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise.

(c)     If Purchaser or its successors or assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Purchaser shall assume all of the obligations of Purchaser set forth in this Section 10.3.

Section 10.4     Car Lease.

Clarke leased a Mercedes Benz pursuant to a California Motor Vehicle Lease Agreement dated December 6, 2016 between the Company and Fletcher Jones Motor Cars, Inc (the "Old Car Lease"). The Old Car Lease was expensed and does not appear on the Company's balance sheet. Clarke hereby represents that the Old Car Lease has been terminated and is of no further effect upon Clarke trading in the vehicle under the Old Car Lease in exchange for a new Mercedes Benz, pursuant to the California Motor Vehicle Lease Agreement dated July 29, 2018, between the Company and Fletcher Jones Motor Cars, Inc. (the "New Car Lease"). The Old Car Lease required monthly payments of $2,456.43. The Company agrees to continue to pay $2,456.43 per month towards the New Car Lease as an off-balance

-64-

sheet expense for the duration of Clarke's employment with the Company or one of its Affiliates, and the difference will be deducted from Clarke's payroll.  At the latest upon termination of his employment with the Company or one of its Affiliates, Clarke shall ensure that the New Car Lease has been terminated or transferred to Clarke, SMS Inc. or another Person designated by Clarke.  Clarke agrees that in no event the Company shall be responsible to assume in excess of $2,456.43 per month under the New Car Lease (unless any amount in excess therefrom is deducted from Clarke's payroll as previously provided) for the duration of his employment with the Company or one of its Affiliates.  From and following the termination of Clarke's employment with the Company or one of its Affiliates, the Company shall be responsible for no payments, expenses or costs pursuant to or under the New Car Lease, nor shall the Company be responsible at any time for any fees or costs in connection with the early termination or transfer of the New Car Lease.

## ARTICLE 11

## TERMINATION

Section 11.1     Grounds for Termination.

(a)     This Agreement may be terminated at any time prior to the Closing:

(i)     by either the Purchaser or the Sellers if the Closing shall not have occurred by December 31, 2018 (the "Outside Date") provided that Purchaser cannot terminate under this Section 11.1(a)(i) if the failure of the Closing to occur is the result of a breach by Purchaser of its representations, warranties, covenants or agreements hereunder and the Sellers cannot terminate this Agreement under this Section 11.1(a)(i) if the failure of the Closing to occur is the result of a breach by Sellers of their representations, warranties, covenants or agreements hereunder;

(ii)     by the Purchaser if any Seller shall have breached any of the representations, warranties, covenants or agreements contained in this Agreement to be complied with by such Seller such that a closing condition set forth in Section 8.1 or Section 8.2 would not be satisfied; provided that such breach, if capable of being cured, is not cured by the Sellers or waived by Purchaser within thirty (30) days after the Sellers receive written notice of such breach from Purchaser;

(iii)     by the Sellers if the Purchaser shall have breached any of the representations, warranties, covenants or agreements contained in this Agreement to be complied with by the Purchaser such that a closing condition set forth in Section 8.1 or Section 8.3 would not be satisfied; provided that such breach, if capable of being cured, is not cured by the Purchaser or waived by the Sellers within thirty (30) days after the Purchaser receive written notice of such breach from the Sellers;

(iv)     by the Purchaser, on the one hand, or the Sellers, on the other hand, in writing if there shall be in effect a non-appealable order prohibiting, enjoining, restricting or making illegal the transactions contemplated by this Agreement; or

(v)     by mutual written agreement of the Purchaser and the Sellers.

(b)     If this Agreement is terminated as permitted by this Article 11, such termination shall be without liability of any Party (or any Party's Affiliates or representatives), except liability for any Fraud or for any willful breach of any covenants or other agreements under this Agreement or the

Ancillary Agreements prior to such termination, or under the following provisions, which shall survive termination: Section 7.3, Section 7.5 this Section 11.1(b) and Article 12.

ARTICLE 12

MISCELLANEOUS

Section 12.1    Notices.

All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered if personally delivered by hand (with written confirmation of receipt), (b) one (1) Business Day following the day sent by a nationally recognized overnight courier service, (c) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and confirmation of receipt is obtained by the Person sending such notice, demand or other communication promptly after completion of the transmission, or (d) on the date of confirmation of receipt of transmission, if sent to the e-mail address given below.  Notices, demands and communications to the Parties shall, unless another address, facsimile number or email address is specified in writing in accordance with the terms set forth herein, be sent to the address, facsimile number or email address indicated below:

> to the Sellers:
>
> > Supplier Management Services, Inc.
> > 4104 Trimaran Drive
> > Lake Havasu City, Arizona 86406
> > Attention:  Steven M. Clarke
> > Email:  SteveClarke@smssolutionsinc.com
>
> With a copy to (which shall not constitute notice)
>
> > Sheppard, Mullin, Richter & Hampton LLP
> > 333 South Hope St., 43rd Floor
> > Los Angeles, California 90071
> > Attention: Lawrence M. Braun, Esq. and Stephen R. LaSala, Esq.
> > Email: LBraun@sheppardmullin.com
> > Email:  SLaSala@sheppardmullin.com
> > Facsimile:  213-443-2814
>
> and
>
> > Corbel Capital Partners
> > 11777 San Vicente Blvd, Suite 777
> > Los Angeles, California 90049
> > Attention:  J. Rudy Freeman
> > Email:  RFreeman@corbelcap.com
>
> to Purchaser:
>
> > TRIGO Group
> > 4 avenue Pablo Picasso
> > 92000 Nanterre – FRANCE 10022

-66-

Attention:  Matthieu Rambaud
Email:  matthieu.rambaud@trigo-group.com
Facsimile:  +33 (0)1 41 44 07 67

With a copy to (which shall not constitute notice):

Osler, Hoskin & Harcourt LLP
1000 De La Gauchetiere Street West
Montreal, Quebec
Canada H3H 1C1
Attention: Niko Veilleux
Email:  nveilleux@osler.com
Facsimile:  514-904-8101

Section 12.2     Time of the Essence.

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.3     Announcements.

No press release, public statement or announcement or other public disclosure with respect to this Agreement, the Ancillary Agreements or the transactions contemplated hereby and thereby (each an "Announcement") may be made (a) prior to the Closing by the Purchaser, except with the prior written consent (not to be unreasonably withheld or delayed) of Sellers or (b) after the Closing by any Party (other than customary factual announcements or statements regarding the fact of ownership of the Company and the fact of the occurrence of the Closing (but not purchase price), including by press release, communications with investors or members or other customary disclosures) or prior to the Closing by any Seller, except with the prior written consent (not to be unreasonably withheld or delayed) of the other Parties, unless in each case required by Law or a Governmental Entity, in which case the Party making the announcement will, to the extent practicable, obtain the approval of the other Parties in writing and in advance as to the form, nature and extent of the disclosure (approval which shall not be unreasonably withheld, conditioned or delayed).

Section 12.4     Third Party Beneficiaries.

Except as otherwise provided in Section 9.2, Section 9.3 and Section 10.3, the Parties intend that this Agreement will not benefit or create any right or cause of action in favor of any Person, other than the Parties.  No Person, other than the Parties, shall be entitled to rely on the provisions of this Agreement in any Legal Proceeding or other forum.

Section 12.5     Amendments.

This Agreement may only be amended, supplemented or otherwise modified by written agreement signed by the Sellers and the Purchaser.

Section 12.6     Waiver.

No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision (whether or not similar).  No waiver will be binding unless executed in writing by the Party to be bound by the waiver.  A Party's failure or delay in exercising any right under this Agreement will not

-67-

operate as a waiver of that right. A single or partial exercise of any right will not preclude a Party from any other or further exercise of that right or the exercise of any other right.

Section 12.7    Entire Agreement.

This Agreement, the Ancillary Agreements and all other agreements, certificates and other instruments delivered or given pursuant to this Agreement constitute the entire agreement among the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties. There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, among the Parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement, the Ancillary Agreements and all other agreements, certificates and other instruments delivered or given pursuant to this Agreement. The Parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

Section 12.8    Successors and Assigns.

(a)    This Agreement becomes effective only when executed by each of the Parties. After that time, it is binding on and inures to the benefit of the Parties and their respective successors and permitted assigns.

(b)    Neither Seller may assign this Agreement without the written consent of the Purchaser, and any such purported assignment is void. The Purchaser may not assign this Agreement without the written consent of the Sellers, and any such purported assignment is void; provided that the Purchaser may assign this Agreement to an Affiliate if Purchaser guarantees the obligations of such Affiliate under this Agreement.

Section 12.9    Specific Performance.

The Parties acknowledge that the failure to comply with a covenant or obligation contained in this Agreement may give rise to irreparable injury to a Party inadequately compensable in damages. Accordingly, a Party may enforce the performance of this Agreement by injunction or specific performance upon application to a court of competent jurisdiction without proof of actual damage (and without requirement of posting a bond or other security).

Section 12.10   Setoff Right

Upon notice to SMS Inc. specifying in reasonable detail the basis therefore, the Purchaser may set off any amount to which it claims to be entitled from SMS Inc. or Clarke, including any amounts that may be owed under Section 3.3 or Article 9 (but subject to the limitations set forth therein), against amounts otherwise payable as Earn-Out Payment or under any provision of this Agreement. The exercise of such right of setoff by the Purchaser in good faith, whether or not ultimately determined to be justified, will not constitute a default under this Agreement, regardless of whether SMS Inc. or Clarke disputes such setoff claim, or whether such setoff claim is for a contingent or an unliquidated amount. Neither the exercise of, nor the failure to exercise, such right of setoff will constitute an election of remedies or limit the Purchaser in any manner in the enforcement of any other remedies that may be available to it. Notwithstanding the foregoing, in the event that SMS Inc. notifies Purchaser that it disputes any setoff claim pursuant to this Section 12.10, such amounts proposed to be withheld by Purchaser in connection with such setoff claim shall instead be placed into escrow with a reputable third-party escrow agent to be agreed upon by SMS Inc. and Purchaser until such claim is resolved pursuant to the terms and conditions

-68-

of this Agreement and a customary escrow agreement between Purchaser, SMS Inc. and the escrow agent. The fees and expenses of the escrow agent shall be borne 50% by Purchaser and 50% by SMS Inc.

Section 12.11   Consent.

Each of the Sellers and Clarke (in each case, in their capacities as members of the Company (as applicable), the manager of the Company (as applicable), and in all other capacities) consent to the transactions contemplated hereunder for all purposes, including all purposes under the Amended and Restated Limited Liability Company Operating Agreement of the Company, dated March 12, 2015, as amended.

Section 12.12   Severability.

If any provision of this Agreement is determined to be illegal, invalid or unenforceable by an arbitrator or any court of competent jurisdiction, (a) that provision will be severed from this Agreement and the remaining provisions will remain in full force and effect, and (b) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision.

Section 12.13   Governing Law.

This Agreement shall be governed by and construed under the Laws of the State of New York as applied to agreements among New York residents entered into and to be performed entirely within New York and all Legal Proceedings or other disputes, claims or controversies arising out of this Agreement or the negotiation, validity or performance hereof or the transactions contemplated herein, shall be construed under and governed by the Laws of such state, without giving effect to any conflicts of Laws principles that would apply any other Law.

Section 12.14   Dispute Resolution.

Each Party agrees that it shall bring any Legal Proceeding arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, exclusively in the United States District Court for the Southern District of New York.  By execution and delivery of this Agreement, each Party (a) accepts the non-exclusive jurisdiction of the aforesaid courts, (b) irrevocably agrees to be bound by any final judgment (after any and all appeals) of any such court and agrees that such final, non-appealable judgment may be enforced by suit on the judgment or in any other manner provided by Law, (c) irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of venue of any Legal Proceeding with respect to this Agreement in any such court, and further irrevocably waives, to the fullest extent permitted by Law, any claim that any such Legal Proceeding brought in any such court has been brought in any inconvenient forum, (d) agrees that service of process in any such action may be effected by mailing a copy thereof by the means of notice set forth in Section 12.1, to such Party at its notice address set forth herein, or at such other address of which the other Party hereto shall have been notified and (e) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Law.

Section 12.15   Waiver of Jury Trial.

Each of the Parties knowingly, voluntarily and intentionally waives, to the extent permitted by Law, any right it may have to a trial by jury in respect of any Legal Proceeding.  Furthermore, each of the Parties waives any right to consolidate any action in which a jury trial has been waived with any other

action in which a jury trial cannot be or has not been waived.  This provision is a material inducement for the Parties to enter into this Agreement.

Section 12.16   Legal Representation.

Sheppard, Mullin, Richter & Hampton LLP ("SMRH") has acted as counsel for Clarke, SMS Inc. and the Company (the "Represented Parties") in connection with this Agreement (the "Acquisition Engagement"). For the avoidance of doubt, SMRH has not acted as counsel for Corbel. Corbel is represented by separate counsel.

(a)     Acquisition Engagement.  All communications between the Represented Parties and SMRH in the course of the Acquisition Engagement shall be deemed to be attorney-client confidences that belong solely to Clarke and SMS Inc. and not the Company.  Accordingly, Purchaser shall not have access to any such communications, or to the files of SMRH relating to the Acquisition Engagement, whether or not the Closing occurs.  Without limiting the generality of the foregoing, upon and after the Closing, (i) Clarke, SMS Inc. and SMRH shall be the sole holders of the attorney-client privilege with respect to the Acquisition Engagement, and neither the Company nor Purchaser shall be a holder thereof, (ii) to the extent that files of SMRH in respect of the Acquisition Engagement constitute property of the client, only Clarke and SMS Inc. shall hold such property rights, and (iii) SMRH shall have no duty whatsoever to reveal or disclose any such attorney-client communications or files to the Company or Purchaser by reason of any attorney-client relationship between SMRH and the Company or otherwise.

(b)     Post-Closing Representation of Clarke and SMS Inc. Including Matters Relating to the Acquisition.  If Clarke or SMS Inc. so desire, and without the need for any consent or waiver by the Company or Purchaser, SMRH shall be permitted to represent Clarke and/or SMS Inc. after the Closing in connection with any matter, including without limitation anything related to the transactions contemplated by this Agreement or any disagreement or dispute relating thereto.  Without limiting the generality of the foregoing, after the Closing, SMRH shall be permitted to represent Clarke and/or SMS Inc. any of their agents and Affiliates, or any one or more of them, in connection with any matter whatsoever, including, without limitation, any negotiation, transaction or dispute ("dispute" includes litigation, arbitration, mediation, negotiation or other adversary proceeding) with Purchaser, the Company or any of their agents or Affiliates under or relating to this Agreement, any transaction contemplated by this Agreement, and any related matter (such as claims for indemnification and disputes involving employment or noncompetition or other agreements entered into in connection with this Agreement), whether or not such matter is related to the Acquisition Engagement.

(c)     Cessation of Attorney-Client Relationship with Company.  Upon and after the Closing, the Company shall cease to have any attorney-client relationship with SMRH, after the Closing SMRH is subsequently engaged in writing by the Company to represent the Company and either such engagement involves no conflict of interest with respect to Clarke or SMS Inc. or Clarke and SMS Inc. consent in writing to such engagement.  Any representation of the Company or Purchaser, or any of their respective Affiliates, by SMRH after Closing shall not affect the provisions of this Section 12.16.  For example, and not by way of limitation, even if SMRH is representing the Company thereof after the Closing, SMRH shall be permitted simultaneously to represent Clarke and/or SMS Inc. in any matter, including, without limitation, any disagreement or dispute relating to the transactions contemplated hereby.  Furthermore, SMRH shall be permitted to withdraw from any engagement by the Company or Purchaser, or any of their respective Affiliates, in order to be able to represent or continue so representing Clarke and/or SMS Inc. even if such withdrawal causes the Company or any Affiliate thereof additional legal expense (such as to bring new counsel "up to speed"), delay or other prejudice.

-70-

(d)     Consent and Waiver of Conflicts of Interest.  All of the parties hereto consent to the arrangements in this <u>Section 12.16</u> and waive any actual or potential conflict of interest that may be involved in connection with any representation by SMRH permitted hereunder.

Section 12.17   Counterparts.

This Agreement may be executed in any number of counterparts (including counterparts by facsimile or email) and all such counterparts taken together shall be deemed to constitute one and the same instrument. This Agreement and any amendments hereto, to the extent executed and delivered by means of a facsimile machine or e-mail of a PDF file containing a copy of an executed agreement (or signature page thereto), shall be treated in all respects and for all purposes as an original agreement or instrument and shall have the same binding legal effect as if it were the original signed version thereof.

*[Remainder of page intentionally left blank. Signature pages follow.]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the date first written above.

**SUPPLIER MANAGEMENT SOLUTIONS, INC.**

By: _____

Name:   Steven M. Clarke
Title:    President

**STEVEN M. CLARKE**

_____

Steven M. Clarke, in his personal capacity

[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]

**CORBEL STRUCTURED EQUITY PARTNERS, L.P.**

By: Corbel Capital Advisors, LLC, its General Partner

    By: Corbel Management, LLC, its Manager

    By: _____
    Name: Jeffrey B. Schwartz
    Title: Manager

**CORBEL STRUCTURED EQUITY PARTNERS PARALLEL, L.P.**

By: Corbel Capital Advisors, LLC, its General Partner

    By: Corbel Management, LLC, its Manager

    By: _____
    Name: Jeffrey B. Schwartz
    Title: Manager

**CORBEL SMS, L.P.**

By: Corbel Capital Advisors, LLC, its General Partner

    By: Corbel Management, LLC, its Manager

    By: _____
    Name: Jeffrey B. Schwartz
    Title: Manager

**CORBEL INTERNATIONAL A, LLC**

By: Corbel Capital Advisors, LLC, its General Partner

    By: Corbel Management, LLC, its Manager

    By: _____
    Name: Jeffrey B. Schwartz
    Title: Manager

[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]

**TRIGO U.S., INC.**

By: _____
Name:   Matthieu Rambaud
Title:    President

**SCHEDULE A**

**DISCLOSURE LETTER**

See attached.

---

DISCLOSURE LETTER

to the

PURCHASE AND SALE AGREEMENT

by and among

SUPPLIER MANAGEMENT SOLUTIONS, INC.

and

CORBEL STRUCTURED EQUITY PARTNERS, L.P.

and

CORBEL STRUCTURED EQUITY PARTNERS PARALLEL, L.P.

and

CORBEL SMS, L.P.

and

CORBEL INTERNATIONAL A, LLC

and

MR. STEVEN M. CLARKE

and

TRIGO U.S., INC.

Dated as of August 10, 2018

---

**Section 1.1(a)**

**Permitted Liens**

Liens customarily arising under state and federal securities Laws.

## Section 5.1(a)

### Execution and Delivery; Valid and Binding Agreements

None.

**<u>Section 5.1(b)</u>**

**Organization**

None.

**<u>Section 5.1(c)</u>**

**Authorization**

None.

**<u>Section 5.1(d)</u>**

**Non-Contravention; No Consents or Approvals**

(i). None.

(ii). The DDTC Notification and CFIUS Notice must be made in connection with the transactions contemplated by the Agreement.

(iii).

1.  Enterprise Sourcing Agreement, dated as of February 14, 2017, between Triumph Group, Inc. and SMS LLC (formerly known as SMS Inc.).

2.  Purchase Order # 4500114090 dated 9/13/17 made by Triumph Aerostructures, LLC under the Adoption Agreement-Enterprise Sourcing Agreement Number 20170308SM made effective as of May 1, 2017 by and between Triumph Aerostructures, LLC and SMS LLC and Statement of Work No. 2017-SMS-001 dated May 1, 2017 issued pursuant thereto.

3.  Statement of Work No. 2017-SMS-001 dated August 14, 2017 issued pursuant to the Adoption Agreement-Enterprise Sourcing Agreement Number 20170308SM made effective as of August 14, 2017 by and between Triumph Aerostructures, LLC and SMS LLC (formerly known as SMS Inc.).

4.  Purchase Order: 200578946 between Hamilton Sundstrand Corp and SMS LLC (formerly known as SMS Inc.).

5.  Master Terms Agreement, dated as of June 1, 2016, among Hamilton Sundstrand Corporation, Goodrich Corporation, and SMS LLC (formerly known as SMS Inc.).

6.  US Small Business Administration Note #400-623-5000, dated March 1, 2011, given by SMS LLC (formerly known as SMS Inc.) in favor of Enterprise Funding Corporation.

7.  Loan Agreement, dated March 1, 2011 between SMS LLC (formerly known as SMS Inc.), Steven M. Clarke and Steven P. Haskett, and Enterprise Funding Corporation.

8.  Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated March 1, 2011, between Enterprise Funding Corporation, SMS LLC (formerly known as SMS Inc.) and Chicago Title Company.

9.  Promissory Note, dated September 6, 2013, between SMS LLC (formerly known as SMS Inc.) and First-Citizens Bank & Trust Company.

10. Business/Commercial Loan Agreement, dated as of September 6, 2013, between First-Citizens Bank & Trust Company and SMS LLC (formerly known as SMS Inc.).

11. Deed of Trust, dated September 6, 2013 among First-Citizens Bank & Trust Company, SMS LLC (formerly known as SMS Inc.) and Neuse Incorporated.

12. Factoring Agreement, dated February 9, 2016, as amended by that certain Modification of Factoring Agreement letter agreement, dated December 2, 2016, between AmeriFactors Financial Group, LLC and the Company.

13. Demand Promissory Note, dated July 3, 2018 given by the Company in favor of AmeriFactors Financial Group, LLC.

14. (i) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank.

**<u>Section 5.1(e)</u>**

**Title and Ownership**

None.

## **Section 5.1(f)**

### **Brokers**

D.A. Davidson & Co. is an investment banking firm which will receive remuneration for services provided in connection with the transactions contemplated by the Agreement.

**<u>Section 5.1(g)</u>**

**No Legal Proceedings**

Robert Fisher, an employee of SMS LLC, filed a workers' compensation claim on August 7, 2018, under Claim #Y67C87995.

## Section 5.2(a)

### Formation and Qualification

None.

**Section 5.2(b)**

**Capitalization**

(i).

**Equity Interests**

| Name | Class A Units | Class B Units |
|---|---|---|
| Supplier Management Solutions, Inc., a Nevada corporation | 7,250 | -0- |
| Corbel Structured Equity Partners, L.P., a California limited partnership | -0- | 199.4205 |
| Corbel Structured Equity Partners Parallel, L.P., a California limited partnership | -0- | 1,735.7898 |
| Corbel SMS, L.P., a California limited partnership | -0- | 1,222.2222 |
| Corbel International A, LLC, a California limited liability company | -0- | 32.5675 |

(ii). None.

(iii). None.

(iv). None.

**Section 5.2(c)**

**No Conflict**

(i). None.

(ii).

1. Enterprise Sourcing Agreement, dated as of February 14, 2017, between Triumph Group, Inc. and SMS LLC (formerly known as SMS Inc.).

2. Purchase Order # 4500114090 dated 9/13/17 made by Triumph Aerostructures, LLC under the Adoption Agreement-Enterprise Sourcing Agreement Number 20170308SM made effective as of May 1, 2017 by and between Triumph Aerostructures, LLC and SMS LLC and Statement of Work No. 2017-SMS-001 dated May 1, 2017 issued pursuant thereto.

3. Statement of Work No. 2017-SMS-001 dated August 14, 2017 issued pursuant to the Adoption Agreement-Enterprise Sourcing Agreement Number 20170308SM made effective as of August 14, 2017 by and between Triumph Aerostructures, LLC and SMS LLC (formerly known as SMS Inc.).

4. Purchase Order: 200578946 between Hamilton Sundstrand Corp and SMS LLC (formerly known as SMS Inc.).

5. Master Terms Agreement, dated as of June 1, 2016, among Hamilton Sundstrand Corporation, Goodrich Corporation, and SMS LLC (formerly known as SMS Inc.).

6. US Small Business Administration Note #400-623-5000, dated March 1, 2011, given by SMS LLC (formerly known as SMS Inc.) in favor of Enterprise Funding Corporation.

7. Loan Agreement, dated March 1, 2011 between SMS LLC (formerly known as SMS Inc.), Steven M. Clarke and Steven P. Haskett, and Enterprise Funding Corporation.

8. US Small Business Administration Note for SBA Loan #400-623-5000, dated March 1, 2011, given by SMS LLC (formerly known as SMS Inc.) in favor of Enterprise Funding Corporation.

9. Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated March 1, 2011, between Enterprise Funding Corporation, SMS LLC (formerly known as SMS Inc.) and Chicago Title Company.

10. Promissory Note, dated September 6, 2013, between SMS LLC (formerly known as SMS Inc.) and First-Citizens Bank & Trust Company.

11. Business/Commercial Loan Agreement, dated as of September 6, 2013, between First-Citizens Bank & Trust Company and SMS LLC (formerly known as SMS Inc.).

12. Deed of Trust, dated September 6, 2013 among First-Citizens Bank & Trust Company, SMS LLC (formerly known as SMS Inc.) and Neuse Incorporated.

13. Factoring Agreement, dated February 9, 2016, as amended by that certain Modification of Factoring Agreement letter agreement, dated December 2, 2016, between AmeriFactors Financial Group, LLC and the Company.

14. Demand Promissory Note, dated July 3, 2018 given by the Company in favor of AmeriFactors Financial Group, LLC.

15. (i) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank.

(iii). None.

(iv). None.

**Section 5.2(d)**

**Required Consents**

None.

**Section 5.2(e)**

**Ordinary Course; No Material Adverse Effect; and Absence of Certain Developments**

(i).

1. Clarke leased a Mercedes Benz pursuant to a California Motor Vehicle Lease Agreement dated December 6, 2016 between SMS LLC (formerly SMS Inc.) and Fletcher Jones Motor Cars, Inc (the "Old Lease"). The Old Lease was expensed and does not show on the Company's balance sheet. Clarke traded in the vehicle under the Old Lease in exchange for a new Mercedes Benz, pursuant to the California Motor Vehicle Lease Agreement dated July 29, 2018, between SMS LLC (formerly SMS Inc.) and Fletcher Jones Motor Cars, Inc. (the "New Lease"). The Old Lease required payments of $2,456.43 monthly. The Company will continue to pay $2,456.43 towards the New Lease as an off-balance sheet expense, and the difference will be deducted from Clarke's payroll.

2. The loan with Mohave State Bank, expiring September 21, 2018, was renewed for $400,000, pursuant to the (i) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank.

(ii). None.

(iii). None.

(iv).

The Company's CPA completed the 2016 and 2017 audits and finalized them in July 2018. Several adjusted journal entries were made as of December 31, 2017:

1. Added 85% factored invoices back into the balance sheet.

2. Transferred general ledger called "Accounts Receivable From LLC" to general ledger account called "Notes Receivable from Shareholder".

3. Reclassified debt issuance costs for the Corbel Credit Agreement from non-current assets to a contra-liability account.

    *Note: The subsequent 2018 monthly balance sheets have not yet been updated.

(v). None.

(vi). None.

(vii). None.

(viii). None.

(ix). None.

**<u>Section 5.2(f)</u>**

**Compliance with Laws**

None.

**Section 5.2(g)**

**Permits**

1.  DSP-05 License Number: 050618494.

2.  DSP-05 License Number: 050618493.

3.  DSP-05 License Number: 050624951 as amended by DSP-06 License Number: 060051299.

4.  DSP-05 License Number: 050618487.

5.  DSP-05 License Number: 050639995.

6.  ITAR Manufacturer Registration Code: M31289.

7.  60-day Notification of Acquisition of SMS Inc. (M31289) by TRIGO Holding, dated June 21, 2018.

8.  City of Temecula Business License Certificate Number 033525.

9.  Lake Havasu Business Permit Number 17-00030237.

10. International Traffic in Arms Regulations Manufacturer Registration Statement Number M31289.

11. Federal Supplier Awards Management Number 5PLE9.

12. Dun & Bradstreet Credit Report 00-607-8509.

13. State Jurisdictions:

| STATE REGISTRATIONS | DEPT. OF REVENUE | UNEMPLOYMENT | SECRETARY OF STATE |
|---|---|---|---|
| Arizona | 26-4433434 | 6713601 | |
| Arkansas | 70716363-WHW | 000368481 | |
| California | 26-4433434 | 281-7728-5 | |
| Colorado | 2872153 | 765351.00-7 | |
| Connecticut | 53899134-00 | 95-041-72 | |
| Florida | | 29036909 | F11000001543 |
| Georgia | 3071512-TP | 085541-01 | |
| Illinois | 26-4433434 | 4727859 | |

| Indiana | 0147045630 001 8 | 631418 | |
| Iowa | 26-4433434 | 00524538 | |
| Kansas | 036264433434F01 | 412234 | 4504734 |
| Maine | | 0276987003 | |
| Maryland | 15950169 | 0077584161 | |
| Massachusetts | WTH-10789442-003 | 21-99075-5 | |
| Michigan | 26-4433434 | 2020170000 | |
| Minnesota | 4543810 | 05134094 | |
| Missouri | 20649291 | 02-71182-0-00 | F01133822 |
| New Jersey | 264-433-434/000 | 264-433-434/000 | |
| New Hampshire | | 000227851 | |
| New Mexico | 03-367213-000 | 10021763 | 5353971 |
| New York | 264433434-8 | 4914014-2 | |
| Nevada | NV20131269346 | | |
| Ohio | 52-7898910 | 1546320-00-9 | |
| Oklahoma | WTH1015329802 | 01-4739108 | |
| Oregon | 1615629-5 | 1615629-5 | |
| South Carolina | 10355508-3 | 629221 | |
| Tennessee | 322593548 | 0824-994 7 | |
| Texas | | 13-195083-7 | |
| Utah | | | 10366554-0161 |
| Washington | | 603-090-733 | |

14.  International Jurisdictions:

| 1. | **Canada** | | |
| | ADP | TIGM | |
| 2. | **Netherlands** | | |
| | ADP | NL143278 | |
| 3. | **Australia** | | |
| | ADP | | |
| | Superannuation | 6050177911 | |
| | Australian Tax Office | 930050873 | |

| | | | |
|---|---|---|---|
| **4.** | **Austria** | | Inactive |
| | Hubner & Hubner | 120895 | |
| **5.** | **Mexico** | | |
| | HRM | HRM-090508-450 | Inactive |
| **6.** | **United Kingdom** | | |

**Section 5.2(h)**

**Assets**

(i).

