UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
STEVEN M. CLARKE and SSD CLARKE
HOLDINGS, INC.,

                  Plaintiffs,                        22-cv-1917 (PKC)

       -against-                        OPINION AND ORDER


TRIGO U.S., INC. and TRIGO HOLDINGS
S.A.S.,

                  Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

           Plaintiffs Steven M. Clarke and SSD Clarke Holdings, Inc. ("SSD") bring this

action for breach of contract and breach of the implied covenant of good faith and fair dealing

against TRIGO U.S. Inc. ("TRIGO U.S.") and its parent company, TRIGO Holdings S.A.S.

("TRIGO Holdings").  Defendants move to dismiss for failure to state a claim, Rule 12(b)(6),

Fed. R. Civ. P.  For the reasons that will be explained, the motion will be granted in part and

denied in part.


BACKGROUND

           For purposes of the motion, the Court accepts the Complaint's well-pleaded

allegations as true and draws all reasonable inferences in favor of the non-movant plaintiffs.  See

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); In re Elevator Antitrust Litigation, 502 F.3d 47, 50

(2d Cir. 2007).

           Clarke founded Supplier Management Solutions, LLC ("SMS") in 2007 and used

SSD as a holding company for his interests in SMS.  (Complaint ¶ 2.)  SMS served aerospace

manufacturers by coordinating their supply chains and ensuring timely delivery of components such as engines and landing gear.  (Id. ¶ 24.)  Defendant TRIGO Holdings is a French company and the ultimate parent company of defendant TRIGO U.S.  (Id. ¶ 21.)

On August 10, 2018, TRIGO U.S. entered into a Purchase and Sale Agreement (the "PSA") with Clarke, SSD, and the other owners of SMS to purchase SMS for $58.5 million in cash at closing and two earn-out payments that would be based on the growth of SMS.  (Id. ¶¶ 3-4, 48-49.)  "The first earn-out payment was to be paid to SSD and maxed out at $7.5 million if SMS's normative 2018 earnings before interest, taxes, depreciation, and amortization ('EBITDA') hit $5.8 million."  (Id. ¶ 50.)  "The second earn-out payment was to be paid to Clarke personally and maxed out at $20 million minus the first earn-out payment.  The second earn-out payment maxed out if SMS's normative 2019 EBITDA hit approximately $8.8 million."  (Id. ¶ 51.)

The acquisition was intended combine SMS's supplier management services with the purchaser's quality management services in order to "bring a complete program to the aerospace industry."  (See id. ¶¶ 33, 67.)  Upon approval of the Committee on Foreign Investment in the United States, the closing took place on January 7, 2019.  (Id. ¶ 56.)  Clarke signed a separate employment agreement to remain as CEO and president of SMS through December 31, 2019.  (Id. ¶ 73.)

The PSA was amended several times after closing to create additional earn-out payments and extend the earn-out period, among other things.  (Id. ¶¶ 57, 93-95.)  Pursuant to one such amendment, an unidentified TRIGO entity paid SSD a $2 million advance for an earn-out that would be based on anticipated revenues during the twelve months ending March 2022.  (Id. ¶ 96.)  Clarke executed a personal guaranty to return the $2 million if the earn-out payments

were less than $2 million.  (Id. ¶ 97.)  A TRIGO entity that the Complaint does not identify made partial earn-out payments of $4 million and $1,275,220 in January 2020 and April 2020, respectively.  (Id. ¶ 92.)


DISCUSSION

I.   Legal Standard

       Rule 12(b)(6), Fed. R. Civ. P., requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  A sufficient complaint must include non-conclusory factual allegations that move its claims "across the line from conceivable to plausible."  Id. at 680.

       In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth.  Id. at 678.  Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll International, 231 F.3d 82, 86 (2d Cir. 2000)).

"A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint. The test of a claim's 'substantive merits' is 'reserved for the summary judgment procedure, governed by [Rule] 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule.'" Goel v. Bunge, Ltd., 820 F.3d 554, 558-59 (2d Cir. 2016) (quoting Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)) (citation omitted).

A court reviewing a motion to dismiss "take[s] no account of [the complaint's] basis in evidence" and "may review only a narrow universe of materials." Id. at 559. Such materials include documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are "integral" to the complaint, even if they are not expressly incorporated. Id.; see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (stating that a document is "integral" to a complaint where the complaint "relies heavily upon its terms and effect").

## II. Plaintiffs Fail to Plausibly State a Claim for Relief or Basis for Personal Jurisdiction over TRIGO Holdings.

The Complaint does not distinguish between TRIGO U.S. and TRIGO Holdings in pleading claims for relief. The two defendants are collectively referred to as TRIGO. Plaintiffs allege two claims for breach of contract, a claim for breach of the implied covenant of good faith and fair dealing, and a claim for declaratory relief against the two defendants. All are premised upon the PSA. Defendants move to dismiss all claims against TRIGO Holdings for lack of personal jurisdiction and failure to state claims for relief. The Court will grant the motion. The Court will first address the failure to state a claim against TRIGO Holdings that directly bears upon the issue of personal jurisdiction.

4

Because the Complaint invokes this Court's diversity jurisdiction, the Court applies New York choice of law principles.  Here, the PSA contains a New York choice of law provision, (ECF 29-1 at 78), and New York substantive law controls these contract-based claims. See N.Y. Gen. Oblig. L. § 5-1401; Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) ("New York law gives full effect to parties' choice-of-law provisions. . . .").