1. First-Citizens Bank & Trust Company has a security interest in the real property located at 27476 and 27482 Via Industria, Temecula, California 92590 as well as related additional collateral pursuant to the (i) Business Commercial Loan Agreement dated as of September 6, 2013 between First-Citizens Bank & Trust Company and SMS LLC (formerly known as SMS Inc.), (ii) Deed of Trust, dated September 6, 2013 among First-Citizens Bank & Trust Company, SMS LLC (formerly as SMS Inc.) and Neuse Incorporated, and (iii) Promissory Note, dated September 6, 2013, given by SMS LLC (formerly known as SMS Inc.) to First-Citizens Bank & Trust Company.  The ownership of this property and all obligations relating thereto will be transferred to SMS Inc. prior to Closing; post-Closing, SMS LLC will lease this property from SMS Inc. pursuant to the terms listed on Exhibit H of the Agreement.

2. Enterprise Funding Corporation has a security interest in the real property located at 27476 and 27482 Via Industria, Temecula, California 92590 as well as related additional collateral pursuant to the (i) Loan Agreement, dated March 1, 2011 between SMS LLC (formerly known as SMS Inc.), Steven M. Clarke and Steven P. Haskett, and Enterprise Funding Corporation, (ii) US Small Business Administration Note for SBA Loan #400-623-5000, dated March 1, 2011, given by SMS LLC (formerly known as SMS Inc.) in favor of Enterprise Funding Corporation, (iii) Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated March 1, 2011, between Enterprise Funding Corporation, SMS LLC (formerly known as SMS Inc.) and Chicago Title Company.  At or prior to the Closing, the Company shall transfer ownership of such real property to SMS Inc. The ownership of this property and all obligations relating thereto will be transferred to SMS Inc. prior to Closing; post-Closing, SMS LLC will lease this property from SMS Inc. pursuant to the terms listed on Exhibit H of the Agreement.

3. Mohave State Bank has a security interest in the real proprety located at 3129 Maricopa Avenue, Lake Havasu City Arizona as well as related additional collateral pursuant to the pursuant to the (i) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank. At or prior to the Closing, the Company shall transfer ownership of such real property to SMS Inc. The ownership of this property and all obligations relating thereto will be transferred to SMS Inc. prior to Closing; post-Closing, SMS LLC will lease this property from SMS Inc. pursuant to the terms listed on Exhibit H of the Agreement.

4. Corbel Structured Equity Partners, L.P., Corbel Structured Equity Partners Parallel, L.P., and any of their designated affiliates have a security interest in all of the Company's assets pursuant to the Corbel Credit Agreement.

5.   AmeriFactors Financial Group, LLC (a wholly-owned subsidiary of Gulf-Coast Bank and Trust) has a security interest in all Accounts (as defined in the Factoring Agreement) pursuant to the Factoring Agreement.

6.   UBS Credit Corp. has a security interest in the SMS Units pursuant to the UBS Line of Credit.

(ii). None.

**Section 5.2(i)**

**Real Property**

1. The Company owns the real property located at 27476 and 27482 Via Industria, Temecula, California 92590. The ownership of this property and all obligations relating thereto will be transferred to SMS Inc. prior to Closing; post-Closing, SMS LLC will lease this property from SMS Inc. pursuant to the terms listed on <u>Exhibit H</u> of the Agreement.

2. The Company owns the real property located at 3129 Maricopa Avenue, Lake Havasu City, Arizona 86406. The ownership of this property and all obligations relating thereto will be transferred to SMS Inc. prior to Closing; post-Closing, SMS LLC will lease this property from SMS Inc. pursuant to the terms listed on <u>Exhibit H</u> of the Agreement.

3. The Company leases real property located at 2330 Ohio Street, Unit C, Augusta, Kansas 67010, pursuant to that certain Lease Agreement, dated as of January 1, 2016m by and between Verus Bank as lessor and SMS LLC (formerly known as SMS Inc.) as lessee.

4. The Company leases real property located at 4675 MacArthur Court, Suite 1150, Newport Beach, California 92660, pursuant to that certain Lease, dated as of February 16, 2018, by and between The Irvine Company as landlord and the Company as tenant.

5. The Company leases real property located at 4104 Trimaran Drive, Lake Havasu City, Arizona 86406, pursuant to that certain Property Lease entered into effective January 1, 2009, by and between Steven M. Clarke and Connie Clarke as lessor and SMS LLC (formerly known as SMS Inc.) as lessee. This lease expired on January 1, 2011 and has continued as a month-month arrangement thereafter.

## Section 5.2(j)

## Material Contracts

(i).

(1)(A)

    1.  Master Terms Agreement, dated as of January 1, 2018, between Pratt & Whitney and SMS LLC and all applicable purchase orders.

(1)(C)

    1.  Service Level and Managed Services Platform Agreement, dated November 8, 2017 between Mythos Technology, Inc. and the Company.

(2).

    1.  Master Terms Agreement, dated as of January 1, 2018, between Pratt & Whitney and SMS LLC and all applicable purchase orders thereunder.

    2.  Enterprise Sourcing Agreement dated February 14, 2017 by and between Triumph Group, Inc. and SMS LLC (formerly known as SMS Inc.), and all applicable purchase orders thereunder.

(3). The Contracts set forth on Section 5.2(c)(ii) hereunder are hereby incorporated herein.

(4). The Contracts set forth on Section 5.2(y) hereunder are hereby incorporated herein.

(5).

    1.  Northrop Grumman Purchase Order Terms and Conditions and Purchase Order 2958605, dated as of June 29, 2017 between Northrop Grumman and SMS LLC.

    2.  Master Terms Agreement, dated as of May 24, 2016 between United Technologies Corporation and SMS LLC, and all applicable purchase orders thereunder.

    3.  Quote #2018-128, Subcontract Management Services, dated as of July 16, 2018 between Lockheed Martin Aeronautics Company and SMS LLC, and all applicable purchase orders thereunder.

    4.  Enterprise Sourcing Agreement, dated as of February 14, 2017, between Triumph Group, Inc. and SMS LLC, and all applicable purchase orders thereunder.

    5.  Master Terms Agreement, dated as of January 1, 2018, between Pratt & Whitney and SMS LLC and all applicable purchase orders.

    6.  Purchase orders M1285948, M5000259 and M5000277 between Eaton Corporation and SMS LLC.

      7.   Purchase order 4501087893, dated as of July 2, 2018 between Bell Helicopter and SMS LLC.

(6).

      1.   The Leases.

      2.   California Motor Vehicle Lease Agreement dated July 29, 2018, between SMS LLC (formerly known as SMS Inc.) and Fletcher Jones Motor Cars, Inc.

(7).

      1.   California Motor Vehicle Lease Agreement dated July 29, 2018, between SMS LLC (formerly known as SMS Inc.) and Fletcher Jones Motor Cars, Inc.

      2.   UBS Line of Credit.

      3.   Corbel Credit Agreement.

(8). None.

(9).

      1.   (a) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank.

      2.   (a) Business Commercial Loan Agreement dated as of September 6, 2013 between First-Citizens Bank & Trust Company and SMS LLC (formerly known as SMS Inc.), (b) Deed of Trust, dated September 6, 2013 among First-Citizens Bank & Trust Company, SMS LLC (formerly known as SMS Inc.) and Neuse Incorporated, and (c) Promissory Note, dated September 6, 2013, given by SMS LLC (formerly known as SMS Inc.) to First-Citizens Bank & Trust Company.

      3.   (i) Loan Agreement, dated March 1, 2011 between SMS LLC (formerly known as SMS Inc.), Steven M. Clarke and Steven P. Haskett, and Enterprise Funding Corporation, (ii) US Small Business Administration Note for SBA Loan #400-623-5000, dated March 1, 2011, given by SMS LLC (formerly known as SMS Inc.) in favor of Enterprise Funding Corporation, (iii) Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated March 1, 2011, between Enterprise Funding Corporation, SMS LLC (formerly known as SMS Inc.) and Chicago Title Company.

      4.   Factoring Agreement.

      5.   Demand Promissory Note, dated July 3, 2018 given by the Company in favor of AmeriFactors Financial Group, LLC.

      6.   Corbel Credit Agreement.

      7.   UBS Line of Credit.

8.  California Motor Vehicle Lease Agreement dated July 29, 2018, between SMS LLC (formerly known as SMS Inc.) and Fletcher Jones Motor Cars, Inc.

9.  The Company has credit cards with American Express, Chase Bank and First National Bank.

(10). None.

(11).

1.  *See* Section 5.2(s)(iii) of this Disclosure Letter. All employees sign a standard employment agreement with the Company.

2.  Consultant Agreement between SMS LLC (formerly SMS Inc.) and TRA Supply Chain Services, LLC, dated January 30, 2018.

3.  Independent Contractor Agreement, dated March 9, 2017, between SMS LLC (formerly SMS Inc.) and KRD Technical Services.

4.  Independent Contractor Agreement, dated May 3, 2018, between SMS LLC (formerly SMS Inc.) and Ryan Sales International.

5.  Independent Contractor Agreement, dated March 12, 2018, between SMS LLC (formerly SMS Inc.) and Center House DMCC.

6.  Independent Contractor Agreement, dated February 2, 2018, between SMS LLC (formerly SMS Inc.) and Westworld Associates.

(12). None.

(13).

1.  Pratt & Whitney Purchase Order #4400226936 issued as a release against SAP Contract #4680002037 for Engineering Services per SMS's Master Terms Agreement with United Technologies Corporation.

2.  Pratt & Whitney Purchase Order #4400226942 issued as a release against SAP Contract #4680002037 for Engineering Services per SMS's Master Terms Agreement with United Technologies Corporation.

3.  Pratt & Whitney Purchase Order #4400232173 issued as a release against SAP Contract #4680002037 for Engineering Services per SMS's Master Terms Agreement with United Technologies Corporation.

4.  Master Terms Agreement, dated as of January 1, 2018, between Pratt & Whitney and SMS LLC.

5.  Enterprise Sourcing Agreement dated February 14, 2017 by and between Triumph Group, Inc. and SMS LLC (formerly known as SMS Inc.)

6.  Purchase Order # 4500114090 dated 9/13/17 made by Triumph Aerostructures, LLC under the Adoption Agreement-Enterprise Sourcing Agreement Number

20170308SM made effective as of May 1, 2017 by and between Triumph Aerostructures, LLC and SMS LLC and Statement of Work No. 2017-SMS-001 dated May 1, 2017 issued pursuant thereto.

7. Statement of Work No. 2017-SMS-001 dated August 14, 2017 issued pursuant to the Adoption Agreement-Enterprise Sourcing Agreement Number 20170308SM made effective as of August 14, 2017 by and between Triumph Aerostructures, LLC and SMS LLC (formerly known as SMS Inc.)

8. Master Terms Agreement among Hamilton Sundstrand Corporation and Goodrich Corporation and SMS LLC (formerly known as SMS Inc.), dated June 1, 2016.

9. Purchase Order 200578946 made under the Master Terms Agreement among Hamilton Sundstrand Corporation and Goodrich Corporation and SMS LLC (formerly known as SMS Inc.)

10. Lockheed Martin Aeronautics Purchase Order Number 7253410, dated April 28, 2018.

11. Northrup Grumman Purchase Order 2958605 dated June 29, 2017.

(14)

1. Service Level and Managed Services Platform Agreement, dated November 8, 2017 between Mythos Technology, Inc. and the Company.

(ii). None.

(iii). None.

(iv). None.

**<u>Section 5.2(k)</u>**

**Intellectual Property**

(i).

(A) United States Copyright Office Certificate of Registration, Registration Number TXu 1-872-898, effective May 16, 2013.

(B)

1.   Assignment Agreement, dated as of December 28, 2011, between Mythos Technology, Inc. and SMS Inc.

2.   Service Level and Managed Services Platform Agreement, dated November 8, 2017 between Mythos Technology, Inc. and the Company.

(ii). None.

(iii). None.

(iv). None.

**Section 5.2(l)**

**Software**

(i.).

Software is purchased per user either as retail or Open License, based on the requirements of such user.  All software is catalogued and tracked via enterprise asset management engines installed on all devices, reporting back to centralized databases.  Software keys are also logged.

Windows desktop operating systems are all OEM provided licenses.

Microsoft Office is distributed to all users and is comprised of a mix of OEM provided licenses and Open License licenses:

| Manufacturer | License Number | Contract/Auth Number | Product Description | |
|---|---|---|---|---|
| MICROSOFT LICENSING GE | | 91901973ZZS1505 | OLP SNGL OFFICE STD 2013 NL | |
| MICROSOFT LICENSING GE | 61910654 | 91901973ZZS1505 | OLP SNGL OFFICE STD 2013 NL | VLIC |
| MICROSOFT LICENSING GE | 67683493 | 97683150ZZS1811 | OLP SNGL OFFICE STD 2016 NL | VLIC |
| MICROSOFT LICENSING GE | 66799305 | 96802690ZZS1804 | OLP SNGL OFFICE STD 2016 NL | VLIC |
| MICROSOFT LICENSING GE | 64164484 | 94166759ZZS1610 | OLP SNGL OFFICE STD 2013 NL | VLIC |
| MICROSOFT LICENSING GE | 63842337 | 93845122ZZS1607 | OLP SNGL OFFICE STD 2013 NL | VLIC |
| MICROSOFT LICENSING GE | 63714335 | 93717235ZZS1606 | OLP SNGL OFFICE STD 2013 NL | VLIC |
| MICROSOFT LICENSING GE | 67812439 | 97816843ZZS1812 | OLP SNGL OFFICE STD 2016 NL | VLIC |
| MICROSOFT LICENSING GE | 66958641 | 96960636ZZS1805 | OLP SNGL OFFICE STD 2016 NL | VLIC |

(ii). None.

**<u>Section 5.2(m)</u>**

**Data Protection**

None.

**Section 5.2(n)**

**Financial Statements**

(i).

The Company's CPA completed the 2016 and 2017 audits and finalized them in July 2018. Several adjusted journal entries were made as of December 31, 2017:

1. Added 85% factored invoices back into the balance sheet.

2. Transferred general ledger called "Accounts Receivable From LLC" to general ledger account called "Notes Receivable from Shareholder".

3. Reclassified debt issuance costs for the Corbel Credit Agreement from non-current assets to a contra-liability account.

   *Note: The subsequent 2018 monthly balance sheets have not yet been updated.

(ii). None.

(iii). None.

**Section 5.2(o)**

**No Liabilities**

None.

**<u>Section 5.2(p)</u>**

**Debt, Guarantees**

(i).

1. The loan with Mohave State Bank, expiring September 21, 2018, was renewed for $400,000, pursuant to the (i) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank.

2. California Motor Vehicle Lease Agreement dated July 29, 2018, between SMS LLC (formerly known as SMS Inc.) and Fletcher Jones Motor Cars, Inc.

(ii). None.

(iii).

10. (a) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank.

11. (a) Business Commercial Loan Agreement dated as of September 6, 2013 between First-Citizens Bank & Trust Company and SMS LLC (formerly known as SMS Inc.), (b) Deed of Trust, dated September 6, 2013 among First-Citizens Bank & Trust Company, SMS LLC (formerly known as SMS Inc.) and Neuse Incorporated, and (c) Promissory Note, dated September 6, 2013, given by SMS LLC (formerly known as SMS Inc.) to First-Citizens Bank & Trust Company.

12. (i) Loan Agreement, dated March 1, 2011 between SMS LLC (formerly known as SMS Inc.), Steven M. Clarke and Steven P. Haskett, and Enterprise Funding Corporation, (ii) US Small Business Administration Note for SBA Loan #400-623-5000, dated March 1, 2011, given by SMS LLC (formerly known as SMS Inc.) in favor of Enterprise Funding Corporation, (iii) Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated March 1, 2011, between Enterprise Funding Corporation, SMS LLC (formerly known as SMS Inc.) and Chicago Title Company.

13. Factoring Agreement.

14. Demand Promissory Note, dated July 3, 2018 given by the Company in favor of AmeriFactors Financial Group, LLC.

15. Corbel Credit Agreement.

16. UBS Line of Credit.

17. California Motor Vehicle Lease Agreement dated July 29, 2018, between SMS LLC (formerly known as SMS Inc.) and Fletcher Jones Motor Cars, Inc.

18. The Company has credit cards with American Express, Chase Bank and First National Bank.

**Section 5.2(q)**

**Bank Accounts**

| BANK | AUTHORIZED PERSON |
|---|---|
| **Chase Bank** | Steve M. Clarke |
| **Wells Fargo Bank** | Steve M. Clarke |
| **First Citizens Bank** | Steve M. Clarke |
| **Mohave State Bank** | Steve M. Clarke |
| **First National Bank** | Steve M. Clarke |

**<u>Section 5.2(r)</u>**

**Environmental Matters**

None.

**Section 5.2(s)**

**Employees**

(i). None.

(ii). None.

(iii).

     (A)

| | DOMESTIC EMPLOYEES AS OF AUGUST 7, 2018 | | | | | |
|---|---|---|---|---|---|---|
| # | Full Time or Part Time | Job | Hire Date | Annual Salary Or Hourly Rate | PTO Accrual Rate (hours per pay period) | PTO Balance |
| 1 | F | Maintenance | 01/01/2013 | 96,000.00 | 4 | 72 |
| 2 | F | DAS | 03/19/2018 | 60,000.00 | 2.67 | 8.01 |
| 3 | F | DAS | 01/02/2018 | 85,000.08 | 2.67 | 21.36 |
| 4 | F | DAS | 02/26/2018 | 70,000.08 | 2.67 | 13.35 |
| 5 | F | Ops Lead | 06/09/2014 | 73,000.08 | 4 | 112 |
| 6 | F | DAS | 08/19/2016 | 71,070.00 | 4 | 64.07 |
| 7 | F | DAS | 09/30/2013 | 78,794.88 | 4 | 96 |
| 8 | F | DAS | 04/02/2018 | 82,000.08 | 4 | 32 |
| 9 | F | DAS | 03/13/2015 | 68,960.16 | 4 | 48 |
| 10 | F | OPS Resource Manager | 04/22/2013 | 73,000.08 | 4 | 72.06 |

| 11 | F | Operations Manager | 02/22/2012 | 94,999.92 | 4 | 108 |
| 12 | F | DAS | 11/07/2016 | 67,000.08 | 4 | 93.4 |
| 13 | F | DAS | 04/09/2013 | 66,440.88 | 4 | 112 |
| 14 | F | DAS | 08/15/2016 | 67,200.00 | 4 | 64.07 |
| 15 | F | DAS | 05/06/2016 | 74,407.20 | 4 | 52.4 |
| 16 | F | DAS | 01/09/2017 | 62,400.00 | 4 | 85.4 |
| 17 | F | CFO | 04/02/2012 | 142,999.92 | 4 | 120 |
| 18 | F | DAS | 11/28/2016 | 67,274.88 | 4 | 105.4 |
| 19 | F | HR/Accounting Asst. | 08/17/2016 | $22.00/hour | 4 | 76.07 |
| 20 | F | DAS | 09/19/2016 | 72,100.08 | 4 | 42.73 |
| 21 | F | DAS | 12/04/2015 | 67,600.08 | 4 | 96 |
| 22 | F | DAS | 03/26/2018 | 72,000.00 | 4 | 12 |
| 23 | F | DAS | 09/05/2017 | 68,000.16 | 2.67 | 42.72 |
| 24 | F | DAS | 02/23/2017 | 60,499.92 | 4 | 65.4 |
| 25 | F | DAS | 04/22/2015 | 60,702.24 | 4 | 120 |
| 26 | F | Operations Administrator | 05/05/2014 | 48,294.00 | 4 | 53.06 |

| 27 | F | DAS | 04/21/2014 | 67,866.72 | 4 | 52 |
|---|---|---|---|---|---|---|
| 28 | F | DAS | 03/13/2017 | 75,000.00 | 4 | 85.4 |
| 29 | F | DAS | 03/26/2018 | 70,000.08 | 4 | 32 |
| 30 | F | DA | 03/25/2015 | $24.04/hour | 4 | 54.69 |
| 31 | PT | Administrative Support | 08/07/2017 | $15/hour | 0 | 0 |
| 32 | F | President/CEO | 04/01/2009 | 450,000.00 | | |
| 33 | F | DAS | 05/21/2018 | 75,000.00 | 0 | 0 |
| 34 | F | DAS | 01/04/2016 | 67,820.16 | 4 | 45.4 |
| 35 | F | Operations Manager | 09/15/2014 | 82,399.92 | 4 | 120 |
| 36 | F | DAS | 6/11/2009 | 66,836.64 | | Out on FMLA. Expected return 11/1/2018 |
| 37 | F | DAS | 10/23/2017 | 68,000.16 | 2.67 | 32.04 |
| 38 | F | DAS | 01/02/2018 | 64,999.92 | 2.67 | 5.36 |
| 39 | F | Assistant Controller | 04/29/2014 | 69,889.92 | 4 | 116 |
| 40 | F | Supplier Development Specialist | 02/21/2012 | 82,352.40 | 4 | 108 |
| 41 | F | DAS | 04/02/2018 | 70,000.08 | 2.67 | 5.34 |

| 42 | F | OPS Proj Coordinator | 06/05/2017 | $26.499/hour | 4 | 15.15 |
| 43 | F | DAS | 01/09/2017 | 72,099.84 | 4 | 65.4 |
| 44 | F | DAS | 02/08/2016 | 69,250.08 | 4 | 36.04 |
| 45 | F | DAS | 04/25/2016 | 74,599.92 | 4 | 57.4 |
| 46 | F | Quality Assurance | 08/24/2015 | 72,000.00 | 4 | 44.06 |
| 47 | F | DAS | 01/03/2018 | 63,000.00 | 2.67 | 21.36 |
| 48 | F | DAS | 08/04/2015 | 80,000.16 | 4 | 96 |
| 49 | F | DAS | 04/02/2014 | 68,500.08 | 4 | 120 |
| 50 | F | Director of Operations | 12/12/2011 | 140,000.16 | 4 | 92 |
| 51 | F | DAS | 03/26/2018 | 72,000.00 | 2.67 | 8.01 |
| 52 | F | DAS | 07/09/2018 | 73,000.08 | 0 | 0 |
| 53 | F | DAS | 07/24/2017 | 70,380.24 | 2.67 | 21.39 |
| 54 | F | DAS | 04/02/2018 | 68,000.16 | 2.67 | 5.34 |
| 55 | F | DAS | 06/19/2018 | 72,000.00 | 0 | 0 |
| 56 | PT | Travel Administrator | 11/30/2009 | $25/hour | 0 | 0 |
| 57 | F | OPS Assistant | 12/18/2017 | $22.12/hour | 2.67 | 24.03 |

| 58 | F | DA | 09/30/2016 | $24.04/hour | 4 | 92.4 |
| 59 | F | DA | 05/26/2016 | $24.76/hour | 4 | 89.4 |
| 60 | F | OPS Assistant | 06/04/2018 | $20/hour | 0 | 0 |
| 61 | F | DAS | 06/12/2017 | 67,274.88 | 4 | 92 |
| 62 | F | DA | 12/12/2016 | $23.66/hour | 4 | 106.73 |
| 63 | F | Operations Manager | 04/04/2012 | 85,200.24 | 4 | 116 |
| 64 | F | DAS | 05/26/2016 | 66,950.16 | 4 | 120 |
| 65 | F | DAS | 11/13/2017 | 68,000.16 | 2.67 | 32.04 |
| 66 | F | DAS | 05/14/2018 | 72,000.00 | 0 | 0 |
| 67 | F | DAS | 01/09/2017 | 67,000.08 | 4 | 72.4 |
| 68 | F | DAS | 07/09/2018 | 73,000.08 | 0 | 0 |
| 69 | F | DAS | 09/12/2016 | 72,450.00 | 4 | 33.4 |
| 70 | F | Director Of Operations | 12/05/2016 | 124,999.92 | 4 | 77.4 |
| 71 | F | DAS | 03/13/2017 | 70,380.00 | 4 | 37.4 |
| 72 | F | DAS | 05/29/2018 | 72,000.00 | 0 | 0 |
| 73 | F | DAS | 11/28/2007 | 70,554.96 | 4 | 120 |
| 74 | F | DAS | 11/07/2016 | 52,999.92 | 4 | 37.4 |

| 75 | F | Ops Lead | 01/16/2017 | 72,000.00 | 4 | 65.4 |
|----|---|----------|------------|-----------|---|------|
| 76 | F | DAS | 11/17/2014 | 74,622.72 | 4 | 66.75 |
| 77 | F | SDS | 08/07/2018 | 85,000.00 | 0 | 0 |
| 78 | F | DAS | 03/27/2017 | 72,099.84 | 4 | 36.06 |
| 79 | F | DA | 06/11/2018 | $26.44/hour | 0 | 0 |
| 80 | F | DAS | 04/24/2017 | 60,499.92 | 4 | 52.07 |
| 81 | F | Director Of HR | 04/04/2016 | 109,999.92 | 4 | 25.4 |
| 82 | F | DA | 11/01/2016 | $25/hour | 4 | 97.15 |
| 83 | F | DAS | 06/02/2016 | 69,300.00 | 4 | 91.4 |
| 84 | F | DAS | 05/24/2017 | 67,600.08 | 4 | 65.4 |
| 85 | F | DAS | 06/28/2017 | 59,739.84 | 4 | 25.4 |
| 86 | F | Director of Business Development | 06/11/2018 | 138,000.00 | 0 | 0 |
| 87 | F | DAS | 03/26/2018 | 60,000.00 | 2.67 | 8.01 |
| 88 | F | Ops Lead | 04/13/2017 | 80,000.16 | 4 | 77.4 |
| 89 | F | DAS | 09/05/2017 | 57,999.84 | 2.67 | 42.72 |
| 90 | F | Program Manager | 03/09/2009 | 112,200.00 | 4 | 80 |

| 91 | F | DAS | 12/12/2016 | 66,950.16 | 4 | 85.4 |
| 92 | F | DAS | 04/16/2018 | 68,000.16 | 2.67 | 2.67 |
| 93 | F | DAS | 04/21/2014 | 64,299.84 | 4 | 44.06 |
| 94 | F | DAS | 03/12/2018 | 73,000.08 | 2.67 | 10.68 |
| 95 | F | DAS | 01/19/2015 | 70,868.16 | 4 | 108 |
| 96 | F | Dir Program Dev | 12/15/2007 | 155,000.16 | 4 | 120 |
| 97 | F | OPS Admin Manager | 06/13/2011 | 63,000.00 | 4 | 70.56 |
| 98 | F | Vice President Operations | 12/01/2008 | 220,000.08 | 4 | 120 |
| 99 | F | DAS | 01/03/2017 | 64,170.00 | 4 | 69.4 |
| 100 | F | DAS | 06/10/2013 | 71,992.56 | 4 | 52 |
| 101 | F | DAS | 06/19/2018 | 68,000.16 | 0 | 0 |
| 102 | F | DAS | 01/16/2017 | 62,100.00 | 4 | 97.4 |
| 103 | F | Supplier Development Specialist | 04/19/2016 | 85,600.08 | 4 | 26.73 |
| 104 | F | DAS | 05/14/2018 | 73,000.08 | 0 | 0 |
| 105 | F | DAS | 06/11/2018 | 75,000.00 | 0 | 0 |
| 106 | F | DAS | 07/26/2018 | 70,000.08 | 0 | 0 |

| 107 | F | DAS | 07/26/2018 | 64,999.92 | 0 | 0 |
|---|---|---|---|---|---|---|
| 108 | F | DAS | 08/15/2016 | 69,999.84 | 4 | 116 |
| 109 | F | DAS | 02/16/2015 | 66,200.16 | 4 | 100 |
| 110 | F | DAS | 02/08/2018 | 49,999.92 | 2.67 | 13.35 |
| 111 | F | DAS | 04/23/2018 | 60,000.00 | 2.67 | 2.67 |
| 112 | F | DAS | 03/13/2017 | 70,039.92 | 4 | 53.4 |
| 113 | F | DAS | 02/01/2016 | 66,950.16 | 4 | 56.76 |
| 114 | F | Supplier Development Specialist | 02/08/2018 | 70,000.08 | 2.67 | 16.02 |
| 115 | F | Operations Manager | 07/02/2014 | 85,284.24 | 4 | 112.06 |
| 116 | F | DAS | 12/02/2013 | 67,080.00 | 4 | 120 |
| 117 | F | DAS | 03/20/2017 | 64,500.00 | 4 | 49.4 |
| 118 | F | DAS | 07/22/2016 | 54,999.84 | 4 | 41.4 |
| 119 | F | Recruiting Manager | 08/17/2016 | 64,999.92 | 4 | 36.07 |
| 120 | F | DAS | 07/30/2018 | 78,000.00 | 0 | 0 |
| 121 | F | DAS | 05/16/2016 | 80,225.04 | 4 | 44.05 |
| 122 | F | Admin | 05/29/2018 | $15/hour | 0 | 0 |