    A.  The Complaint Does Not Plausibly Allege an Objective Manifestation by TRIGO Holdings of an Intent to Bound by the PSA.

Plaintiffs do not challenge the proposition that TRIGO Holdings was not a party to the PSA but assert that it may nevertheless be held to the terms of the agreement.  Under New York law, parent and subsidiary corporations are generally "treated separately and independently so that one will not be held liable for the contractual obligations of the other."  Sheridan Broadcasting Corp. v. Small, 19 A.D.3d 331, 332 (1st Dep't 2005); In re Refco Inc. Securities Litigation, 826 F. Supp. 2d 478, 495 (S.D.N.Y. 2011) (citing Sheridan, 19 A.D. at 332).  But New York law also provides that "a parent company can be held liable as a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract, which intent is inferable from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes."[1]  Horsehead Industries, Inc. v. Metallgesellschaft AG, 239 A.D.2d 171, 171-72 (1st Dep't 1997); see also RUS, Inc. v. Bay Industries, Inc., 01-Civ-3122, 2004 WL 1240578, at *20-21 (S.D.N.Y. May 25, 2004), aff'd sub nom. Recticel Foam Corp. v. Bay Industries, Inc., 128 F. App'x 798 (2d Cir. 2005).  The assessment of the non-signatory's intent

---

[1] While New York law would allow a plaintiff to proceed on the theory that the subsidiary was a dummy for the parent or controlled by the parent for the parent's own purposes or similar alter ego theory, at a conference before the Court plaintiffs expressly disclaimed any alter ego theory against TRIGO Holdings.  (ECF 26 at ¶ 2.)  Consistent with its representation, in its memorandum in opposition to the motion, plaintiffs advance no argument based upon "dummy" corporation, control by the parent, or other form of alter ego liability.  (See ECF 30.)

to be bound is premised upon "objective manifestations" and the "totality" of the words and deeds expressed as of the time of entry into the agreement. RUS, 2004 WL 1240578, at *20 (quoting Brown Brothers Electric Contractors v. Beam Construction Co., 41 N.Y.2d 397 (1977)).

The Complaint does not annex the PSA. Because the Complaint refers to the PSA and bases its claims of breach on its terms, the Court may properly consider the PSA on this motion.

The PSA is 82-pages in length with 7-pages of exhibits. (ECF 29-1.) It has a title page identifying TRIGO U.S. as a party but not TRIGO Holdings. (ECF 29-1 at 2.) The "Purchaser" is defined with considerable precision as "TRIGO U.S., Inc., a Delaware corporation existing and organized under the laws of the State of Delaware, registered with the Division of Corporations of the Delaware Secretary of State Office under file number 0121412-8, having its registered office at 50459 Central Industrial Drive, Shelby Township, Michigan 48315." (Id. at 10.) The PSA also contains a signature block for TRIGO U.S. but no other affiliated entity. (Id. at 83.)

The PSA was executed on August 10, 2018, and subsequently amended on five separate occasions. (ECF 29-2 at 2 (December 2018), 9 (May 24, 2019), 16 (December 21, 2019), 25 (July 14, 2020), 33 (December 18, 2020).) Each of these amendments over a period of two years and four months was executed on behalf of TRIGO U.S. and none were executed by TRIGO Holdings. Each amendment also has the same definition of the "Purchaser" as the PSA. (Id. at 2, 9, 16, 25, 33.)

To demonstrate an objective manifestation of an intent to be bound, plaintiffs rely on a "Letter of Intent" sent by the TRIGO Group on May 9, 2018, and signed by Matthieu

Rambaud as CEO of the TRIGO Group.[2]  (ECF 30-1, Ex. 7.)  The Letter of Intent preceded the PSA by three months.[3]  But New York courts generally treat letters of intent as unenforceable agreements to agree.  See New York Military Academy v. NewOpen Group, 142 A.D.3d 489, 490 (2d Dep't 2016) ("[T]he letter of intent demonstrated that the plaintiff's allegations of breach of contract related to a mere agreement to agree.").  "[I]t is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."  Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109 (1981).

New York law provides that a fully integrated writing, as manifested by a merger clause, precludes extrinsic evidence to vary or modify its terms.[4]  Primex International Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599 (1997); Meinrath v. Singer Co., 482 F. Supp. 457, 460 (S.D.N.Y. 1979) (Weinfeld, J.), aff'd, 697 F.2d 293 (2d Cir. 1982) (rejecting attempt to "alter or refute the clear meaning" of an integrated contract based on a letter of intent signed four months previously).  The Court does not hold that the existence of a merger clause forecloses, as a matter of law, an argument that a parent manifested an intent to be bound by a subsidiary's

---

[2] The TRIGO Group is alleged to be "a group of affiliated companies under the control of TRIGO Holdings." (Complaint ¶ 30.)

[3] While the letter of intent is not alleged or referred to in the body of the Complaint, plaintiffs tender it and thus there is no prejudice to plaintiffs, the non-movant, in its consideration on the motion.

[4] The PSA has a strong merger clause providing that:

This Agreement, the Ancillary Agreements and all other agreements, certificates and other instruments delivered or given pursuant to this Agreement constitute the entire agreement among the Parties with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.  There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, among the Parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement, the Ancillary Agreements and all other agreements, certificates and other instruments delivered or given pursuant to this Agreement. The Parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

(ECF 29-1 at 77.)

agreement.  But the existence of the clause, as well as the Letter of Intent, may be part of the totality of words or deeds that may be considered.