| 123 | F | Supplier Development Specialist | 10/31/2016 | 87,250.08 | 4 | 48.07 |
|---|---|---|---|---|---|---|
| 124 | F | DAS | 01/09/2017 | 66,950.16 | 4 | 53.4 |
| 125 | F | Program Manager | 01/19/2011 | 109,200.00 | 4 | 60 |
| 126 | F | DAS | 01/30/2017 | 70,040.16 | 4 | 96.07 |
| 127 | F | Operations Manager | 07/14/2014 | 82,999.92 | 4 | 92 |
| 128 | F | Director of Business Development | 05/31/2018 | 156,000.00 | 0 | 0 |
| 129 | F | DAS | 06/27/2016 | 72,500.16 | 4 | 113.4 |
| 130 | F | DAS | 05/08/2017 | 70,039.92 | 4 | 45.4 |
| 131 | F | DAS | 08/19/2016 | 70,720.08 | 4 | 60.07 |
| 132 | F | DAS | 08/29/2016 | 54,000.00 | 4 | 68.07 |
| 133 | F | Operations Manager | 06/25/2014 | 83,200.08 | 4 | 53.39 |
| 134 | F | Supplier Development Specialist | 06/19/2018 | 90,000.00 | 0 | 0 |
| 135 | F | Admin | 01/09/2017 | 35,361.36 | 4 | 38.4 |
| 136 | F | DAS | 06/25/2018 | 72,000.00 | 0 | 0 |

| 137 | F | Senior Dev. Specialist | 03/02/2015 | 71,770.08 | 4 | 120 |
|-----|---|------------------------|------------|-----------|---|-----|
| 138 | F | Quality Assurance | 11/10/2009 | 84,000.24 | 4 | 104 |
| 139 | F | DAS | 12/12/2016 | 62,100.00 | 4 | 82.73 |
| 140 | F | Program Manager | 08/01/2014 | 94,999.92 | 4 | 72 |
| 141 | F | DAS | 05/14/2018 | 55,000.08 | 0 | 0 |
| 142 | F | DAS | 01/29/2018 | 64,999.92 | 2.67 | 18.69 |
| 143 | F | DAS | 09/05/2017 | 60,000.00 | 2.67 | 1.72 |
| 144 | F | DAS | 06/08/2016 | 72,140.16 | 4 | 61.4 |
| 145 | F | DAS | 01/20/2012 | 64,000.08 | 4 | 108 |
| 146 | F | DAS | 11/28/2011 | 61,800.00 | 4 | 96 *Expected to be on FMLA 8/20/18-9/30/18 |
| 147 | F | DAS | 10/26/2016 | 77,250.00 | 4 | 120 |
| 148 | F | DAS | 07/31/2017 | 57,500.16 | 2.67 | 48.06 |
| 149 | F | DAS | 03/01/2017 | 77,700.00 | 4 | 80 |
| 150 | F | DAS | 03/15/2018 | 60,000.00 | 2.67 | 10.68 |
| 151 | F | DAS | 01/16/2017 | 66,950.16 | 4 | 25.4 |

| 152 | F | DAS | 07/05/2016 | 66,840.00 | 4 | 77.4 |

| INTERNATIONAL EMPLOYEES AS OF AUGUST 7, 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Country** | **Currency** | **Salary** | **US Equivalent as of 8/6/18** | **Title** | **Status** | **Hire Date** | **PTO Accrual Days per Year** | **PTO Balance (Hours)** |
| UK | GBP | £63,000 | $81,513 | SDS | Full Time | 6/14/18 | 32 | 0 |
| Canada | CAN | $66,409 | $51,061 | DAS | Full Time | 10/01/12 | 10 | 35 |
| Netherlands | Euro | €68,000 | $78,585 | Ops Manager | Full Time | 05/01/16 | 28 | 101 |
| UK | GBP | £63,000 | $81,513 | SDS | Full Time | 04/16/18 | 32 | 21 |
| Canada | CAN | $93,112 | $71,592 | DAS | Full Time | 07/26/18 | 10 | 7 |
| Canada | CAN | $70,300 | $54,052 | DAS | Full Time | 07/18/16 | 10 | 67 |
| Canada | CAN | $67,980 | $52,268 | DAS | Full Time | 09/16/16 | 10 | -28 |
| Canada | CAN | $83,000 | $63,817 | DAS | On Personal leave until 10/8/18 | 04/30/18 | 10 | 20 |
| Australia | AUD | $87,802 | $64,833 | DAS | Full Time | 05/23/11 | 20 | 644 |
| Canada | CAN | $75,849 | $58,321 | DAS | Full Time | 06/20/11 | 10 | 49 |

| UK | GBP | £60,000 | $77,632 | DAS | Full Time | 07/30/18 | 32 | 0 |
|----|-----|---------|---------|-----|-----------|----------|-----|---|

(B) Two former employees are entitled to COBRA benefits of $628.36 per month, expiring September 30 and October 31 2018, respectively.

(C)

| INDEPENDENT CONTRACTORS | | |
|----|----|----|
| **NAME** | **DBA** | **TERM** |
| Kevin Dwyer | KRD Technical Services, LLC | 4 years from 3/9/2017, with one year renewal options |
| Thomas Armijo | TRA Supply Chain Services, LLC | Expires 1/30/2019 |
| Robbie Robinson | Westworld Associates | 4 years from 02/02/2018, with one year renewal options |
| Mac McClelland | Center House | 1 year from 3/12/2018, with one year renewal options |
| Abdou Lahlali | Center House | 1 year from 3/12/2018, with one year renewal options |
| Neil Shah | Ryan Sales International (RSI) | 4 years from 05/03/2018, with one year renewal options |
| John Ericta | App Above, LLC | Effective 3/26/2018 until further notice , with at least 5 days notice given |
| Michael Song | | Expires 7/25/2019 |
| Patrick Simpson | Motion Encoding, Inc. | Effective 11/21/2016 until further notice , with at least 5 days notice given |

(D) None.

(iv). (C)

1.  Rodney Smith has been hired as a director of business development pursuant to his Offer of Employment dated May 16, 2018.

2.  Michael Maniscalo has been hired as a director of business development pursuant to his Offer of Employment dated May 18, 2018.

(v). None.

(vi). Robert Fisher filed a workers' compensation claim on August 7, 2018, under Claim #Y67C87995.

(vii).

1.  Jeffrey Asselta will be resigning as of August 17, 2018, and is owed his final payroll and PTO payout of 26.7 hours.

2.  Leslie Ross resigned on August 8, 2018 and the Company has no liabilities with respect to her.

**Section 5.2(t)**

**Employee Plans**

(i).

| Plan | Provider |
|---|---|
| **Medical Insurance** | |
| **PPO- All States** | **United Healthcare** |
| **HMO- California Only** | **United Healthcare** |
| **HMO Advantage- California Only** | **United Healthcare** |
| **Dental Insurance** | **United Concordia** |
| **Vision** | **Reliance Standard** |
| **Life $25,000** | **Reliance Standard** |
| **Voluntary Life** | **Reliance Standard** |
| **Short Term Disability** | **Reliance Standard** |
| **Long Term Disability** | **Reliance Standard** |
| **401k** | **American Funds/San Diego Pension** |

(ii). None.

(iii). None.

(iv). None.

(v). None.

(vi). None.

(vii). None.

(viii). None.

(ix). None.

**Section 5.2(u)**

**Insurance**

| Company | Policy # | Description | Period | Annual Premium | Coverage | Notes |
|---|---|---|---|---|---|---|
| Farmers | 604771744 | General business liability and auto | 10/01/17 - 10/01/18 | $18,511 | $2,000,000 | Aggregate |
| Farmers | 604771748 | Umbrella Liability $5M | 10/01/17 - 10/01/18 | $2,784 | $5,000,000 | |
| Farmers/Kinsale Insurance Co. | SUB178843-01 | EPLI | 04/15/18 - 04/15/19 | $22,919 | $1,000,000 | |
| World Source | WS11004160 | Foreign Commercial Package Policy | 06/01/18 - 06/01/19 | $2,500 | $2,000,000 | Aggregate |
| TransAmerica | 43131611 | Key Man Life Insurance $13.5M | 01/23/14 - 01/23/24 | $33,059 | $13,500,000 | |
| Ohio Bureau of Workers' Compensation | 1649336 | Monopolistic Works Comp | 07/01/18 - 07/01/19 | $1,000 | Varies based on claim | Varies based on payroll |
| The Hartford | 72 WBG ZT6782 | Works Comp | 12/31/17 - 12/31/18 | $79,200 | Varies based on claim | Varies based on bi-monthly payroll; pay based on actual |
| Platte River Insurance Company | A270016484 | 401(K) ERISA Bond | 02/01/18 - 02/0/21 | $404 | $200,000 | |

**Section 5.2(v)**

**Litigation**

None.

**Section 5.2(w)**

**Taxes**

(i). None.

(ii). None.

(iii). None.

(iv). None.

(v). The spouses of the shareholders of the Company at the time the S corporation election was made did not sign the Company's S corporation election.  However, the Company is eligible for automatic relief under Revenue Procedure 2004-35 and the Company is in the process of applying for such relief with the IRS.

(vi). SMS LLC filed a protective check the box election to be treated as a disregarded entity effective May 12, 2014.

(vii). See the Company's Operating Agreement for allocation of income and loss.

(viii). None.

(ix). None.

(x). None.

(xi). None.

(xii). None.

(xiii). None.

(xiv). None.

(xv). None.

(xvi). None.

(xvii). None

(xviii). None.

**Section 5.2(x)**

**Customers**

(i)

    (A) Key Customers :

        1.  Pratt & Whitney;

        2.  Triumph Group, Inc.;

        3.  Lockheed Martin Aeronautics;

        4.  UTC Aerospace Systems; and

        5.  Northrop Grumman

    (B)

| CUSTOMER | LAST 24 MONTHS' REVENUE ENDING DECEMBER 31, 2017 | CONTRACT END DATE | NOTES |
|---|---|---|---|
| **1** | $7,525,558 | 12/31/18 | 3 year extension currently in process |
| **2** | $7,000,000 | 06/30/20 | |
| **3** | $4,595,555 | 02/14/20 | |
| **4** | $4,453,970 | 10/07/18 | 3 year extension currently in process |
| **5** | $2,736,075 | 12/31/18 | 1 year contract with 3 year MTA |

**Section 5.2(y)**

**Affiliated Transactions**

1. Corbel Credit Agreement.

2. UBS Line of Credit.

3. The (i) Loan Agreement, dated March 1, 2011 between SMS Inc., Steven M. Clarke and Steven P. Haskett, and Enterprise Funding Corporation, (ii) US Small Business Administration Note for SBA Loan #400-623-5000, dated March 1, 2011, given by SMS Inc. in favor of Enterprise Funding Corporation, (iii) Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated March 1, 2011, between Enterprise Funding Corporation, SMS Inc. and Chicago Title Company.

4. California Motor Vehicle Lease Agreement dated July 29, 2018, between SMS LLC (formerly known as SMS Inc.) and Fletcher Jones Motor Cars, Inc.

5. Property Lease entered into effective January 1, 2009, by and between Steven M. Clarke and Connie Clarke as lessor and SMS LLC (formerly known as SMS Inc.) as lessee.

6. (i) Business Loan Agreement for Loan Number 3071339001, (ii) Modification of Deed of Trust, (iii) Limited Liability Company Resolution to Borrow/Grant Collateral, and (iv) Promissory Note, each dated July 2, 2018, between the Company and Mohave State Bank.

7. (i) Business Commercial Loan Agreement dated as of September 6, 2013 between First-Citizens Bank & Trust Company and SMS LLC (formerly known as SMS Inc.), (ii) Deed of Trust, dated September 6, 2013 among First-Citizens Bank & Trust Company, SMS LLC (formerly known as SMS Inc.) and Neuse Incorporated, and (iii) Promissory Note, dated September 6, 2013, given by SMS LLC (formerly known as SMS Inc.) to First-Citizens Bank & Trust Company.

8. Factoring Agreement.

9. Demand Promissory Note, dated July 3, 2018 given by the Company in favor of AmeriFactors Financial Group, LLC.

**<u>Section 5.2(z)</u>**

**Brokers**

D.A. Davidson & Co. is an investment banking firm which will receive remuneration for services provided in connection with the transactions contemplated by the Agreement.

**Section 7.2**

**Conduct of Business Pending Closing**

None.

**EXHIBIT A**

**FORM OF CLARKE EMPLOYMENT AGREEMENT**

See attached.

[●], 2018

**PRIVATE AND CONFIDENTIAL**

Steven M. Clarke
4104 Trimaran Drive
Lake Havasu City, Arizona 86406

Dear Steven:

On behalf of Supplier Management Solutions, LLC (the "**Company**"), I am pleased to offer you the position of Chief Executive Officer and President of the Company commencing on the close of the transactions contemplated by the Purchase and Sale Agreement by and among Supplier Management Solutions, Inc., Corbel Structured Equity Partners, L.P., Corbel Structured Equity Partners Parallel, L.P., Corbel SMS, L.P., Corbel International A, LLC, Mr. Steven M. Clarke and TRIGO U.S., Inc. dated as of August 10, 2018 (the "**Purchase Agreement**").  In the event the Purchase Agreement is terminated prior to the close of the transactions contemplated therein, this offer shall be null and void.  The date of the closing of the transactions contemplated in the Purchase Agreement is the "**Closing**".

1.    **Position**

As Chief Executive Officer and President of the Company, you will be the Company's most senior officer and will report to the Executive Vice President of the TRIGO Group Aerospace Division, although reporting structures may change from time to time depending upon business requirements.  Your duties and responsibilities will be commensurate with the position of Chief Executive Officer and President of the Company, including being responsible for the management of the Company.  You shall primarily perform your duties in Temecula, California ("**Primary Workplace**").

2.    **Time and Attention**

You will devote substantially all of your attention, skill and effort to the business on a full-time basis and in compliance with the written policies, practices, directions and instructions of the TRIGO Group that are provided to you.   With respect to your other activities that are not related to Company business, (i) you may engage in charitable activities and community affairs, and (ii) you may manage your personal investments and affairs.

3.    **Base Salary**

The Company will pay you an annual base salary of $350,000. This base salary cannot be decreased without your prior written consent. All wages shall be paid to you in accordance with the Company's payroll practices, as amended from time to time.

4.    **Benefits**

Subject to the terms and conditions of the applicable benefit plan policies, you will be entitled to participate in such group benefit plans as the Company may make available in

- 2 -

its sole discretion, including group health insurance plans for you, your domestic partner and children provided however that such benefits shall be no less favorable than what you were receiving as of immediately before the Closing.

5. **Vacation**

Subject to the terms and conditions of the Company's vacation policy in effect from time to time, you will be entitled to 30 days (i.e. six weeks) of paid vacation in each calendar year, accrued pro-rata on a monthly basis, to be taken at times agreed upon by you and the Company. Vacation time must accrue before you may use it, except at the sole discretion of the Company. The Company reserves the right to require you to take some or all of the accrued vacation days at any time during scheduled or unscheduled office shut-down periods, at its sole discretion. Vacation accrual is capped at 35 days and you will not accrue any further vacation in excess of such cap.

6. **Company Car**

You will be provided with a vehicle which you may use for business and personal travel. You will also be reimbursed for fuel and maintenance costs incurred in connection with such business travel. The vehicle you utilize will be the same vehicle (or comparable or superior vehicle) that you were using as of immediately before the Closing.

7. **Currency and Deductions**

The Company may withhold from any amounts payable relating to your employment such federal, state, local or other taxes as are required to be withheld pursuant to any applicable law or regulation and subject to any deductions or customary contributions to the cost of employee benefits, if any. Unless otherwise specified, all references to amounts in or contemplated by these terms and conditions are to the lawful currency of the United States of America.

8. **Expenses**

You will be paid or reimbursed for all reasonable and customary business expenses (including travel expenses) in accordance with the Company's and TRIGO Group's expense policy and you may also continue to use any Company provided credit card.

9. **Confidential Information**

You acknowledge that the Company continually develops Confidential Information, that you may develop Confidential Information for the Company and that you may learn of Confidential Information during the course of your employment. You will comply with the policies and procedures of the Company for protecting Confidential Information and will not disclose to any person (except as required by applicable law or for the proper performance of your duties and responsibilities to the Company), or use for your own benefit or gain, any Confidential Information obtained by you incident to your employment or other association with the Company. You understand that this restriction will continue to apply after your employment terminates, regardless of the reason for such termination.

For purposes of this agreement, "**Confidential Information**" means all confidential or proprietary information, intellectual property (including trade secrets) and confidential facts relating to or used or proposed to be used in the business, affairs or property of the Company and its affiliates, including, without limitation (i) all information which is confidential based upon its nature or the circumstances surrounding its disclosure, and (ii) any confidential information relating to the Company's and its affiliates' business policies, processes and templates, strategies, operations, finances, plans or opportunities, in each case, which was acquired by you during your employment with the Company (or during any negotiations in anticipation of such employment).  You understand that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. Confidential Information will not include information that is generally available to and known by the public at the time of disclosure to you; provided that, such disclosure is through no direct or indirect fault of you or person(s) acting on your behalf.

Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016.  Notwithstanding any other provision of this Agreement:

> (i)     You will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that

>> (A)     is made (1) in confidence to an authorized federal, state, or local government official, either directly or indirectly, or to an attorney, and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

>> (B)     is made in a complaint or other document filed under seal in a lawsuit or other proceeding.

> (ii)     If you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you:

>> (A)     file any document containing trade secrets under seal; and

>> (B)     do not disclose trade secrets, except pursuant to court order.

10.    **Proprietary Rights**.

> (a)     <u>Work Product</u>.  You acknowledge and agree that all writings, works of authorship, software, inventions, ideas and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by you individually or jointly with others during your employment and relating in any way to the business or contemplated business or development of the Company (regardless of when or where the Work

Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical and electronic copies, all improvements, rights and claims related to the foregoing, and other tangible embodiments thereof (collectively, "**Work Product**") will be the sole and exclusive property of the Company. For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, agreements, documents, contracts, terms of agreements, negotiations, manuals, reports, market studies, formulae, notes, communications, marketing information, advertising information and sales information.

(b)     <u>Assignment of Rights</u>.  You will promptly and fully disclose all Work Products to the Company. You hereby assign and agree to assign to the Company (or as otherwise directed by the Company) your full right, title and interest in and to all Work Products. You agree to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Work Products to the Company and to permit the Company to enforce any patents, copyright or other proprietary rights to the Work Products. You will not charge the Company for time spent in complying with these obligations. All copyrightable works that you create will be considered "work made for hire". You irrevocably waive to the greatest extent permitted by law, for the benefit of the Company, all of your moral rights (if any) in the Work Products, including any right to the integrity of any Work Products, any right to be associated with any Work Products and any right to restrict or prevent the modification or use of any Work Products in any way whatsoever.

(c)     Notwithstanding any provision to the contrary herein, in accordance with Section 2870 of the California Labor Code, you are not required to assign any invention, as that term is used in Section 2870 of the California Labor Code, which was developed entirely on your own time without using the Company's equipment, supplies, facilities or trade secret information, except for those inventions that either: (a)  relate at the time of conception or reduction to practice of the invention to the Company's business or actual or demonstrably anticipated research or development of the Company, or  (b)  result from any work performed by you for the Company.

11.     **Non-Solicitation and Non-Competition Agreement**

You acknowledge and agree that you are subject to the non-solicitation and non-competition covenants set out in the Purchase Agreement.

12.     **Termination**

(a)     The term of this Agreement shall be from the Closing to December 31, 2019. Your employment with the Company will terminate by mutual agreement as of 11:59 pm Pacific Time on December 31, 2019 unless an extension is mutually agreed between you and the Company or your employment is terminated prior to December 31, 2019 pursuant to this Section 12.

- 5 -

(b)    Your employment may be terminated by either the Company or you at any time and for any reason. Upon such termination, you will be entitled to the compensation and benefits described in this <u>Section 12</u>.

(c)    The Company may terminate your employment for Cause.  In the event of such termination for Cause, you will not be entitled to receive any further compensation or benefits whatsoever other than those amounts which have accrued up to your last day of service with the Company.

For purposes of this agreement, "**Cause**" means:

(i)    your willful and repeated failure to perform your duties (other than any such failure resulting from incapacity due to physical or mental illness and for avoidance of doubt the failure to achieve performance goals or objectives shall not constitute Cause);

(ii)    your willful and repeated failure to comply with any valid and legal directive of the TRIGO Group (for avoidance of doubt the failure to achieve performance goals or objectives shall not constitute Cause);

(iii)    your willful engagement in dishonesty, illegal conduct or misconduct, which is, in each case, materially injurious to the Company or its affiliates;

(iv)    your embezzlement, misappropriation or fraud, which is related to your employment with the Company;

(v)    your conviction of or plea of guilty or *nolo contendere* to a crime that constitutes a felony (or state law equivalent);

(vi)    your violation of a written material policy of the Company or the TRIGO Group which has been provided to you and which is materially injurious to the Company or its affiliates; or

(vii)    your material breach of any material obligation under this Agreement or any other written agreement between you and the Company;

unless, in each case, the event constituting Cause is curable (in the good faith judgment of the board of directors of the company) and has been cured or remedied by you within 30 days of your receipt of written notice from the Company that an event constituting Cause has occurred and specifying the details of such event.  Prior to any termination for Cause, you will also be given a reasonable opportunity to present facts and evidence to the board of directors of the Company supporting your position that Cause does not exist, after which time the board of directors of the Company shall make its determination of whether Cause exists.   The foregoing above items represent the exclusive list for which your employment may be terminated by the Company for Cause.

(d)    If the Company terminates your employment without Cause, or you terminate your employment for "Good Reason" (as defined below) provided you sign a

waiver and release in the form attached hereto as Exhibit A and such release becomes effective and irrevocable within 60 days following your date of termination, you will be entitled to receive an amount equal to the greater of 6 months' base salary or the amount of base salary that would otherwise have been paid to you from your termination date through December 31, 2019 had you remained employed by the Company, payable in equal installments in accordance with the Company's customary payroll practices over such same period.  The first payment will occur on the first payroll date following the date the release becomes effective, provided that if the 60 day period for the release spans 2 calendar years, the payments will commence on the first payroll date in the second calendar year.  The first payment will include all installments in respect of payroll periods between the date of termination and the first payment date. For purposes of this agreement, "**Good Reason**" means the occurrence of any one or more of the following without your written consent:  (i) a reduction of your duties and responsibilities as described in Section 1, (ii) a reduction in your base salary described in Section 3; (iii) a relocation of your principal place of employment to a new location that is more than twenty-five (25) miles from the Primary Workplace; or (iv) the Company's material breach of this letter agreement or other written agreement with you.

Notwithstanding the foregoing, "Good Reason" shall only be found to exist if, prior to your resignation and within ninety (90) days after the initial existence of an alleged event of Good Reason, you have provided written notice to the Company describing such alleged Good Reason event(s), and the Company does not cure or remedy such event within thirty (30) days following the Company's receipt of such notice from you, and the date of your termination of employment due to your resignation for Good Reason occurs within thirty (30) days after the expiration of the foregoing thirty (30) day cure/remedy period.

(e)     You may terminate your employment without Good Reason with the Company by giving the Company at least 90 days' written notice to such effect. Other than as provided under the Purchase Agreement, you will not be entitled to receive any further compensation or benefits whatsoever other than those amounts which have accrued up to your last day of service with the Company. Upon providing the Company with written notice of your intent to terminate your employment, the Company reserves the right at any time to waive some or all of the remaining notice period (except that such notice period shall be in all cases at least ten business days), in which case you agree that the effective date of your termination from employment shall be the last day of service with the Company.

(f)     Upon your termination of employment for any reason, you will receive: (i) all unpaid salary accrued through your termination date, (ii) any unpaid vacation accrued through your termination date, (iii) any vested payments/benefits to which you are entitled as of your termination date under the terms of any Company employee benefit plan, and (iv) any unreimbursed valid business expenses.  The payments under this Section 12(f) will be provided to you within forty-five (45) days of your termination date subject to the requirements of the applicable program and applicable law.

- 7 -

13. **Return of Property**

Upon (i) termination of your employment for any reason, or (ii) the Company's request at any time during your employment, you will return to the Company all property belonging to the Company and its predecessors, successors, affiliates or related companies, including all documents in any format whatsoever, including electronic format, that is in your possession or control, and you agree not to retain any copies of such property in any format whatsoever.

14. **Representation Regarding Restrictive Covenants or Legal Obligations**

By signing below, you represent and warrant that you are not bound by any restrictive covenant or other legal obligation with your current employer, any former employer or any other third party that would prevent you from accepting these terms and conditions or that would reasonably interfere with your ability to perform the employment duties and responsibilities contemplated by this letter.

15. **Representation Regarding Legal Eligibility**

The offer of employment set forth in this agreement is conditional on you being legally eligible to work in the United States. By signing below, you represent and warrant that you are or will be legally eligible to work in the United States for the duration of your employment. In the event that the Company determines at any time that you are or were not eligible, you shall be disqualified from employment, or if your employment has commenced, you may be subject to immediate termination from employment for Cause in accordance with the terms of the agreement.

16. **Entire Agreement**

Subject to the following sentence, you acknowledge and agree that this letter agreement contains the whole understanding between you and the Company with respect to the subject matter herein and supersedes and replaces all oral or written prior negotiations, representations or agreements. This letter agreement does not modify or reduce or alter any rights or entitlements that are provided to you under the Purchase Agreement. Your agreement to the terms and conditions in this letter have not been induced by, nor do you rely upon or regard as material, any representations or writings whatsoever not incorporated into or made a part of these terms and conditions. You further agree that the terms and conditions cannot be amended, modified or supplemented except by subsequent written agreement signed by you and the Company. In the event of any conflict in terms between this letter agreement and any other agreement between you and the Company (or any Company affiliate) or any Company policy, the terms of this letter agreement shall prevail and govern. No payments or benefits paid or payable to you shall be subject to offset or mitigation.

17. **Governing Law**

The terms and conditions of your employment will be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of law.

- 8 -

18.  **Enforcement and Severability**

(a)  *Acknowledgement.* You acknowledge that the potential restrictions on your future employment imposed by <u>Sections 9, 10 and 11</u> (collectively, the "**Restrictive Covenants**") are reasonable in both duration and geographic scope and in all other respects.  If for any reason any court of competent jurisdiction shall find any provisions of the Restrictive Covenants to be unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein shall be effective to the fullest extent allowed under applicable law in such jurisdiction.

(b)  *Consideration.*  The parties acknowledge that this agreement would not have been entered into and the benefits described in this agreement would not have been promised in the absence of your promises under this agreement, and in particular the Restrictive Covenants.

(c)  *Notice to New Employers.*  Before you either apply for or accept employment with any other person or entity while Non-Solicitation and Non-Competition is in effect, you will provide the prospective employer with written notice of the provisions of those sections and will deliver a copy of the notice to the Company.

(d)  *Severability.* If, in any jurisdiction, any of these terms and conditions or their application to any party or circumstance is restricted, prohibited or unenforceable, such provision will, as to such jurisdiction, be ineffective only to the extent of such restriction, prohibition or unenforceability without invalidating the remaining terms and conditions and without affecting the validity or enforceability of such provision in any other jurisdiction or without affecting its application to other parties or circumstances.

(e)  *Remedies.*  In the event of your breach or threatened breach of the Restrictive Covenants, you consent and agree that the Company will be entitled to seek, in addition to other available remedies, specific performance, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. Such equitable relief will be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

19.  **Survival of Obligations**

Upon cessation of your employment under any circumstances whatever, and however and whenever occurring or effected, the terms and conditions that impose obligations upon you that extend beyond the termination of your employment, shall survive and can be enforced by the Company in a court of competent jurisdiction.

20. **Section 409A**

This Agreement is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**") or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made if such termination of employment constitutes a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A.

Notwithstanding any other provision of this Agreement, if at the time of your termination of employment, you are a "specified employee", determined in accordance with Section 409A, any payments and benefits provided under this Agreement or otherwise that constitute "nonqualified deferred compensation" subject to Section 409A that are provided to you on account of separation from service shall not be paid until the first payroll date to occur following the 6-month anniversary of the termination date ("**Specified Employee Payment Date**"). The aggregate amount of any payments that would otherwise have been made during such 6-month period shall be paid in a lump sum on the Specified Employee Payment Date without interest and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule. If you die during the 6-month period, any delayed payments shall be paid to your estate in a lump sum upon your death.

To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

a) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year.

b) any reimbursement of an eligible expense shall be paid to you on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

c) any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

- 10 -

To signify your agreement to the above terms and conditions of employment, please sign and date a copy of this letter below and return one complete signed original of this letter to me by no later than [●], 2018**.** We look forward to your acceptance of this offer of employment and to working with you.