A parent corporation's participation in a negotiation may be an indicator of an intent to be bound.  Warnaco Inc. v. VF Corp., 844 F. Supp. 940, 946 (S.D.N.Y. 1994).  Here, plaintiffs rely on the circumstance that Rambaud and Emmanuel Marquis, Executive Vice President of Aerospace, Defense and Rail at the TRIGO Group, conducted negotiations with Clark and SMS.  (Complaint ¶ 29.)  But in addition to Rambaud's position as CEO of TRIGO Group and Chairman of TRIGO Holdings, Rambaud was President of TRIGO U.S. and executed the PSA in that capacity.  (ECF 29-1 at 83.)  The Complaint alleges that both Rambaud and Marquis were employed by both TRIGO U.S. and TRIGO Holdings.  (Complaint ¶¶ 29-31.)  Thus, they had every reason to be at the negotiating table on behalf of TRIGO U.S., and their presence while also holding positions on behalf of other entities does not manifest an intent that that the other entity or entities intend to be bound.  In this respect, this case is distinguishable from RUS, Inc. v. Bay Industries, Inc., in which Judge Lynch noted that "none of the relevant players in the negotiations culminating in or subsequent to the execution of the Agreement had any status whatsoever with" the "shell acquisition vehicle" that was nominally a party to the agreement.  2004 WL 1240578, at *21.

Plaintiffs also rely on Jennings v. Hunt Companies, Inc., 367 F. Supp. 3d 66 (S.D.N.Y. 2019), and Warnaco Inc. v. VF Corp., 844 F. Supp. 940 (S.D.N.Y. 1994).  In Jennings, the complaint alleged that the subsidiary that signed the relevant agreement was "formed to serve as parent entity of the then shell broker-dealer arm of" the parent company. 367 F. Supp. 3d at 71.  The complaint also alleged that the officers of the parent company assured the plaintiff that the parent "was prepared to provide [him] with whatever resources he

needed to start and run [the subsidiary]" and that the parent company participated in "intense"

negotiations.  Id. at 71-72; see also TransformaCon, Inc. v. Vista Equity Partners, Inc., 15-Civ-

3371, 2015 WL 4461769, at *5 (S.D.N.Y. July 21, 2015) (complaint "plainly allege[d]" parent

company was "intimately involved," subsidiary agreed to the contract under the parent's "watch

and control," and senior executives reviewed and approved aspects of the agreement).  In

Warnaco, the subsidiary "existed solely as an acquisition vehicle" for the parent.  844 F. Supp. at

946.

   Based upon the totality of the allegations of the Complaint, plaintiffs have not

plausibly alleged that TRIGO Holdings manifested an intent by words or deeds to be bound by

the PSA.

   **B.  The Complaint Does Not Plausibly Allege**
     **Personal Jurisdiction over TRIGO Holdings.**

   TRIGO Holdings also moves to dismiss for lack of personal jurisdiction.  It

is a joint stock company organized under the laws of the Republic of France

headquartered in Nanterre, France.  (Complaint ¶ 21.)  It asserts that it does not have

offices or employees in the U.S., does not own real property in the U.S. and does not make

sales or provide services in the United States or otherwise transact business in the United

States.  (ECF 29 at ¶¶ 10-11.)

   In opposition to the motion, plaintiffs do not argue that there is general or

specific jurisdiction over TRIGO Holdings.  Rather, they urge that because TRIGO

Holdings has manifested an intent to be bound by the PSA, it is bound by the consent to

jurisdiction in the forum clause of the PSA.  They also argue that TRIGO Holdings is

"closely related to" TRIGO U.S., the undisputed signatory to the forum selection clause.

See Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 723 (2d Cir. 2013)

(holding that "a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory").[5]

The Court has concluded that the Complaint does not plausibly allege that TRIGO Holdings manifested an intent to be bound by the PSA.  The Court assumes, *arguendo*, that the relation between TRIGO Holdings and its subsidiary meets the "closely related" test.  But that does not end the inquiry.

The Court joins those district courts that have concluded that personal jurisdiction premised on the "closely related to" or other theory of constructive consent must still satisfy the requirements of due process of law.  Mersen USA EP Corp. v. TDK Electronics Inc., 594 F. Supp. 3d 570, 584 (S.D.N.Y. 2022) (Vyskocil, J.) (due process concerns precluded application of the "closely related to" theory); HSM Holdings, LLC v. Mantu I.M. Mobile Ltd., 20-Civ-00967, 2021 WL 918556, at *9 (S.D.N.Y. Mar. 10, 2021) (Liman, J.) (due process barred suit against individuals who signed forum selection clause in their official capacity only); Arcadia Biosciences, Inc. v. Vilmorin & Cie, 356 F. Supp. 3d 379, 389, 394-95 (S.D.N.Y. 2019) (Rakoff, J.) (due process inquiry applied to claim that affiliate was bound to forum clause).

 "[T]here are two parts to the due process test for personal jurisdiction . . . the minimum contacts inquiry and the reasonableness inquiry."  Waldman v. Palestinian Liberation Organization, 835 F.3d 317, 331 (2d Cir. 2016) (citing International Shoe Co.