*[Signature pages follow]*

Yours sincerely,


Matthieu Rambaud
President, TRIGO U.S., Inc.

LEGAL_1:50557657.7

**EMPLOYEE AGREEMENT**


I, **Steven M. Clarke**, have reviewed and agree to the terms and conditions of employment as set out in this letter.

I have had an opportunity to ensure that I clearly understand the terms and conditions of my employment with the Company, and I was represented by legal counsel in negotiating these terms and conditions of employment.


_____
       **STEVEN M. CLARKE**

Date:

**EXHIBIT A**

**RELEASE OF CLAIMS**

        I, **STEVEN CLARKE**, in exchange for the consideration of the severance payments described in the offer letter agreement dated [●], 2018 between me and Supplier Management Solutions LLC (the "**Company**") (the "**Employment Agreement**"), the sufficiency of which is hereby expressly acknowledged, agree, represent and warrant that:

1.      Except for the rights and obligations to the severance payments, I, for and on behalf of myself and my past and present spouse(s), agents, heirs, executors, administrators and assigns, hereby release, acquit and forever discharge the Company, TRIGO U.S. Inc., the TRIGO Group and their past and present parent companies, subsidiaries, affiliates and related companies, as well as their respective current and former officers, directors, agents, trustees, shareholders, insurers, assigns, representatives, and attorneys, and each of them, both in their individual and representative capacities, (collectively, the "**Released Parties**"), to the fullest extent permitted by law, from any and all claims, demands, grievances, causes of action and rights of appeal ("**Claims**"), whether known and unknown, that I had, have or may have against any of them and that are based upon acts, omissions or events that occurred on or before the Effective Date (as defined below), including, but not limited to:

    (a)    all Claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. s. 2000e, the Americans with Disabilities Act, 42 U.S.C. s. 12101, *et seq.*, the Age Discrimination in Employment Act, 29 U.S.C. s. 621, *et seq.* ("**ADEA**"), the Worker Adjustment and Retraining Notification Act, 29 U.S.C. s. 210, *et seq.*, and the Family Medical Leave Act, all as amended;

    (b)    all Claims, whether in tort, contract, by statute, or on any other basis, whether in law or in equity, whether civil, criminal or administrative, whether known or unknown, for damages or monies owed by Releasees, including compensatory damages, emotional distress damages, physical injury damages, punitive damages, attorney's fees, costs, and interest, including all Claims for back pay, overtime pay, severance pay, notice pay, health benefits, retirement benefits, all other benefits, vacation pay, holiday pay, sick pay, commissions, bonuses, relocation expenses, loans, expense reimbursements, or other monies due. I acknowledge and agree that, except as set forth herein, I have received payment in full for all services rendered to the Company prior to my termination date, including, but not limited to, all wages, vacation pay, sick leave, bonuses, commissions, and any other employment compensation or fringe benefit, and I hereby release the Company and the Released Parties from any such claims;

    (c)    all Claims under the California Labor Code, the California Family Rights Act, the California Temporary Disability Insurance Law, the California Unruh Civil Rights Act, the California State Constitution and any other state, federal, city, county or local statute, rule, regulation, ordinance or order, or the national or local

common law of any jurisdiction located within or outside the United States of America;

(d)   any Claim for future consideration for employment with the Company, any claims for attorneys' fees and costs and any employment rights or entitlement law, and any claims for wrongful discharge, intentional infliction of emotional distress, defamation, libel or slander, payment of wages, outrageous behavior, breach of contract or any duty allegedly owed to me, discrimination based upon race, color, ethnicity, sex, age, national origin, religion, disability, sexual orientation, or another unlawful criterion or circumstance, and any other theory of recovery.

2.    As part of the general release set out above, I specifically agree that I hereby release, remise and forever discharge the Company and the Released Parties, and each of them, both in their individual and representative capacities, from any and all Claims, both known and unknown, arising under the ADEA that I had, have or may have against any of them and that are based upon acts, omissions or events that occurred on or before the Effective Date. I understand and acknowledge the significance and consequences of this specific waiver of any ADEA Claims, have received or have had the opportunity to receive independent legal advice from my attorneys regarding this waiver, and hereby assume full responsibility for any damage, loss or liability which I may hereafter incur by reason of such waiver.

3.    I specifically and expressly waive the benefit of the provisions of Section 1542 of the Civil Code of California or any similar provision of law in any other jurisdiction ("**Section 1542 Waiver**"). Section 1542 provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

4.    Thus, for the purposes of effecting a complete release of all Claims which I may have or claim to have against the Company and Released Parties, I release any and all Claims against the Company and Released Parties, including Claims which are unknown and unsuspected as of the Effective Date. I warrant that I have read this Release, including the Section 1542 Waiver, and that I have had an opportunity to receive independent legal advice from my attorneys regarding this Release and specifically about the Section 1542 Waiver, and that I understand this Release and the Section 1542 Waiver.

5.    It is the intention of the parties to make this release as broad and as general as the law permits.  This Release does not prevent me from enforcing my non-forfeitable rights to accrued benefits (within the meaning of Sections 203 and 204 of the Employee Retirement Income Security Act of 1974, as amended) under applicable retirement plans, unemployment insurance benefits, workers' compensation Claims, or other Claims that cannot legally be waived.  Further, nothing herein prevents me from interacting with or

filing a charge with, as authorized by law, the EEOC or any other bona fide government agency; however, I will not seek or be entitled to any personal recovery in any action or proceeding that may be commenced on my behalf arising out of the matters released hereby.

6.      Representations and Warranties

(a)      I represent and warrant that I do not have any lawsuit, claim, charge, grievance or complaint (each an "**Action**") against the Company or any of the Released Parties pending in any forum, based upon acts, omissions or events occurring prior to the Effective Date of this Release, that I will not at any time hereafter file any Action against the Company or any of the Released Parties in any forum.

(b)      Representations re Waiver of ADEA Claims: As required by the ADEA, I understand, represent, warrant and agree that:

(i)      I was advised (and am hereby advised) in writing to consider the terms of this Release and to consult with an attorney of my choice prior to executing this Release;

(ii)      prior to executing this Release, I had the opportunity to consider this Release for an amount of time that I considered to be reasonable;

(iii)      I knowingly and voluntarily agree to all of the terms set forth in this Release; and

(iv)      I knowingly and voluntarily intend to be legally bound by this Release

(c)      Consideration Period

(i)      I acknowledge that I have been afforded at least 21 days to consider the meaning and effect of this Release. If I sign this Release, the 7-day Revocation Period described below will begin after I have signed this Release.

(ii)      I acknowledge and agree that if I execute this Release prior to the expiration of 21 days after my receipt thereof, and/or choose to forego seeking the advice of independent legal counsel, I do so freely, and I knowingly waive any and all future claims that such action(s) would affect the validity of this Release.  I understand that I cannot execute this Release prior to my termination date.

7.      Revocation Period: I have the right to revoke this Release within 7 days of signing it ("**Revocation Period**"). To revoke this Release, I must send a written letter by overnight delivery, personal delivery or registered mail to: [●].

8.      This Release is binding upon me and my past and present spouse(s), agents, heirs, executors, administrators, and assigns and shall inure to the benefit of the Company and the Released Parties.

- 4 -

9.     This Release constitutes the complete understanding between me and the Company and supersede all other agreements not specifically reaffirmed in those agreements.  No other promises or agreements will be binding unless signed by me and the Company.

10.    This Release shall be effective on the date on which I sign this Release, but no sooner than my last day of employment (the "**Effective Date**") and shall become irrevocable upon expiration of the Revocation Period described above.

_____          Name: Steven Clarke
Dated
**Not to be signed prior to final date of employment.**

                                                SUPPLIER MANAGEMENT SOLUTIONS, LLC

                                                By: _____
                                                     Name:
                                                     Title:

**EXHIBIT B**

**ILLUSTRATIVE EXAMPLE OF CURRENT ASSETS OF THE COMPANY**

See attached.

| *Currency: $ 000* | Dec17A | May18A |
|---|---:|---:|
| 11000 · Accounts Receivable | *671* | *473* |
| 25300 · Due To/Due From SMS | - | 10 |
| 11600 · Prepaid Rent | 3 | 5 |
| 11610 · Prepaid Insurance | 8 | 8 |
| 11202 - Factor 15% Receivables | 93 | 45 |
| 11250 · Miscellaneous Receivable | - | 216 |
| **Current Assets** | **775** | **757** |

**EXHIBIT C**

**ILLUSTRATIVE EXAMPLE OF CURRENT LIABILITIES OF THE COMPANY**

See attached.

| *Currency: $ 000* | Dec17A | May18A |
|---|---|---|
| *20000 · Accounts Payable - excluding adj.* | (227) | (202) |
| 24500 · Advance Customer Payments | (35) | - |
| 26000 · Accrued Expenses | (261) | (64) |
| 27000 · SMS International:27001 · | 4 | 4 |
| 24003 · Accrued Vacation | (233) | (287) |
| 24004 · Accrued Payroll | - | 0 |
| 24005 · 401(K) Liability | (19) | (16) |
| 12000 · Undeposited Funds | (56) | - |
| 27000 · SMS International:27002 · | (38) | (38) |
| 27000 · SMS International:27003 · | (2) | (2) |
| 27000 · SMS International:27004 · | (1) | (1) |
| 27000 · SMS International:27005 · Taxes- | - | - |
| **Current Liabilities** | **(868)** | **(606)** |

Excludes aged payables, fixed assets payables, and payables to Corbel, which should be included in debt definition

Section Lead - Lead Schedules

## Quality of Debt

**To be included in SPA Exhibit**

| Currency: $ 000 | May18A |
|---|---|
| Cash & Cash Equivalents | 98 |
| Short-term financial debt | (272) |
| Corbel Convertible bonds | (10 000) |
| Long-term liabilities | (1 834) |
| **Net financial debt** | **(12 008)** |
| | |
| Corbel shares acquisition | (10 000) |
| Break-up fees AmeriFactors | (150) |
| | |
| Factoring payables | - |
| Steve Clark Advances | 1 365 |
| Aged trade payables | (427) |
| Accrued expenses - Credit cards | (210) |
| Corbel payables | (183) |
| Fixed assets payables | (16) |
| **Debt like items included in WC** | **528** |
| **Net debt adjustements** | **(9 622)** |
| **Debt (as defined in SPA)** | **(21 630)** |

Source: Management information, EY Analysis

Ref: Quality of Debt - Section Lead - Lead Schedules



**EXHIBIT D**

**ILLUSTRATIVE EXAMPLE OF CALCULATION OF NORMATIVE EBITDA**

See attached.

Section Lead - Lead Schedules

## Normative EBITDA

| Currency: $ 000 | | FY16A | FY17A | LTM May18A | comments for 2018 post-closing and 2019 periods |
|---|---|---|---|---|---|
| **Reported EBITDA** | | **1 352** | **1 865** | **2 543** | |
| *As % of revenue* | | *11.6%* | *11.6%* | *14.8%* | |
| Professional fees | 1 | 214 | 552 | 255 | *No add back expected in 2019 as there should not be any more professional fee post closing* |
| Factoring Fees | 2 | 138 | 477 | 513 | *No add back expected in 2019 as there should not be any more factoring fee post closing* |
| Owner Personal | 3 | 70 | 254 | 346 | *No add back expected in 2019 as these costs should disappear post closing* |
| Owner Salary | 4 | 100 | 100 | 100 | *No add back expected in 2019 as salary will be adjusted by -100k/annum post closing* |
| Key Man Insurance | 5 | 33 | 33 | 33 | *No add back expected in 2019 as these costs should disappear post closing* |
| SGS / AEI Travel | 6 | - | 35 | 35 | *No add back expected in 2019 as these costs should disappear post closing* |
| Orange County full year rent | 7 | (212) | (212) | (199) | *No add back expected in 2019 as rental will be part of EBITDA post closing* |
| Proceeds from fixed asset sale | 8 | - | (37) | n.q. | |
| Walz rental income | 9 | (15) | - | - | |
| **EBITDA adjustments** | | **328** | **1 202** | **1 084** | |
| **Adjusted EBITDA** | | **1 680** | **3 067** | **3 626** | |
| *As % of revenue* | | *14.4%* | *19.0%* | *21.1%* | |

Source: Management information, EY Analysis

Ref: Normative EBITDA - Section Lead - Lead Schedules

| Currency: $ 000 | | FY16A | FY17A | LTM |
|---|---|---|---|---|
| Accounting costs | | 46 | 119 | 90 |
| Legal | | 97 | 283 | 56 |
| Consulting costs | | 1 | 151 | 110 |
| Walz eviction costs | | 55 | - | - |
| HR director severance costs | | 15 | - | - |
| **Professional Services** | 1 | **214** | **552** | **255** |

| Currency: $ 000 | | FY16A | FY17A | LTM |
|---|---|---|---|---|
| Maintenance costs | | - | 100 | 100 |
| SMS Discretionary Exp | | - | - | 27 |
| SC business development | | - | 48 | 83 |
| Employee Recognition | | 2 | 47 | 63 |
| Rent - Havasu | | 41 | 44 | 47 |
| S. Clarke Expenses | | 21 | 8 | 15 |
| Personal cars insurance | | 6 | 8 | 11 |
| **Owner Personal expenses** | 3 | **70** | **254** | **346** |

Exhibit D - Illustrative Example of Normative EBITDA.xlsx
Reliance Restricted

EY

**EXHIBIT E**

**WIRE TRANSFER INFORMATION OF SMS INC. AND CORBEL**

<u>**SMS Inc.:**</u>

<u>Bank</u>: Chase Bank

<u>Account Name</u>: Supplier Management Solutions, Inc.

<u>Routing</u>: 322271627

<u>Account Number</u>: 3412597756


<u>**Corbel:**</u>

<u>Bank</u>: First Republic Bank

<u>Account Name</u>: Corbel Structured Equity Partners

<u>Routing</u>: 321081669

<u>Account Number</u>: 80001665463

**EXHIBIT F**

**FORM OF TERMINATION OF LLC AGREEMENT**

See attached.

## TERMINATION OF OPERATING AGREEMENT
## AND RELEASE

This Termination of Operating Agreement and Release, dated [●], 2018 (the "**Agreement**"), is entered into by and among Supplier Management Solutions, LLC (the "**Company**"), a California limited liability company, Supplier Management Solutions, Inc. ("**SMS Inc.**"), a Nevada corporation, Corbel Structured Equity Partners, L.P. ("**Corbel 1**"), a California limited partnership, Corbel Structured Equity Partners Parallel, L.P. ("**Corbel 2**"), a California limited partnership, Corbel SMS, L.P. ("**Corbel 3**"), a California limited partnership, Corbel International A, LLC ("**Corbel 4**" and, together with Corbel 1, Corbel 2 and Corbel 3, "**Corbel**"), a [California] limited liability company, and Steven M. Clarke ("**Clarke**"). The Company, SMS Inc., Corbel and Clarke collectively shall be referred to as the "**Parties**" and each of Clarke, Corbel and SMS Inc. collectively shall be referred to as the "**Members**".

**WHEREAS**, the Parties hereto entered into that certain Amended and Restated Limited Liability Company Operating Agreement of Supplier Management Solutions, LLC, dated March 12, 2015, as amended by (i) that certain Amendment Agreement dated February 12, 2016, (ii) that certain Second Amendment to Amended and Restated Limited Liability Company Operating Agreement dated July 2016, (iii) that certain Offer of Conditional Sale of SMS Class B Units letter dated May 17, 2018 and (iv) that certain Third Amendment to Amended and Restated Limited Liability Company Operating Agreement dated September 28, 2016 (collectively, the "**Operating Agreement**"), which, among other things, contains certain rights, obligations, and duties of the Parties;

**WHEREAS**, on August 10, 2018, the Parties and TRIGO U.S., Inc. ("**Purchaser**"), entered into that certain Purchase and Sale Agreement (the "**Purchase Agreement**"), pursuant to which, among other things, Purchaser agreed to purchase from SMS Inc. and Corbel the Purchased Equity Interests (as defined in the Purchase Agreement) (the "**Transaction**");

**WHEREAS**, concurrently with, and subject to, the consummation of the Transaction, the Parties desire to mutually terminate the Operating Agreement; and

**WHEREAS**, concurrently with, and subject to, the consummation of the Transaction, each of the Members desires to release each of the Parties upon the terms and subject to the conditions set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and other good and valuable considerations hereinafter contained, the Parties agree as follows:

1.  <u>Defined Terms</u>.  Unless otherwise defined in this Agreement, all capitalized terms shall have the meanings ascribed to them in the Operating Agreement.

2.  <u>Mutual Termination of the Operating Agreement</u>.  Concurrently with, and subject to, the consummation of the Transaction, the Operating Agreement is hereby terminated so as to be rendered null and void and of no further force and effect, and the Parties (and their assignees) are hereby relieved of all of their respective obligations thereunder.

3.      <u>Mutual Release</u>. Concurrently with, and subject to, the consummation of the Transaction, each Member (each, a "**Releasing Party**") agrees that, effective as of the Closing Date (as defined in the Purchase Agreement), such Releasing Party hereby releases and discharges each other Party (including, for the avoidance of doubt, the Company) and such other Party's Affiliates and their respective representatives (whether in such Person's (as defined below) capacity as a shareholder, director, member, manager, officer, employee or otherwise) (collectively, the "**Released Parties**") from any and all claims, demands and causes of action, whether known or unknown, liquidated or contingent, relating to, arising out of or in any way connected with the dealings of the Company and such Released Party from the beginning of time through the Closing Date, it being understood, however, that such release shall not operate to release such Released Party from its obligations under the Purchase Agreement or any Ancillary Agreement (as defined in the Purchase Agreement). Each Releasing Party acknowledges that the laws of many states provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." Each Releasing Party acknowledges that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, each Releasing Party agrees that, effective as of the Closing Date, such Releasing Party hereby waives any such provision.  Each Releasing Party further agrees that such Releasing Party shall not, nor permit any Affiliate thereof to, (a) institute a lawsuit or other legal proceeding based upon, arising out of, or relating to any of the released claims hereunder, (b) participate, assist, or cooperate in any such proceeding or (c) encourage, assist and/or solicit any third party to institute any such proceeding.  For purposes of this release, "**Person**" means a natural person, partnership, limited partnership, limited liability partnership, corporation, limited liability company, unlimited liability company, joint stock company, trust, unincorporated association or organization, voluntary association, joint venture or any other entity, whether acting in an individual, fiduciary or other capacity, and pronouns have a similarly extended meaning.

4.      <u>Mutual Consent</u>.   The Parties hereto, and each of them, do hereby: (i) acknowledge that they have reviewed or caused to be reviewed the Operating Agreement; (ii) acknowledge that they have reviewed or caused to be reviewed this Agreement; (iii) unconditionally consent to the termination of the Operating Agreement; and (iv) unconditionally consent to the release of the released claims as set forth in Section 3.

5.      <u>Condition Precedent</u>. The obligations of the Parties hereunder and the effectiveness of Section 2 and the release set forth in Section 3 above, is hereby expressly made conditional upon the Transaction having been fully consummated and closed.

6.    <u>Duplicate Originals; Counterparts</u>.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single agreement.

7.    <u>Governing Law</u>.  This Agreement shall be interpreted and the rights and liabilities of the Parties determined in accordance with the laws of the State of California, excluding its conflict of laws rules that would otherwise require the application of the laws of any other jurisdiction.

8.    <u>Severability</u>.  If any provision, including any word, phrase, sentence, clause, section or subsection, of this Agreement is deemed invalid, inoperative or unenforceable under applicable law for any reason, such provision shall be deemed and treated by the Parties to be in effect to the fullest extent permitted by applicable law, and such circumstances shall not have the effect of rendering such provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision herein contained invalid, inoperative, or unenforceable to any extent whatsoever.

***[Signature Pages Follow]***

IN WITNESS WHEREOF, the Parties hereto have executed this Termination of Operating Agreement and Release as of the day and year first written above.

**SUPPLIER MANAGEMENT SOLUTIONS, LLC**

By: _____
Name: Steven M. Clarke
Title: Manager


**SUPPLIER MANAGEMENT SOLUTIONS, INC.**

By: _____
Name: Steven M. Clarke
Title: President


_____
Steven M. Clarke, individually


**CORBEL STRUCTURED EQUITY PARTNERS, L.P.**

By: _____
Name:
Title:


**CORBEL STRUCTURED EQUITY PARTNERS PARALLEL, L.P.**

By: _____
Name:
Title:

**CORBEL SMS, L.P.**


By: _____
Name:
Title:



**CORBEL INTERNATIONAL A, LLC**


By: _____
Name:
Title:

**EXHIBIT G**

**FORM OF RESIGNATION AND RELEASE LETTER**

See attached.

**Resignation**

Date: [●], 2018

To Supplier Management Solutions, LLC

Re:     <u>Resignation</u>

Effective immediately as of the closing of the sale (the "**Closing**") of Supplier Management Solutions, LLC ("**SMS LLC**") to TRIGO U.S., Inc. (the "**Purchaser**") pursuant to that certain Purchase and Sale Agreement, dated as of August 10, 2018, by and among Supplier Management Solutions, Inc., Corbel Structured Equity Partners, L.P., Corbel Structured Equity Partners Parallel, L.P., Corbel SMS, L.P. and Corbel International A, LLC (the "**Agreement**"), I hereby resign from my positions as Manager, Chief Executive Officer/President, Treasurer and Secretary of SMS LLC and from any and all other positions I hold and from all committees of which I am a member at SMS LLC, as applicable.

[*Signature page follows*]

IN WITNESS WHEREOF, I have executed this Resignation as of the date first above written.


Very truly yours,


_____
Name: Steven M. Clarke

**EXHIBIT H**

**TERMS OF TEMECULA LEASE AND LAKE HAVASU CITY LEASE**

See attached.

**EXHIBIT H**

**LEASE TERMS**

|  | __TEMECULA LEASE__ | __LAKE HAVASU CITY LEASE__ |
|---|---|---|
| **Premises:** | Entire second floor at 27476 and 27482 Via Industria, Temecula, California | All office space (approximately 50% of square footage) at 3129 Maricopa Avenue, Lake Havasu City, Arizona |
| **Term:** | 2 years, commencing on the Closing Date. | 2 years, commencing on the Closing Date. |
| **Gross Rent:** | $10,000 per month, increasing by 3% annually | $2,500 per month |
| **Security Deposit:** | None. | None. |
| **Parking:** | 6 reserved spaces at no additional cost. | Non-exclusive use of parking area at no additional cost. |
| **Condition of Premises / Improvements:** | As-is. | As-is. |
| **Utilities and Services:** | Landlord to provide sewer, HVAC, trash removal and janitorial services at Landlord's sole cost and expense.<br><br>Landlord will supply electricity and water to the building and Tenant to reimburse Landlord for 100% of the costs and expenses of same until a tenant leases and occupies the first floor. Thereafter Tenant to reimburse Landlord for 50% of the costs and expenses of electricity and water supplied to the building.<br><br>Tenant to be responsible for the costs and expenses for telephone, data and other utilities use by Tenant and solely serving the premises. Tenant to contract with utility company directly for such utilities. | Landlord to provide electricity, water, sewer, HVAC, trash removal and janitorial services at Landlord's sole cost and expense.<br><br>Tenant to be responsible for the costs and expenses for telephone, data and other utilities use by Tenant and solely serving the premises. Tenant to contract with utility company directly for such utilities. |
| **Taxes:** | Landlord to be responsible at its costs and expense for all real property taxes and assessments. Tenant to be | Landlord to be responsible at its costs and expense for all real property taxes and assessments. Tenant to be |

|  | | |
|---|---|---|
|  | responsible at its costs and expense for taxes on Tenant's personal property. | responsible at its costs and expense for taxes on Tenant's personal property. |
| **Insurance:** | Landlord to maintain commercial general liability insurance and property damage insurance for replacement value of building, at Landlord's expense. | Landlord to maintain commercial general liability insurance and property damage insurance for replacement value of building, at Landlord's expense. |
|  | Tenant to maintain commercial general liability insurance, business interruption insurance, property damage insurance for Tenant's personal property, worker's compensation insurance at statutory minimum, and automobile liability insurance, with commercially reasonable limits, all at Tenant's expense. | Tenant to maintain commercial general liability insurance, business interruption insurance, property damage insurance for Tenant's personal property, worker's compensation insurance at statutory minimum, and automobile liability insurance, with commercially reasonable limits, all at Tenant's expense. |
| **Permitted Use:** | General office use. | General office use. |
| **Hours:** | 24/7 access. | 24/7 access. |
| **Renewal:** | No automatic renewals or extension options. | No automatic renewals or extension options. |
| **Signage:** | Standard/existing signage. | Standard/existing signage. |
| **Brokers:** | None. | None. |
| **Maintenance and Operating Costs:** | Landlord to be responsible for all costs and expenses of operating, maintaining, repairing and replacing structural components of building and premises, utility and building systems, common areas of building, and exterior areas. | Landlord to be responsible for all costs and expenses of operating, maintaining, repairing and replacing structural components of building and premises, utility and building systems, common areas of building, and exterior areas. |
|  | Subject to Landlord's maintenance obligations, Tenant to be responsible for nonstructural repairs and maintenance of the interior of premises at its cost. | Subject to Landlord's maintenance obligations, Tenant to be responsible for nonstructural repairs and maintenance of the interior of premises at its cost. |
| **Assignment and Subletting:** | Not permitted without Landlord's prior written consent. | Not permitted without Landlord's prior written consent. |
| **SNDA:** | Parties to sign commercially reasonable SNDA if required by | Parties to sign commercially reasonable SNDA if required by |

| | |
|---|---|
| Landlord's lender or requested by Tenant. | Landlord's lender or requested by Tenant. |

**EXHIBIT I**

**ILLUSTRATIVE EXAMPLE OF CALCULATION OF WEEKLY BILLING**

See attached.