---

[5] Magi XXI presented a circumstance in which a non-signatory was permitted to enforce the forum selection clause against a party who had consented to be sued in the forum but did not expressly consent to be sued in the forum by the non-signatory.  It is not obvious that the Circuit would come out the same way in a suit against a non-signatory. Magi XXI, 714 F.3d at 723, n.10 ("[W]e do not reach the question of when a signatory may enforce a forum selection clause against a non-signatory.").

v. Washington, 326 U.S. 310 (1945); Bank Brussels Lambert v. Fiddler Gonzalez &
Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)).  "The minimum contacts inquiry requires
that the court determine whether a defendant has sufficient minimum contacts with
the forum to justify the court's exercise of personal jurisdiction" and "the reasonableness
inquiry requires the court to determine whether the assertion of personal jurisdiction over
the defendant comports with traditional notions of fair play and substantial justice."  Id.
(citations and quotations omitted).

  The contacts that TRIGO Holdings has with New York are thin to none
and, indeed, the dispute itself has little to do with New York.  Plaintiff Steven Clarke is
domiciled in Lake Havasu City, Arizona.  (Complaint ¶ 18.)  Plaintiff SSD is a Nevada
corporation with its principal place of business in Lake Havasu City. Arizona.  (Id. ¶ 19.)
TRIGO U.S. is a Delaware corporation with its principal place of business Shelby
Township, Michigan.  (Id. ¶ 20.)  The Complaint is devoid of any allegation that the PSA
was negotiated or executed in New York.

  The Court comfortably concludes that TRIGO Holdings does not have
sufficient minimum contacts with New York to justify personal jurisdiction.  The exercise
of personal jurisdiction over TRIGO Holdings would not comport with traditional notions
of fair play and substantial justice.

III. <u>Breach of Contract</u>

  The Court reviews the balance of the allegations of the Complaint through the
lens of whether they state a claim against TRIGO U.S.  Because of the manner in which the

plaintiffs have framed their pleading, i.e., pleading collective fault or liability of two entities, it is not always clear who the alleged actor is.  The Court assumes it is TRIGO U.S.

Plaintiffs bring two causes of action for breach of contract.  The first alleges that TRIGO U.S. breached the PSA by failing to provide quality management services as promised and, as a result, forcing SMS to divert its own resources to develop such services in-house (the "quality management allegations").  (Complaint ¶ 118.)  The second cause of action alleges that TRIGO U.S. breached the PSA by requiring SMS to slow down business development in 2021 and by directing SMS to stop pursuing a large contract with L3Harris (the "slow down allegations").  (Id. ¶¶ 127, 130.)  Defendants urge that neither claim is plausibly alleged.

A.  Quality Management Allegations

The Complaint alleges that during negotiations and discussions, Rambaud and Marquis "claimed that TRIGO had the expertise, ability, and infrastructure in place to provide quality management services immediately to SMS' customers and other U.S. aerospace companies."  (Id. ¶¶ 29, 34.)  "TRIGO" also provided a 23-page presentation to SMS stating that "TRIGO" had a global footprint that involved providing quality management services to U.S.-based aerospace customers.  (Id. ¶ 38.)

In a press release announcing the deal, "TRIGO" stated that the acquisition would "strengthen SMS's position as a quality partner in the aerospace supply chain by providing global coverage" and an "extended service offering into quality inspection and conformity management" – services that SMS did not provide at the time.  (Id. ¶¶ 58-59.)  "TRIGO" also accompanied Clarke and SMS to meetings with some of SMS's key customers.  At those meetings, "TRIGO" represented that its services included quality management services and that SMS would be able to offer those services.  (Id. ¶¶ 60-66.)  Based on these representations,

Clarke assured his customers that the acquisition would allow SMS to continue to deliver its services with the addition of quality management offerings.  (Id. ¶ 69.)   Some customers were interested in such services and began requesting them "almost immediately."  (Id. ¶ 71.)

However, after closing, Clarke and SMS discovered that "TRIGO" did not possess the aerospace quality management capabilities it had promised.  (Id. ¶ 76.)   After the SMS board meeting on February 21, 2019, "TRIGO" acknowledged that the "[c]urrent TRIGO US aerospace organization [is] insufficient to support development of innovative quality services in the US."  (Id. ¶ 78.)

Thereafter, Clarke and his team "devoted significant time and effort" to developing SMS's own quality management capabilities.  (Id. ¶¶ 81-84.)  The Complaint alleges "TRIGO provided no support."  (Id. ¶ 84.)  The cost, time, and effort associated with developing these capabilities "from the ground up" negatively impacted the normative EBITDA used to calculate the earn-out payments as well as SMS's ability to secure new contracts, and maintain existing contracts, for its traditional supplier management services.  (Id. ¶¶ 85-87.)

Plaintiffs plausibly allege that TRIGO U.S. breached the PSA by failing to provide the services it promised and by forcing SMS to expend resources to develop its own quality management capabilities.  (Id. ¶ 118.)

Specifically, the Complaint alleges that TRIGO "breached the contract, including section 3.4(e), with SSD by not providing the quality management services it claimed to have and forcing SMS to divert its own resources to provide what TRIGO had falsely promised."  (Id.) Section 3.4(e) of the PSA is part of the earn-out provision.  It provides in relevant part that, until the expiration of the earn-out period or payment in full of the maximum earn-out payment, TRIGO U.S. must operate SMS "in good faith and refrain from taking any action with the

primary purpose of reducing or eliminating the Earn-Out Payment," (section 3.4(e)(iii)), and must operate the business of SMS "consistent with past practice and not adopt strategic, commercial or financial changes to the way [SMS] is managed which could have a negative impact on the EBITDA of [SMS]," (section 3.4(e)(vii)).