*As of August 7, 2018*                                        *($ actual)*

| Week Ending: | Weekly Billing: | Less: Sales Tax | Net Weekly Billing: |
|---|---|---|---|
| juillet 13, 2018 | $ 369 593 | - | $ 369 593 |
| juillet 20, 2018 | 369 593 | - | 369 593 |
| juillet 27, 2018 | 374 209 | - | 374 209 |
| août 03, 2018 | 378 825 | - | 378 825 |
| **Average Weekly Billing at Closing:** | **$ 373 055** | **-** | **$ 373 055** |

## 2018 52 WEEK SALES FORECAST   2018-08-03

| | Week Ending | NGAS | LMCO | UTAS | Pratt & Whitney | Triumph | Eaton | Bell | New Business | Total | Projected as of 3/1 | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | janvier 5, 2018 | $67 307 | $43 585 | $73 574 | $46 640 | $90 584 | $2 212 | $0 | $0 | $323 902 | | |
| 2 | janvier 12, 2018 | $67 307 | $43 585 | $73 574 | $46 640 | $90 584 | $2 212 | $0 | $0 | $323 902 | | |
| 3 | janvier 19, 2018 | $67 307 | $43 585 | $73 574 | $46 640 | $90 584 | $2 212 | $0 | $0 | $323 902 | | |
| 4 | janvier 26, 2018 | $67 307 | $43 585 | $73 574 | $46 640 | $88 276 | $2 212 | $0 | $0 | $321 594 | | |
| 5 | février 2, 2018 | $67 307 | $43 585 | $73 574 | $46 640 | $85 968 | $4 424 | $0 | $0 | $321 498 | | |
| 6 | février 9, 2018 | $67 307 | $43 585 | $75 882 | $46 640 | $85 968 | $4 424 | $0 | $0 | $323 806 | | |
| 7 | février 16, 2018 | $67 307 | $43 585 | $76 075 | $46 640 | $88 276 | $4 424 | $0 | $0 | $326 307 | | |
| 8 | février 23, 2018 | $67 307 | $43 585 | $76 075 | $46 640 | $88 276 | $4 424 | $0 | $0 | $326 307 | | |
| 9 | mars 2, 2018 | $67 307 | $43 585 | $76 075 | $46 640 | $85 968 | $4 424 | $0 | $0 | $323 999 | | |
| 10 | mars 9, 2018 | $67 307 | $43 585 | $76 075 | $46 640 | $88 276 | $4 424 | $0 | $0 | $326 307 | $326 307 | $0 |
| 11 | mars 16, 2018 | $67 307 | $43 585 | $76 075 | $46 640 | $93 468 | $4 424 | $0 | $0 | $331 499 | $326 307 | $5 192 |
| 12 | mars 23, 2018 | $67 307 | $43 585 | $76 075 | $46 640 | $93 468 | $4 424 | $0 | $0 | $331 499 | $328 615 | $2 884 |
| 13 | mars 30, 2018 | $67 307 | $43 585 | $80 499 | $46 640 | $95 776 | $4 424 | $0 | $0 | $338 231 | $337 655 | $576 |
| 14 | avril 6, 2018 | $67 307 | $43 585 | $82 711 | $46 640 | $95 776 | $4 424 | $0 | $0 | $340 443 | $347 157 | ($6 714) |
| 15 | avril 13, 2018 | $67 307 | $43 585 | $85 019 | $46 640 | $95 776 | $4 424 | $0 | $0 | $342 751 | $347 157 | ($4 406) |
| 16 | avril 20, 2018 | $67 307 | $43 585 | $87 615 | $53 088 | $98 084 | $4 424 | $0 | $0 | $354 103 | $354 128 | ($25) |
| 17 | avril 27, 2018 | $67 307 | $43 585 | $87 615 | $50 876 | $102 700 | $4 424 | $0 | $0 | $356 507 | $364 745 | ($8 238) |
| 18 | mai 4, 2018 | $67 307 | $43 585 | $85 403 | $50 876 | $98 084 | $4 424 | $0 | $0 | $349 679 | $365 321 | ($15 642) |
| 19 | mai 11, 2018 | $67 307 | $43 585 | $85 403 | $50 876 | $100 392 | $4 424 | $0 | $0 | $351 987 | $365 321 | ($13 334) |
| 20 | mai 18, 2018 | $67 307 | $43 585 | $87 615 | $50 876 | $102 700 | $2 212 | $0 | $0 | $354 295 | $365 321 | ($11 026) |
| 21 | mai 25, 2018 | $67 307 | $43 585 | $87 615 | $50 876 | $102 704 | $2 212 | $0 | $0 | $354 299 | $365 321 | ($11 022) |
| 22 | juin 1, 2018 | $67 307 | $43 585 | $87 615 | $50 876 | $102 704 | $2 212 | $0 | $0 | $354 299 | $365 321 | ($11 022) |
| 23 | juin 8, 2018 | $67 307 | $43 585 | $87 808 | $50 876 | $102 708 | $2 212 | $0 | $0 | $354 496 | $454 872 | ($100 376) |
| 24 | juin 15, 2018 | $67 307 | $43 585 | $87 808 | $50 876 | $105 016 | $2 212 | $0 | $0 | $356 804 | $454 872 | ($98 068) |
| 25 | juin 22, 2018 | $67 307 | $43 585 | $90 309 | $50 876 | $105 016 | $2 212 | $0 | $0 | $359 305 | $454 872 | ($95 567) |
| 26 | juin 29, 2018 | $67 307 | $43 585 | $92 905 | $53 377 | $102 704 | $2 212 | $0 | $0 | $362 090 | $454 872 | ($92 782) |
| 27 | juillet 6, 2018 | $67 307 | $43 585 | $95 117 | $51 165 | $102 704 | $3 982 | $0 | $0 | $363 860 | $454 872 | ($91 012) |
| 28 | juillet 13, 2018 | $67 307 | $43 585 | $95 117 | $51 165 | $102 704 | $9 715 | $0 | $0 | $369 593 | $563 045 | ($193 452) |
| 29 | juillet 20, 2018 | $67 307 | $43 585 | $95 117 | $51 165 | $102 704 | $9 715 | $0 | $0 | $369 593 | $563 045 | ($193 452) |
| 30 | juillet 27, 2018 | $67 307 | $43 585 | $95 117 | $51 165 | $102 704 | $11 927 | $2 404 | $0 | $374 209 | $563 045 | ($188 836) |
| 31 | août 3, 2018 | $67 307 | $43 585 | $97 425 | $51 165 | $105 012 | $11 927 | $2 404 | $0 | $378 825 | $563 045 | ($184 220) |
| 32 | août 10, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $198 300 | $582 452 | $563 045 | |
| 33 | août 17, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $198 300 | $582 452 | $563 045 | |
| 34 | août 24, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $198 300 | $582 452 | $563 045 | |
| 35 | août 31, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $198 300 | $582 452 | $563 045 | |
| 36 | septembre 7, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $186 760 | $570 912 | $558 429 | |
| 37 | septembre 14, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $186 760 | $570 912 | $558 429 | |
| 38 | septembre 21, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $186 760 | $570 912 | $558 429 | |
| 39 | septembre 28, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $186 760 | $570 912 | $558 429 | |
| 40 | octobre 5, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 41 | octobre 12, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 42 | octobre 19, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 43 | octobre 26, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 44 | novembre 2, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 45 | novembre 9, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 46 | novembre 16, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 47 | novembre 23, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 48 | novembre 30, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 49 | décembre 7, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 50 | décembre 14, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 51 | décembre 21, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| 52 | décembre 28, 2018 | $67 307 | $43 585 | $100 540 | $53 377 | $105 012 | $11 927 | $2 404 | $294 933 | $679 085 | $666 602 | |
| | 52 Week Totals | $3 499 964 | $2 266 420 | $4 705 375 | $2 640 691 | $5 200 916 | $388 425 | $55 292 | $5 374 369 | $24 131 452 | | ($1 310 542) |

Original Projections   $25 599 910
Variance   ($1 468 458)

| | |
|---|---|
| $2 308 | UTAS - new UK DAS support |
| $2 308 | Triumph PC - new short-term support |

**EXHIBIT J**

**TARGET WORKING CAPITAL**

See attached.

Section BS - Balance Sheet Analysis
Annual

## Target WCR

| Target in days of sales | 50.0 |
|---|---|
| *Weekly sales ($ 000)* | **Target WC** |
| 400 | *2 859* |
| 410 | 2 930 |
| 420 | 3 002 |
| 430 | 3 073 |
| 440 | 3 145 |
| 450 | 3 216 |
| 460 | 3 288 |
| 470 | 3 359 |
| 480 | 3 431 |
| 490 | 3 502 |
| 500 | 3 574 |

Project Wilson - Target WCR.xlsx
Reliance Restricted

EY

# EXHIBIT 2



FIRST AMENDMENT TO
PURCHASE AND SALE AGREEMENT

**THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "First Amendment"), dated as of December **20**, 2018 (the "Effective Date"), is made and entered into by and among Supplier Management Solutions, Inc. ("SMS Inc."), a Nevada corporation, Corbel Structured Equity Partners, L.P. ("Corbel 1"), a California limited partnership, Corbel Structured Equity Partners Parallel, L.P. ("Corbel 2"), a California limited partnership, Corbel SMS, L.P. ("Corbel 3"), a California limited partnership, Corbel International A, LLC ("Corbel 4" and, together with SMS Inc., Corbel 1, Corbel 2 and Corbel 3, the "Sellers") and TRIGO U.S., Inc., a Delaware corporation existing and organized under the laws of the State of Delaware, registered with the Division of Corporations of the Delaware Secretary of State Office under file number 0121412-8, having its registered office at 50459 Central Industrial Drive, Shelby Township, Michigan 48315 (the "Purchaser"). The Sellers and the Purchaser shall each individually be referred to herein as a "Party" and collectively as the "Parties".

RECITALS

**WHEREAS,** the Purchaser, the Sellers and Steven M. Clarke have entered into that certain Purchase and Sale Agreement, dated as of August 10, 2018 (the "Original Agreement");

**WHEREAS,** Section 12.5 of the Original Agreement provides that the Original Agreement may not be amended except by an instrument in writing signed by the Sellers and the Purchaser; and

**WHEREAS,** the Parties desire to amend the Original Agreement by entering into this First Amendment.

**NOW, THEREFORE,** in consideration of the foregoing recitals, which are incorporated herein by reference, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties (as such term is defined below) hereby agree as follows:

## ARTICLE I   Amendments to Original Agreement.

**Section 1.1**      <u>Amendments to Section 1.1. of the Original Agreement</u>.

(a)      The definition of "Average Weekly Billing Post-Closing" set forth at Section 1.1 of the Original Agreement is hereby amended and restated as follows:

"Average Weekly Billing Post-Closing" means the average amount in dollars invoiced to customers of the Business for services rendered (<u>minus</u> applicable sales taxes) during each four (4) complete and consecutive weeks during the period from the Closing to April 30, 2019. For illustration purposes, the average amount in dollars invoiced to customers of the Business for services rendered (<u>minus</u> applicable sales taxes) during each of the four (4) complete weeks immediately preceding the date hereof is set forth on <u>Exhibit I</u>. For purposes of this Agreement if the Average Weekly Billing Post-Closing otherwise totals at least USD430,000, Average Weekly Billing Post-Closing shall then, and only then, take into account each New Assignment entered into during the applicable post-Closing period, in an amount equal to the projected amount of revenue from such New Assignment (<u>minus</u> projected applicable sales taxes) during the first twelve (12) months for which services are rendered to such New Assignment (determined in good faith pursuant to the Contract with such New Assignment) <u>divided by</u> fifty-two (52).

(b)      The following definitions are hereby added to Section 1.1 of the Original Agreement:



"Applicable Measurement Date" means the Closing Date or the last day of any of the four (4) complete and consecutive weeks during the period from the Closing to April 30, 2019 that are used to determine the Average Weekly Billing at Closing or the Average Weekly Billing Post-Closing, as the case may be.

"Corbel Debt Legal Expense Amount" means USD28,575.00, which amount represents the reimbursable out-of-pocket legal fees and expenses of Corbel pursuant to the Corbel Credit Agreement.  For avoidance of doubt, Corbel Debt Legal Expense Amount is in addition to the legal fees and expenses of Corbel (up to USD60,000) referenced in Transaction Expenses.

"Earn-Out Payment 3" has the meaning specified in Section 3.4(a)(iii).

"Earn-Out Payment 4" has the meaning specified in Section 3.4(a)(iv).

"Earn-Out Payment 5" has the meaning specified in Section 3.4(a)(v).

"Earn-Out Payment 6" has the meaning specified in Section 3.4(a)(vi).

**Section 1.2    Amendment to Section 3.1(a) of the Original Agreement**.  The second sentence of Section 3.1(a) of the Original Agreement is hereby amended and restated as follows:

The Purchase Price shall be allocated among the Sellers as follows: USD9,500,000 to Corbel and the remainder of the Purchase Price to SMS Inc.; provided, however, that in the event the Company (a) chooses to defer any portion of the quarterly interest payment payable to Corbel for the quarter ending September 30, 2018 or the quarter ending December 31, 2018 under the Corbel Credit Agreement or (b) fails to pay to Corbel the Corbel Debt Legal Expense Amount by December 31, 2018, the portion of the Purchase Price allocable to Corbel shall instead be USD10,000,000.

**Section 1.3    Amendment to Section 3.4 of the Original Agreement**.  Section 3.4 of the Original Agreement is hereby amended and restated as follows:

Section 3.4    Earn-Out Payment.

(a)    Principle.

(i)    The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the fiscal year ending December 31, 2018 an aggregate cash performance amount (the "Earn-Out Payment 1") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD7,500,000:

$$\text{Earn-Out Payment 1} = (7.5 / 0.4) \times (2018 \text{ Normative EBITDA} - USD5,400,000)$$

(ii)    The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to Clarke for the fiscal year ending December 31, 2019 an aggregate cash performance amount (the "Earn-Out Payment 2") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD20,000,000:

$$\text{Earn-Out Payment 2} = ((20 / 3.4) \times (2019 \text{ Normative EBITDA} - USD5,400,000)) - \text{Earn-Out Payment 1}$$

(iii)   The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to Clarke for the twelve month period ending March 31, 2020 an aggregate cash performance amount (the "Earn-Out Payment 3") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD20,000,000:

Earn-Out Payment 3 = ((20 / 3.4) X (2020 Q1 TTM Normative EBITDA – USD5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2

(iv)   The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to Clarke for the twelve month period ending June 30, 2020 an aggregate cash performance amount (the "Earn-Out Payment 4") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD20,000,000:

Earn-Out Payment 4 = ((20 / 3.4) X (2020 Q2 TTM Normative EBITDA – USD5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3

(v)   The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to Clarke for the twelve month period ending September 30, 2020 an aggregate cash performance amount (the "Earn-Out Payment 5") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD20,000,000:

Earn-Out Payment 5 = ((20 / 3.4) X (2020 Q3 TTM Normative EBITDA – USD5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4

(vi)   The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to Clarke for the twelve month period ending December 31, 2020 an aggregate cash performance amount (the "Earn-Out Payment 6" and, collectively with the Earn-Out Payment 1, the Earn-Out Payment 2, the Earn-Out Payment 3, the Earn-Out Payment 4, and the Earn-Out Payment 5, the "Earn-Out Payment") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD20,000,000:

Earn-Out Payment 6 = ((20 / 3.4) X (2020 Normative EBITDA – USD5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4 – Earn-Out Payment 5

Any aerospace service activities of Purchaser and its Affiliates in the US will be included in the 2018 Normative EBITDA and 2019 Normative EBITDA; provided, however, (i) no customer contracts of Purchaser or its Affiliates entered into with US customers prior to Closing that have profitability margins of zero (0)% or less will be included, and (ii) with regards to the 2018 Normative EBITDA, the profitable contracts of the Purchaser's US aerospace activities will be included on a pro rata basis for the period from Closing to, and including, December 31, 2018.

With regards to 2020 Q1 TTM Normative EBITDA, 2020 Q2 TTM Normative EBITDA, 2020 Q3 TTM Normative EBITDA and 2020 Normative EBITDA, Normative EBITDA for each such period shall be equal to zero dollars ($0.00) unless there are dollars invoiced to The Boeing Company or any of its Affiliates as a customer of the Business during such period.

For purposes of the above calculation, "2018 Normative EBITDA" means Normative EBITDA for the twelve month period ending December 31, 2018, "2019 Normative EBITDA" means Normative EBITDA for the twelve month period ending December 31, 2019, "2020 Q1 TTM Normative EBITDA" means Normative EBITDA for the twelve month period ending March 31,

2020, "2020 Q2 TTM Normative EBITDA" means Normative EBITDA for the twelve month period ending June 30, 2020, "2020 Q3 TTM Normative EBITDA" means Normative EBITDA for the twelve month period ending September 30, 2020, and "2020 Normative EBITDA" means Normative EBITDA for the twelve month period ending December 31, 2020.

(b)    Earn-Out Statements.  Within ten (10) Business Days of completion of the Company's audited or unaudited (as applicable) financial statements for each of the twelve month periods ending December 31, 2018, December 31, 2019, March 31, 2020, June 30, 2020, September 30, 2020 and December 31, 2020, respectively, and in any event no later than March 31, 2019, March 31, 2020, May 30, 2020, August 31, 2020, November 30, 2020 and March 31, 2021, respectively, the Purchaser shall deliver to Clarke (i) the audited or unaudited (as applicable) corporate financial statements of the Company for the twelve month period ending December 31, 2018, December 31, 2019, March 31, 2020, June 30, 2020, September 30, 2020 and December 31, 2020, respectively, and (ii) a statement setting forth the 2018 Normative EBITDA, 2019 Normative EBITDA, 2020 Q1 TTM Normative EBITDA, 2020 Q2 TTM Normative EBITDA, 2020 Q3 TTM Normative EBITDA and 2020 Normative EBITDA, respectively, and the resulting Earn-Out Payment 1 ,Earn-Out Payment 2, Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5 and Earn-Out Payment 6, respectively, if any, due and payable (the "Earn-Out Certificate").  Upon delivery of an Earn-Out Certificate by the Purchaser, the Purchaser shall cause the Company to provide Clarke and his Representatives with reasonable access, during normal business hours, to the Company's auditor and accounting and other personnel and to the books and records of the Company, as the case may be, and any other document or information (including documents and information relating to the Purchaser, its Affiliates and/or their successors and assigns) reasonably requested by Clarke and/or his Representatives to verify the accuracy of the Earn-Out Certificate.

(c)    Dispute Resolution.  The applicable Earn-Out Certificate (and the proposed determination of the 2018 Normative EBITDA, 2019 Normative EBITDA, 2020 Q1 TTM Normative EBITDA, 2020 Q2 TTM Normative EBITDA, 2020 Q3 TTM Normative EBITDA and 2020 Normative EBITDA reflected thereon, as applicable, and of the resulting Earn-Out Payment amount) will be final, conclusive and binding on the Parties with regards to such Earn-Out Payment (and referred to herein as the "Final Earn-Out Certificate"), unless Clarke provides a written notice (the "Earn-Out Dispute Notice") to the Purchaser no later than the fifteenth (15th) Business Day after delivery to Clarke of the applicable Earn-Out Certificate. Any Earn-Out Dispute Notice must set forth in reasonable detail (i) any item on the applicable Earn-Out Certificate which Clarke believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) Clarke's alternative calculation of Normative EBITDA for such applicable period, and any Earn-Out Payment resulting thereof.  Any item or amount to which no dispute is raised in the Earn-Out Dispute Notice will be final, conclusive and binding on the Parties on such fifteenth (15th) Business Day.  Any Earn-Out Dispute Notice must specify, with reasonable particularity, all facts that form the basis of such disagreements.  The Purchaser and Clarke will attempt to resolve the matters raised in an Earn-Out Dispute Notice in good faith.  If the Purchaser and Clarke reach a resolution with respect to such matters, then the Earn-Out Certificate, as modified by such resolution, shall be deemed the "Final Earn-Out Certificate." Fifteen (15) Business Days after delivery of any Earn-Out Dispute Notice (or such

longer period as may be mutually agreed in writing by Clarke and the Purchaser), either the Purchaser or Clarke may provide written notice to the other that it elects to submit the disputed items to the Arbiter, which resolution shall be final and binding on the Parties and shall be deemed the "Final Earn-Out Certificate." The Arbiter shall be instructed to resolve the dispute within fifteen (15) Business Days after the item has been referred to it. The costs, fees, and expenses of the Arbiter shall be borne equally by the Purchaser and Clarke.

(d)      Payment.  If any Earn-Out Payment is determined to be payable pursuant to the Final Earn-Out Certificate, then the Purchaser shall, within five (5) Business Days of the determination of the Final Earn-Out Certificate, pay such amount to Clarke's accounts set forth in Exhibit E, by wire transfer of immediately available funds.

(e)      Operation of the Business.  Until expiration of the Earn-Out period (or payment in full of the maximum Earn-Out Payment, if earlier), the Purchaser shall: (i) operate the Company in the ordinary course of business and so as to maintain it as a going concern; (ii) operate the Company as a measurable business unit with the same perimeter as on the Closing with its own separate chart of accounts; (iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment; (iv) not, except to the extent strictly required under applicable Law and for so long as Clarke is employed as the Chief Executive Officer and President of the Company, unilaterally intervene with the management of the Company; (v) not cause the Company to enter into voluntary liquidation; (vi) operate the Company as a separate entity, owned directly or indirectly by Purchaser; (vii) operate the business of the Company consistent with past practice and not adopt strategic, commercial or financial changes to the way the Company is managed which could have a negative impact on the EBITDA of the Company; and (viii) maintain complete and accurate books and records of the Company on a stand-alone basis adequate in all material respects to permit an audit of the Company as a stand-alone business.  Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, in the event that (i) the Company or Purchaser undergoes a transaction during the Earn-Out period which results in a Change of Control of the Company or (ii) Clarke is terminated without Cause (as defined in the Clarke Employment Agreement) or leaves with Good Reason (as defined in the Clarke Employment Agreement), then the maximum amount of each Earn-Out Payment (to the extent previously unpaid) shall automatically and without any further action of any Party or any other Person become due and payable to SMS Inc. and Purchaser shall, within five (5) Business Days thereof, pay such amount SMS Inc.'s account set forth in Exhibit D, by wire transfer of immediately available funds.

**Section 1.5      Amendment to Section 11.1(a)(i) of the Original Agreement.**      Section 11.1(a)(i) of the Original Agreement is hereby amended and restated as follows:

(i)      by either the Purchaser or the Sellers if the Closing shall not have occurred by January 18, 2019 (the "Outside Date") provided that Purchaser cannot terminate under this Section 11.1(a)(i) if the failure of the Closing to occur is the result of a breach by Purchaser of its representations, warranties, covenants or agreements hereunder and the Sellers cannot terminate this Agreement under this Section 11.1(a)(i) if the failure of the Closing to occur

is the result of a breach by Sellers of their representations, warranties, covenants or agreements hereunder;

## ARTICLE II Miscellaneous

**Section 2.1** <u>**No Other Amendments**</u>. Except as expressly set forth herein, the Original Agreement shall continue unmodified and in full force and effect.

**Section 2.2** <u>**Miscellaneous**</u>. The applicable provisions of <u>ARTICLE 12</u> of the Purchase Agreement shall apply to this First Amendment, *mutatis mutandis*.

**Section 2.3** <u>**Counterparts; Facsimile Signatures**</u>. This First Amendment may be executed in any number of counterparts (including by means of facsimile or other electronic signature), each of which when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument binding upon all the Parties. Delivery of an executed counterpart of a signature page to this First Amendment by facsimile or other electronic signature shall be effective as delivery of a manually executed counterpart of this First Amendment.

*[Remainder of page intentionally left blank]*



**IN WITNESS WHEREOF**, the Parties have caused this First Amendment to be executed as of the date first written above.

**SUPPLIER MANAGEMENT SOLUTIONS, INC.**

By: _____
Name: Steven M. Clarke
Title: President

**CORBEL STRUCTURED EQUITY PARTNERS, L.P.**

By: _____
Name: Jeff Schwartz
Title: Managing Partner

**CORBEL STRUCTURED EQUITY PARTNERS PARALLEL, L.P.**

By: _____
Name: Jeff Schwartz
Title: Managing Partner

**CORBEL SMS, L.P.**

By: _____
Name: Jeff Schwartz
Title: Managing Partner

**CORBEL INTERNATIONAL A, LLC**

By: _____
Name: Jeff Schwartz
Title: Managing Partner

**TRIGO U.S., INC.**

By: _____
Name: Matthieu Rambaud
Title: President

[SIGNATURE PAGE TO FIRST AMENDMENT TO
PURCHASE AND SALE AGREEMENT]

# EXHIBIT 3



# SECOND AMENDMENT TO
# PURCHASE AND SALE AGREEMENT

**THIS SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "Second Amendment"), dated as of May  24  , 2019 (the "Effective Date"), is made and entered into by and between SSD Clarke Holdings, Inc., f/k/a Supplier Management Solutions, Inc. ("SMS Inc."), a Nevada corporation, and TRIGO U.S., Inc., a Delaware corporation existing and organized under the laws of the State of Delaware, registered with the Division of Corporations of the Delaware Secretary of State Office under file number 0121412-8, having its registered office at 50459 Central Industrial Drive, Shelby Township, Michigan 48315 (the "Purchaser"). SMS Inc. and the Purchaser shall each individually be referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

**WHEREAS,** the Purchaser, SMS Inc., Corbel Structured Equity Partners, L.P., a California limited partnership, Corbel Structured Equity Partners Parallel, L.P., a California limited partnership, Corbel SMS, L.P., a California limited partnership, and Corbel International A, LLC (collectively, the "Corbel Entities", and together with SMS, Inc., the "Sellers") and Steven M. Clarke have entered into that certain Purchase and Sale Agreement, dated as of August 10, 2018 (the "Original Agreement", and as amended, supplemented and otherwise modified by the First Amendment (as defined below), the "Purchase and Sale Agreement");

**WHEREAS,** the Purchaser and the Sellers have entered into that certain First Amendment to the Original Agreement, dated as of December 20, 2018 (the "First Amendment");

**WHEREAS,** Section 12.5 of the Purchase and Sale Agreement provides that the Purchase and Sale Agreement may not be amended except by an instrument in writing signed by the Sellers and the Purchaser; and

**WHEREAS,** the Parties desire to amend the Purchase and Sale Agreement by entering into this Second Amendment.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are incorporated herein by reference, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I   Amendments to the Purchase and Sale Agreement.

**Section 1.1**      **Amendment to Section 3.4 of the Purchase and Sale Agreement.  Section 3.4 of the Purchase and Sale Agreement is hereby amended and restated as follows:**

**Section 3.4      Earn-Out Payment.**

(a)      Principle.

(i)      The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the fiscal year ending December 31, 2018 an aggregate cash performance amount (the "Earn-Out Payment 1") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 7,500,000:

Earn-Out Payment 1 = (7.5 / 0.4) X (2018 Normative EBITDA – USD 5,400,000)

- 2 -

(ii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the fiscal year ending December 31, 2019 an aggregate cash performance amount (the "Earn-Out Payment 2") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 2 = ((20 / 3.4) X (2019 Normative EBITDA – USD 5,400,000)) – Earn-Out Payment 1

(iii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the six-month period ending March 31, 2020 an aggregate cash performance amount (the "Earn-Out Payment 3") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 3 = ((40 / 3.4) X (2020 Q1 LSM Normative EBITDA – USD 2,700,000)) – Earn-Out Payment 1 – Earn-Out Payment 2

(iv)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the six-month period ending June 30, 2020 an aggregate cash performance amount (the "Earn-Out Payment 4") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 4 = ((40 / 3.4) X (2020 Q2 LSM Normative EBITDA – USD 2,700,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3

(v)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the six-month period ending September 30, 2020 an aggregate cash performance amount (the "Earn-Out Payment 5") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 5 = ((40 / 3.4) X (2020 Q3 LSM Normative EBITDA – USD 2,700,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4

(vi)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the six-month period ending December 31, 2020 an aggregate cash performance amount (the "Earn-Out Payment 6" and, collectively with the Earn-Out Payment 1, the Earn-Out Payment 2, the Earn-Out Payment 3, the Earn-Out Payment 4, and the Earn-Out Payment 5, the "Earn-Out Payment") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 6 = ((40 / 3.4) X (2020 Q4 LSM Normative EBITDA – USD 2,700,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4 – Earn-Out Payment 5

(vii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. for the twelve-month period ending December 31, 2020 an aggregate cash performance amount (the "**Earn-Out Payment 7**" calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 7 = ((20 / 3.4) X (2020 Normative EBITDA – USD 5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4 – Earn-Out Payment 5 – Earn-Out Payment 6

Any Quality Segment EBITDA will be included in each calculation of Normative EBITDA set forth above; provided, however, that for purposes of determining any such Normative EBITDA, any negative Quality Segment EBITDA generated during the relevant period shall be excluded from the determination.

For purposes of the above calculations, "2018 Normative EBITDA" means Normative EBITDA for the twelve-month period ending December 31, 2018, "2019 Normative EBITDA" means Normative EBITDA for the twelve-month period ending December 31, 2019, "2020 Q1 LSM Normative EBITDA" means Normative EBITDA for the six-month period ending March 31, 2020, "2020 Q2 LSM Normative EBITDA" means Normative EBITDA for the six-month period ending June 30, 2020, "2020 Q3 LSM Normative EBITDA" means Normative EBITDA for the six-month period ending September 30, 2020, "2020 Q4 LSM Normative EBITDA" means Normative EBITDA for the six-month period ending December 31, 2020, and "2020 Normative EBITDA" means Normative EBITDA for the twelve-month period ending December 31, 2020.

For purposes of this Second Amendment, "Quality Segment EBITDA" shall mean, collectively, the EBITDA generated by the quality service segments of (i) the Business being developed by the Purchaser and its Affiliates, and (ii) the business of the Purchaser and its Affiliates in the U.S. aerospace sector.

(b)     Earn-Out Statements.   Within ten (10) Business Days of completion of the Company's audited or unaudited (as applicable) financial statements for each of the twelve-month periods ending December 31, 2018, December 31, 2019 and December 31, 2020 and for each of the six-month periods ending March 31, 2020, June 30, 2020, September 30, 2020 and December 31, 2020, respectively, and in any event no later than March 31, 2019, March 31, 2020, May 30, 2020, August 31, 2020, November 30, 2020 and March 31, 2021, respectively, the Purchaser shall deliver to SMS Inc. (i) the audited or unaudited (as applicable) corporate financial statements of the Company for each of the twelve-month periods ending December 31, 2018, December 31, 2019,  and December 31, 2020 and for each of the six-month periods ending March 31, 2020, June 30, 2020, September 30, 2020 and December 31, 2020, (ii) a statement setting forth the 2018 Normative EBITDA, 2019 Normative EBITDA, 2020 Q1 LSM Normative EBITDA, 2020 Q2 LSM Normative EBITDA, 2020 Q3 LSM Normative EBITDA, 2020 Q4 LSM Normative EBITDA and 2020 Normative EBITDA, respectively, (iii) a statement setting forth the Quality Segment EBITDA for each period referenced in subpart (ii) of this paragraph (other than the period ending December 31, 2018), and the resulting Earn-Out Payment 1, Earn-Out Payment 2, Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5, Earn-Out Payment 6 and Earn-Out Payment 7, respectively, if any, due and payable (the "Earn-Out Certificate").   Upon delivery of an Earn-Out Certificate by the Purchaser, the Purchaser shall cause the Company to provide SMS Inc. and its Representatives with reasonable access, during normal business hours, to the Company's auditor and accounting and other personnel and to the books and records of the Company, as the case may be, and any other document or information (including documents and information relating to the Purchaser, its Affiliates and/or their successors and assigns) reasonably requested by SMS Inc. and/or its Representatives to verify the accuracy of the Earn-Out Certificate.