Defendants argue that the quality management allegations do not support a claim for breach of section 3.4(e)(iii) because TRIGO U.S. did not act with the primary purpose of reducing or eliminating the earn-out.  (ECF 28 at 20.)  Despite plaintiffs' arguments in their opposition brief that the Court can "reasonably infer" that TRIGO U.S. breached section 3.4(e)(iii), (ECF 30 at 18-19), there is no allegation in the Complaint that defendants declined to provide quality management services in bad faith or with the primary purpose of reducing or eliminating the earn-out payment.

However, the Complaint plausibly alleges a breach of section 3.4(e)(vii), a provision defendants ignore.  Specifically, the Complaint alleges sufficient facts at this stage to state a claim that TRIGO U.S.'s failure to provide the promised services constituted a "strategic, commercial or financial change" that could negatively impact SMS's EBITDA.  The Complaint states that "TRIGO" made representations – including in a press release announcing the acquisition and in presentations to key SMS customers – that it would provide quality management services.  (Complaint ¶¶ 58-71.)  It is foreseeable that a failure to provide those services could jeopardize SMS's relationships with its customers, particularly those that "almost immediately began asking SMS to provide [quality management] services," (id. ¶ 71), and leave SMS with little choice but to expend significant resources to develop its own quality management capabilities in order to fulfill the promises SMS and TRIGO U.S. had made.[6]

---

[6] Relatedly, the Court rejects defendants' argument that the allegation that SMS was faced with a "harsh dilemma" is implausible.  (See ECF 28 at 23.)  Defendants note that SMS did not provide quality management services to its

The Complaint also plausibly alleges that TRIGO U.S. failed to operate SMS "consistent with past practice" when it failed to provide the services it had promised, thereby forcing SMS to develop in-house quality management capabilities for the first time.  Defendants' arguments that this claim is frivolous and made in bad faith and that the decision to develop quality management services was Clarke's and not that of TRIGO U.S. are an oversimplification of the Complaint.[7]  Regardless of whether plaintiffs' claim ultimately succeeds, the Complaint adequately alleges that TRIGO U.S. held itself out, to SMS and to SMS's customers, as willing and able to provide quality management services, and that by failing to provide those promised services TRIGO U.S. left SMS with no reasonable choice but to deviate from SMS's past practice and develop in-house capabilities.

Defendants' argument that plaintiffs' quality management claims are precluded by the post-closing amendments to the earn-out provision fails.  First, the amendments do not constitute an accord and satisfaction.  "An accord and satisfaction is an agreement between two parties under which one party accepts a stipulated performance by the other party in discharge of an unresolved obligation by the latter party."  Stahl Mgmt. Corp. v. Conceptions Unlimited, 554 F. Supp. 890, 892 (S.D.N.Y. 1983) (citing Rein v. Wagner, 268 N.Y.S.2d 659, 662 (N.Y. Sup. Ct. 1965), modified on other grounds, 269 N.Y.S.2d 578 (3d Dep't 1966), aff'd, 224 N.E.2d 728 (N.Y. 1966)).  Accord and satisfaction requires "an intention to discharge the old obligation

---

customers in the past, and they argue that Clarke was the "victim of his own decision about the time and resources to devote to building SMS's quality management infrastructure or, indeed, to build it at all."  (Id.)  Quite the contrary, it is plausible that key customers would expect – based on the representations of TRIGO U.S. – to be able to receive quality management services and that SMS felt compelled to develop those capabilities in order to meet that new expectation.  Failure to provide services that customers newly expected, even if SMS had not provided those services in the past, could plausibly lead to loss of customers or customer confidence.

[7] Defendants also dispute that TRIGO U.S. "operated" SMS within the meaning of section 3.4(e)(vii).  (ECF 31 at 3.)  The term "operated" in context is arguably ambiguous and therefore cannot be readily resolved on a Rule 12(b)(6) motion. See Maniolos v. United States, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), aff'd, 469 F. App'x 56 (2d Cir. 2012).

when the new one has been performed."  Id. at 893.  It is an affirmative defense that the

defendants have the burden of proving.[8]  Id. (citing Reilly v. Barrett, 115 N.E. 453, 454 (1917)).

Defendants argue that the amendments "represented an agreed-to concession to

remedy TRIGO's alleged wrongdoing."  (ECF 28 at 25; see also Complaint ¶ 93 ("To reflect the

delay caused by TRIGO's failure to perform and the subsequent impact of the pandemic, Clarke,

SSD Holdings and TRIGO made further amendments to the PSA . . . .").)  In other words,

plaintiffs supposedly agreed to forgive TRIGO U.S.'s failure to provide quality management

services in exchange for a longer period of time to reach the earn-out targets.  However, the

amendments merely adjusted the timing for the earn-out payments and left section 3.4(e)(iii) and

(vii) unchanged.  (Compare ECF 29, Ex. A at 28-29, with ECF 29, Ex. B at 6, 12, 19, 29.)

Defendants have not met their burden to show that the amendments demonstrate an intention to

discharge the obligations imposed on TRIGO U.S. by section 3.4(e).

The amendments also do not amount to a waiver of plaintiffs' breach claims.  The

amendments each state that "except as expressly set forth herein, the Original Agreement shall

continue unmodified and in full force and effect."  (ECF 30 at 20; ECF 29, Ex. B at 7, 13, 29,

38.)  Additionally, the PSA contains a no-waiver clause that provides:

> No waiver of any of the provisions of this Agreement will constitute
> a waiver of any other provision (whether or not similar).  No waiver
> will be binding unless executed in writing by the Party to be bound
> by the waiver.  A Party's failure or delay in exercising any right
> under this Agreement will not operate as a waiver of that right.  A
> single or partial exercise of any right will not preclude a Party from
> any other or further exercise of that right or the exercise of any other
> right.