(c)     Dispute Resolution. The applicable Earn-Out Certificate (and the proposed determination of the 2018 Normative EBITDA, 2019 Normative EBITDA, 2020 Q1 LSM

- 4 -

Normative EBITDA, 2020 Q2 LSM Normative EBITDA, 2020 Q3 LSM Normative EBITDA, 2020 Q4 LSM Normative EBITDA and 2020 Normative EBITDA reflected thereon, as applicable, and of the resulting Earn-Out Payment amount) will be final, conclusive and binding on the Parties with regards to such Earn-Out Payment (and referred to herein as the "Final Earn-Out Certificate"), unless SMS Inc. provides a written notice (the "Earn-Out Dispute Notice") to the Purchaser no later than the fifteenth (15th) Business Day after delivery to SMS Inc. of the applicable Earn-Out Certificate. Any Earn-Out Dispute Notice must set forth in reasonable detail (i) any item on the applicable Earn-Out Certificate which SMS Inc. believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) SMS Inc.'s alternative calculation of Normative EBITDA for such applicable period, and any Earn-Out Payment resulting thereof. Any item or amount to which no dispute is raised in the Earn-Out Dispute Notice will be final, conclusive and binding on the Parties on such fifteenth (15th) Business Day. Any Earn-Out Dispute Notice must specify, with reasonable particularity, all facts that form the basis of such disagreements. The Purchaser and SMS Inc. will attempt to resolve the matters raised in an Earn-Out Dispute Notice in good faith. If the Purchaser and SMS Inc. reach a resolution with respect to such matters, then the Earn-Out Certificate, as modified by such resolution, shall be deemed the "Final Earn-Out Certificate." Fifteen (15) Business Days after delivery of any Earn-Out Dispute Notice (or such longer period as may be mutually agreed in writing by SMS Inc. and the Purchaser), either the Purchaser or SMS Inc. may provide written notice to the other that it elects to submit the disputed items to the Arbiter, which resolution shall be final and binding on the Parties and shall be deemed the "Final Earn-Out Certificate." The Arbiter shall be instructed to resolve the dispute within fifteen (15) Business Days after the item has been referred to it. The costs, fees, and expenses of the Arbiter shall be borne equally by the Purchaser and SMS Inc.

(d)     Payment. If any Earn-Out Payment, except for Earn-Out Payment 3, Earn-Out Payment 4 and Earn-Out Payment 5, is determined to be payable pursuant to a Final Earn-Out Certificate, then the Purchaser shall, within five (5) Business Days of the determination of such Final Earn-Out Certificate, pay such amount to SMS Inc.'s accounts set forth in Exhibit E, by wire transfer of immediately available funds. If Earn-Out Payment 3, Earn-Out Payment 4 and/or Earn-Out Payment 5 is determined payable pursuant to the Final Earn-Out Certificate, then the Purchaser shall, by no later than January 10, 2021, pay such amount(s) to SMS Inc.'s accounts set forth in Exhibit E, by wire transfer of immediately available funds.

(e)     Operation of the Business. Until expiration of the Earn-Out period (or payment in full of the maximum Earn-Out Payment, if earlier), the Purchaser shall: (i) operate the Company in the ordinary course of business and so as to maintain it as a going concern; (ii) operate the Company as a measurable business unit with the same perimeter as on the Closing with its own separate chart of accounts; (iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment; (iv) not, except to the extent strictly required under applicable Law and for so long as Clarke is employed as the Chief Executive Officer and President of the Company, unilaterally intervene with the management of the Company; (v) not cause the Company to enter into voluntary liquidation; (vi) operate the Company as a separate entity, owned directly or indirectly by Purchaser; (vii) operate the business of the Company consistent with past practice and not adopt strategic, commercial or financial changes to the way the Company is managed which could have a negative impact on the EBITDA of the Company; and (viii) maintain complete and accurate books and records of the Company on a stand-alone basis adequate in all material respects to permit an audit of the Company as a stand-alone business. Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, in the event that (i) the Company or Purchaser undergoes a transaction during the Earn-Out period which results in a Change of

Control of the Company or (ii) Clarke is terminated without Cause (as defined in the Clarke Employment Agreement) or leaves with Good Reason (as defined in the Clarke Employment Agreement), then the maximum amount of each Earn-Out Payment (to the extent previously unpaid) shall automatically and without any further action of any Party or any other Person become due and payable to SMS Inc. and Purchaser shall, within five (5) Business Days thereof, pay such amount SMS Inc.'s account set forth in <u>Exhibit D</u>, by wire transfer of immediately available funds.

## ARTICLE II  Miscellaneous

Section 2.1    **No Other Amendments**. Except as expressly set forth herein, the Purchase and Sale Agreement shall continue unmodified and in full force and effect.

Section 2.2    **The Corbel Parties**. The Corbel Parties do not have any rights or obligations under the Purchase and Sale Agreement that are impacted in any way by this Second Amendment. Accordingly, and notwithstanding Section 12.5 of the Purchase and Sale Agreement, the Parties have mutually determined that the execution and delivery of this Second Amendment by the Corbel Parties is not necessary for this Second Amendment to be enforceable by or against any of the Parties.

Section 2.3    **Miscellaneous**. The applicable provisions of <u>ARTICLE 12</u> of the Purchase Agreement shall apply to this Second Amendment, *mutatis mutandis*.

Section 2.4    **Counterparts; Facsimile Signatures**. This Second Amendment may be executed in any number of counterparts (including by means of facsimile or other electronic signature), each of which when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument binding upon all the Parties. Delivery of an executed counterpart of a signature page to this Second Amendment by facsimile or other electronic signature shall be effective as delivery of a manually executed counterpart of this First Amendment.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the Parties have caused this Second Amendment to be executed as of the date first written above.

**SSD CLARKE HOLDINGS, INC.**

By: _____
Name:   Steven M. Clarke
Title:   President


**TRIGO U.S., INC.**

By: _____
Name:   Matthieu Rambaud
Title:   President

[SIGNATURE PAGE TO SECOND AMENDMENT TO
ID SALE AGREEMENT]

**IN WITNESS WHEREOF**, the Parties have caused this Second Amendment to be executed as of the date first written above.

**SSD CLARKE HOLDINGS, INC.**


By: _____
Name:  Steven M. Clarke
Title:    President



**TRIGO U.S., INC.**


By: _____
Name:  Matthieu Rambaud
Title:    President

[SIGNATURE PAGE TO SECOND AMENDMENT TO
[D SALE AGREEMENT]

# EXHIBIT 4



*EXECUTION VERSION*

## THIRD AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

**THIS THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "Third Amendment"), dated as of December 21, 2019 (the "Effective Date"), is made and entered into by and between SSD Clarke Holdings, Inc., f/k/a Supplier Management Solutions, Inc. ("SMS Inc."), a Nevada corporation, and TRIGO U.S., Inc., a Delaware corporation existing and organized under the laws of the State of Delaware, registered with the Division of Corporations of the Delaware Secretary of State Office under file number 0121412-8, having its registered office at 50459 Central Industrial Drive, Shelby Township, Michigan 48315 (the "Purchaser"). SMS Inc. and the Purchaser shall each individually be referred to herein as a "Party" and collectively as the "Parties".

### RECITALS

**WHEREAS,** the Purchaser, SMS Inc., Corbel Structured Equity Partners, L.P., a California limited partnership, Corbel Structured Equity Partners Parallel, L.P., a California limited partnership, Corbel SMS, L.P., a California limited partnership, and Corbel International A, LLC (collectively, the "Corbel Entities", and together with SMS, Inc., the "Sellers") and Steven M. Clarke have entered into that certain Purchase and Sale Agreement, dated as of August 10, 2018, as amended by the First Amendment to Purchase and Sale Agreement dated as of December 20, 2018 and the Second Amendment to Purchase and Sale Agreement dated as of May 20, 2019 (collectively, the "Purchase and Sale Agreement");

**WHEREAS,** Section 12.5 of the Purchase and Sale Agreement provides that the Purchase and Sale Agreement may not be amended except by an instrument in writing signed by the Sellers and the Purchaser; and

**WHEREAS,** the Parties desire to amend the Purchase and Sale Agreement by entering into this Third Amendment.

**NOW, THEREFORE,** in consideration of the foregoing recitals, which are incorporated herein by reference, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I    Amendments to the Purchase and Sale Agreement.

**Section 1.1** <u>Amendment to Section 3.4 of the Purchase and Sale Agreement.</u> <u>Section 3.4</u> of the Purchase and Sale Agreement is hereby amended and restated as follows:

Section 3.4    **Earn-Out Payment.**

(a)    Principle.

(i)    The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 1") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 4,000,000:

---
Earn-Out Payment 1 = [Average Weekly Revenue for the month of December 2019 x 21.73913 − 11,304,348] x Normative EBITDA Margin / 20%
---

- 2 -

(ii)    The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 2") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 15,000,000:

$$\text{Earn-Out Payment 2} = [\text{Average Weekly Revenue for the three months ending March 31, 2020} \times 65.2173913 - 33,913,043] \times \text{Normative EBITDA Margin} / 20\% - \text{Earn-Out Payment 1}$$

(iii)    The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 3") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

$$\text{Earn-Out Payment 3} = [\text{Average Weekly Revenue for the month of June 2020} \times 60.6060606 - 31,515,151] \times \text{Normative EBITDA Margin} / 20\% - \text{Earn-Out Payment 1} - \text{Earn-Out Payment 2}$$

For avoidance of doubt, in no event shall (x) Earn-Out Payment 1 exceed USD 4,000,000, (y) the sum of Earn-Out Payment 1 and Earn-Out Payment 2 exceed USD 15,000,000 and (z) the total Earn-Out Payment exceed USD 20,000,000.

See Earn-Out payment illustration attached in **Appendix A**.

For purposes of determining Earn-Out Payment 1, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending December 31, 2019 divided by Quarterly Revenue for the three months ending December 31, 2019.  For purposes of determining Earn-Out Payment 2, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending March 31, 2020 divided by Quarterly Revenue for the three months ending March 31, 2020.  For purposes of determining Earn-Out Payment 3, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending June 30, 2020 divided by Quarterly Revenue for the three months ending June 30, 2020.

For purposes of determining Normative EBITDA Margin, (1) any negative Quality Segment EBITDA generated during the relevant period shall be excluded from the determination and (2) all up-front structuring costs, expenses and investments listed in **Appendix B** incurred by the Company with respect to the Quality Segment will be added back to Normative EBITDA (without duplication). Growth related investments incurred by the Business (i.e. the supplier management segment) will not be added back to Normative EBITDA except if pre-approved in writing by the Purchaser.

"Average Weekly Revenue" means the average amount in dollars invoiced to customers of the Company for services rendered (minus applicable sales taxes) during each week of the applicable measurement period. For December 2019, Average Weekly Revenue will include the weekly "run rate" of firm written orders of new business accounts received before 31st December 2019 and for which billing have not yet started. For June 2020, Average Weekly Revenue will include weekly "run rate" of purchase orders of new business accounts received before 30th August 2020 and for which billing has not yet started, provided said purchase orders are for a minimum of one-year contract duration.

"Quality Segment" means the quality service segments of the Company.

- 3 -

"Quality Segment EBITDA" shall mean, collectively, the EBITDA generated by Quality Segment.

"Quarterly Revenue" means dollars invoiced to customers of the Company for services rendered (minus applicable sales taxes) during an applicable quarterly period.

(b)     Earn-Out Statements.   Within ten (10) Business Days of completion of the Company's unaudited financial statements for each of the three-month periods ending December 31, 2019, March 31, 2020 and June 30, 2020, respectively, and in any event no later than February 29, 2020, May 30, 2020 and August 31, 2020, respectively, the Purchaser shall deliver to SMS Inc. (i) the unaudited corporate financial statements of the Company for each of the three-month periods ending December 31, 2019, March 31, 2020, June 30, 2020, respectively, (ii) a statement setting forth the Quarterly Revenue, Normative EBITDA, Normative EBITDA Margin and Quality Segment EBITDA for each such quarterly period,, (iii) a statement setting forth the Average Weekly Revenue for the month of December 2019, the three months ending March 31, 2020, the month of June 2020, and (iv) the resulting Earn-Out Payment 1, Earn-Out Payment 2, Earn-Out Payment 3, respectively, if any, due and payable (the "Earn-Out Certificate").  Upon delivery of an Earn-Out Certificate by the Purchaser, the Purchaser shall cause the Company to provide SMS Inc. and its Representatives with reasonable access, during normal business hours, to the Company's auditor and accounting and other personnel and to the books and records of the Company, as the case may be, and any other document or information (including documents and information relating to the Purchaser, its Affiliates and/or their successors and assigns) reasonably requested by SMS Inc. and/or its Representatives to verify the accuracy of the Earn-Out Certificate.

(c)     Dispute Resolution. The applicable Earn-Out Certificate (and the proposed determinations reflected thereon, as applicable, and of the resulting Earn-Out Payment amount) will be final, conclusive and binding on the Parties with regards to such Earn-Out Payment (and referred to herein as the "Final Earn-Out Certificate"), unless SMS Inc. provides a written notice (the "Earn-Out Dispute Notice") to the Purchaser no later than the fifteenth (15th) Business Day after delivery to SMS Inc. of the applicable Earn-Out Certificate. Any Earn-Out Dispute Notice must set forth in reasonable detail (i) any item on the applicable Earn-Out Certificate which SMS Inc. believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) SMS Inc.'s alternative calculation(s) for such applicable period, and any Earn-Out Payment resulting thereof. Any item or amount to which no dispute is raised in the Earn-Out Dispute Notice will be final, conclusive and binding on the Parties on such fifteenth (15th) Business Day. Any Earn-Out Dispute Notice must specify, with reasonable particularity, all facts that form the basis of such disagreements. The Purchaser and SMS Inc. will attempt to resolve the matters raised in an Earn-Out Dispute Notice in good faith. If the Purchaser and SMS Inc. reach a resolution with respect to such matters, then the Earn-Out Certificate, as modified by such resolution, shall be deemed the "Final Earn-Out Certificate." Fifteen (15) Business Days after delivery of any Earn-Out Dispute Notice (or such longer period as may be mutually agreed in writing by SMS Inc. and the Purchaser), either the Purchaser or SMS Inc. may provide written notice to the other that it elects to submit the disputed items to the Arbiter, which resolution shall be final and binding on the Parties and shall be deemed the "Final Earn-Out Certificate."  The Arbiter shall be instructed to resolve the dispute within fifteen (15) Business Days after the item has been referred to it. The costs, fees, and expenses of the Arbiter shall be borne equally by the Purchaser and SMS Inc.

(d)     Payment. If any Earn-Out Payment is determined to be payable pursuant to a Final Earn-Out Certificate, then the Purchaser shall, within five (5) Business Days of the

- 4 -

determination of such Final Earn-Out Certificate, pay such amount to SMS Inc.'s accounts set forth in Exhibit E, by wire transfer of immediately available funds.  Notwithstanding the foregoing, a good faith estimate of Earn-Out Payment 1 will be made no later than January 15, 2020 and a good faith estimate of Earn-Out Payment 2 will be made no later than April 15, 2020 based on Average Weekly Revenue and Normative EBITDA Margin data available at the time. If either of such estimated payments are finally determined later (pursuant to a Final Earn-Out Certificate) to have been too high or too low, the applicable party will pay the other the difference (which may include an offset or adjustment to Earn-Out Payment 3) based on such Final Earn-Out Certificates.

(e)     Operation of the Company. Until expiration of the Earn-Out period (or payment in full of the maximum Earn-Out Payment, if earlier), the Purchaser shall: (i) operate the Company in the ordinary course of business and so as to maintain it as a going concern; (ii) operate the Company as a measurable business unit with the same perimeter as on the Closing with its own separate chart of accounts; (iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment; (iv) not, except to the extent strictly required under applicable Law and for so long as Clarke is employed as the Chief Executive Officer and President of the Company, unilaterally intervene with the management of the Company; (v) not cause the Company to enter into voluntary liquidation; (vi) operate the Company as a separate entity, owned directly or indirectly by Purchaser; (vii) operate the business of the Company consistent with past practice and not adopt strategic, commercial or financial changes to the way the Company is managed which could have a negative impact on the EBITDA of the Company; and (viii) maintain complete and accurate books and records of the Company on a stand-alone basis adequate in all material respects to permit an audit of the Company as a stand-alone business. Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, in the event that (i) the Company or Purchaser undergoes a transaction during the Earn-Out period which results in a Change of Control of the Company or (ii) Clarke is terminated without Cause (as defined in the Clarke Employment Agreement) or leaves with Good Reason (as defined in the Clarke Employment Agreement), then the maximum amount of each Earn-Out Payment (to the extent previously unpaid) shall automatically and without any further action of any Party or any other Person become due and payable to SMS Inc. and Purchaser shall, within five (5) Business Days thereof, pay such amount SMS Inc.'s account set forth in Exhibit E, by wire transfer of immediately available funds.

## ARTICLE II Miscellaneous

**Section 2.1     No Other Amendments.** Except as expressly set forth herein, the Purchase and Sale Agreement shall continue unmodified and in full force and effect.

**Section 2.2     The Corbel Parties.** The Corbel Parties do not have any rights or obligations under the Purchase and Sale Agreement that are impacted in any way by this Third Amendment. Accordingly, and notwithstanding Section 12.5 of the Purchase and Sale Agreement, the Parties have mutually determined that the execution and delivery of this Third Amendment by the Corbel Parties is not necessary for this Third Amendment to be enforceable by or against any of the Parties.

**Section 2.3     Miscellaneous.** The applicable provisions of ARTICLE 12 of the Purchase Agreement shall apply to this Third Amendment, *mutatis mutandis.*

**Section 2.4     Counterparts; Facsimile Signatures.** This Third Amendment may be executed in any number of counterparts (including by means of facsimile or other electronic signature),

- 5 -

each of which when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument binding upon all the Parties. Delivery of an executed counterpart of a signature page to this Third Amendment by facsimile or other electronic signature shall be effective as delivery of a manually executed counterpart of this Third Amendment.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF,** the Parties have caused this Third Amendment to be executed as of the date first written above.

**SSD CLARKE HOLDINGS, INC.**

By: _____
Name:  Steven M. Clarke
Title:  President


**TRIGO U.S., INC.**

By: _____
Name:  Matthieu Rambaud
Title:  President

[SIGNATURE PAGE TO THIRD AMENDMENT TO
ID SALE AGREEMENT]

**Appendix A**

**Illustration of Earn-Out Calculation**

[see attached]

# EARN-OUT MECHANISM - REVISION 16 OCT 2019

Max earn-out of USD 20M
Reminder EBITDA threshold for earn-out: USD 5400K corresponding to USD 519K weekly billing at 20% EBITDA
Normative EBITDA to be adjusted for quality non reccuring costs and investments, structuring one-offs....)

## DECEMBER 2019

| Weekly Billing (Dec avg) | Normative EBITDA% (Oct-Dec avg) | Earn-Out amount | First Payment |
|---|---|---|---|
| 850 | 20.0% | 7,174 | 7,174 |
| 800 | 20.0% | 6,087 | 6,087 |
| 750 | 20.0% | 5,000 | 5,000 |
| 700 | 20.0% | 3,913 | 3,913 |
| 650 | 20.0% | 2,826 | 2,826 |
| 600 | 20.0% | 1,739 | 1,739 |
| 550 | 20.0% | 652 | 652 |
| 520 | 20.0% | - | - |

a= 21.74
b= -11304.35

| EBITDA margin | Adjusted Earn-Out at Target Weekly Billing | Payment |
|---|---|---|
| 25% | 6,250 | 6,250 |
| 20% | 5,000 | 5,000 |
| 15% | 3,750 | 3,750 |

## MARCH 2020

| Weekly Billing (Jan-Mar avg) | Normative EBITDA% (Jan-Mar avg) | Earn-Out amount (Incl. First Payment) | Second Payment |
|---|---|---|---|
| 850 | 20.0% | 20,000 | 12,826 |
| 800 | 20.0% | 18,261 | 12,174 |
| 750 | 20.0% | 15,000 | 10,000 |
| 700 | 20.0% | 11,739 | 7,826 |
| 650 | 20.0% | 8,478 | 5,652 |
| 600 | 20.0% | 5,217 | 3,478 |
| 550 | 20.0% | 1,957 | 1,304 |
| 520 | 20.0% | - | - |

a= 65.2174
b= -33913.04

| EBITDA margin | Adjusted Earn-Out at Target Weekly Billing | Payment |
|---|---|---|
| 25% | 18,750 | 13,750 |
| 20% | 15,000 | 10,000 |
| 15% | 11,250 | 6,250 |

## JUNE 2020

| Weekly Billing (Jun avg) | Normative EBITDA% (Apr-Jun avg) | Earn-Out amount (Incl. First & Second Payment) | Third Payment |
|---|---|---|---|
| 900 | 20.0% | 20,000 | - |
| 875 | 20.0% | 20,000 | 1,739 |
| 850 | 20.0% | 20,000 | 5,000 |
| 800 | 20.0% | 16,970 | 5,231 |
| 750 | 20.0% | 13,939 | 5,451 |
| 700 | 20.0% | 10,909 | 5,692 |
| 600 | 20.0% | 4,848 | 2,892 |
| 520 | 20.0% | - | - |

a= 60.606
b= -31515

## Appendix B
### Normative EBITDA Add-Backs

- Quality consultants costs (M. Song, B. Smith) in H1 2020

- Quality BD director costs in H1 2020

# EXHIBIT 5



*EXECUTION VERSION*

**FOURTH AMENDMENT TO**
**PURCHASE AND SALE AGREEMENT**

**THIS FOURTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "Fourth Amendment"), dated as of July 14, 2020 (the "Effective Date"), is made and entered into by and between SSD Clarke Holdings, Inc., f/k/a Supplier Management Solutions, Inc. ("SMS Inc."), a Nevada corporation, and TRIGO U.S., Inc., a Delaware corporation existing and organized under the laws of the State of Delaware, registered with the Division of Corporations of the Delaware Secretary of State Office under file number 0121412-8, having its registered office at 50459 Central Industrial Drive, Shelby Township, Michigan 48315 (the "Purchaser"). SMS Inc. and the Purchaser shall each individually be referred to herein as a "Party" and collectively as the "Parties".

**RECITALS**

**WHEREAS,** the Purchaser, SMS Inc., Corbel Structured Equity Partners, L.P., a California limited partnership, Corbel Structured Equity Partners Parallel, L.P., a California limited partnership, Corbel SMS, L.P., a California limited partnership, and Corbel International A, LLC (collectively, the "Corbel Entities", and together with SMS, Inc., the "Sellers") and Steven M. Clarke have entered into that certain Purchase and Sale Agreement, dated as of August 10, 2018, as amended by the First Amendment to Purchase and Sale Agreement dated as of December 20, 2018, the Second Amendment to Purchase and Sale Agreement dated as of May 20, 2019 and the Third Amendment to Purchase and Sale Agreement dated as of December 21, 2019 (collectively, the "Purchase and Sale Agreement");

**WHEREAS,** Section 12.5 of the Purchase and Sale Agreement provides that the Purchase and Sale Agreement may not be amended except by an instrument in writing signed by the Sellers and the Purchaser; and

**WHEREAS,** the Parties desire to amend the Purchase and Sale Agreement by entering into this Fourth Amendment.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are incorporated herein by reference, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I   Amendments to the Purchase and Sale Agreement**.

**Section 1.1      Amendment to Section 3.4 of the Purchase and Sale Agreement.  Section 3.4** of the Purchase and Sale Agreement is hereby amended and restated as follows:

   **Section 3.4        Earn-Out Payment.**

    (a)       Principle.

      (i)        The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 1") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 4,000,000:

Earn-Out Payment 1 = [Average Weekly Revenue for the month of December 2019 x 21.73913 − 11,304,348] x Normative EBITDA Margin / 20%

(ii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 2") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 15,000,000:

Earn-Out Payment 2 = [Average Weekly Revenue for the three months ending March 31, 2020 x 65.2173913 – 33,913,043] x Normative EBITDA Margin / 20% – Earn-Out Payment 1

(iii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 3") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 3 = [Average Weekly Revenue for the three months ending June 30, 2020 x 60.6060606 – 31,515,151] x Normative EBITDA Margin / 20% – Earn-Out Payment 1 – Earn-Out Payment 2

(iv)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 4") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 4 = [Average Weekly Revenue for the three months ending September 30, 2020 x 60.6060606 – 31,515,151] x Normative EBITDA Margin / 20% – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3

(v)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 5") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 5 = [Average Weekly Revenue for the three months ending December 31, 2020 x 60.6060606 – 31,515,151] x Normative EBITDA Margin / 20% – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4

(vi)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 6") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 6 = [Average Weekly Revenue for the three months ending March 31, 2021 x 60.6060606 – 31,515,151] x Normative EBITDA Margin / 20% – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4 – Earn-out Payment 5

For avoidance of doubt, in no event shall (x) Earn-Out Payment 1 exceed USD 4,000,000, (y) the sum of Earn-Out Payment 1 and Earn-Out Payment 2 exceed USD 15,000,000 and (z) the sum of any or all of Earn-Out Payment 1, Earn-Out Payment 2, Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5 and Earn-Out Payment 6 exceed USD 20,000,000.

See Earn-Out payment illustration attached in **Appendix A**.

For purposes of determining Earn-Out Payment 1, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending December 31, 2019 divided by Quarterly Revenue for the three months ending December 31, 2019.  For purposes of determining Earn-Out Payment 2, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending March 31, 2020 divided by Quarterly Revenue for the three months ending March 31, 2020.  For purposes of determining Earn-Out Payment 3, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending June 30, 2020 divided by Quarterly Revenue for the three months ending June 30, 2020. For purposes of determining Earn-Out Payment 4, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending September 30, 2020 divided by Quarterly Revenue for the three months ending September 30, 2020. For purposes of determining Earn-Out Payment 5, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending December 31, 2020 divided by Quarterly Revenue for the three months ending December 31, 2020. For purposes of determining Earn-Out Payment 6, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending March 31, 2021 divided by Quarterly Revenue for the three months ending March 31, 2021.

For purposes of determining Normative EBITDA Margin, (1) any negative Quality Segment EBITDA generated during the relevant period shall be excluded from the determination and (2) all up-front structuring costs, expenses and investments listed in **Appendix B** incurred by the Company with respect to the Quality Segment will be added back to Normative EBITDA (without duplication). Growth related investments incurred by the Business (i.e. the supplier management segment) will not be added back to Normative EBITDA except if pre-approved in writing by the Purchaser.

 "Average Weekly Revenue" means the average amount in dollars invoiced to customers of the Company for services rendered (minus applicable sales taxes) during each week of the applicable measurement period. For December 2019, Average Weekly Revenue will include the weekly "run rate" of firm written orders of new business accounts received before 31st December 2019 and for which billing have not yet started.

"Quality Segment" means the quality service segments of the Company.

 "Quality Segment EBITDA" shall mean, collectively, the EBITDA generated by Quality Segment.

"Quarterly Revenue" means dollars invoiced to customers of the Company for services rendered (minus applicable sales taxes) during an applicable quarterly period.

(b)     Earn-Out Statements.  Within ten (10) Business Days of completion of the Company's unaudited financial statements for each of the three-month periods ending December 31, 2019, March 31, 2020, June 30, 2020, September 30, 2020, December 31, 2020 and March 31, 2021 respectively, and in any event no later than February 29, 2020, May 30, 2020, August 31, 2020, November 30, 2020, February 28, 2021 and May 30, 2021, respectively, the Purchaser shall deliver to SMS Inc. (i) the unaudited corporate financial statements of the Company for each of the three-month periods ending December 31, 2019, March 31, 2020, June 30, 2020, September 30, 2020 December 31, 2020 and March 31, 2021, respectively, (ii) a statement setting forth the Quarterly Revenue, Normative EBITDA, Normative EBITDA Margin and Quality Segment EBITDA for each such quarterly period, (iii) a statement setting forth the Average Weekly Revenue for the month of December 2019, the three months ending March 31, 2020, the three months ending June 30 2020, the three months ending September 30, 2020, the

- 4 -

three months ending December 31, 2020, the three months ending March 31, 2021 and (iv) the resulting Earn-Out Payment 1, Earn-Out Payment 2, Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5, Earn-Out Payment 6 respectively, if any, due and payable (the "Earn-Out Certificate"). Upon delivery of an Earn-Out Certificate by the Purchaser, the Purchaser shall cause the Company to provide SMS Inc. and its Representatives with reasonable access, during normal business hours, to the Company's auditor and accounting and other personnel and to the books and records of the Company, as the case may be, and any other document or information (including documents and information relating to the Purchaser, its Affiliates and/or their successors and assigns) reasonably requested by SMS Inc. and/or its Representatives to verify the accuracy of the Earn-Out Certificate.

(c)     Dispute Resolution. The applicable Earn-Out Certificate (and the proposed determinations reflected thereon, as applicable, and of the resulting Earn-Out Payment amount) will be final, conclusive and binding on the Parties with regards to such Earn-Out Payment (and referred to herein as the "Final Earn-Out Certificate"), unless SMS Inc. provides a written notice (the "Earn-Out Dispute Notice") to the Purchaser no later than the fifteenth (15th) Business Day after delivery to SMS Inc. of the applicable Earn-Out Certificate. Any Earn-Out Dispute Notice must set forth in reasonable detail (i) any item on the applicable Earn-Out Certificate which SMS Inc. believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) SMS Inc.'s alternative calculation(s) for such applicable period, and any Earn-Out Payment resulting thereof. Any item or amount to which no dispute is raised in the Earn-Out Dispute Notice will be final, conclusive and binding on the Parties on such fifteenth (15th) Business Day. Any Earn-Out Dispute Notice must specify, with reasonable particularity, all facts that form the basis of such disagreements. The Purchaser and SMS Inc. will attempt to resolve the matters raised in an Earn-Out Dispute Notice in good faith. If the Purchaser and SMS Inc. reach a resolution with respect to such matters, then the Earn-Out Certificate, as modified by such resolution, shall be deemed the "Final Earn-Out Certificate." Fifteen (15) Business Days after delivery of any Earn-Out Dispute Notice (or such longer period as may be mutually agreed in writing by SMS Inc. and the Purchaser), either the Purchaser or SMS Inc. may provide written notice to the other that it elects to submit the disputed items to the Arbiter, which resolution shall be final and binding on the Parties and shall be deemed the "Final Earn-Out Certificate." The Arbiter shall be instructed to resolve the dispute within fifteen (15) Business Days after the item has been referred to it. The costs, fees, and expenses of the Arbiter shall be borne equally by the Purchaser and SMS Inc.