---

[8] "An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998).

(ECF 30 at 19-20; ECF 29, Ex. A at 76-77.)  No-waiver clauses are enforceable in New York. Structured Cap. Sols., LLC v. Commerzbank AG, 177 F. Supp. 3d 816, 825 (S.D.N.Y. 2016); Park Irmat Drug Corp. v. Optumrx, Inc., 152 F. Supp. 3d 127, 137 (S.D.N.Y. 2016).

### B.  Slow Down Allegations

The Complaint alleges that in late 2020 and early 2021, SMS established a budget, revenue plan, and sales forecast for 2021 that each included a new supplier management contract with L3Harris Technologies. (Complaint ¶¶ 98-99.)  SMS was allegedly "on target in June 2021" to obtain the contract.  (Id. ¶ 100.)  Clarke planned to hire Steven O'Bryan, a consultant who had a close relationship with L3Harris's President Chris Kubasik, to assist in securing the contract.  (Id.)  O'Bryan would "accelerate future opportunities" once Kubasik became CEO of L3Harris on July 1, 2021.  (Id.)

Plaintiffs allege that, on June 8, 2021, Rambaud "agreed to support Clarke's efforts to secure the L3Harris contract, including hiring Steve O'Bryan."  (Id. ¶ 101.)  They also allege that Rambaud stated that "TRIGO" would prepare a consulting agreement, but it did not do so.  (Id.)

The next day, Rambaud allegedly called Clarke and "told him that instead of pursuing the large L3Harris contract, SMS would seek smaller contracts with L3Harris that would grow over time."  (Id. ¶ 102.)  According to the Complaint, this decision "ensured SMS would not hit its $8,800,000 EBITDA target for the year."  (Id. ¶ 103.)

The decision to pursue smaller contracts with L3Harris was "made primarily by Emmanuel Marquis," but Rambaud told Clarke that the decision was made jointly with SMS President Jay Nicholas and Stephen Spell, a new business development officer.  (Id. ¶ 105.) Rambaud's "misrepresentation" caused Nicholas to resign, which plaintiffs allege "further

disrupt[ed] the company's traditional business and ensur[ed] the earn-out would not be met." (Id. ¶ 106.)

Also in June 2021, TRIGO U.S. "told SMS to stop business development for 90 days," which further contributed to SMS's inability to receive earn-out payments.  (Id. ¶¶ 109-10.)  As a result of the slow-down decision, Clarke cancelled business development meetings with Raytheon and Crane Aerospace.  (Id.)

Plaintiffs plausibly allege that TRIGO U.S. breached the PSA by directing SMS to slow down business development and to stop pursuing the large contract with L3Harris.  (Id. ¶¶ 127-130.)

The Complaint alleges that TRIGO U.S. violated section 3.4(e) of the PSA in two ways.  First, it alleges that TRIGO U.S. breached section 3.4(e)(vii) because the "decision to slow down business development was a strategic change to the way SMS was managed that had a negative aggregate impact on SMS's EBITDA by reducing the number of contracts SMS was able to secure."  (See id. ¶ 128.)  Second, it alleges that TRIGO U.S. breached section 3.4(e)(iii) because the decision "was taken in such a manner and at such time as to indicate that its primary purpose" was to reduce the earn-out payment.  (See id. ¶ 129.)  As will be explained, both allegations are sufficient to state a claim against TRIGO U.S.

1.  Negative Impact on EBITDA

The Complaint plausibly alleges that TRIGO U.S. breached section 3.4(e)(vii) of the PSA because the decision to slow down business development was a strategic change that could negatively impact SMS's EBITDA.

Defendants do not respond to this allegation, focusing instead on plaintiffs' second claim that TRIGO U.S. purposefully interfered with the earn-out payment.  Notably,

18

section 3.4(e)(vii) does not require that TRIGO U.S. <u>intend</u> to negatively impact SMS's EBITDA – all it requires is that the change "could" have a negative impact on EBITDA.  The Complaint alleges that the decision to slow down business development hindered SMS's ability to secure contracts, that the decision reduced SMS's weekly billings and earnings that would have triggered or increased the earn-out payments, and that Clarke cancelled business development meetings with two companies.  (Complaint ¶¶ 109, 128.)  These allegations are sufficient to state a claim for breach of section 3.4(e)(vii).

### 2.  <u>Primary Purpose</u>

Defendants argue that plaintiffs' allegations that the defendants purposefully reduced the earn-out payment are "implausible as a matter of law" and "provably false."  (ECF 28 at 26-27.)  They assert that it is inherently implausible that TRIGO U.S. would "jeopardize its lucrative investment" in SMS simply to prevent SMS from achieving the earn-out target.  (<u>Id.</u>)  Pointing to cases involving claims under the implied covenant of good faith and fair dealing that purchasers "subverted their own business in an effort to undermine Earn-Out rights," defendants argue that "[n]o such claim has ever[] survived summary disposition."  (<u>Id.</u> at 26.)