(d)     Payment. If any Earn-Out Payment is determined to be payable pursuant to a Final Earn-Out Certificate, then the Purchaser shall, within five (5) Business Days of the determination of such Final Earn-Out Certificate, pay such amount to SMS Inc.'s accounts set forth in Exhibit E, by wire transfer of immediately available funds. Notwithstanding the foregoing, a good faith estimate of Earn-Out Payment 1 will be made no later than January 15, 2020 a good faith estimate of Earn-Out Payment 2 will be made no later than April 15, 2020, a good faith estimate of Earn-Out Payment 3 will be made no later than July 15, 2020, a good faith estimate of Earn-Out Payment 4 will be made no later than October 15, 2020 a good faith estimate of Earn-Out Payment 5 will be made no later than January 15, 2021, and a good faith estimate of Earn-Out Payment 6 based on no later than April 15, 2021 based on Average Weekly Revenue and Normative EBITDA Margin data available at the time. If either of such estimated payments are finally determined later (pursuant to a Final Earn-Out Certificate) to have been too high or too low, the applicable party will pay the other the difference (which may include an offset or adjustment to Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5 or Earn-Out Payment 6) based on such Final Earn-Out Certificates.

- 5 -

(e)     Operation of the Company. Until expiration of the Earn-Out period (or payment in full of the maximum Earn-Out Payment, if earlier), the Purchaser shall: (i) operate the Company in the ordinary course of business and so as to maintain it as a going concern; (ii) operate the Company as a measurable business unit with the same perimeter as on the Closing with its own separate chart of accounts; (iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment; (iv) not, except to the extent strictly required under applicable Law and for so long as Clarke is employed as the Chief Executive Officer and President of the Company, unilaterally intervene with the management of the Company; (v) not cause the Company to enter into voluntary liquidation; (vi) operate the Company as a separate entity, owned directly or indirectly by Purchaser; (vii) operate the business of the Company consistent with past practice and not adopt strategic, commercial or financial changes to the way the Company is managed which could have a negative impact on the EBITDA of the Company; and (viii) maintain complete and accurate books and records of the Company on a stand-alone basis adequate in all material respects to permit an audit of the Company as a stand-alone business. Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, in the event that (i) the Company or Purchaser undergoes a transaction during the Earn-Out period which results in a Change of Control of the Company or (ii) Clarke is terminated without Cause (as defined in the Clarke Employment Agreement) or leaves with Good Reason (as defined in the Clarke Employment Agreement), then the maximum amount of each Earn-Out Payment (to the extent previously unpaid) shall automatically and without any further action of any Party or any other Person become due and payable to SMS Inc. and Purchaser shall, within five (5) Business Days thereof, pay such amount SMS Inc.'s account set forth in <u>Exhibit E</u>, by wire transfer of immediately available funds.

## ARTICLE II   Miscellaneous

**Section 2.1**    <u>**No Other Amendments**</u>. Except as expressly set forth herein, the Purchase and Sale Agreement shall continue unmodified and in full force and effect.

**Section 2.2**    <u>**The Corbel Parties**</u>. The Corbel Parties do not have any rights or obligations under the Purchase and Sale Agreement that are impacted in any way by this Fourth Amendment. Accordingly, and notwithstanding Section 12.5 of the Purchase and Sale Agreement, the Parties have mutually determined that the execution and delivery of this Fourth Amendment by the Corbel Parties is not necessary for this Fourth Amendment to be enforceable by or against any of the Parties.

**Section 2.3**    <u>**Miscellaneous**</u>. The applicable provisions of <u>ARTICLE 12</u> of the Purchase Agreement shall apply to this Fourth Amendment, *mutatis mutandis*.

**Section 2.4**    <u>**Counterparts; Facsimile Signatures**</u>. This Fourth Amendment may be executed in any number of counterparts (including by means of facsimile or other electronic signature), each of which when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument binding upon all the Parties. Delivery of an executed counterpart of a signature page to this Fourth Amendment by facsimile or other electronic signature shall be effective as delivery of a manually executed counterpart of this Fourth Amendment.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the Parties have caused this Fourth Amendment to be executed as of the date first written above.

**SSD CLARKE HOLDINGS, INC.**

By: _____
Name:  Steven M. Clarke
Title:  President

**TRIGO U.S., INC.**

By: _____
Name:  Matthieu Rambaud
Title:  President

[SIGNATURE PAGE TO THIRD AMENDMENT TO
PURCHASE AND SALE AGREEMENT]

## Appendix A

## Illustration of Earn-Out Calculation

**EARN-OUT MECHANISM - REVISION MAY 2020**

Max earn-out of USD 20M

Reminder EBITDA threshold for earn-out: USD 5400K corresponding to USD 519K weekly billing at 20% EBITDA

Normative EBITDA to be adjusted for quality non recurring costs (eg up front structuring costs and investments, structuring one-offs....)

**DECEMBER 2019**

| Weekly Billing (Dec avg) | Normative EBITDA% (Oct-Dec avg) | Earn-Out amount |
|---|---|---|
| 850 | 20,0% | 7 174 |
| 800 | 20,0% | 6 087 |
| 750 | 20,0% | 5 000 |
| 700 | 20,0% | 3 913 |
| 650 | 20,0% | 2 826 |
| 600 | 20,0% | 1 739 |
| 550 | 20,0% | 652 |
| 520 | 20,0% | - |
| a= | 21,73913 | |
| b= - | 11 304,35 | |

**Q1 2020**

| Weekly Billing (Q1 avg) | Normative EBITDA% (Q1 avg) | Total Earn-Out amount (incl. First Payment) |
|---|---|---|
| 850 | 20,0% | 20 000 |
| 800 | 20,0% | 18 261 |
| 750 | 20,0% | 15 000 |
| 700 | 20,0% | 11 739 |
| 625 | 20,0% | 6 848 |
| 600 | 20,0% | 5 217 |
| 550 | 20,0% | 1 957 |
| 520 | 20,0% | - |
| a= | 65,2173913 | |
| b= - | 33 913,04 | |

**Q2/Q3/Q4 2020 and Q1 2021**

| Weekly Billing (Q2/Q3/Q4 avg) | Normative EBITDA% (Q1/Q2/Q3 avg) | Total Earn-Out amount (incl. previous payments) |
|---|---|---|
| 900 | 20,0% | 20 000 |
| 875 | 20,0% | 20 000 |
| 850 | 20,0% | 20 000 |
| 800 | 20,0% | 16 970 |
| 625 | 20,0% | 6 364 |
| 700 | 20,0% | 10 909 |
| 600 | 20,0% | 4 848 |
| 520 | 20,0% | - |
| a= | 60,60606 | |
| b= - | 31 515,15 | |

| EBITDA margin | Adjusted Earn-Out at Target Weekly Billing | Payment |
|---|---|---|
| 25% | 6 250 | 6 250 |
| 20% | 5 000 | 5 000 |
| 15% | 3 750 | 3 750 |

| EBITDA margin | Adjusted Earn-Out at Target Weekly Billing | Payment |
|---|---|---|
| 25% | 18 750 | 13 750 |
| 20% | 15 000 | 10 000 |
| 15% | 11 250 | 6 250 |

Appendix A

- 2 -

**Appendix B**

**Normative EBITDA Add-Backs**

- Quality consultants costs (M. Song, B. Smith) in H1 and H2 2020

- CFO costs from Aug 1st, 2020 to Nov 30th 2020

- A senior VP (if hired prior to 12/31/20)

# EXHIBIT 6



*EXECUTION VERSION*

**FIFTH AMENDMENT TO
PURCHASE AND SALE AGREEMENT**

**THIS FIFTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "Fifth Amendment"), dated as of December 18, 2020 (the "Effective Date"), is made and entered into by and between SSD Clarke Holdings, Inc., f/k/a Supplier Management Solutions, Inc. ("SMS Inc."), a Nevada corporation, and TRIGO U.S., Inc., a Delaware corporation existing and organized under the laws of the State of Delaware, registered with the Division of Corporations of the Delaware Secretary of State Office under file number 0121412-8, having its registered office at 50459 Central Industrial Drive, Shelby Township, Michigan 48315 (the "Purchaser"). SMS Inc. and the Purchaser shall each individually be referred to herein as a "Party" and collectively as the "Parties".

**RECITALS**

**WHEREAS,** the Purchaser, SMS Inc., Corbel Structured Equity Partners, L.P., a California limited partnership, Corbel Structured Equity Partners Parallel, L.P., a California limited partnership, Corbel SMS, L.P., a California limited partnership, and Corbel International A, LLC (collectively, the "Corbel Entities", and together with SMS Inc., the "Sellers") and Steven M. Clarke have entered into that certain Purchase and Sale Agreement, dated as of August 10, 2018, as amended by the First Amendment to Purchase and Sale Agreement dated as of December 20, 2018, the Second Amendment to Purchase and Sale Agreement dated as of May 20, 2019, the Third Amendment to Purchase and Sale Agreement dated as of December 21, 2019, and the Fourth Amendment to Purchase and Sale Agreement dated as of July 14, 2020 (collectively, the "Purchase and Sale Agreement");

**WHEREAS,** Section 12.5 of the Purchase and Sale Agreement provides that the Purchase and Sale Agreement may not be amended except by an instrument in writing signed by the Sellers and the Purchaser; and

**WHEREAS,** the Parties desire to amend the Purchase and Sale Agreement by entering into this Fifth Amendment.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are incorporated herein by reference, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I   Amendments to the Purchase and Sale Agreement**.

**Section 1.1     Amendment to Section 3.4 of the Purchase and Sale Agreement.   Section 3.4** of the Purchase and Sale Agreement is hereby amended and restated as follows:

**Section 3.4     Earn-Out Payment.**

(a)     Principle.

(i)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 1") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 4,000,000:

---

Earn-Out Payment 1 = [Average Weekly Revenue for the month of December 2019 x 21.73913 – 11,304,348] x Normative EBITDA Margin / 20%

---

(ii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 2") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 15,000,000:

Earn-Out Payment 2 = [Average Weekly Revenue for the three months ending March 31, 2020 x 65.2173913 – 33,913,043] x Normative EBITDA Margin / 20% – Earn-Out Payment 1

(iii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 3") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 3 = [Average Weekly Revenue for the three months ending June 30, 2020 x 60.6060606 – 31,515,151] x Normative EBITDA Margin / 20% – Earn-Out Payment 1 – Earn-Out Payment 2

(iv)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 4") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 4 = [Average Weekly Revenue for the three months ending September 30, 2020 x 60.6060606 – 31,515,151] x Normative EBITDA Margin / 20% – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3

(v)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 5") calculated as follows, only to the extent the result of such calculation is a positive amount and only up to USD 20,000,000:

Earn-Out Payment 5 = [Average Weekly Revenue for the three months ending December 31, 2020 x 60.6060606 – 31,515,151] x Normative EBITDA Margin / 20% – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4

(vi)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 6") calculated as follows, and only up to USD 20,000,000 (inclusive of the Advance Payment (as defined below)):

Earn-Out Payment 6 = ((20 / 3.4) X (2021 EBITDA – USD5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4 – Earn-Out Payment 5

(vii)     The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 7") calculated as follows, and only up to USD 20,000,000 (inclusive of the Advance Payment (as defined below)):

> Earn-Out Payment 7 = ((20 / 3.4) X (March 2022 LTM EBITDA – USD5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4 – Earn-Out Payment 5 – Earn-Out Payment 6.

(viii)   The Purchaser shall, as additional contingent consideration for the Purchased Equity Interests, pay to SMS Inc. an aggregate cash performance amount (the "Earn-Out Payment 8") calculated as follows, and only up to USD 20,000,000:

> Earn-Out Payment 8 = ((20 / 3.4) X (June 2022 LTM EBITDA – USD5,400,000)) – Earn-Out Payment 1 – Earn-Out Payment 2 – Earn-Out Payment 3 – Earn-Out Payment 4 – Earn-Out Payment 5 – Earn-Out Payment 6 – Earn-Out Payment 7 - Advance Payment (as defined below).

Prior to February 1st, 2021, the Purchaser shall pay to SMS Inc., as an advance payment on Earn-Out Payment 7, a cash amount of USD 2,000,000 (the "Advance Payment").

If the result of the calculation of Earn-Out Payment 8 is a negative amount and an Advance Payment was made by the Purchaser to SMS Inc., SMS Inc. shall, as a reimbursement on the Advance Payment, pay to the Purchaser, in cash, the equivalent positive cash amount (the "Reimbursement"), and only up to the amount of the Advance Payment.

In order to guarantee SMS Inc.'s obligations with regards to the Reimbursement, Steven M. Clarke shall, on the date hereof, deliver to the Purchaser a personal guarantee, in form and substance satisfactory to the Purchaser, acting reasonably, whereby Mr. Clarke fully guarantees SMS Inc.'s Reimbursement obligations (the "SMC Guarantee").

Furthermore, the parties hereby agree that, in addition to any rights and remedies of the Purchaser provided by the SMC Guarantee, the Purchase and Sale Agreement and by law, the Purchaser shall have the right in its sole discretion, without prior notice to SMS Inc., any such notice being expressly waived by SMS Inc. to the extent permitted by applicable law, fifteen (15) days or later following any Reimbursement becoming due and payable by SMS Inc. hereunder, to set-off and appropriate and apply against such Reimbursement any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Purchaser thereof to or for the credit or the account of SMS Inc., including, for the avoidance of doubt, any and all rental payments owed to SMS Inc., Mr. Clarke or any legal entity controlled by Mr. Clarke.  The Purchaser agrees promptly to notify SMS Inc. after any such set-off and application made by the Purchaser; provided that the failure to give such notice shall not affect the validity of such set-off and application.

For avoidance of doubt, in no event shall (x) Earn-Out Payment 1 exceed USD 4,000,000, (y) the sum of Earn-Out Payment 1 and Earn-Out Payment 2 exceed USD 15,000,000 and (z) the sum of any or all of Earn-Out Payment 1, Earn-Out Payment 2, Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5, Earn-Out Payment 6, Earn-Out Payment 7, Earn-Out Payment 8 and Advance Payment exceed USD 20,000,000.

See Earn-Out payment illustration attached in **Appendix A**.

For purposes of determining Earn-Out Payment 1, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending December 31, 2019 divided by Quarterly Revenue for the three months ending December 31, 2019.  For purposes of determining Earn-Out Payment 2, "Normative EBITDA Margin" means the Normative EBITDA for the three months

ending March 31, 2020 divided by Quarterly Revenue for the three months ending March 31, 2020. For purposes of determining Earn-Out Payment 3, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending June 30, 2020 divided by Quarterly Revenue for the three months ending June 30, 2020. For purposes of determining Earn-Out Payment 4, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending September 30, 2020 divided by Quarterly Revenue for the three months ending September 30, 2020. For purposes of determining Earn-Out Payment 5, "Normative EBITDA Margin" means the Normative EBITDA for the three months ending December 31, 2020 divided by Quarterly Revenue for the three months ending December 31, 2020. For purposes of determining Earn-Out Payment 6, "2021 EBITDA" means the EBITDA for the twelve months ending December 31, 2021, as published in the 2021 annual accounts, adjusted to include any EBITDA generated by Purchaser and its other Affiliates based on new business awarded as a direct result of the efforts of Mr. Clarke and/or the Company's employees. For purposes of determining Earn-Out Payment 7, "March 2022 LTM EBITDA" means the EBITDA for the twelve months ending March 31, 2022, adjusted to include any EBITDA generated by Purchaser and its other Affiliates based on new business awarded as a direct result of the efforts of Mr. Clarke and/or the Company's employees. For purposes of determining Earn-Out Payment 8, "June 2022 LTM EBITDA" means the EBITDA for the twelve months ending June 30, 2022, adjusted to include any EBITDA generated by Purchaser and its other Affiliates based on new business awarded as a direct result of the efforts of Mr. Clarke and/or the Company's employees. "Consulting Agreement" means that certain Consulting Agreement, effective January 1, 2021, by and among the Company, SMS Inc. and Steven M. Clarke.

For purposes of determining Normative EBITDA Margin, (1) any negative Quality Segment EBITDA generated during the relevant period shall be excluded from the determination and (2) all up-front structuring costs, expenses and investments listed in **Appendix B** incurred by the Company with respect to the Quality Segment will be added back to Normative EBITDA (without duplication). Growth related investments incurred by the Business (i.e. the supplier management segment) will not be added back to Normative EBITDA except if pre-approved in writing by the Purchaser.

"Advance Payment" has the meaning ascribed to such expression above.

"Average Weekly Revenue" means the average amount in dollars invoiced to customers of the Company for services rendered (minus applicable sales taxes) during each week of the applicable measurement period. For December 2019, Average Weekly Revenue will include the weekly "run rate" of firm written orders of new business accounts received before 31st December 2019 and for which billing have not yet started.

"Quality Segment" means the quality service segments of the Company.

"Quality Segment EBITDA" shall mean, collectively, the EBITDA generated by Quality Segment.

"Quarterly Revenue" means dollars invoiced to customers of the Company for services rendered (minus applicable sales taxes) during an applicable quarterly period.

"Reimbursement" has the meaning ascribed to such expression above.

(b) Earn-Out Statements. Within ten (10) Business Days of completion of the Company's unaudited financial statements for each of the three-month periods ending December

31, 2019, March 31, 2020, June 30, 2020, September 30, 2020, December 31, 2020, December 31, 2021, March 31, 2022 and June 30, 2022 respectively, and in any event no later than February 29, 2020, May 30, 2020, August 31, 2020, November 30, 2020, February 28, 2021, February 28, 2022, May 30, 2022 and August 31, 2022, respectively, the Purchaser shall deliver to SMS Inc. (i) the unaudited corporate financial statements of the Company for each of the three-month periods ending December 31, 2019, March 31, 2020, June 30, 2020, September 30, 2020, December 31, 2020 and for each of the twelve months period ending December 31, 2021, March 31, 2022 and June 30, 2022, respectively, (ii) a statement setting forth the Quarterly Revenue, Normative EBITDA, Normative EBITDA Margin and Quality Segment EBITDA for each such quarterly period, (iii) a statement setting forth the Average Weekly Revenue for the month of December 2019, the three months ending March 31, 2020, the three months ending June 30 2020, the three months ending September 30, 2020, the three months ending December 31, 2020, (iv) a statement setting forth the 2021 EBITDA for the twelve months period ending December 31, 2021, (v) a statement setting forth the March 2022 LTM EBITDA for the twelve months period ending March 31, 2022, (vi) a statement setting forth the June 2022 LTM EBITDA for the twelve months period ending June 30, 2022,  and (vii) the resulting Earn-Out Payment 1, Earn-Out Payment 2, Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5, Earn-Out Payment 6, Earn-Out Payment 7, Earn-Out Payment 8, Advance Payment, and Reimbursement, respectively, if any, due and payable (the "Earn-Out Certificate"). Upon delivery of an Earn-Out Certificate by the Purchaser, the Purchaser shall cause the Company to provide SMS Inc. and its Representatives with reasonable access, during normal business hours, to the Company's auditor and accounting and other personnel and to the books and records of the Company, as the case may be, and any other document or information (including documents and information relating to the Purchaser, its Affiliates and/or their successors and assigns) reasonably requested by SMS Inc. and/or its Representatives to verify the accuracy of the Earn-Out Certificate.

(c)      Dispute Resolution. The applicable Earn-Out Certificate (and the proposed determinations reflected thereon, as applicable, and of the resulting Earn-Out Payment amount) will be final, conclusive and binding on the Parties with regards to such Earn-Out Payment  (and referred to herein as the "Final Earn-Out Certificate"), unless SMS Inc. provides a written notice (the "Earn-Out Dispute Notice") to the Purchaser no later than the fifteenth (15th) Business Day after delivery to SMS Inc. of the applicable Earn-Out Certificate. Any Earn-Out Dispute Notice must set forth in reasonable detail (i) any item on the applicable Earn-Out Certificate which SMS Inc. believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) SMS Inc.'s alternative calculation(s) for such applicable period, and any Earn-Out Payment resulting thereof. Any item or amount to which no dispute is raised in the Earn-Out Dispute Notice will be final, conclusive and binding on the Parties on such fifteenth (15th) Business Day. Any Earn-Out Dispute Notice must specify, with reasonable particularity, all facts that form the basis of such disagreements. The Purchaser and SMS Inc. will attempt to resolve the matters raised in an Earn-Out Dispute Notice in good faith. If the Purchaser and SMS Inc. reach a resolution with respect to such matters, then the Earn-Out Certificate, as modified by such resolution, shall be deemed the "Final Earn-Out Certificate." Fifteen (15) Business Days after delivery of any Earn-Out Dispute Notice (or such longer period as may be mutually agreed in writing by SMS Inc. and the Purchaser), either the Purchaser or SMS Inc. may provide written notice to the other that it elects to submit the disputed items to the Arbiter, which resolution shall be final and binding on the Parties and shall be deemed the "Final Earn-Out Certificate."  The Arbiter shall be instructed to resolve the dispute within fifteen (15) Business Days after the item has been referred to it. The costs, fees, and expenses of the Arbiter shall be borne equally by the Purchaser and SMS Inc.

(d)      Payment. If any Earn-Out Payment is determined to be payable pursuant to a Final Earn-Out Certificate, then the Purchaser shall, within five (5) Business Days of the determination of such Final Earn-Out Certificate, pay such amount to SMS Inc.'s accounts set forth in Exhibit E, by wire transfer of immediately available funds. If a Reimbursement is determined to be payable pursuant to the Final Earn-Out Certificate, then SMS Inc. shall, within five (5) Business Days of the determination of such Final Earn-Out Certificate, pay such amount to the Purchaser's accounts, which information shall be provided in writing by Purchaser, by wire transfer of immediately available funds.  Notwithstanding the foregoing, a good faith estimate of Earn-Out Payment 1 will be made no later than January 15, 2020 a good faith estimate of Earn-Out Payment 2 will be made no later than April 15, 2020, a good faith estimate of Earn-Out Payment 3 will be made no later than July 15, 2020, a good faith estimate of Earn-Out Payment 4 will be made no later than October 15, 2020 a good faith estimate of Earn-Out Payment 5 will be made no later than January 15, 2021, based on Average Weekly Revenue and Normative EBITDA Margin data available at the time, a good faith estimate of Earn-Out Payment 6 will be made no later than January 15, 2022, based on the 2021 EBITDA data available at the time, a good faith estimate of Earn-Out Payment 7 will be made no later than April 15, 2022, based on the March 2022 LTM EBITDA data available at that time, and a good faith estimate of Earn-Out Payment 8 will be made no later than July 15, 2022, based on the June 2022 LTM EBITDA data available at the time. If either of such estimated payments are finally determined later (pursuant to a Final Earn-Out Certificate) to have been too high or too low, the applicable party will pay the other the difference (which may include an offset or adjustment to Earn-Out Payment 3, Earn-Out Payment 4, Earn-Out Payment 5, Earn-Out Payment 6, Earn-Out Payment 7 or Earn-Out Payment 8) based on such Final Earn-Out Certificates.

(e)      Operation of the Company. Until expiration of the Earn-Out period (or payment in full of the maximum Earn-Out Payment, if earlier), the Purchaser shall: (i) operate the Company in the ordinary course of business and so as to maintain it as a going concern; (ii) operate the Company as a measurable business unit with the same perimeter as on the Closing with its own separate chart of accounts; (iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment; (iv) not cause the Company to enter into voluntary liquidation; (v) operate the Company as a separate entity, owned directly or indirectly by Purchaser; (vi) operate the business of the Company consistent with past practice since Closing and not adopt strategic, commercial or financial changes to the way the Company is managed which could have, in the aggregate, a materially negative impact on the EBITDA of the Company and (vii) maintain complete and accurate books and records of the Company on a stand-alone basis adequate in all material respects to permit an audit of the Company as a stand-alone business. For the avoidance of doubt, the Parties agree to the hiring by the Company of a chief commercial officer during the first quarter of 2021. Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, in the event of a Change of Control, then the maximum amount of each Earn-Out Payment (to the extent previously unpaid) shall automatically and without any further action of any Party or any other Person become due and payable to SMS Inc. and Purchaser shall, within five (5) Business Days thereof, pay such amount SMS Inc.'s account set forth in Exhibit E, by wire transfer of immediately available funds.

## ARTICLE II  Miscellaneous

**Section 2.1      No Other Amendments**. Except as expressly set forth herein, the Purchase and Sale Agreement shall continue unmodified and in full force and effect.

**Section 2.2    The Corbel Parties**. The Corbel Parties do not have any rights or obligations under the Purchase and Sale Agreement that are impacted in any way by this Fifth Amendment. Accordingly, and notwithstanding Section 12.5 of the Purchase and Sale Agreement, the Parties have mutually determined that the execution and delivery of this Fifth Amendment by the Corbel Parties is not necessary for this Fifth Amendment to be enforceable by or against any of the Parties.

**Section 2.3    Miscellaneous**. The applicable provisions of ARTICLE 12 of the Purchase Agreement shall apply to this Fifth Amendment, *mutatis mutandis*.

**Section 2.4    Counterparts; Facsimile Signatures**. This Fifth Amendment may be executed in any number of counterparts (including by means of facsimile or other electronic signature), each of which when executed, shall be deemed to be an original and all of which together will be deemed to be one and the same instrument binding upon all the Parties. Delivery of an executed counterpart of a signature page to this Fifth Amendment by facsimile or other electronic signature shall be effective as delivery of a manually executed counterpart of this Fifth Amendment.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the Parties have caused this Fifth Amendment to be executed as of the date first written above.

**SSD CLARKE HOLDINGS, INC.**

By: _____
Name:  Steven M. Clarke
Title:    President

**TRIGO U.S., INC.**

By: _____
Name:  Matthieu Rambaud
Title:    President

[SIGNATURE PAGE TO FIFTH AMENDMENT TO
PURCHASE AND SALE AGREEMENT]

**Appendix A**

**Illustration of Earn-Out Calculation**

**EARN-OUT ILLUSTRATION**

| | | | | | |
|---|---|---|---|---|---|
| Full Earn-Out Potential | 20 | 20 | 20 | 20 | |
| Amounts in million USD | **Scenario 1** | **Scenario 2** | **Scenario 3** | **Scenario 4** | |
| Dec 2021 LTM EBITDA | 8.0 | 7.0 | 6.0 | 5.0 | |
| Mar 2022 LTM EBITDA | 8.5 | 7.5 | 6.2 | 5.5 | |
| June 2022 LTM EBITDA | 9.0 | 8.0 | 6.5 | 6.0 | |
| | | | | | |
| EO1 | 4.0 | 4.0 | 4.0 | 4.0 | *paid in January 2020* |
| EO2 | 1.3 | 1.3 | 1.3 | 1.3 | *paid in April 2020* |
| EO3 | 0.0 | 0.0 | 0.0 | 0.0 | |
| EO4 | 0.0 | 0.0 | 0.0 | 0.0 | |
| EO5 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Advance Payment | 2.0 | 2.0 | 2.0 | 2.0 | *paid in February 2021* |
| EO6 | 8.0 | 2.1 | 0.0 | 0.0 | *as per formula* |
| EO7 | 2.9 | 2.9 | 0.0 | 0.0 | *as per formula* |
| EO8 | 1.8 | 2.9 | 0.0 | 0.0 | *as per formula* |
| Reimbursement | 0.0 | 0.0 | 0.8 | 2.0 | *as per definition* |
| **TOTAL Earn-Out paid** | **20.0** | **15.3** | **6.5** | **5.3** | |
| | | | | | |
| *Total EO due as of Dec 21* | 15.3 | 9.4 | 3.5 | -2.4 | |
| *Total EO due as of Mar 22* | 18.2 | 12.4 | 4.7 | 0.6 | |
| *Total EO due as of June 22* | 20.0 | 15.3 | 6.5 | 3.5 | |
| *Balance due after Advance Payment* | 12.7 | 8.0 | -0.8 | -3.7 | |

**Appendix B**

**Normative EBITDA Add-Backs**

- Quality consultants costs (M. Song, B. Smith) in H1 and H2 2020

- CFO costs from Aug 1st, 2020 to Nov 30th, 2020

- A senior VP (if hired prior to Dec 31st, 2020)

# EXHIBIT 7





Matthieu RAMBAUD
TRIGO Group
4 avenue Pablo Picasso
92000 Nanterre – FRANCE

**To the attention of:**

**Paul WEISBRICH**
D.A. Davidson & Co.
611 Anton Boulevard, Suite 600
Costa Mesa, CA 92626

**Letter of Intent**

May 9, 2018

Dear Sir,

We thank you for inviting us to consider a potential acquisition of Supplier Management Solutions, Inc. (hereafter referred to as "**SMS**" or the "**Company**"). After a review of the information provided on which you made available to us through our meeting on March 21, 2018 and follow-up information packages, we are pleased to confirm the interest of TRIGO Holding SAS, head company and 100% shareholder of the TRIGO Group (together "**TRIGO**") in acquiring up to 100% of SMS (the "**Transaction**") from its shareholders (the "**Sellers**").