Defendants rely almost entirely on summary judgment cases that held the plaintiff failed to present sufficient evidence that the defendant acted in bad faith to intentionally reduce or avoid an earn-out payment.  These cases do not support defendants' argument that plaintiffs' allegations are implausible as a matter of law.  <u>See</u> <u>Lykins v. IMPCO Technologies, Inc.</u>, 15-Civ-2102, 2018 WL 3231542, at *10 (S.D.N.Y. Mar. 6, 2018); <u>CCM Rochester, Inc. v. Federated Investors, Inc.</u>, 234 F. Supp. 3d 501, 509 (S.D.N.Y. 2017); <u>Vista Outdoor Inc. v. Reeves Family Trust</u>, 234 F. Supp. 3d 558, 571 (S.D.N.Y. 2017), <u>aff'd</u>, 725 F. App'x 17 (2d Cir. 2018); <u>Keene Corp. v. Bogan</u>, 88-Civ-0217, 1990 WL 1864, at *16 (S.D.N.Y. Jan. 11, 1990).  In fact, several

months prior to the summary judgment decision in CCM Rochester, the court denied a motion to

dismiss the plaintiff's implied covenant claim, concluding that the plaintiff adequately alleged

that the defendant's "acts and omissions during the Earnout Period were intentionally undertaken

to harm [the plaintiff's] Earnout Payments in breach of an implied covenant of good faith and

fair dealing." CCM Rochester, Inc. v. Federated Investors, Inc., 14-Civ-3600, 2014 WL

6674480, at *7 (S.D.N.Y. Nov. 25, 2014).

   Defendants offer two cases disposing of similar implied covenant claims on

motions to dismiss, one from the Sixth Circuit and one from the District of Oregon. (ECF 31 at

7 (citing Deom v. Walgreen Co., 591 F. App'x 313, 319-20 (6th Cir. 2014); Colby v. InterDent

Serv. Corp., 18-Civ-781, 2018 WL 5284202, at *4 (D. Or. Oct. 24, 2018)). These cases do not

carry the day for TRIGO U.S. For example, in Deom, the Sixth Circuit concluded in the context

presented that it was "facially implausible" that a purchaser would "intentionally drive off

customers" to avoid paying an earn-out bonus, but relied exclusively on summary judgment

cases. 591 F. App'x at 319-20. The summary judgment cases cited in Deom had the benefit of

an evidentiary record demonstrating that the parties' economic interests were aligned such that

no reasonable trier of fact could conclude the defendant intentionally sabotaged the business. No

such evidence is yet available here.

   Deom is distinguishable in other respects. There, the plaintiff alleged the

defendant, Walgreen, gave new and existing customers "bad customer service" – but he "did not

allege that Walgreen intentionally mismanaged its pharmacies or purposefully lost customers in

order to defeat the earnout bonus" or that "Walgreen's mismanagement of its pharmacies was

specifically directed at Deom's former customers." Id. at 319. The plaintiff had also conceded

that Walgreen's actions could be explained by negligence or ineptitude rather than "deliberate

subversion." <u>Id.</u> at 320.  Here, however, plaintiffs have expressly alleged that TRIGO U.S.

purposely interfered with the earn-out payment.  At the motion to dismiss stage, there is no basis

to conclude that plaintiffs' claim is inherently implausible.

   Next, defendants argue that it is "provably false" that TRIGO U.S. directed SMS

not to pursue the large L3Harris contract.  In support of this argument, defendants rely on an

email Clarke sent to Matthieu Rambaud in June 2021, material that is extraneous to the

Complaint and which the Court declines to consider on this motion.  But if the Court were to

consider this email, it does not support the position of TRIGO U.S.  In the email, Clarke states,

"What's worse, is that the conversation I had with you today, Matthieu, regarding the team not

wanting to follow my suggestion to contract Steve O'Bryan as a consultant to help secure the L3

contract means that L3 opportunities for me to obtain my earnout have been sabotaged."  (ECF

29, Ex. F.)  This aligns with the allegation in the Complaint that "[o]n June 9, 2021, Rambaud

called Clarke and told him that instead of pursuing the large L3Harris contract, SMS would seek

smaller contracts with L3Harris that would grow over time."[9]  (Complaint ¶ 102.)

   Clarke's email goes on to say, "[i]t appears that Steffen and Emmanuel are having

their own strategic discussions on how L3 should be handled" and that "[a]llowing Emmanuel

and Steffen to be decision makers on L3 jeopardizes" Clarke's ability to receive the full earn-out.

Those statements directly correlate to the allegations in the Complaint that the decision "was

made primarily by Emmanuel Marquis" and that Rambaud inaccurately told Clarke "that it was a

joint decision with SMS President Jay Nicholas and Stephen Spell, a new business development

officer."  (<u>Id.</u> ¶ 105.)  Clarke's statement in the email that "the CEO, Bill shut [the contract]

down" does not eliminate the involvement of the leadership of TRIGO U.S. in the decision, and

---

[9] The Court notes that the time stamp on the email in Exhibit F is June 10, 2021, at 00:57, which appears to be local time in France.  Accordingly, Clarke's use of "today" would refer to June 9.

therefore does not render the allegations in the Complaint "provably false."  Factual disputes

about whether a contract with L3Harris was in place and who was ultimately responsible for the

decision not to pursue the large contract are not appropriately resolved at this stage.  (Compare

ECF 28 at 27 ("What remains of the L3Harris story . . . is inherently speculative . . . . [T]here

was no big contract to forgo in June 2021."), with Complaint ¶ 100 ("SMS was on target in June

2021 . . . to get the contract with L3Harris Technologies.").)

   The Court concludes that plaintiffs have plausibly alleged that TRIGO U.S.

breached section 3.4(e)(iii) of the PSA by directing SMS to slow down business development.