This Letter of Intent has been approved by the Supervisory Board of TRIGO.

## 1. Overview of TRIGO

Founded in 1997, TRIGO is a multinational quality support and conformity assessment services specialist, serving the automotive, aerospace, railway and other heavy transportation industries, with more than 8,000 employees throughout Europe, America and Asia. TRIGO provides a comprehensive range of quality inspection and quality management services in more than 400 industrial sites around 25 countries.

The majority of the capital of TRIGO has been held since July 2016 by ARDIAN (www.ARDIAN.com). The remainder is held by TRIGO's management team as well as minority shareholders.

ARDIAN is an independent private investment company with assets of US$66 billion managed or advised in Europe, North America and Asia. ARDIAN maintains a truly global network, with more than 470 employees working through thirteen offices in Paris, London, Madrid, New York, San Francisco, Beijing, Frankfurt, Jersey, Luxembourg, Milan, Singapore, Zurich and Tokyo. ARDIAN's clients comprise both institutional investors and sovereign fund.

ARDIAN fully supports management's development strategy and ambition to further internationalize and diversify the company.

1



## 2. Strategic Project

Based on the information made available to us and our latest conversation, we believe that a combination of SMS and TRIGO represents a very attractive industrial strategy for both companies and for the combined entity they would form (the "**Combined Group**").

Through a combination of organic development and acquisitions (6 build-ups achieved over the past 2 years, with PIC in USA/Canada, Böllinger in Germany, MAEC and MAVE in Spain, Bridge Group in the U.K. and Eurosymbiose in France), TRIGO aims at becoming the global leader of operational quality and supply chain management solutions for key manufacturers of the transportation industries (automotive, aerospace & defence, heavy-duty vehicles, railway…).

### Key attractions for TRIGO

An acquisition of SMS would be a beneficial step in achieving TRIGO's strategic objective for the following key reasons:

- North America is a strategic market for TRIGO, and SMS immediately strengthens TRIGO's US coverage;
- Supplier development and management, supplier program readiness, procurement, engineering and technical services are key areas of focus for TRIGO;
- SMS' successful track record within the aerospace market would allow TRIGO to penetrate a large key end market and leverage SMS' credentials for opportunities outside of the USA.

### Mutual benefits of a combination

We believe that a combination with SMS would generate significant strategic value, including:

- Accelerated development of customer relationships by offering extensive global coverage for their needs across America, Europe, Asia and North Africa and comprehensive service portfolio targeting at supply chain performance;
- Scale benefits: less vulnerability to single country macro-economic cycles, limited client dependency, potential economies of scale on some key functions (sales, marketing, IT…);
- Capacity to attract and retain more talents with international and cross-industry opportunities.

Furthermore, we believe that TRIGO is the ideal partner for SMS to grow further thanks to:

- Complementary geographic footprint;
- Complementary service portfolio;
- Access to new customers;
- Historical track of successful integration of founders' businesses, across different geographies and cultures.

### Integration principles

We believe that the Combined Group would generate significant synergies, especially with regards to commercial development, provided the respective organisations are properly combined. As such, it will be of a strategic importance to define, together with SMS management, the most appropriate integration approach. TRIGO's intention would be to use SMS as the unique aerospace platform of TRIGO for USA and Canada, relying on SMS' existing organisation/management team. TRIGO would contribute its current aerospace activities in the USA to the SMS platform.



**3. Valuation**

Based upon and subject to the matters set forth in this letter, we value 100% of SMS fully diluted share capital (including 100% of all its subsidiaries), on a cash-free and debt-free basis (the "**Enterprise Value**" or "**EV**") at **USD 60 million.**

This Enterprise Value is based on the information which you have communicated to TRIGO and especially:
- A normative level of sales and EBITDA as of December 2017 amounting respectively to USD 16.1 million and USD 3.1 million;
- A budgeted level of sales and EBITDA for 2018 of respectively USD 25.2 million and USD 5.8 million;
- A forecasted level of sales and EBITDA for 2019 of respectively USD 38.3 million and USD 8.8 million;
- An annual run-rate EBITDA in May/June 2018 of USD 5.4 million (i.e. weekly billing of USD 450k at 23% EBITDA margin)

Based on the Enterprise Value, the price of 100% of SMS shares acquired by TRIGO (the "**Purchase Price**") at close will be calculated as follows, based on the latest available financial information prior to the completion of the Transaction:

Purchase Price =

Enterprise Value

**+** cash available at completion of the Transaction

**-** adjusted financial debt at completion of the Transaction

**+/-** normative working capital adjustment at completion of the Transaction.

During our due diligence process, we will review all usual debt and cash-like items, which may have an impact on the financial net debt. We will also review working capital evolution in order to propose an estimated amount of normative working capital and a methodology to agree on any potential adjustment of working capital at closing.

The Seller may elect at closing to roll up to 20% of its proceeds from the Transaction into TRIGO at the top holding company level on an equity valuation of TRIGO on (i) an EV / EBITDA LTM of 10x as of the closing date and (ii) a net financial debt as of the closing date; all data coming from TRIGO official reporting to the banks.

**4. Earn-Out**

Given the substantial growth expected by the Seller for 2018 and 2019, TRIGO may pay an additional amount to the Purchase Price (the "**Earn-Out**" or "**EO**"), depending on the achievement of budgeted figures for 2018 and 2019. The Earn-Out will be structured in two potential payments:

1. First Earn-Out ("EO1") to be paid in Q1 2019 of up to USD 7.5 million. The Earn-Out calculation for the first installment will be a linear calculation beginning at a

3



threshold EBITDA of USD 5.4m up to the maximum payout upon achieving the budget of USD 5.8m:

$$EO1 = 7.5/0.4 \text{ x (EBITDA 2018} - 5.4)$$

2. Second Earn-Out ("EO2") to be paid in Q1 2020 of up to USD 20 million. The Earn-Out calculation for the second installment will be a linear calculation beginning at a threshold EBITDA of USD 5.4m up to the maximum payout upon achieving the forecast of USD 8.8m, minus any amounts paid in the First Earnout:

$$EO2 = 20 / 3.4 \text{ x (EBITDA 2019} - 5.4) - EO1$$

Given the significance of the potential Earnout payments and the nature of Trigo's ownership structure, the parties agree to work together to find adequate language in the transaction documentation to protect the Vendor's unhindered ability to meet the obligations needed to achieve the full Earnout and to protect the Vendor's entitlement to the payment of the calculated Earnout in the event of a change of ownership of Trigo.

## 5.  Contemplated Financing

TRIGO would finance the Transaction via mix of cash, debt and potentially new shareholders' equity, which ARDIAN is willing to commit.

## 6.  Conditions and Next Steps

Conditions for completion of the Transaction are the following:
- Achievement of USD +450K weekly billing;
- Management presentation meeting;
- Satisfactory due diligence (tax, financial, legal, social, insurance, commercial, key contract reviews);
- Agreed integration strategy of SMS, including any potential future involvement of the Sellers;
- Negotiation of satisfactory acquisition documentation (in particular a share purchase agreement);
- Approval of TRIGO's Supervisory Board on final documentation, it being specified that TRIGO's Supervisory Board has approved this LOI.

## 7.  Timing and exclusivity

Due to other commitments, we would be prepared to commence the speedy completion of this transaction beginning June 4, provided (i) weekly billing has reached the USD +450K threshold, (ii) we are given 2 weeks prior notice to mobilize the appropriate resources and (iii) we can start the due diligence phase with a comprehensive management presentation.

We are committed to invest all commercially reasonable efforts, resources, and expenses to move forward in the most expeditious manner. Considering our industry knowledge, our experience of similar successful transactions, and provided we are given access to enough information, we are confident that we can reach a signing of a definitive agreement within 8 weeks once we have been given access to all necessary information.



In consideration of the time and effort each of the parties will devote to the Transaction, the Company agrees, and agrees on behalf of its equity holders, by countersigning this letter, to work exclusively with TRIGO for a period of 8 weeks following the date of acceptance of this letter (the "**Exclusivity Period**"), as described in this paragraph. During the Exclusivity Period, the Company, its equity holders, members of its management team and their respective advisors (a) will work exclusively with TRIGO in an effort to negotiate the definitive agreement and complete the Transaction, (b) will not, directly or indirectly, enter into or continue any discussions with, provide information to (other than informing third parties making inquiries that the Company is subject to pending exclusivity requirements), or enter into any agreement with any other person which, if completed, would reasonably be likely to result in the direct or indirect disposition of the Company, any of its securities or any substantial portion of its assets (other than sales of inventory or other dispositions of its assets, in each case in the ordinary course of business), and (c) will promptly advise TRIGO of its receipt of any unsolicited proposals, subject to confidentiality obligations applicable to such proposals.

Notwithstanding anything to the contrary herein, TRIGO agrees to notify the Company immediately in writing if it determines that it will not be reasonably likely to consummate the proposed Transaction in accordance with the terms set forth herein, and upon the earlier of (i) the Company's receipt of such notice or (ii) the Company's notice to TRIGO with one business day notice based on the Company's determination that TRIGO has not complied with this paragraph, the Company shall have the right to terminate the Exclusivity Period immediately.

## 8. Other

Except for Section 7 (Timing and Exclusivity), and this Section 8 (Other) and the defined terms, in each case, referenced therein (collectively, the "**Binding Provisions**"), which are intended to and will be legally binding on TRIGO and the Company, each party acknowledges and agrees that this letter and its contents shall not create any binding obligation or commitment on any party to consummate a Transaction. Other than with respect to the Binding Provisions, a commitment may only be created by the execution and delivery of definitive transaction documentation related to the Transaction.

The existence and content of this Agreement, including our identity, your identity and the identity of our shareholders, your shareholders and our proposed Transaction, are strictly confidential. Under no circumstances may they be disclosed to anyone other than (i) as required by applicable law and (ii) to those of such party's advisors (legal, financial, tax or otherwise) or equityholders as may reasonably be required in connection with the matters contemplated hereby.

## 9. Contacts

For any information, please contact:

Ashley Rountree, Alantra Managing Director, acting as advisor of TRIGO:
+33 6 07 58 83 27
ashley.rountree@alantra.com

Matthieu Rambaud, CEO:
+1 647 326 24 81
+33 6 29 84 07 12
matthieu.rambaud@TRIGO-group.com



We hope that you share with us our excitement over the potential of this joint project that represents a unique value creation opportunity for SMS shareholders, customers and employees, and confirm that we would feel privileged to support such an outstanding company. We are highly motivated and look forward to continuing our discussions on this exciting opportunity. We remain available for any question you may have related to this letter and we look forward to receiving your response at your earliest convenience.

Yours sincerely,

_____
Matthieu Rambaud
CEO TRIGO Group

6

# EXHIBIT 8





# AGENDA

- GROUP INTRODUCTION
- AEROSPACE DIVISION
- VISION & STRATEGY



# INTRODUCTION



# QUALITY SOLUTIONS FOR SUPPLY CHAIN PERFORMANCE

TRIGO mission is to support critical phases in the customer's supply chain by providing **responsive quality management solutions** through a global network of dedicated people.



Foundation of TRIGO in France — **1997**

Start of international development (Asia) — **2005**

1st Acquisition (Hungary) to expand in Eastern Europe — **2008**

Acquisition of Qualitaire to develop into Aerospace — **2012**

Acquisition of PIC to expand in USA/Canada — **2015**

1st acquisition in consulting & engineering — **2016**

*1st LBO*

*2nd LBO*

*3rd LBO*

*4th LBO with ARDIAN*

**TRIGO**
The quality network

# OUR APPROACH: CUSTOMIZED QUALITY SOLUTIONS



# GLOBAL COVERAGE ACROSS 23 COUNTRIES





# FOCUS ON TRANSPORTATION







## AUTOMOTIVE

- FCA, Renault-Nissan, Audi-VW, Daimler, PSA, Toyota, Ford, GM, Hyundai-Kia, Honda, Suzuki, Porsche, Aston Martin….
- Bosch, Continental, Lear, Delphi, Magna, Valeo, Honeywell…

## AEROSPACE

- AIRBUS, Dassault, Lockheed Martin….
- Zodiac, Diehl Aerospace, Thales, SAFRAN, Triumph aerospace….

## OTHER TRANSPORTATION

- ALSTOM, Bombardier…
- John Deere, CNH, CLAAS…



# DECENTRALISED, ENTREPREUNERIAL & MULTICULTURAL ORGANIZATION

- **Strong local footprint with presence on clients' sites (400+ sites globally)**

- **+10 000 professionals (o/w +50% permanent)**

- **Comprehensive Group organization with complementarity of profiles**

  - 6 Business Units: Americas, Asia, Continental Europe, South EMEA, Aero & Rail and Consulting

  - 1 Group Sales & Mktg developing Global Key Accounts for the group

  - Lean central support functions: Finance, IT, Quality, HR, Operational excellence



**Key member of the Management Team**

 Matthieu Rambaud - CEO: He joined TRIGO in 2008 as MD for Western Europe and became CEO in 2013. Previously, he worked in AtriA Capital for 3 years and at Bain & company for 5 years. He graduated from Ecole Polytechnique and holds an MBA from Insead

 Daniel Jürgen Mestre - CFO: He joined TRIGO in 2016 as group CFO. Previously, he worked in ATOS for 11 years and prior to that in RHODIA and ARCELOR. He graduated from Universitat Politècnica de Catalunya and École Centrale Paris, and holds an MBA from Collège des Ingénieurs.

 Zsolt Puskas - EVP TREQ : He worked for Imagement since its foundation and served as MD for Central Europe between 2013 and 2016 before being appointed as EVP for TREQ business unit (consulting, auditing, training and resident engineering). He graduated in Mechanical Engineering

 Gyula Toth - EVP Innovation: He was the founder and CEO of Imagement (Hungary), acquired by TRIGO in 2008. From 2013 to 2016, he served as Head of Automotive and MD for Asia. He graduated from Technical University of Budapest

 José Navas – Chief IT Office: He joined TRIGO in 2015 after holding senior IT positions in retail and electronics industries. He holds an electronics engineering degree from Escuela Politechnica de Madrid (Spain) and an Executive MBA from Essec Business school

 Benoit Leblanc – Deputy CEO : He joined TRIGO in 2013 as MD for Western Europe and was appointed as group Deputy-CEO in 2018. Previously, he worked in IK Investment Partners for 8 years and in Morgan Stanley for 2 years. He graduated from SciencesPo Paris and Berkeley USA

 Elaine Regas – EVP Global Sales & Marketing. She joined PIC in 2001 after 10 years in various sales and marketing positions at Amadeus International Inc. and Paxar Corporation. She holds an Honours Bachelor of Business Degree from Wilfrid Laurier University.

 Emmanuel Marquis – EVP of Aerospace and Rail: He joined TRIGO in 2014 to lead the development of the aero business. He previously worked for Safran and Thales. He holds a Master of Science in Electronics

 Frédéric Maury - EVP Asia: He joined TRIGO in 2015 to lead the Asia area. He previously worked at Bureau Veritas in Asia. He graduated from Ecole Nationale Supérieure de Mécanique et Aérotechnique, University of California San Diego and Washington University



# KEY FIGURES

## 10000+



**PROFESSIONALS** WORLDWIDE

## 1BILLION+

**COMPONENTS/PRODUCTS**
INSPECTED / CONTROLLED / REWORKED // year
with average quality performance <5ppm

Permanent teams in

## 400

**MANUFACTURING SITES**
including 90+ final assembly plants

  

## 100+

QUALITY EXPERTS WORLDWIDE
Consulting, auditing, training

## 190+ QUALITY TRAINING
(standard and tailor-made)

## 350M+ € Annual Revenue



## 8000+ CUSTOMERS

## 22+ COUNTRIES

# OUR KEY VALUES



**INITIATIVE** We trust in courageous and innovative people, leaders and trustworthy professionals, that take responsibility for their actions.

**EXCELLENCE** We deliver outstanding results building on continuous creativity, reliability and efficiency.

**GLOBAL TEAM SPIRIT** We value individual and collective commitment, loyalty and honesty in full respect of local cultures and people.

**CUSTOMER FOCUS** We strive for our customers' success by delivering tailor-made solutions for their most critical quality challenges.

12



# TRIGO – AEROSPACE DIVISION

# GLOBAL FOOTPRINT IN AEROSPACE











# FACTS & FIGURES

## FLEXIBILITY, RELIABILITY, AUTONOMY



OTHERS 10

QUALITY ASSURANCE 45

INSPECTION 45

## 50+ CUSTOMERS

Airbus // Boeing // General Dynamics // Pilatus // Triumph Aerospace // Bombardier // MBDA // UTC // Honeywell // Zodiac Aerospace // Thales Avionics // Safran // Snecma // Daher // Stelia // Dassault // Liebherr // Diehl // Hutchinson // Hamilton // ELTA // AVIC
….. And many more …..

## PEOPLE

| TECHNICIANS | ENGINEERS |
|---|---|
| 761 | 551 |

## 1300+ EMPLOYEES

## ALL PROGRAMS

| | | | | |
|---|---|---|---|---|
| B747 | B777 | B737 | A320 | A330 |
| MRTT | A400M | Mirage | A380 | PC 12 |
| Rafale | ATR42 | ATR72 | A350 | C295 |
| G7000 | G8000 | A340 | Falcon | |


TRIGO
The quality network

# ALL ALONG THE SUPPLY CHAIN



| | | ON SUPPLIERS SITES | ON PRODUCTION SITE | ON CUSTOMERS SITES |
|---|---|---|---|---|
| **TRIGO SERVICES PORTFOLIO** | **INSPECTION** | | Documentation Management | |
| | | | FAI inspection | |
| | | | Tests, non destructive control | |
| | | | Quality Firewall | |
| | | | Inspection before shipping / Source Inspection | |
| | | | Incoming inspection | |
| | | | Production control | |
| | | | Final Inspection | |
| | | | Metrology | |
| | **MANAGEMENT** | | Expertise and Quality Management | |
| | | | Training | |
| | | | Quality audits (product, process…) | |
| | | Quality Improvement | | |
| | | | After sales service management | |
| | | Resident | | Resident |

Corrective services   Preventive services

The quality network

# TRIGO AEROSPACE POSITIONING

## COMPREHENSIVE MANUFACTURER SUPPORT

- Quality Inspection, Engineering Services and Supplier Development
- Experience and presence with Airframers, OEMs, Tier-1 and Tier-2 Suppliers
- Resident and as-needed rapid action support for global supply chain issues

## ALL ALONG THE SUPPLY CHAIN

- Problems solved at their source
- Local costs
- Global skills

## ECONOMICAL MODEL : FIXED AND ALL INCLUSIVE PRICE

- On parts
- On results
- On Work Package

**Local Intervention on a Global Scale**



# VISION & STRATEGY



# OUR VISION

- **To be the global leader of technical services for supply chain performance…**

   Comprehensive service portfolio covering the full supply chain

   Permanent presence in all key geographies with local leadership position : Europe, America, Asia

   Recognized expertise, from inspection to expert consulting with focus on supply chain performance

- **…with differentiated value proposition to customers…**

   Most valuable service: reactive and reliable impact based on comprehensive data

   Value for money: productive, cost avoidance for the customer

   Solution more than service: project management, one stop shop….



- **…and attractive financial profile**

   Profitable growth profile

   Balanced risk profile (customer portfolio, geographic exposure, sector diversification)



# STRATEGIC FOCUS

1. **Expand service offering to offer one-stop-shop solution for supply chain performance**

2. **Accelerate development in Aerospace and Heavy Transportation industries**

3. **Consolidate geographic coverage in strategic markets (North America, Germany, Asia…)**

4. **Continuously invest in technology to differentiate value proposition**



# CONSTANT GROWTH AMBITION



- *12 years historical annual growth rate > **20%***
- *+24% average annual **organic growth** rate since 2013*

*=> Growth trend expected to continue with ambition to reach **500M€** before 2020*



# SOLID M&A TRACK RECORD

| Acquired company | Geography | Transaction year | Sector | Service type | Strategic rationale | Acquired revenues | Current revenues | CAGR % | Status of historical founders/top mgt |
|---|---|---|---|---|---|---|---|---|---|
| Imagement | Hungary | 2008 | Auto | Inspection | Expand in Central Europe | 19 | 45 | 11% | Still in Trigo |
| 4CE | France | 2011 | Auto | Inspection | Consolidate in France | 5 | 5 | 0% | Still in Trigo |
| Qualitaire | France | 2012 | Aero | Inspection & engineering | Develop in aerospace | 12 | 25 | 20% | Retired after deal |
| GlobalQ | Spain | 2015 | Aero | Inspection & engineering | Accelerate in aerospace | 2,8 | 5 | 79% | Progressively retiring |
| PIC | USA/Can | 2015 | Auto | Inspection | Expand in America | 45 | 55 | 22% | Founder retired. Top mgt still in Trigo |
| Böllinger | Germany | 2016 | Auto | Inspection | Expand in Germany | 6 | 6 | NA | Full spin-off. New mgt |
| MAEC | Spain | 2016 | Auto | Resident engineering | Develop new services | 3 | 3 | NA | Founder still in Trigo |
| Eurosymbiose | France | 2016 | Auto / Aero | Consulting & Training | Develop new services | 4 | 5 | NA | Founder retired. New management |
| Dahan | South Korea | 2017 | Auto | Inspection | Expand in SK | 1 | 1 | NA | Founder still in Trigo |
| MAVE | Spain | 2017 | Aero | Inspection & engineering | Consolidate in aero | 28 | 28 | NA | Founder retired. Top management in place |
| The Bridge Group | UK | 2017 | Auto | Consulting & Inspection | Expand in the UK | 5 | 5 | NA | Founder still in Trigo |

- **10+ successful acquisitions** since 2008 across 3 continents
- Average annual **growth rate of +20%** after acquisition
- Experience of all types of **transaction structuring and integration**
- **Key guiding principles**: strategic fit, shared culture, transparent communication and execution



# STRONG FINANCIAL PARTNER

- **ARDIAN** invested in TRIGO in June 2016 after 6 months of **direct discussions** with the management and without a standard M&A sale process

- ARDIAN is a **leading European private investor, with +66B€** under management
  - Direct private equity investment
  - Infrastructure
  - Private debt
  - Funds of funds
  - Real Estate

- Since its creation, ARDIAN invested in more than **+250 companies** and has developed a solid experience of « **buy-and-build** » strategies

- **Dedicated ARDIAN team** to support TRIGO in its growth ambition with **commitment for deploying additional capital** to finance acquisitions

ARDIAN



# ORIGINAL CORPORATE PROFILE

## Global Player

- **Global presence** in +23 countries with dense **local network**

- **Standardized processes** supported by synergetic group functions (quality, IT, marketing…) and investments (IT, marketing…)

- **Global Key Account Management** to leverage network and generate sales synergies

## Strong entrepreneurial spirit

- **ca. 25%** of capital owned by TRIGO managers

- **9 founders/top mgrs** of past acquisitions still in Trigo management (8) or sitting on the Board (1)

- Local business units lead by **local entrepreneurial managers** with strong autonomy and accountability

TRIGO offers a unique combination between the **agility of entrepreneurial spirit** and the strength of **a global player**



# THANK YOU!

www.trigo-group.com

This document is the property of TRIGO and cannot be used or reproduced without the written authorization of TRIGO.



# EXHIBIT 9



**Danielle Taliaferro**

| | |
|---|---|
| **From:** | Rambaud, Matthieu <matthieu.rambaud@trigo-group.com> |
| **Sent:** | Tuesday, February 26, 2019 9:24 AM |
| **To:** | Steve Clarke; Jay Nicholas; Kathy Buie; Jurgens-Mestre, Daniel; Tony Long |
| **Subject:** | SMS Board meeting minutes |

All,

Please find below minutes of our Board meeting.

Any comment / addition / correction welcome.

Thank you

Matthieu

# SMS Board meeting - 2019/02/21

samedi 23 février 2019
17:06

1. **Participants**
- TRIGO: M.Rambaud, D.Jürgens-Mestre, T.Long
- SMS: S.Clarke, J.Nicholas, K.Buie

2. **Agenda**
- Business review
- Financial performance
- Governance
- PMI status
- Transaction related topics

3. **Business review**
- See attached presentation & pipeline report
  - Key running contracts
    - NGAS (USD 3.5M/year): RAS
    - LM (USD 2.4M/year): RAS
    - Collins (ex-UTAS USD 6.2M/year): 90 days performance improvement plan in progress
    - P&W (USD 2.6M): RAS but main customer contact left P&W to join Bombardier => need to establish contact with new decision maker
    - Triumph (USD 4.4M): Wing division sold to Bombardier => risk on USD1M of revenues if activity insourced by Bombardier / opportunities to penetrate Bombardier
    - NGMS (new USD 3.7M/y): ramp-up phase. High margin expected in Feb & March due to full billing but resources still ramping-up. Revenues could increase to USD4M+ depending on final supplier list
  - Key opportunities
    - LM Rotary System: RFP for supplier management services in progress (pilot for 300+ suppliers!). Planned SOP in Q2
    - NG Australia: RFP in progress
    - Boeing: 3-4 pilots expected for Q2 (decision maker looking for internal budget approval). One pilot should combine Supplier Management and Quality Management
    - NG Quality: upcoming meeting with NG VP of Quality
- Pipeline & outlook:
  - $488K/week secured
  - $600K/week planned by May
  - $688K/week planned for Q4 2019
- Status on Quality services

- Decision not to transfer, in the short term, existing TRIGO US aero business : different business models + resistance from customers (esp. LM)
  - Short term interest confirmed by customers visited in Q4 2018: Boeing, Northrop Grummann...
  - Current TRIGO US aerospace organisation insufficient to support development of innovative quality services in the US
  - 2 options proposed
    - Option 1: postpone, until further notice (2020?), development of quality services in the US.
      - Pros: no execution risk
      - Cons: reputation risk with existing SMS clients to which quality services have already been pitched + risk of missing the "market window of opportunity" for quality services
    - Option 2: launch Quality Taskforce + build-up Quality organisation to answer requests of NG/Boeing and get prepared for possible pilots in Q2 while putting on-hold active promotion
      - Pros: avoid immediate reputation risk + seize immediate market need + accelerate development of innovative/differentiating QA solution
      - Cons: significant investment required + potential execution risk
  - Option 2 description
    - Service design team: 1 full-time dedicated consultant (ex-LM SI mgr. $400K) + additional part-time support of Mike Song (ex-Boeing Quality $50K) + part-time involvement of a TRIGO expert (to be appointed) => one-off investment of ca. $450K
    - Quality operational organisation: 1 Director of Quality Operations (to be recruited. $175K/year) + 3 regional managers (to be recruited. $125K/year each)
  - **Decision to be made by Feb 27 => Matthieu**

## 4. Financial performance

- Review of FY18 performance vs. May 2018 LTM performance: lower EBITDA despite higher revenues coming from
  - Increase in staff cost (annual pay rise)
  - 2 new BD managers (4 months in 2018 post-May and terminated in Nov)
  - Increased operational management to support growth
  - More travel in Q4 for business development
  - Additional Boeing consultants
- Jan 2018 performance review: Reps & Warranty insurance costs to be reclassified below EBITDA
- 2019 outlook: NGMS new contract should drive growth in Feb-Mar with high gross margin (100% billing but ramp-up of resources). Further growth expected in Q2 especially with Boeing pilots, LMRS pilot and NG Australia request
- 2019 revenue target of USD34M maintained
- Cash forecast: possible better forecast if UTAS payment terms remain unchanged. Will know by mid-March
- Usual productivity KPIs (revenue per hour / revenue per head / staff occupation rate...) not appropriate given specific HR model
  **ACTION: need to define appropriate operational KPIs to understand profitabilty without jeopardizing business model => Daniel/Kathy/Albert to propose solution by next Board meeting. Need to liaise with Labour Law attorney !**

## 5. Governance

- Adjustment of SMS finance organization according to TRIGO standards:
  - Solid reporting line from Kathy to Daniel
  - Dotted line reporting from Kathy to Steve
  - Attention raised about Kathy multiple contacts (Daniel, Tony, Albert) => need to keep it simple and efficient
- Standard TRIGO governance policy document presented and shared (see attached)
  **ACTION: need to adjust salary threshold for approval => Matthieu by 3/31**
  **ACTION: need to define SC expenses mgt process => Matthieu & Steve by 3/31**

## 6. PMI

- See PMI file for full status update
- Key action points
- **ACTION PMI call: next call to be planned within 2 weeks => Matthieu to send invitation**

**ACTION SMS International : open international account for payroll of international employees directly via SMS LLC => Kathy/Tony by 3/8**

**ACTION Credit cards : cancel existing AMEX cards with SC personal guarantee and replace with no guarante => Kathy/Tony by 3/8**

**ACTION Bank accounts : cancel SC personal guarantee on SMS bank accounts => Kathy/Tony by 3/8**

7. **Transaction related topics**

- Billing shortfall adjustment reviewed & validated

**Matthieu RAMBAUD**

CEO / Président

M. +1 647 326 2481
M. +33 6 29 84 07 12
E. matthieu.rambaud@trigo-group.com



Global Quality Solutions

This message may contain confidential information and is intended only for addressee. If you are not the addressee, you are kindly requested to notify us that you have received this message by error. Then delete this message without copying it. Any use, dissemination, or reproduction of this message is strictly prohibited. E-Mail transmission cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If verification is required please request a hard copy version.