IV. Implied Covenant of Good Faith and Fair Dealing

   Finally, plaintiffs allege that TRIGO U.S. breached its implied duty of good faith

and fair dealing under the PSA by "requiring SMS to develop the very business TRIGO had

represented it would contribute to the business, subsequently directing SMS to slow its business

and development activities, and finally directing SMS not to secure the contract with L3Harris."

(Complaint ¶ 136.)  TRIGO U.S. argues that this claim must be dismissed because it is

duplicative of the breach of contract claims.  (ECF 28 at 28.)  The Court agrees.

   "Under New York law, parties to an express contract are bound by an implied

duty of good faith, but breach of that duty is merely a breach of the underlying contract."  Harris

v. Provident Life & Accident Insurance Co., 310 F.3d 73, 80 (2d Cir. 2002) (quoting Fasolino

Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal

quotation marks and citations omitted)).  New York "does not recognize a separate cause of

action for breach of the implied covenant of good faith and fair dealing when a breach of

contract claim, based upon the same facts, is also pled."  Id. at 81.  "Therefore, when a complaint

alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013) (citing L–7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 434 n.17 (2d Cir. 2011)).  Put differently, "claims for breach of the implied covenant of good faith and fair dealing are duplicative of breach of contract claims when both arise from the same facts and seek the identical damages for each alleged breach." Advanced Oxygen Therapy Inc. v. Orthoserve Inc., 572 F. Supp. 3d 26, 34-35 (S.D.N.Y. 2021) (quoting Deutsche Bank National Trust Co. v. Quicken Loans Inc., 810 F.3d 861, 869 (2d Cir. 2015)) (quotations omitted).  On the other hand, "a claim for breach of the implied covenant of good faith and fair dealing is not duplicative when the claim 'depends on facts in addition to those that might support a breach of contract claim.'" Id. at 35 (quoting Fantozzi v. Axsys Technologies, Inc., 07-Civ-2667, 2007 WL 2454109, at *3 (S.D.N.Y. Aug. 20, 2007)).

Plaintiffs argue that their implied covenant claim is not duplicative of the breach of contract claims because "the PSA's provisions are not identical to the implied covenant." (See ECF 30 at 24-25.)  Plaintiffs' argument misses the mark.  The relevant inquiry is whether the claims "arose from the same facts and seek the identical damages for each alleged breach." Deutsche Bank National Trust, 810 F.3d at 869 (quoting Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce, 70 A.D.3d 423, 426 (1st Dep't 2010)).  Even Dreni v. PrinterOn America Corporation, on which plaintiffs rely, based its decision that the plaintiff's implied covenant claim was not wholly duplicative of the breach of contract claim on its conclusion that the "predicate facts underlying [the] good faith and fair dealing claim [were] distinct from [the] breach of contract claim." 486 F. Supp. 3d 712, 730 (S.D.N.Y. 2020).

Plaintiffs' implied covenant and breach of contract claims are predicated on identical facts and seek identical remedies.  The first breach of contract claim alleges TRIGO U.S. breached the PSA "by not providing the quality management services it claimed to have and forcing SMS to divert its own resources to provide what TRIGO had falsely promised." (Complaint ¶ 118.)  The second breach of contract claim alleges that TRIGO U.S. breached the PSA "by requiring SMS to slow down business development" and that, "[s]pecifically, TRIGO directed SMS to stop pursuing the large contract with L3 Harris and imposed a broader slow down of all business development in 2021."  (Id. ¶¶ 127, 130.)  Both breach of contract claims allege that SSD was "damaged through a reduction in weekly billing and earnings that would have triggered or increased any earn-out payments due to SSD up to $20 million minus any payments already made."  (Id. ¶¶ 120, 131.)  The implied covenant claim alleges in nearly identical terms that "TRIGO breached the implied covenant of good faith and fair dealing by directing requiring SMS to develop the very business TRIGO had represented it would contribute to the business, subsequently directing SMS to slow its business and development activities, and finally directing SMS not to secure the contract with L3Harris."  (Id. ¶ 136.)  It states that "[a]s a direct result of TRIGO's breaches, SMS was unable to achieve the increase in billing and earnings would have triggered additional earn-out payments to SSD up to the maximum amount of $20 million."  (Id. ¶ 137.)

The claims are substantially the same.  Plaintiffs' implied covenant claim does not "depend[] on facts beyond those that might support [the] breach of contract claim," Advanced Oxygen Therapy, 572 F. Supp. 3d at 35, and it does not allege "something more" than a breach of section 3.4(e) of the PSA, Fantozzi, 2007 WL 2454109, at *3.  The alleged breach of the implied covenant "merely repeats the allegations set forth" in the first two claims for breach of

contract. <u>Atlantis Information Technology, GmbH v. CA, Inc.</u>, 485 F. Supp. 2d 224, 231

(E.D.N.Y. 2007).  The implied covenant claim will be dismissed.


CONCLUSION

The motion to dismiss is GRANTED as to (1) all claims against TRIGO

Holdings; and (2) the Third Claim for breach of the implied covenant of good faith and fair

dealing against TRIGO U.S.  Plaintiffs' request, (ECF 13 at 7), to voluntarily dismiss the Fourth

Claim for declaratory judgment is GRANTED.  The motion to dismiss the First and Second

Claims, each alleging breach of contract, is DENIED as to TRIGO U.S.  The Court

acknowledges that the claims may look quite directly at the summary judgment stage on a

complete factual record.

The Clerk is directed to terminate the motion.  (ECF 27.)

SO ORDERED.


P. Kevin Castel
United States District Judge


Dated:  New York, New York
        March 10, 2023