UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
STEVEN M. CLARKE, individually, and SSD
CLARKE HOLDINGS, INC., f/k/a SUPPLIER
MANAGEMENT SOLUTIONS, INC.,

       Plaintiffs,      22-cv-1917 (PKC)

   -against-

             FINDINGS OF FACT AND
             <u>CONCLUSIONS OF LAW</u>

TRIGO U.S. INC.,

       Defendant.
----------------------------------------------------------------x
TRIGO U.S. INC.,

       Counterclaimant,

   -against-

STEVEN M. CLARKE and SSD CLARKE
HOLDINGS, INC.,

       Counterclaim Defendants.
----------------------------------------------------------------x

CASTEL, U.S.D.J.,

    Plaintiff and counterclaim defendant Steven M. Clarke was the founder and CEO

of Supplier Management Solutions, LLC ("SMS"), which he agreed to sell to defendant and

counterclaimant TRIGO U.S. Inc. ("TRIGO") in August 2018.  At that time, SMS exclusively

provided supplier management services to customers in the U.S. aerospace industry, while

TRIGO was part of a group of affiliates that provided quality management services to customers

across various industries and throughout the world.  Supplier management services and quality

management services are distinct from one another.  TRIGO's plan was to integrate its quality

management business in the U.S. aerospace industry, which was of limited size and capabilities, into SMS.

In addition to the $58.5 million in cash that TRIGO paid for SMS, under the Purchase and Sale Agreement (the "PSA") Clarke, personally, had the opportunity to receive earnout payments of up to $20 million if SMS reached certain EBITDA thresholds. The PSA also imposed several restrictions on TRIGO's operation of SMS for the period during which Clarke could achieve his earnout. TRIGO subsequently agreed to amend the PSA's earnout provision five times, extending Clarke's earnout period for a total of two-and-a-half years. The fifth and final amendment to the PSA extended Clarke's earnout period through June 2022. Ultimately, Clarke only received earnout payments of $4 million and $1,275,220 under the third amendment.

Clarke and SSD Clarke Holdings, Inc. ("SSD") claim that TRIGO prevented Clarke from achieving his full $20 million earnout in two ways. First, they allege that TRIGO, after misleading SMS and its customers about the true nature of its U.S. quality management business during the pre-signing and pre-closing periods, forced SMS to build a quality management business internally after the transaction closed in January 2019. Clarke and SSD claim that SMS's building of its quality management business distracted SMS from conducting its core supplier management business. Second, they allege that an instruction from TRIGO to Clarke in June 2021 to pause his business development efforts for 90 days prevented SMS from securing a multimillion-dollar contract with the aerospace and defense technology company L3Harris Technologies, Inc. ("L3Harris") and from obtaining other business. Clarke and SSD bring two claims for breach of the PSA against TRIGO.

TRIGO, for its part, brings a breach of contract counterclaim against Clarke and SSD based on Clarke's failure to repay a $2 million advance payment on his earnout that TRIGO made to SSD under the fifth amendment to the PSA. Clarke entered into a personal guaranty with respect to SSD's repayment obligation. Because SMS did not reach any of the EBITDA thresholds necessary to extinguish SSD's repayment obligation under the fifth amendment, TRIGO seeks the return of the full $2 million advance.

The Court presided over a three-day bench trial from December 10, 2024 to December 12. The Court finds by a preponderance of the evidence that Clarke and SSD have failed to prove their breach of contract claims against TRIGO. TRIGO did not force SMS to build its quality management business. The Court also finds it purely speculative that, absent the temporary pause on Clarke's business development efforts, SMS would have obtained the multimillion-dollar contract with L3Harris or any other contracts that it did not ultimately secure. These findings lead to the conclusion that Clarke and SSD did not prove by a preponderance of the evidence that TRIGO is liable on their breach of contract claims. The Court also concludes based on Clarke's personal guaranty that TRIGO is entitled to judgment on its counterclaim for $2 million. Accordingly, the Court finds in favor of TRIGO on all claims.

FINDINGS OF FACT

The Parties.

1.      Clarke founded SMS in 2007. (Fact Stip. ¶ 1.)[1] Until February 2019, SMS exclusively provided supplier management services to customers in the aerospace industry, ensuring that parts from the customers' suppliers arrived on time and in sufficient quantities. (Id.

---

[1] Citations to "Fact Stip." are to the Stipulations of Fact found in the parties' Joint Pretrial Order ("JPTO"). (ECF 106.) The citation to evidence in the course of these findings is for illustrative purposes. It does not intend to imply that it is the only evidence that supports a finding. If a finding of fact is incorrectly labelled as a conclusion of law or vice versa, it should be considered under the proper label.

¶¶ 2, 5.)  SMS's customers included Pratt & Whitney, Triumph Group, Inc., Lockheed Martin Aeronautics Company ("Lockheed Martin"), United Technologies Aerospace Systems ("UTAS"), and Northrop Grumman Systems Corporation ("Northrop Grumman").  (Id. ¶ 5.) Clarke formed SSD, which was formerly named Supplier Management Solutions, Inc., to hold his interests in SMS.  (Id. ¶ 6; ECF 1 ¶ 19.)

2.    TRIGO is a subsidiary of France-based TRIGO Holdings, S.A.S., which holds numerous affiliates collectively known as TRIGO Group whose primary business is providing quality management services for customers in the automotive, e-mobility, aerospace, and heavy transportation industries.  (Fact Stip. ¶¶ 7-11; Rambaud Decl. ¶ 6.)  Quality management services are distinct from supplier management services.  (Fact Stip. ¶ 12.)  They involve monitoring the manufacturing procedures and processes of customers' suppliers to ensure they meet customer and regulatory requirements.  (Id. ¶ 11.)  TRIGO Group has over 10,000 employees in 28 countries around the globe and annual revenue of approximately $523 million.  (Rambaud Decl. ¶ 12.)

3.    Ardian, an independent private investment company, is TRIGO Holdings's majority shareholder.  (Fact Stip. ¶¶ 15-16.)

SMS's Introduction to TRIGO.

4.    In late 2016 and early 2017, TRIGO began to expand its quality management business to the U.S. aerospace and defense sector through a contract with Airbus. (Rambaud Decl. ¶ 22.)  TRIGO rented an office in Irvine, California and hired two aerospace quality management professionals, Phil Nevenhoven and Ken Walston, to manage its contracts in the U.S.  (Id.)  In 2017, TRIGO secured a quality management contract with Lockheed Martin. (Id. ¶ 23.)  To service Lockheed Martin, TRIGO hired as hourly employees quality management engineers and inspectors that had been working on site at Lockheed Martin for Verify, a TRIGO

competitor.  (Id.; Tr. at 226.)  By the end of 2018, TRIGO's U.S. aerospace and defense business consisted of quality management contracts with Lockheed Martin, Moog, Senior Aerospace SSP, and Gulfstream.  (Rambaud Decl. ¶ 24.)  TRIGO's revenue that year from its U.S. aerospace and defense business was about $2 million.  (Marquis Decl. ¶ 18.)

5.      As of late 2018, Nevenhoven and Walston were TRIGO's only managers in its U.S. aerospace and defense business.  (Tr. at 186.)  Nevenhoven was charged with managing TRIGO's contract with Lockheed Martin, which involved supervising approximately 20 hourly employees.  (Id. at 186-87; Marquis Decl. ¶ 17.)  Walston was responsible for other quality management contracts in the U.S., which required that he oversee about five hourly employees.  (Tr. at 186-87; Marquis Decl. ¶ 17.)  At the time, TRIGO's U.S. aerospace and defense business was entirely comprised of Nevenhoven, Walston, and the hourly employees they oversaw.  (Tr. at 187.)

6.      At trial, Matthieu Rambaud, CEO of TRIGO Group and President of TRIGO, testified that, toward the end of 2018, TRIGO was limited in its capacity to provide quality management services to the U.S. aerospace and defense sector.  (Id.; Fact Stip. ¶¶ 19-20.)

7.      By 2018, TRIGO had established a "toehold" in the U.S. aerospace and defense sector and was exploring the possibility of an acquisition in the U.S.  (Rambaud Decl. ¶ 25.)  After identifying SMS as a possible target, Rambaud and Emmanuel Marquis, TRIGO Group's Executive Vice President of Aerospace Defense & Rail, met with the SMS executive team in Temecula, California on March 23, 2018.  (Id. ¶¶ 25-26; Fact Stip. ¶¶ 25, 28.)  SMS was represented by Clarke, CEO and President, and Jay Nicholas, Vice President of Operations. (Clarke Decl. ¶¶ 70-71; Nicholas Decl. ¶ 40.)

- 5 -

8. During the March 23 meeting, Rambaud and Marquis gave a presentation to SMS about TRIGO's business. (Fact. Stip. ¶ 30; PX 6.) The presentation included a section on TRIGO's aerospace division. (PX 6.) That section illustrated that TRIGO had a "global footprint in aerospace" by shading in various countries on a map, including the U.S. (Id.) It also stated that TRIGO's aerospace division had over 1,300 employees and more than 50 customers, including the U.S. aerospace companies Boeing, General Dynamics, Triumph Aerospace, Honeywell, and UTAS. (Id.; Fact Stip. ¶ 31.) It further asserted that the aerospace division utilized a "fixed and all inclusive" pricing model. (PX 6.)

9. Clarke testified that he took away from the presentation that TRIGO had a footprint in the U.S. and several U.S. aerospace companies as its customers and that the size of the U.S. aerospace and defense quality management business was larger than just Nevenhoven, Walston, and the employees they supervised. (Tr. at 110.) The Court does not credit this testimony. The presentation did not provide any information about TRIGO's aerospace division that was specific to the U.S. business. As Clarke testified, Rambaud and Marquis "never broke . . . down" at the meeting how many of TRIGO's 1,300 aerospace employees were U.S.-based or whether TRIGO serviced the U.S. operations of the U.S. aerospace companies that it had listed as customers. (Id. at 17-18, 112-13.) In any event, TRIGO did have a footprint in the U.S. aerospace and defense sector, despite its small size. (Rambaud Decl. ¶¶ 22-24.) And TRIGO also provided quality management services to U.S. aerospace companies at their facilities outside of the U.S. (Id. ¶ 24.)

10. Clarke also testified that "according to [Rambaud] and [Marquis], TRIGO used the same firm-fixed pricing model, and salaried employees" as SMS. (Clarke Decl. ¶ 76.) SMS utilized a "firm-fixed" pricing model that fixed the total cost of a contract on an annual

basis or, if the contract was shorter, according to the total length of the contract and relied on full-time, salaried employees who were billed to a customer on a weekly basis. (Id. ¶ 75.) Clarke further testified that at the meeting Rambaud and Marquis told SMS "[m]ultiple times" that TRIGO's U.S. employees were salaried. (Tr. at 25.) According to Clarke, TRIGO's use of the same fixed pricing model and salaried employees was important to him because that approach had made SMS successful and would allow the companies to easily integrate their businesses. (Clarke Decl. ¶¶ 74, 76.)

11.    The Court finds it credible that the presentation led Clarke to assume that TRIGO utilized the same pricing model for its U.S. aerospace and defense business as SMS did. The presentation did not make a distinction between TRIGO's use of hourly employees and its practice of billing by hours worked in the U.S. aerospace business and the use of full-time employees and fixed-price contracts in the aerospace business outside of the U.S. (Rambaud Decl. ¶ 23; Marquis Decl. ¶ 14.; Tr. at 189-90.) As Rambaud testified, the presentation's reference to a "fixed and all inclusive" pricing model "was the truth for 98 percent of our aerospace business," but did not accurately describe the U.S. business. (PX 6; Tr. at 189-90.)

12.    Nonetheless, the Court does not find credible Clarke's testimony that Rambaud and Marquis falsely stated to SMS at the meeting that TRIGO's U.S. employees were salaried. Clarke's testimony was impeached at trial by his prior deposition testimony. (Tr. at 28-29.) At deposition, Clarke testified regarding the substance of the March 23 meeting that Rambaud and Marquis "were trying to promote to us they were a good company for us to partner with, and why, and a little bit about them so we understood what was going on. And we did the same on our end. We also presented to them our company." (Clarke Dep. Tr. at 55.) Clarke described the meeting as "[k]ind of a meet and greet" and testified that he did not "remember

much more detail." (Id.) Clarke's inability to describe with any specificity at deposition what Rambaud and Marquis conveyed to SMS at the March 23 meeting undermines his trial testimony that they stated "[m]ultiple times" that TRIGO's U.S. employees were salaried. (Tr. at 25.)

13.    Coming out of the March 23 meeting in Temecula, both TRIGO and SMS recognized a strong business rationale for a transaction between the two companies. Given SMS's "much more established presence in the United States than TRIGO," Rambaud testified that "we thought SMS's relationships and infrastructure would provide TRIGO an opportunity to reach many of the U.S.-based [aerospace and defense] manufacturers and suppliers that were not yet customers of TRIGO." (Rambaud Decl. ¶ 26.) Rambaud further explained that "[o]ne of the key reasons for doing the deal for TRIGO was to have SMS provide the corporate infrastructure for TRIGO's existing quality management services business in the U.S. . . . ." (Id. ¶ 27.) Clarke testified that customers had previously asked him whether SMS would consider offering quality management services, but that he "was never interested in developing those services at SMS because [he] had no knowledge or experience in quality management." (Clarke Decl. ¶ 76.) In turn, he was "excited by the idea that by TRIGO's acquisition of SMS, SMS could provide the type of 'one-stop-shop' SMS customers had been asking for." (Id.) Clarke "felt like it was a match made in heaven for the aerospace industry." (Id. ¶ 77.)

14.    TRIGO and Clarke proceeded to negotiate the terms of an acquisition of SMS. The purchase price was a sticking point, with Clarke seeking $80 million for SMS and TRIGO initially offering $59 million. (Id. ¶ 80.) As a compromise, TRIGO offered Clarke an earnout through which he could earn an additional $20 million if SMS hit certain EBITDA targets. (Id. ¶ 82; Rambaud Decl. ¶ 37.) To Clarke, the earnout was a "critical part of the deal"

because while he planned to "use a lot of the $59 million to pay off SMS's partner and its debts, the additional $20 million would be [his] retirement fund." (Clarke Decl. ¶ 83.)

15. TRIGO also agreed to contribute to SMS's EBITDA "all of the profitable quality management contracts" that TRIGO had secured in the U.S. aerospace and defense sector. (Rambaud Decl. ¶ 39; DX 12.) According to Clarke's testimony, he knew that TRIGO was going to contribute these quality management contracts. (Tr. at 23.) Nicholas testified that Clarke told him that "the revenues from that business would be applied to his earn-out potential." (Id. at 408-09.) Nicholas understood from this that Clarke would "oversee the quality management business that was being transferred into SMS." (Id. at 408.)

16. Indeed, on April 25, 2018, TRIGO's investment bankers at Alantra and Clarke's investment banker at D.A. Davidson had a call regarding a proposed letter of intent during which they discussed Clarke's management of TRIGO's U.S. aerospace and defense business. (Rambaud Decl. ¶ 25; Clarke Decl. ¶ 69; DX 10; DX 11.) One of TRIGO's investment bankers wrote to Rambaud following the call:

> Steve is ok running / having P&L responsibility for Trigo's North American operations as it relates to Aerospace and Defense work. He was under the impression that your existing A&D business was much larger ($70m+) and that is why he wanted to keep SMS separate from that in order to simplify the earnout calculation etc. Given the existing Trigo business is much smaller, there shouldn't be any issue with Steve running the A&D side of things.

(DX 10). Consistent with this, Clarke's investment banker wrote to Clarke and another individual:

> Lots of "Spanglish" confusion with the notion Steve will run all of TRIGO's North American business. First, we heard wrong. Yes $70m in total revenues, but mostly its auto and therefore NOT under steve. Ashley [of Alantra] guessed that No. American A&D revs might be $5m, with $200-300k to the bottom line and its presently just 4 customers. The No. American A&D business would 100% be under Steve. This new clarity should be discussed.

(DX 11.)

17.    TRIGO subsequently prepared a draft letter of intent addressed to Clarke's investment banker and dated May 11, 2018 setting forth TRIGO's intention to "use SMS as the unique aerospace platform of TRIGO for USA and Canada, relying on SMS' existing organisation/management team." (DX 12.) The letter specified that "TRIGO would contribute its current aerospace activities in the USA to the SMS platform" and that those activities would be "included in the SMS EBITDA for purposes of calculating the Earnout." (Id.) The parties signed the letter of intent. (Clarke Decl. ¶ 87; Rambaud Decl. ¶ 30.)

18.    Clarke testified that "[d]uring the due diligence period between May 2018 and August 2018" he "repeatedly asked TRIGO to tell [him] more about its quality management business and team in the United States." (Clarke Decl. ¶ 88.) According to Clarke, "TRIGO refused, insisting that such information was proprietary." (Id.) Rather than insist on answers to his questions, however, Clarke "accepted" that he would be provided with that information after the transaction closed and "chose to trust" TRIGO that the answers would be consistent with what had been presented to him. (Id.; Clarke Rebuttal Decl. ¶ 9.) In fact, as Clarke testified, the information that TRIGO presented to him about its own business was the full extent of what he relied on during the due diligence period. (Clarke Rebuttal Decl. ¶¶ 7, 9.) Rambaud confirmed in his testimony that TRIGO did not receive any formal inquiries from SMS about "the number of its employees," "the number of its contracts," or "the nature of its contracts with its customers" during this time. (Rambaud Decl. ¶ 32.)

19.    That Clarke did not perform due diligence on TRIGO's quality management business in the U.S. is consistent with his trial testimony that the business "didn't really matter" to him. (Tr. at 107.) Although he would be receiving certain quality management contracts to go toward his earnout, Clarke explained that he did not care about TRIGO's quality

management business because he would be responsible for selling supplier management services to customers following the acquisition.  (Id. at 113.)

The Parties Enter Into the PSA.

20.    TRIGO, Clarke, and SSD, among others, signed the PSA on August 10, 2018.  (Fact Stip. ¶ 32.)  Pursuant to the PSA, TRIGO acquired SMS for $58.5 million in cash at closing, subject to potential adjustments, and two earnout payments.  (Id. ¶ 33.)  Under the first earnout payment, if SMS achieved 2018 Normative EBITDA of $5.8 million SSD was to receive $7.5 million.  (Id. ¶ 34; Clarke Decl. ¶ 90.)  Under the second earnout payment, if SMS achieved 2019 Normative EBITDA of $8.8 million, Clarke was to personally receive $20 million, less the amount paid to SSD on the first earnout payment.  (Fact Stip. ¶ 35; Clarke Decl. ¶ 90.)

21.    TRIGO viewed these potential earnout payments as mutually beneficial to itself and Clarke.  As Rambaud testified, an earnout was "a way to keep the seller motivated so that the business that we had just acquired would continue on a successful trajectory.  In other words, if Clarke achieved his earn-out, it meant the acquisition was a success."  (Rambaud Decl. ¶ 40.)  In addition, because Ardian had set TRIGO's equity value at "10x EBITDA minus net financial debt" at the time of its investment, each additional dollar of EBITDA that Clarke was able to generate at SMS for TRIGO Group in pursuit of his earnout would result in $10 of additional equity value less the increase of the net financial debt.  (Id. ¶ 41.; Tr. at 262-63.)  This stood to benefit Ardian, as TRIGO Holdings's majority shareholder, and Rambaud, as a minority shareholder.  (Rambaud Decl. ¶ 41.)

22.    As originally memorialized in the letter of intent, the PSA provided that TRIGO's aerospace activities in the U.S. would be included in SMS's 2018 and 2019 Normative EBITDA, except for any contracts with U.S. customers that were not profitable.  (Fact. Stip. ¶

36; PX 10.)  While the PSA included a list of SMS's material contracts, it did not include a

corresponding list of TRIGO's material contracts in the U.S.  (PX 10; Tr. at 15-16.)  At trial,

Clarke did not recall asking for such a list of TRIGO's contracts before entering into the PSA.

(Tr. at 16.)

        23.     The PSA also did not include any provision requiring TRIGO to provide

quality management services to SMS customers directly or through SMS following the

acquisition.  (Id. at 12-13; PX 10.)  Rambaud testified credibly that "Clarke and SMS did not

require TRIGO to promise any level of support with respect to its quality management business."

(Rambaud Decl. ¶ 34.)

        24.     Section 3.4(e) of the PSA imposed several restrictions on TRIGO's

operation of SMS until the expiration of the earnout period or, if earlier, full payment of the

maximum earnout.  (Fact Stip. ¶ 37; PX 10.)  TRIGO was required to, among other things, "(iii)

operate the Company in good faith and refrain from taking any action with the primary purpose

of reducing or eliminating the Earn-Out Payment" and "(vii) operate the business of the

Company consistent with past practice and not adopt strategic, commercial or financial changes

to the way the Company is managed which could have a negative impact on the EBITDA of the

Company."  (Fact. Stip. ¶ 37; PX 10.)

        25.     Clarke had insisted on these restrictions because he considered them to be

important to protecting his earnout.  (Clarke Decl. ¶¶ 84-86.)  Clarke testified that the restrictions

ensured he could "focus on growing the business and increasing SMS's revenue so that [he]

could get the earn-out without being interrupted or interfered with at all, and [he] could do it the

same way [he] had always done it."  (Id. ¶ 85.)

26.    Clarke testified that TRIGO had up to that point refused to provide him with more information about its quality management business in the U.S. despite his repeated inquiries.  (Id. ¶ 88.)  Yet, Clarke did not secure any representation or warranty in the PSA concerning the size or nature of TRIGO's U.S. aerospace and defense quality management business.  (PX 10; Rambaud Decl. ¶ 34.)  As Clarke testified at trial, TRIGO's refusals did not stop him from signing the PSA.  (Tr. at 21.)

27.    The Court finds that when Clarke and SSD signed the PSA in August 2018, Clarke knew that he would be managing TRIGO's profitable quality management contracts in the U.S. aerospace and defense sector and that those contracts would factor into his earnout.  Clarke therefore agreed to run a business that he had no prior knowledge of or experience in and into which he claims to have had little visibility.  Nonetheless, Clarke did not perform due diligence on TRIGO's quality management business prior to entering into the PSA or secure any representations or warranties in the PSA itself regarding that business.  This is consistent with Clarke's testimony that TRIGO's quality management business in the U.S. did not matter to him.  The Court also finds that Clarke was informed by his investment banker prior to entering into the PSA that TRIGO's U.S. aerospace and defense business was limited in its size, including that TRIGO only had four customers.

SMS and TRIGO Meet with SMS's Key Customers During the Pre-Closing Period.

28.    The acquisition's closing was contingent on obtaining approval from the Committee on Foreign Investment in the United States ("CFIUS").  (Fact Stip. ¶ 40.)  CFIUS did not approve the transaction until the end of December 2018.  (Id.)  Closing followed on January 7, 2019.  (Id. ¶ 51.)

29.    Under the PSA, SMS was required to organize meetings between the dates of signing and closing to present TRIGO to its key customers, including Lockheed Martin, Pratt

& Whitney, Northrop Grumman, and UTAS.  (Id. ¶ 41; PX 10.)  Rambaud testified that part of

the purpose of these meetings was to pitch the quality management services that SMS and

TRIGO would offer to the customers after closing.  (Tr. at 207.)  More specifically, these would

be services offered by "the SMS entity with the support of TRIGO professionals and experience

as was described in the letter of intent from May in which we clearly stated our intention is to

rely on SMS organization and management to develop the business, and part of the business was

quality."  (Id. at 208.)  Rambaud added that these meetings were not organized in response "to

any specific opportunity or request."  (Rambaud Decl. ¶ 49.)

   30. Clarke testified that the statements that TRIGO made to SMS's customers

at these meetings "only further assured [him] that TRIGO could and would deliver the quality

management services they pitched, since they were pitching to the highest-level executives at the

largest aerospace companies in the world that TRIGO could do all of this."  (Clarke Decl. ¶ 110.)

Clarke also testified, "[i]f I had known that [TRIGO] did not have the resources to provide

quality management services to these major aerospace companies, I never would have risked my

hard-earned reputation in the industry by pitching to the highest level executives something they

did not have."  (Id. ¶ 111.)

   31. On September 24, 2018, the SMS team, including Clarke, Nicholas, and

Business Development and Contracts Manager Sarah Beecher, and the TRIGO team, including

Rambaud and Marquis, met with representatives from Northrop Grumman.  (Id. ¶ 49; Rambaud

Decl. ¶ 50.)  Clarke testified that during this meeting Rambaud and Marquis told Northrop

Grumman that TRIGO "could deploy its robust quality management infrastructure and suite of

services for Northrop in a matter of weeks."  (Clarke Decl. ¶ 99.)  Nicholas testified the same.

(Nicholas Decl. ¶ 50.)  On the other hand, both Rambaud and Marquis denied under oath that

they said this at the September 24 meeting with Northrop Grumman.  (Rambaud Decl. ¶ 50; Marquis Decl. ¶ 27.)  Rambaud further testified that they did not tell Northrop Grumman that TRIGO "had a large infrastructure locally in the United States."  (Rambaud Decl. ¶ 50.)

32.    The Court credits Rambaud's and Marquis's testimony on this point and finds it to be more credible than that of Clarke and Nicholas.  The presentation that was shown to Northrop Grumman included four slides specific to TRIGO's business.  (PX 14; Tr. at 37.) Those slides did not contain any representation as to the timeline within which TRIGO could deploy its quality management services in the U.S.  (PX 14.)  Beecher took notes of the Q&A portion of the meeting following the presentation.  (PX 109; Tr. at 120.)  As Clarke acknowledged at trial, Beecher's notes did not reflect that either Rambaud or Marquis told Northrop Grumman that TRIGO could deploy its services in a matter of weeks.  (PX 109; Tr. at 43.)

33.    The September 24 Northrup Grumman presentation did not contain any representation as to the size of TRIGO's aerospace and defense business in the U.S.  (PX 14.) The presentation included a slide that was nearly identical to one shown to SMS during the introductory meeting in March 2018 providing that TRIGO's aerospace division had over 1,300 employees and more than 50 customers, including several U.S. aerospace companies.  (PX 14; PX 6.)  As was the case during that earlier presentation to SMS, Clarke testified that TRIGO "never broke . . . down" in its presentations to SMS's customers whether it serviced the U.S. operations of the listed U.S. aerospace companies.  (Tr. at 112-13.)

34.    Clarke further testified that none of the information about TRIGO's business in the presentation to Northrop Grumman was false.  (Id. at 38.)

35.    SMS and TRIGO next met with UTAS on November 6, 2018.  (Fact Stip. ¶ 44.)  Clarke, Nicholas, Beecher, and Danielle Taliaferro, Clarke's assistant, attended on behalf of SMS, while Marquis attended on behalf of TRIGO.  (DX 18; Tr. at 19.)  Clarke testified that Marquis told UTAS that "TRIGO's global footprint would enable UTAS to leverage local resources" and that "TRIGO could deploy its robust quality management services and suite of services in a matter of weeks."  (Clarke Decl. ¶ 102.)  Nicholas also testified that Rambaud represented that UTAS would be able to leverage local resources through TRIGO's global footprint.  (Nicholas Decl. ¶ 52.)  The Court declines to credit this testimony.

36.    The presentation that was shown to UTAS, which SMS and TRIGO prepared jointly, did not make any representations specific to TRIGO's aerospace and defense business in the U.S.  (Fact Stip. ¶ 45.)  Clarke testified that SMS and TRIGO "reused the Northrop [presentation] for this meeting," but that "TRIGO's slides and information were combined more and more with SMS to show that the companies were integrating."  (Clarke Decl. ¶ 101.)  Nicholas similarly testified that the presentation "further integrate[d] SMS and TRIGO because it was important to come across as one company so as to look like we were blending services and maximizing synergies."  (Nicholas Decl. ¶ 52.)  Indeed, the presentation consistently referred to the combined entity of "SMS/Trigo," including that "SMS/Trigo's global footprint allows for quick response with local resources."  (PX 16.)  As to the U.S. in particular, one slide titled "Domestic Geographical Presence" represented that "SMS provides '*boots on the ground*' supplier management and quality services nation wide."  (Id.)  The slide featured a map of the U.S. with red markers in numerous locations and explained that "[e]ach red marker represents a HUB location within a zone where multiple SMS/Trigo Delivery Assurance Specialists and Quality/Source Inspectors are located."  (Id.)   However, the map and markers

were copied from a slide in the Northrop Grumman presentation that previously only stated that "[e]ach red marker represents a HUB location within a zone where multiple SMS Delivery Assurance Specialists are located." (PX 14; PX 16.) The Court finds that the representations in the UTAS presentation about the provision of quality management services did not make a distinction between SMS's and TRIGO's existing resources in the U.S.

37. Such an approach to pitching to UTAS is consistent with SMS's and TRIGO's shared understanding that TRIGO would be leveraging the SMS organization and management team after closing in order to provide quality management services. In fact, based on Taliaferro's notes of the meeting, Marquis told UTAS that "[q]uality in the U.S. will be under SMS," while "[i]nternationally will be under TRIGO." (DX 18.) Taliaferro's notes and Marquis's testimony also reflect that to the extent Marquis spoke about TRIGO's standalone footprint, he focused on TRIGO's coverage outside of the U.S. and named as its customers three French aerospace companies. (Id.; Marquis Decl. ¶ 28.) As Clarke confirmed at trial, Taliaferro's notes did not capture any statement by Marquis that TRIGO could deploy its quality management services in the U.S. in a matter of weeks. (DX 18; Tr. at 45-46.)

38. Clarke also testified that during the UTAS meeting "SMS and TRIGO pitched their joint firm-fixed price solution; never once during this presentation to UTAS did [Marquis] explain that TRIGO's U.S. quality management resources were not actually amenable to a firm-fixed pricing model." (Clarke Decl. ¶ 102.) The Court finds Clarke's testimony on this point to be credible. The presentation stated that "SMS/Trigo employ full-time, salaried results focused professionals" and described "SMS/Trigo's Firm Fixed Price Solution with Performance Guarantees." (PX 16.) The presentation did not specify that TRIGO used hourly employees and billed by hours worked in its U.S. aerospace business. Given Marquis's testimony that he "said

- 17 -

almost nothing about TRIGO's U.S. business" at the meeting, it does not appear that Marquis

explained the nature of TRIGO's pricing model in the U.S. to UTAS.  (Marquis Decl. ¶ 28.)

39.     When asked at trial if he came away from the UTAS meeting with an

impression of how TRIGO staffed its contracts, Clarke testified, "I knew it was always salaried."

(Tr. at 126.)  However, at this time Clarke was still seeking clarity about the nature of TRIGO's

staffing in the U.S.  Five days prior to the UTAS meeting, ahead of an upcoming budget meeting

between SMS and TRIGO, Taliaferro, Clarke's assistant, sent a list of questions for TRIGO to

Clarke, Nicholas, and others at SMS for their approval.  (PX 110.)  One line of questioning

asked, referencing a slide in a presentation that TRIGO had previously sent to SMS, "Slide 3 –

20 inspectors – How are these broken up between customers?  Who is assigned to which

customers? . . . How many full time heads?  Part-time heads?  Hourly and/or exempt?"  (Id.)

Clarke testified that SMS was asking these questions "to confirm [TRIGO's] business model, to

make sure we understood it, because we were going to be taking [TRIGO's U.S.] contracts over

and wanted to make sure we were, what's the word, validating that they just did salaried

employees."  (Tr. at 123.)  Marquis declined to respond to these questions emanating from

Clarke at this juncture, writing, "We will go in detail once we get the CFIUS clearance."  (PX

110.)

40.     SMS and TRIGO then met with Pratt & Whitney on November 8, 2018.

(Fact Stip. ¶ 46.)  Clarke and Nicholas attended on behalf of SMS, while Rambaud and Marquis

attended on behalf of TRIGO.  (Rambaud Decl. ¶ 52.)  Rambaud and Marquis both testified that

they "provided a high-level overview of TRIGO's business and our goals for the acquisition, but

made no specific representations about our existing capabilities in the United States."  (Id.;

Marquis Decl. ¶ 29.)  The Court credits this testimony.  Their description is consistent with the

information about TRIGO's business that was previously presented to Northrop Grumman and UTAS, which did not include U.S.-specific representations.

41.     On December 12, 2018, Clarke, Nicholas, Beecher, Rambaud, and Marquis met with Boeing.  (Fact Stip. ¶ 48; Rambaud Decl. ¶ 53.)  Clarke testified that during the meeting Rambaud and Marquis "told Boeing that it could leverage TRIGO's infrastructure in deploying advanced product quality planning methodology ('APQP') according to AS9145, which was a very specific aerospace standard."  (Clarke Decl. ¶ 109.)  APQP "is a set of processes for creating product quality plans" and "AS9145 is a set of standards . . . that applies APQP to aerospace manufacturing."  (Fact Stip. ¶ 50.)  Clarke testified that "[s]ince SMS had no quality management background or capability, [Rambaud] and [Marquis] could only have been referring to TRIGO's resources and capabilities when explaining all of this to Boeing at this meeting."  (Clarke Decl. ¶ 109.)  The presentation that SMS and TRIGO jointly prepared for Boeing included a slide detailing an "APQP / AS9145 Service Package in Aerospace."  (Fact Stip. ¶¶ 49-50; PX 18.)

42.     Rambaud and Marquis both testified that Marquis responded to questions from Boeing regarding APQP.  (Rambaud Decl. ¶ 53; Marquis Decl. ¶ 30.)  Nonetheless, Rambaud testified that Marquis "made no representations with respect to TRIGO's U.S. presence – in APQP or any other quality management service – to Boeing at that meeting."  (Rambaud Decl. ¶ 53.)  The Court finds Rambaud's testimony to be credible.  The "APQP / AS9145 Service Package in Aerospace" slide in the presentation does not contain any representations that are specific to TRIGO's infrastructure and capabilities in the U.S.  (PX 18.)  To go along with this, Beecher's notes of the Q&A portion of the meeting reflect that Boeing's only question as to the scope of TRIGO's APQP service was whether it was providing it to Airbus, which TRIGO

said it was not.  (DX 21; Tr. at 336.)  Based on Beecher's notes, the only U.S.-specific question

from Boeing about TRIGO's other quality management services was whether it did "cabin

inspection in Mobile, AL," to which TRIGO responded, "Not yet."  (DX 21.)

43.    In the midst of these customer meetings, and while the parties were still

awaiting CFIUS approval, Clarke had begun to reach out to Rambaud about amending the PSA

with respect to his earnout.  (Rambaud Decl. ¶¶ 42, 44.)  Rambaud testified that by the fall of

2018 "it became clear that SMS was not going to hit its Normative EBITDA targets for 2018 and

Clarke was not going to receive his first earn-out payment."  (Id. ¶ 42.)

44.    The first amendment to the PSA was executed on December 20, 2018.

(Fact Stip. ¶ 67.)  It extended the earnout period by one year to December 31, 2020, adding four

more potential earnout payments in each quarter of 2020 based on the previous 12 months'

Normative EBITDA.  (Id.; Rambaud Decl. ¶ 47; DX 20.)  As in the PSA, TRIGO would

continue to contribute its profitable U.S. aerospace activities to SMS's Normative EBITDA.

(Rambaud Decl. ¶ 47; DX 20.)  No contractual provision obligated TRIGO to agree to this

amendment.  (Rambaud Decl. ¶ 45.) Yet, as Rambaud testified, TRIGO did so because "[t]he

earn-out kept Clarke's interests aligned with those of TRIGO" and "any increase in EBITDA

was only to TRIGO's benefit.  Any pay out in real cash to Clarke was more than compensated by

the corresponding increase in TRIGO's equity value."  (Id. ¶ 46.)  This was to be the first of five

amendments to Clarke's earnout.  (DX 20; DX 34; DX 41; DX 47; DX 60.)  TRIGO's actions

were inconsistent were those of an entity determined to thwart Clarke in his efforts to achieve an

earnout.

Clarke Rejects TRIGO's Existing Quality Management
<u>Infrastructure and Determines that SMS Will Build Its Own.</u>

- 20 -

45.     CFIUS approved the transaction at the end of December 2018.  (Fact Stip. ¶ 40.)  The transaction closed on January 7, 2019.  (Id. ¶ 51.)

46.     The next day, as contemplated by the PSA, Clarke signed a separate employment agreement pursuant to which he would remain as SMS's CEO and President through December 31, 2019.  (Id. ¶ 52; PX 21.)  Clarke's responsibilities included maintaining relationships with SMS's customers and engaging in business development.  (Fact Stip. ¶ 53.)

47.     At trial, Clarke and Rambaud both testified that during the meetings with SMS's key customers in late 2018 those customers expressed interest in the quality management services that were pitched to them.  (Tr. at 128-29, 210.)  That interest continued to be present in the weeks after closing.  In a document dated February 6, 2019, SMS identified business development opportunities in quality management with Boeing, Collins Aerospace (formerly UTAS), Northrop Grumman Mission Systems, and Northrop Grumman Aerospace Systems.  (Id. at 46, 52; PX 31.)  Boeing, for instance, had requested a follow-up call regarding the APQP service, which took place on January 16.  (Clarke Decl. ¶¶ 109, 115; PX 31.)  As another example, Northrop Grumman Mission Systems expressed to Clarke during a meeting in early January that it was "looking to expand the relationship down the road into the Quality realm . . . ."  (Clarke Decl. ¶ 116; PX 22.)  Clarke testified that the opportunities listed in the February 6 document, apart from an opportunity with Triumph that was not recorded, were those that were available to SMS at that time.  (Tr. at 51-52; PX 31.)

48.     Rambaud testified that after closing TRIGO "did not insist on an immediate integration of TRIGO's existing U.S. aerospace and defense business operations into SMS."  (Rambaud Decl. ¶ 56.)  However, on January 30, 2019, Rambaud received a call from Clarke "complaining about the lack of integration and sharing of information about TRIGO's

existing quality U.S. A&D business."  (Id. ¶ 58.)  According to Rambaud, Clarke "essentially

asked for us to accelerate this process."  (Id.)  Rambaud further testified that "[d]uring that call,

[Clarke] made representations about various customer inquiries regarding our quality

management services[] capabilities . . . ."  (Id.)

       49.     That same day, Rambaud emailed Benoit Leblanc, TRIGO Group's

Deputy CEO, a "debrief" of his call with Clarke.  (Tr. at 211; PX 26.)  Rambaud reported to

Leblanc that Clarke had told him that "[s]ince the restart in January, client requests have been

pouring in . . . including requests to integrate Source Inspection into current Supplier

Management contracts (call from the Quality VP at Northrop Grumman asking for this, with a

request for a concept proposal for in 2 weeks' time) . . . ."  (Tr. at 212; PX 26.)  Rambaud

testified that source inspection is a quality management service.  (Tr. at 212-13.)  Rambaud also

wrote to Leblanc that Clarke conveyed to him that "[t]o date, no/very little information shared by

TRIGO on Source Inspection know-how, the integration plan, no meeting with the US teams, no

designated US point of contact . . . ."  (Id.; PX 26.)  Rambaud added that Clarke reported to him

that he "[h]as an urgent request from [Northrop Grumman] for source inspection with

presentation to give in 2 weeks but has never seen anything like a TRIGO

methodology/approach."  (Tr. at 212; PX 26.)

       50.     Rambaud then relayed to Leblanc some "[i]mmediate needs/proposals in

terms of next steps."  (PX 26.)  Rambaud recognized the need to prepare a presentation for

Northrop Grumman describing TRIGO's source inspection methodology and "[p]ut key US

employees in contact ASAP with SMS (have the 2 Irvine employees go to meet the team in

Temecula + ideally the manager of our [source inspection] business and Lockheed Martin) . . . ."

(Id.)  Rambaud also saw the need to develop a "U.S. integration plan (in particular, to respond to

SMS clients and employees to whom we have sold this this!)." (Id.)  He wrote, "Upon

reflection, I think that we don't have any choice, we need to integrate the US team in a rush . . .

." (Id.)

        51.      Before concluding his email, Rambaud stated to Leblanc, referencing

Clarke, "The guy is worried, quite rightly in my opinion, because the client requests are coming

in faster than we thought and we are being really stretched to deliver in a market that expects

immediate responses and it's up to us to adapt . . . The good news is that the business is there . . .

!!!!" (Id.)

        52.      Rambaud testified at trial that there was "true interest" from customers in

quality management services at the time of his email on January 30.  (Tr. at 220.)  But, according

to Rambaud, his understanding of the urgency and magnitude of the support that needed to be

provided to the customers that Clarke was speaking to, which Rambaud conveyed to Leblanc,

was based on the information that Clarke had provided to him during their call.  (Id. at 218.)

Rambaud testified that he "was relying on Clarke's word" about the customer inquiries that

Clarke reported to him when they spoke.  (Rambaud Decl. ¶ 58.)  This was because, as Rambaud

explained, "to that date, [TRIGO] had not been forwarded any such requests and [had] not

received anything such as a formal [Request for Proposal] requesting quality management

services in the United States."  (Id.)

        53.      The Court credits Rambaud's testimony that he relied on Clarke's word

regarding the customer inquiries Clarke shared during their January 30 call and that this

information formed the basis of Rambaud's view in his email to Leblanc that there was an

immediate and substantial need to provide quality management services to these customers.  In

early January, Clarke reported to Rambaud only a general expression of interest from Northrop

Grumman Mission Systems in quality management services.  (PX 22.)  In addition, as SMS memorialized in its February 6 document listing available business development opportunities in quality management, Northrop Grumman Aerospace Systems was the sole customer to have issued a Request for Information or Request for Proposal by that time.  (PX 31; Clarke Decl. ¶¶ 55-56.)  Northrop Grumman Aerospace Systems had sent SMS a Request for Information on December 13, 2018, to which SMS responded on January 25.  (PX 25; PX 31; Clarke Decl. ¶ 116.)  But that Request for Information was for quality and supplier management of the customer's manufacturers in Australia, not the U.S.  (PX 25; Clarke Decl. ¶ 116.)  Furthermore, none of the quality management opportunities in the February 6 document had resulted in the issuance of a purchase order confirming the award of the project to SMS.  (PX 31; Tr. at 48-50; Clarke Decl. ¶ 58.)

54.     Following his call with Clarke and email to Leblanc on January 30, Rambaud began to facilitate the integration of SMS and TRIGO.  (Tr. at 221; Rambaud Decl. ¶ 59.)  On February 1, Rambaud introduced Walston and Nevenhoven to Clarke over email.  (PX 29; Clarke Decl. ¶ 125.)  In that same email, Rambaud informed Clarke that he would be "taking over some coordination tasks" for North America on behalf of Marquis, who was then on medical leave.  (PX 29; Rambaud Decl. ¶ 58.)

55.     Clarke and Nicholas both subsequently spoke to Walston over the phone. (Clarke Decl. ¶ 127; Nicholas Decl. ¶ 67.)  Clarke and Nicholas also met with Walston and Nevenhoven at SMS's office in Temecula on February 18, 2019.  (Fact Stip. ¶ 56; DX 26.)  Clarke testified that he was "shocked" to learn at that meeting that Walston and Nevenhoven were TRIGO's only two quality managers in the U.S.  (Tr. at 31.)  According to Clarke's and Nicholas's testimony, this was when they first realized that TRIGO did not have a robust quality

management infrastructure in the U.S. (Id. at 53; Clarke Decl. ¶ 129; Nicholas Decl. ¶ 68.) The Court does not find the testimony of Clarke and Nicholas to be credible that prior to February 18, 2019, they had no general awareness of the small size of TRIGO's pre-existing full-time quality management staff in the U.S.

56.      As the Court previously noted, in early November 2018 Clarke's assistant had sent a list of questions for TRIGO to Clarke and Nicholas for approval ahead of a budget meeting between SMS and TRIGO. (PX 110.) These questions were emailed to TRIGO in response to a presentation that TRIGO had previously sent to SMS. (Id.) One of the questions asked, "Slide 3 – Project Managers – What do those job descriptions look like? Which customers are they assigned to?" (Id.) Marquis responded, in an email that both Clarke and Nicholas were copied on, "It is classical project management. We have 2 guys Phil [Nevenhoven] for Lockheed & Airbus Ken Walston for Moog, Safran, SSP." (Id.) Clarke testified that he understood at the time of Marquis's response that Lockheed, Airbus, Moog, Safran, and SSP were TRIGO's profitable quality management services contracts that it was going to contribute toward Clarke's earnout. (Tr. at 20, 23.) As provided in the PSA, these were contracts with U.S. customers. (Fact. Stip. ¶ 36; PX 10.) Clarke testified that Marquis's email told him how many managers TRIGO had on the contracts it was going to contribute. (Tr. at 20.) For his part, Nicholas testified that Marquis's response disclosed both the people that TRIGO had in the U.S. and the contracts they were managing. (Id. at 404.)

57.      Another question that SMS emailed to TRIGO in early November 2018 in advance of their budget meeting asked, "Slide 3 – 20 inspectors – How are these broken up between customers? Who is assigned to which customers? . . . How many full time heads? Part-time heads? Hourly and/or exempt?" (PX 110.) Marquis responded, "We will go in detail once

we get the CFIUS clearance." (Id.)  Although Marquis declined to provide more detail than was

on the presentation slide, citing CFIUS restrictions, Clarke testified that by the time of Marquis's

response he had been told that 20 U.S.-based inspectors would be transferred to SMS as part of

the quality management contracts that TRIGO was going to contribute to his earnout.  (Tr. at 20-

21.)

   58. At trial, Clarke testified that Marquis's email only told him how many

managers and inspectors TRIGO had on the contracts SMS was going to receive, not how many

managers and inspectors it had in the U.S.  (Id. at 20.)  Clarke testified that he believed there was

more to TRIGO's U.S. aerospace business than the contracts TRIGO was set to contribute

toward his earnout.  (Id. at 106-07.)  However, as the Court previously noted, Clarke's

investment banker communicated to Clarke in late April 2018 that TRIGO's North American

aerospace and defense business at the time consisted of "just 4 customers."  (DX 11.)  Clarke had

therefore been previously told of the small number of contracts that TRIGO had in the U.S.

   59. The Court finds that TRIGO informed Clarke and Nicholas of the limited

scope of its U.S. quality management infrastructure in November 2018, well before their

conversations with Walston and Nevenhoven in February 2019.  The Court does not credit

Clarke's and Nicholas's testimony that they did not realize until their conversations with

Walston and Nevenhoven in February 2019 that TRIGO did not have a robust infrastructure in

the U.S.

   60. Clarke and Nicholas also testified that it was from Walston and

Nevenhoven that they first learned that TRIGO was using hourly employees to staff its contract

with Lockheed Martin, instead of the salaried, full-time employees that SMS's business model

utilized.  (Clarke Decl. ¶ 128; Nicholas Decl. ¶ 73.)  The Court finds Clarke's and Nicholas's

testimony on this point to be credible.  As part of the integration, on January 30, 2019, TRIGO

provided a list to SMS of its employees in the U.S. for aerospace quality management services.

(PX 27; Tr. at 223-24.)  Rambaud then forwarded the email exchange to Leblanc, writing, "Did

you realize that 90% of our US employees (so, essentially those working on [Lockheed Martin])

were freelancers?"  (PX 27; Tr. at 224.)  Rambaud added, "We are doubtless going to have to

hire a certain number of them to avoid distorting the SMS model . . . Yet another not-so-simple

discussion with Steve whom we had told that we were on a model similar to his own . . . ."  (PX

27.)  As Rambaud testified at trial, this was when he first realized that these U.S. employees

were hourly.  (Tr. at 227.)  He also testified that Marquis "[p]robably" knew this fact.  (Id.)

Marquis, however, had previously declined to share this type of information about TRIGO's U.S.

employees due to CFIUS restrictions.  (PX 110.)  Rambaud acknowledged at trial that "[i]t

seems the case" that no one from TRIGO had told Clarke by that time that its employees on the

Lockheed Martin contract were hourly.  (Tr. at 227-28.)

        61.    After their initial conversations with Walston and Nevenhoven, Clarke and

Nicholas concluded that they were "low-level managers," who, as Nicholas testified, "were of no

value" to SMS in providing quality management services.  (Clarke Decl. ¶ 129; Nicholas Decl. ¶

72.)  According to Nicholas, Walston and Nevenhoven lacked the necessary skill sets and

therefore "could not help" SMS.  (Nicholas Decl. ¶ 72.)  TRIGO did not share their views.

Rambaud testified that Walston and Nevenhoven were "seasoned quality management

specialists" who "developed from scratch a $2M+ annual business in the US aerospace and

defense market."  (Rambaud Decl. ¶ 66.)  Rambaud also testified that Marquis, whom Walston

and Nevenhoven reported to prior to the closing, was "very satisfied" with their work.  (Tr. at

240.)  Indeed, in his testimony Marquis described the pair as "senior, highly-experience[d] aerospace and defense professional[s] in the quality space."  (Marquis Decl. ¶ 13.)

62.    After consulting with SMS's corporate attorneys, Clarke and Nicholas made the recommendation to TRIGO that Walston and Nevenhoven should not be transferred to SMS.  (Tr. at 468.)  Rambaud testified credibly that Clarke communicated to him that Walston and Nevenhoven did not have the appropriate level of expertise and experience and that there were labor regulation issues with integrating TRIGO's hourly employees on the Lockheed Martin contract into SMS.  (Id. at 240.)  Rambaud also testified credibly that he agreed to find another solution to address customers' requests for quality management services because Clarke had a certain level of autonomy in running SMS and Rambaud could not force him to work with Walston and Nevenhoven.  (Id. at 241.)  Ultimately, none of TRIGO's pre-existing U.S. aerospace activities were integrated into SMS.  (Clarke Decl. ¶ 139.)

63.    Clarke testified that Rambaud subsequently "directed that [SMS] build the aerospace quality management business in the U.S. from scratch."  (Id. ¶ 137.)  Nicholas similarly testified that Rambaud "decided and directed that SMS should build a quality business from the ground up."  (Nicholas Decl. ¶ 79.)  The Court does not credit their testimony.

64.    It was Clarke who first determined that SMS's quality management infrastructure would "have to be built from the ground up," as he communicated to Rambaud on February 18, 2019.  (PX 33; Tr. at 54, 63.)  As Clarke testified, "[t]here seemed to be only two options for moving forward: ruining my reputation with my customers by telling them TRIGO and SMS didn't actually have the quality management services TRIGO had pitched to them, or scramble to develop the quality management services business from the ground up to support the customers that had already requested it."  (Clarke Decl. ¶ 131.)  Clarke asked Rambaud that

TRIGO's limited quality management infrastructure be discussed at an SMS board meeting scheduled for February 21.  (Id.; Nicholas Decl. ¶ 79; Fact Stip. ¶ 58.)  Clarke testified that he then "worked frantically with [Nicholas] during the next couple of days to develop various options for how to move forward to discuss at the board meeting."  (Clarke Decl. ¶ 131.)

65.     In the leadup to the board meeting, Clarke's efforts were focused on developing a plan for building a quality management business within SMS.  He had the idea to hire Bruce Smith, a quality management expert who was formerly at Lockheed Martin, to help build the business.  (Id. ¶ 132; Nicholas Decl. ¶ 78.)  Clarke called Smith prior to the SMS board meeting to see if he would be interested in doing so.  (Tr. at 59.)  Clarke and his team were also principally responsible for creating a slide in a presentation for the board meeting that bulleted out several steps for building the quality management business internally at SMS and proposed a $1 million budget.  (Rambaud Decl. ¶ 67; PX 34.)  The slide did not include the option of maintaining the status quo.  (PX 34.)  Clarke testified at trial that he prepared the budget shown on the slide and came up with the $1 million figure.  (Tr. at 58, 66.)  He also testified at trial that he and his team prepared the bullets outlining the steps for building out the business after speaking with Rambaud and Smith.  (Id. at 59, 61.)

66.     Nicholas testified that at the February 21 board meeting Clarke "presented two options for how we might move forward . . . ."  (Nicholas Decl. ¶ 79.)  Rambaud's notes from the meeting reflect that "Option 1" was to postpone the development of quality management services in the U.S. until further notice, while "Option 2" was to build the quality management business internally at SMS, as detailed in the presentation.  (PX 34; PX 35.)  Rambaud's notes also state that he was to make a "[d]ecision" by February 27.  (PX 35.)  Rambaud testified that this meant that he "was to seek TRIGO board approval for the $1 million

investment in SMS." (Rambaud Decl. ¶ 68.) The Court credits Rambaud's testimony. As Clarke testified at deposition, after he "suggested to [Rambaud], this is how we should do it. I'll get my guys, we'll get us up and going. I gave them all the information, told them the cost," Rambaud "was going to go to the board to get approval. Because obviously I can't get approval like that. I don't own the company." (Clarke Dep. Tr. at 102.)

67.    On March 1, Clarke followed up with Rambaud regarding the $1 million investment, asking him, "I am assuming you have received the official 'go ahead' from the board?" (DX 31.) Clarke also told Rambaud that he was already preparing an agreement to hire Smith as a consultant. (Id.; Clarke Decl. ¶ 140; PX 39.) The next day, Rambaud informed Clarke that the TRIGO board had approved the $1 million investment. (Fact Stip. ¶ 60; Rambaud Decl. ¶ 73; DX 31.) Rambaud made a presentation to the TRIGO board in March seeking approval for the $1 million investment that Clarke had proposed. (Fact Stip. ¶ 59; Rambaud Decl. ¶ 72; PX 42.)

68.    Clarke rejected TRIGO's existing quality management infrastructure and personnel in the U.S. and determined that SMS would need to build a quality management business from the ground up. Clarke was principally responsible for developing the plan and $1 million budget for this initiative, which he then presented to Rambaud and others at the February 21 SMS board meeting. Following the SMS board meeting, Rambaud was only responsible for securing the TRIGO board's approval for the $1 million investment. Rambaud informed Clarke of the TRIGO board's approval on March 2. TRIGO's actions were not those of an entity undermining Clarke's ability to achieve an earnout. To the contrary, TRIGO was proactive in promoting the SMS business under Clarke, even if its actions were not always optimally timed or implemented.

SMS Builds Its Quality Management Business.

69.     By the start of March 2019, Clarke had already been in contact with Rambaud about renegotiating his earnout a second time.  (Rambaud Decl. ¶ 74; DX 31.)  As of this date, there were still nine months remaining in Clarke's 2019 earnout period.  (Rambaud Decl. ¶ 74; DX 20.)  Rambaud testified that Clarke requested this second amendment to ensure that "certain of the costs that SMS might incur in hiring and building out a quality management services portfolio . . . did not undercut his Normative EBITDA calculation."  (Rambaud Decl. ¶ 75.)  At the same time, TRIGO viewed amending Clarke's earnout as being in its own economic best interest.  (Tr. at 356.)  Rambaud testified that the second amendment "kept the interests of the parties aligned and kept Clarke motivated to grow the business TRIGO had recently acquired."  (Rambaud Decl. ¶ 80.)

70.     The parties executed the second amendment to the PSA on May 24, 2019. (Fact Stip. ¶ 68; DX 34.)  As Clarke had requested, the second amendment provided that any negative EBITDA generated by the quality management business that was being developed would not be included in the calculation of Clarke's Normative EBITDA in 2020.  (Rambaud Decl. ¶ 77; DX 34.)

71.     Contemporaneous with the second amendment, Clarke executed a revised employment agreement.  (Fact Stip. ¶ 68; DX 35.)  The agreement extended Clarke's employment with SMS until the end of 2020.  (DX 35.)  It also provided that during 2020 Clarke would continue to serve as SMS's CEO and President, "or at the Company's election, as the Chairman of the Company."  (Id.)  TRIGO's actions in agreeing to the second amendment to the PSA excluding the negative EBITDA generated by the quality management business and extending Clarke's employment period were signs of good faith on TRIGO's part and certainly

not the actions of an entity trying to undermine Clarke's success or his ability to achieve an earnout.

72.     Following the TRIGO board's approval of the $1 million investment in March 2019, SMS worked to build the quality management business internally. Nicholas, who knew at the time of closing that he would have oversight of SMS's quality management services as Vice President of Operations, became responsible for helping to build the business. (Tr. at 466; Nicholas Decl. ¶ 80.) This was despite the fact that he lacked any formal background in quality management services. (Nicholas Decl. ¶ 82.) Nicholas described his role as akin to that of a project manager and testified that he "was involved with every aspect of the quality project in great detail." (Id. ¶ 83.)

73.     SMS's first steps were to hire Smith as a consultant and to renegotiate its consulting contract with Mike Song, who it had previously hired to work with Boeing on the supplier management side, to expand his role to include supporting Smith and the development of the quality management business. (Id. ¶¶ 81-82; Clarke Decl. ¶¶ 140-41.) From there, SMS entered the "startup phase" of the initiative, as Nicholas testified. (Nicholas Decl. ¶ 85.) During this initial phase, SMS, among other things, developed internal quality management processes and procedures, hired and trained new employees, drafted sales presentations for customers, and prepared pricing models, on-site surveillance models, and a quality management service scope of work. (Id.; Clarke Decl. ¶¶ 144-45.)

74.     By September 2019, SMS had a sufficient quality management infrastructure in place to start taking on new contracts from customers for quality management services. (Tr. at 426; Nicholas Decl. ¶ 86; Clarke Decl. ¶ 150.) SMS secured quality management contracts with Northrop Grumman Mission Systems and Collins Aerospace

Landing Systems, as well as Collins Landing Gear in Canada.  (Tr. at 427; Nicholas Decl. ¶ 86; Fact Stip. ¶ 65.)  Nicholas testified that at this stage what remained in order to complete SMS's quality management infrastructure was "actually implementing and executing the plans that had been developed."  (Tr. at 465.)  Nicholas testified that he "became the face of SMS on quality management" as SMS's "primary interface" for its three new contracts.  (Id.; Nicholas Decl. ¶ 86.)  According to Nicholas, once SMS secured these contracts he was "dedicating almost 100% of his time to overseeing the quality management business."  (Nicholas Decl. ¶ 86.)

75.    Clarke testified that this work "building the quality management business greatly distracted from SMS's ability to maximize its growth and EBITDA because my team and I could not focus on growing and servicing the supplier management business."  (Clarke Decl. ¶ 146.)  Nicholas similarly testified that "[b]ecause of the time constraints forced on us by having to build the quality management infrastructure, we were forced to pause business development and we essentially stopped supplier management pursuits because we did not want to sell something we would not have been able to deliver."  (Nicholas Decl. ¶ 84.)  Clarke and Nicholas shared the view that during this period SMS was forced to leave significant supplier management opportunities on the table.  (Id. ¶ 89; Clarke Decl. ¶ 151.)  It is understandable that Clarke, who had built and operated his own supplier management business free from external control, would chafe under the direction of foreign-based managers who, in his view, did not fully understand the challenges he faced.  Clarke knew as early as the May 11, 2018 letter of intent that "TRIGO would contribute its current aerospace activities in the USA to the SMS platform" and that those activities would be "included in the SMS EBITDA for purposes of calculating the Earnout."  (DX 12.)  Yet, Clarke was content to proceed with the PSA without conducting due diligence on

the U.S.-based activities of TRIGO, i.e., the quality management business, or securing

contractual representations as to the magnitude and profitability of that business.

76.     Clarke and Nicholas continued to develop and manage the business of

SMS.  In a document from around July 2019, SMS identified 13 business development

opportunities that it was pursuing.  (PX 46; Tr. at 416-17.)  Nicholas testified at trial that this

document reflected that SMS was pursing business opportunities around July.  (Tr. at 417.)

Nicholas further testified that at the same time SMS was building the quality management

business internally, it was still performing existing contracts with its customers, performing any

new contracts, and pursuing business development opportunities.  (Id. at 418-20.)  Although

Nicholas's increased obligations "turned [his] life upside down," he testified that SMS "adjusted

accordingly and conducted business," as was the SMS way.  (Id. at 419-20.)  Indeed, despite

having to build the quality management business from the ground up, by October 2019 SMS's

revenue had increased 60%.  (Clarke Decl. ¶ 151; PX 50.)  Because it was not until October that

SMS began to receive weekly revenue from its three new quality management contracts, this

60% increase was driven by growth on the supplier management side of the business.  (Fact Stip.

¶ 65.)

77.     Nicholas also testified that having to develop the quality management

business "proved detrimental to [his] ability to maintain certain supplier management contracts."

(Nicholas Decl. ¶ 83.)  In particular, Nicholas testified that SMS lost a contract with Wesco

Aircraft, a distributor within the aerospace industry, because his time "was redirected from

managing supplier management contracts" such that he was unable to "provide the oversight or

management of the Wesco contract [he] normally would have."  (Id.)  Contrary to Nicholas's

testimony that SMS "essentially stopped supplier management pursuits" while building its

quality management infrastructure, SMS, and Nicholas himself, pursued a new supplier management contract with Wesco Aircraft in August and September 2019.  (Id. ¶ 84.; PX 48; DX 37.)  In negotiating the contract, Nicholas offered Wesco Aircraft a 90-day pilot period after which the company could end the contract at no additional cost if it was not seeing its desired results.  (DX 37.)  Wesco Aircraft awarded the pilot contract to SMS in September, and SMS began to perform in October.  (Id.; Tr. at 432.)

78.    As the Court previously noted, by September 2019 SMS had already developed its quality management infrastructure enough to begin taking on new quality management contracts.  At that time, Nicholas told Wesco Aircraft, a potential supplier management customer, that SMS was "confident that we will deliver measur[able] results as we have with all of our customers."  (DX 37; Tr. at 433.)  Ultimately, however, Wesco Aircraft decided to end the pilot contract with SMS in late February 2020 because it had not seen a sufficient improvement in its supplier metrics.  (PX 56; Tr. at 434.)  Nicholas attempted to convince Wesco Aircraft to continue the pilot contract for another 90 days.  (PX 56.)  Rather than place the blame entirely on SMS's performance for why Wesco Aircraft was not seeing its desired results, Nicholas pointed out to Wesco Aircraft that it was partly at fault.  (Id.; Tr. at 435.)  Nicholas took issue with Wesco Aircraft disclosing to its suppliers that SMS's engagement was a pilot because it led them to view the engagement as a short-term effort and not take it seriously.  (PX 56; Tr. at 435.)  He also told Wesco Aircraft that its method for assessing SMS's performance on the pilot contract was inaccurate.  (PX 56; Tr. at 435.)

79.    On the heels of SMS increasing its revenue 60% and securing its first quality management contracts, Nicholas was promoted to President of SMS in October 2019. (Fact Stip. ¶ 66.)  Clarke, for his part, had already been in contact with Rambaud about

renegotiating his earnout a third time.  (Rambaud Decl. ¶ 85.)  Despite being under no obligation to agree to another amendment, TRIGO considered it to be in its own economic best interest to do so.  (Tr. at 356.)  The third amendment to the PSA was executed on December 21, 2019. (Fact Stip. ¶ 69; DX 41.)

80.    The third amendment changed Clarke's earnout provision for 2019 by allowing for a payment of up to $4 million based solely on SMS's average weekly revenue in December 2019.  (DX 41; Rambaud Decl. ¶ 88.)  As of early December, Clarke was expecting to receive $1,739,000 under the prior earnout provision for 2019, and had asked Rambaud for an increased payment of $3,900,000.  (DX 40; Tr. at 69-70.)  Clarke testified at trial that when the third amendment was executed on December 21 both he and TRIGO would have had a good idea of what SMS's average weekly revenue was for the month.  (Tr. at 71-72.)  Therefore, as Clarke further testified, it was a forgone conclusion for both parties when entering into the amendment that he would receive the $4 million payment.  (Id. at 72.)  Clarke did receive that $4 million earnout payment for 2019, which he testified was the maximum amount of earnout he could have received that year.  (Id. at 70.)

81.    The third amendment also changed Clarke's potential earnout payments for 2020.  (DX 41; Rambaud Decl. ¶¶ 90-91.)  The amendment shortened the 2020 earnout period from December 31, 2020 to the end of June 2020.  (DX 41; Rambaud Decl. ¶ 90.)  Based on SMS's average weekly revenue for the three months preceding March 31, Clarke had the opportunity to receive a payment of up to $15 million.  (DX 41; Rambaud Decl. ¶ 90.)  TRIGO ultimately paid Clarke $1,275,220 in earnout for this period.  (Fact Stip. ¶ 70.; Rambaud Decl. ¶ 90.)  Clarke also had the opportunity to receive a payment of up to $20 million, less any earnout payments he had already received, based on SMS's average weekly revenue for the month of

June.  (DX 41; Rambaud Decl. ¶ 91.)  Clarke did not receive any earnout amount for the June

period.  (Rambaud Decl. ¶ 91.)

82.    Moreover, the third amendment continued to exclude from the calculation

of SMS's Normative EBITDA any negative EBITDA generated from SMS's quality

management business.  (Id. ¶ 92; DX 41.)  TRIGO's pre-existing quality management business

in the U.S. was also removed from the calculation of SMS's EBITDA for the first time.  (DX 41;

Rambaud Decl. ¶ 92.)  Furthermore, the third amendment "added back" to SMS's EBITDA the

salaries for Smith, Song, and another executive-level quality employee, meaning they were not

deducted as costs.  (DX 41; Rambaud Decl. ¶ 92.)

83.    Contemporaneous with the third amendment, Clarke's employment

agreement with SMS was amended a second time.  (DX 42; Rambaud Decl. ¶ 93.)  The term of

his employment was set to end on June 30, 2020, to be coterminous with his earnout.  (DX 42;

Rambaud Decl. ¶ 93.)  Clarke also entered into a consulting agreement with SMS pursuant to

which he committed to staying on as a consultant from July 1, 2020, to December 31, 2021.  (DX

42; Rambaud Decl. ¶ 93.)  TRIGO's actions were consistent with a party acting in good faith

with a desire to accommodate or at least mollify Clarke.

84.    The Court credits that Clarke and Nicholas, as leaders of TRIGO's entire

U.S.-based operation, could not devote their entire time and attention to the supplier management

business because of the nascent and understaffed quality management business for which they

were also responsible.  But TRIGO took steps to ameliorate the situation by amending the

earnout provision to essentially guarantee that Clarke would receive a $4 million earnout

payment for 2019, approving a $1 million budget to grow the quality management business,

agreeing not to charge Clarke with any negative EBITDA from the quality management

business, and accounting for the up-front costs that SMS incurred in building that business.  The

Court finds that SMS continued to pursue business development opportunities in supplier

management while building the quality business.  In fact, SMS's revenue increased 60% by

October 2019 due to growth in the supplier management side of the business.  Once SMS's

quality management infrastructure was sufficiently developed to start taking on new quality

management customers, SMS was also confident that it could perform a supplier management

pilot contract with Wesco Aircraft.  The Court finds that Wesco Aircraft's decision not to

proceed beyond the pilot project was due to a variety of factors, some unique to Wesco, e.g.

telling suppliers that the arrangement with SMS was only short term which encouraged a lack of

cooperation on their part.  The Court rejects Clarke's position that the decision by Wesco not to

proceed further with SMS is fairly attributable to the actions or inactions of TRIGO in causing

the management of SMS to be distracted by concerns with the quality management side of the

business.

        85.    The Court finds that TRIGO paid Clarke the maximum amount of earnout

he could have received in 2019, the year during which SMS built out its quality management

infrastructure enough to begin servicing new quality management customers.  Revenue from

SMS's three initial quality management contracts, which began to flow to SMS in October 2019,

contributed to that $4 million earnout payment for 2019 under the third amendment to the PSA.

Under the third amendment TRIGO not only excluded from the calculation of SMS's Normative

EBITDA any negative EBITDA generated from SMS's quality management business, but also

accounted for the up-front costs that SMS incurred in building that business.  In turn, the PSA's

earnout provision was revised such that SMS's quality management business could only have a

positive impact on SMS's Normative EBITDA.

The Fourth and Fifth Amendments to the PSA.

86.     The COVID-19 pandemic brought substantial disruption to the aerospace industry and its suppliers in March 2020.  (Clarke Decl. ¶ 160; Rambaud Decl. ¶ 94; Fact Stip. ¶ 81.)  With respect to SMS in particular, the pandemic suddenly halted the company's revenue growth that had continued into the first quarter of 2020.  (DX 50.)

87.     By the end of March, Clarke had again reached out to Rambaud about amending his earnout.  (Rambaud Decl. ¶ 94.)  Clarke's final opportunity to receive an earnout payment under the third amendment executed in December 2019 was set to end in June 2020.  (Id.; DX 41.)  A downturn in business because of the pandemic was not a risk assumed by TRIGO under the contractual earnout provision.  TRIGO remained under no obligation to extend Clarke's earnout a fourth time, but, as Rambaud testified, it agreed to do so "to maintain some harmony in the transition of the business, to keep Clarke motivated, and to keep TRIGO's interests aligned with the seller's."  (Rambaud Decl. ¶ 95.)  The fourth amendment to the PSA was executed on July 14, 2020.  (Fact Stip. ¶ 71; DX 47.)

88.     The fourth amendment extended Clarke's earnout period through March 2021, providing him with the opportunity to receive quarterly payments based on SMS's average weekly revenue for the three months preceding the end of each quarter.  (Rambaud Decl. ¶ 96; DX 47.)  The fourth amendment also continued to exclude from the calculation of SMS's Normative EBITDA any negative EBITDA generated from SMS's quality management business and continued to "add back" Smith's and Song's salaries to SMS's Normative EBITDA. (Rambaud Decl. ¶ 96; DX 47.)

89.     Clarke also entered into a third amended employment agreement and amended consulting agreement with SMS at this time.  (Rambaud Decl. ¶ 97; DX 46.)  Clarke was to remain as CEO until December 31, 2020, after which, unless the parties agreed to extend

his employment term, Clarke would become a consultant for SMS through the end of 2021. (Rambaud Decl. ¶ 97; DX 46.)

90.     As the COVID-19 pandemic continued into the summer and fall of 2020, SMS experienced a 25-27% reduction in revenue and was forced to lay off 50 to 60 employees. (Nicholas Decl. ¶ 92; DX 50.)  Although the fourth amendment to the PSA had just been executed on July 14, by early September Clarke had already reached out to Rambaud about extending his earnout a fifth time.  (Rambaud Decl. ¶ 98.)  As of October, it was clear to Clarke and TRIGO that Clarke would not receive much of an earnout payment under the fourth amendment unless there was a large increase in business in January 2021.  (Id. ¶ 105; Tr. at 258; DX 50.)  In turn, Clarke threatened to quit from SMS entirely in January 2021 if TRIGO did not extend his earnout.  (Rambaud Decl. ¶ 105; DX 50.)  Clarke also requested a $2 million advance on his earnout.  (Rambaud Decl. ¶ 108; DX 57.)

91.     Rambaud recommended to the TRIGO board in December that TRIGO extend Clarke's earnout again and advance the requested $2 million.  (Rambaud Decl. ¶ 109; DX 57.)  Rambaud made this recommendation because he considered Clarke's continued involvement at SMS to be instrumental to the company's ongoing business development efforts. (DX 57; Tr. at 259.)  As with each of the four previous amendments, it was TRIGO's position that a fifth amendment was in its own economic best interest.  (Tr. at 356.)  The fifth amendment to the PSA was executed on December 18, 2020.  (Fact Stip. ¶ 73; DX 60.)

92.     The fifth amendment extended Clarke's earnout period through June 2022. (Fact Stip. ¶ 73; DX 60.)  It provided for potential earnout payments of up to $20 million, less any amounts already paid to Clarke, that would be calculated based on SMS's 2021 EBITDA, SMS's EBITDA for the 12-month period ending March 31, 2022, and SMS's EBITDA for the

12-month period ending June 30, 2022.  (Fact Stip. ¶ 75; DX 60.)  To maximize Clarke's earnout payment, SMS's EBITDA for any of these three new earnout periods would have had to hit $8.8 million.  (Fact Stip. ¶ 75.)

93.    The fifth amendment also revised section 3.4(e) of the PSA, which imposed several restrictions on TRIGO's operation of SMS until the expiration of the earnout period or, if earlier, full payment of the maximum earnout.  (Id. ¶ 74; DX 60.)  Under the fifth amendment, TRIGO was now required to, among other things, "(vi) operate the business of the Company consistent with past practice since Closing and not adopt strategic, commercial or financial changes to the way the Company is managed which could have, in the aggregate, a materially negative impact on the EBITDA of the Company . . . ."  (Fact Stip. ¶ 74; DX 60.)  The fifth amendment continued to require in section 3.4(e) that TRIGO "(iii) operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment . . . ."  (Fact Stip. ¶ 74; DX 60.)

94.    Furthermore, under the fifth amendment to the PSA, TRIGO paid SSD a $2 million advance on the earnout payment that would be based on SMS's EBITDA for the 12-month period ending March 31, 2022.  (Fact Stip. ¶ 76; DX 60.)  At the same time, Clarke executed a personal guaranty that, subject to the terms set forth therein, required him to pay back the $2 million advance if SMS did not earn at least $2 million pursuant to the earnout mechanism under the fifth amendment to the PSA.  (Fact Stip. ¶ 76; Rambaud Decl. ¶ 113; DX 58.)  Clarke's repayment obligation would be extinguished if SMS's EBITDA equaled $6.65 million for any of the three new earnout periods under the fifth amendment.  (Fact Stip. ¶ 108.)

95.    Contemporaneous with the fifth amendment, Clarke entered into a second amended consulting agreement with SMS.  (Id. ¶ 77; DX 61.)  Clarke's employment agreement

was not renewed.  (Clarke Decl. ¶ 179.)  The second amended consulting agreement provided

that as of January 1, 2021, Clarke would no longer be an employee of SMS.  (DX 61; Tr. at 144.)

On that date, Clarke ceased to be CEO of SMS.  (Fact Stip. ¶ 78.)  Under the consulting

agreement, Clarke instead agreed to serve as a consultant to SMS and as its non-executive

Chairman from January 1, 2021, to December 31, 2022.  (Id. ¶ 79; DX 61.)  As a consultant,

Clarke was to provide to SMS "(A) consulting and oversight services relating to the retention of

customers of the Company, (B) assistance in the identification and consummation of

opportunities to develop and acquire new customers for the Company . . . and (C) assistance to

the leadership of the Company with transition issues."  (DX 61.)

96.     The Court finds that through five amendments to the PSA, TRIGO

extended Clarke's earnout period by a total of two-and-a-half years, despite being under no

obligation to do so.  These amendments revised the PSA's earnout provision to make it easier for

Clarke to reach the EBITDA thresholds necessary to receive his earnout.  The Court also finds

that TRIGO agreed to each of the five amendments because it recognized that they were in its

own economic best interest.  While the amendments were in the best interest of TRIGO, they

were also in the best interest of Clarke.  TRIGO's agreement to the amendments is consistent

with a party acting in good faith and without an intent to impede or impair Clarke's ability to

reach an earnout milestone.

SMS Pursues an Enterprise Contract with L3Harris.

97.     On December 3, 2019, SMS received an email from Gary Jones, Sr., the

Global Director of Corporate Category Management at L3Harris, seeking to learn more about

SMS's supplier management services.  (Fact Stip. ¶ 80; Jones Aff. ¶¶ 14-16; PX 51.)  At the

time, L3Harris had a need for supplier management services, and Jones was "specifically seeking

a long-term agreement at the Corporate level with a potential vendor to service all segments and

sectors of the L3Harris business in order to improve revenue recognition and supplier on-time delivery across the whole business." (Jones Aff. ¶ 14.) After Jones submitted a Request for Information to SMS, SMS provided him with information about the company's services and performance metrics. (Clarke Decl. ¶ 154; PX 52; PX 53.)

98.    Jones was employed at L3Harris from December 2018 through February 2021. (Jones Aff. ¶ 12.) In his role as Global Director of Corporate Category Management, Jones reported to a Vice President, who in turn reported to Byron Green, the Corporate Vice President of Operations for L3Harris. (Id. ¶ 13; Tr. at 158.) Green, in turn, reported to Chief Operating Officer Chris Kubasik, who then reported to Bill Brown, L3Harris's CEO. (Jones Aff. ¶¶ 13, 23; Tr. at 158.) Beginning around September 2020, Jones also reported to Carrie Eubanks after she became L3Harris's Corporate Vice President of Supply Chain. (Jones Aff. ¶ 13.)

99.    In April 2020, shortly after the start of the COVID-19 pandemic, SMS began to have more serious conversations with L3Harris about the services that it could provide. (Clarke Decl. ¶¶ 162-66.) On April 8, Nicholas signed a Non-Disclosure Agreement on behalf of SMS with L3Harris. (Id. ¶ 163; Fact Stip. ¶ 83.) On April 20, SMS gave a presentation to Jones, Green, and Eubanks, who as Clarke testified were "some of the highest-ranking executives" at L3Harris. (Clarke Decl. ¶ 165; PX 61.) On April 30, SMS then submitted to Jones and Green a draft Statement of Work outlining the general scope of work SMS would provide to L3Harris and a contract price of about $6.5 million. (Clarke Decl. ¶ 166; Jones Aff. ¶ 18; PX 62.)

100.    After receiving an updated list of L3Harris's suppliers, SMS provided L3Harris with a revised quote for supplier management services of about $13 million annually for three years. (Clarke Decl. ¶ 167; PX 63; Fact Stip. ¶ 84.) Clarke subsequently gave a

presentation to Kubasik, along with Green, Jones, and Eubanks, on August 3, 2020, regarding SMS's services and how they could benefit L3Harris. (Clarke Decl. ¶ 169; PX 69.) On August 9, Clarke had a phone call with Green. (Clarke Decl. ¶ 171.) Clarke's notes from his call, which he shared with Jones, reflect that Green told Clarke that Kubasik was "in" on entering into a contract with SMS. (Id.; PX 70.) According to Clarke's notes, however, Green also told him that Brown was "asking if they could keep things as status quo" and Green was "not sure [Eubanks] is 100%." (PX 70.) Clarke further noted that Green "indicated that he is having his team look at the supplier list again to ensure it's the one we want to move forward with." (Id.)

101.    Green, Jones, and SMS agreed after further discussions to limit the Statement of Work for the first phase of the project to L3Harris's U.S.- and Australia-based suppliers. (Clarke Decl. ¶ 173; Jones Aff. ¶ 19.) In turn, on September 8, SMS provided L3Harris with a revised quote for supplier management services of approximately $8 million annually over five years (the "L3Harris Contract"). (Clarke Decl. ¶ 174; Jones Aff. ¶ 19; PX 73; Fact Stip. ¶ 85.) On September 28, SMS and L3Harris executed a Master Service Agreement ("MSA"). (Clarke Decl. ¶ 172; Fact Stip. ¶ 86.) The MSA operated as a frame agreement for a relationship between the two companies, requiring L3Harris to utilize SMS's services if it chose to engage a supplier management company. (Tr. at 180-81.) No money changed hands between SMS and L3Harris with the MSA's execution. (Id.)

102.    TRIGO supported SMS's negotiations with L3Harris throughout 2020, including with respect to the MSA. (Id. at 437; Marquis Decl. ¶ 45.) As Marquis testified, "We were fully supportive of SMS getting any work from L3Harris. We wanted the business to succeed." (Marquis Decl. ¶ 45.)

103.    After the MSA was executed, L3Harris still needed to issue a purchase order in order to engage SMS. (Tr. at 180; Clarke Decl. ¶ 174; Jones Aff. ¶ 21.) But L3Harris did not issue a purchase order pursuant to the MSA in 2020. (Tr. at 180.) As Jones testified at trial, toward the end of the year there was a disagreement inside L3Harris as to whether the company needed outside help to manage its suppliers. (Id. at 177.) Jones testified that Brown's position was that L3Harris could perform the services that it was pursuing from SMS internally and that they were core to L3Harris's capabilities. (Id.) Jones further testified that, on the other hand, his, Kubasik's, and Green's position was that L3Harris needed outside help. (Id. at 177-78.) Brown, who was CEO at the time, ultimately had the final say. (Id. at 159; Jones Aff. ¶ 24.) He decided that the company would not move forward with the L3Harris Contract at that time. (Jones Aff. ¶ 23.)

104.    On December 7, 2020, Jones sent SMS an email informing the company of Brown's decision:

> After extensive analysis and internal debate we have decided to postpone a final decision for this important business process change. The factors contributing to the postpone [sic] are the effects of Covid-19 upon our supply base and business, continued integration priorities and an impending leadership change . . . Thus we will seek to re-engage you and your team during Q2 of next year . . . .

(PX 74; Fact Stip. ¶ 88.)

105.    Jones's reference in his email to an "impending leadership change" spoke to the fact that as part of an "integration agreement" at L3Harris Brown was to step down as CEO in June 2021 and be succeeded by Kubasik. (Tr. at 162; Jones Aff. ¶ 23.) Jones testified that, unlike Brown, Kubasik, "as soon as he ascended to the CEO role in July 2021, was committed to moving forward with the contract with SMS, in the full scope set out in the $8 million a year quote, with the plan to later expand the contract assuming SMS was successful in

executing the original statement of work." (Jones Aff. ¶ 24.) Jones added that Kubasik's

"commitment to the SMS contract was known to me and others at L3Harris, including [Green],"

and that he and Green discussed the plan to move forward with the L3Harris Contract once

Kubasik became CEO "on several occasions." (Id. ¶¶ 24, 26.) Jones further testified that he

called Clarke prior to his December 7 email to explain to him that "once [Brown] stepped down

in July 2021, [Kubasik], [Green], and I would be ready to move forward with the contract as

planned." (Id. ¶ 25.)

106.    Clarke testified as to his understanding from Jones's call that Kubasik,

Green, and Jones "were all in agreement to start the contract as soon as Mr. Brown retired in July

2020." (Clarke Decl. ¶ 176.) Clarke also testified that in his December 7 email Jones "made it

clear that there was no doubt that the only thing standing in the way was Mr. Brown, and that

Mr. Kubasik and Mr. Green would go through with the contract with SMS in July 2021." (Id.)

107.    The Court finds that Jones's December 7 email, which Jones confirmed at

trial was true and accurate when he sent it, communicated to SMS that L3Harris was postponing

a final decision on whether to issue a purchase order pursuant to the MSA. (Tr. at 165.) The

Court rejects Clarke's stated belief that the L3Harris Contract was a done deal and that L3Harris

would definitely engage SMS in Q2 2020 once a new CEO was in place. Read in the context of

the internal debate at L3Harris over whether the company truly needed outside help to manage

its suppliers, Jones's email spoke to the postponement of "a final decision for this important

business process change." (PX 74.) It remained to be decided whether L3Harris would

outsource these services to SMS or do them itself. Jones's email set out three reasons for the

postponement: 1) the effects of COVID-19, 2) continued "integration priorities," and 3) the

impending CEO transition. (Id.; Tr. at 76.) Accordingly, the Court does not credit Clarke's

testimony that Jones's email made clear to him that the "only thing standing in the way" of the L3Harris Contract was Brown. (Clarke Decl. ¶ 176.) To the contrary, Jones's email states that factors going beyond the CEO transition contributed to L3Harris's decision.

108.    The Court finds that, as of Jones's December 7 email, the awarding of actual work to SMS in Q2 was far from certain. Indeed, Clarke conceded at trial that as of December 7 the L3Harris Contract was not a certainty. (Tr. at 77.) Consistent with Clarke's view, notes from an SMS meeting held on December 11 that Nicholas participated in state with respect to the L3Harris Contract that "[e]verything is off the table at this point." (Id. at 441; DX 56.) A final decision on whether to issue a purchase order still needed to be made by Kubasik, who would have final say once he became CEO in July 2021. (Tr. at 183.) Simply put, the December 7 email was a polite "no" from L3Harris that left open the door that matters might change in the future.

SMS Secures a Single-Segment Contract with L3Harris Amid Personnel Changes.

109.    At the start of 2021, Clarke ceased to be an employee of SMS and became a consultant to the company and its non-executive Chairman. (DX 61; Nicholas Decl. ¶ 101.) Nicholas, as SMS's President, was running the company's day-to-day operations. (Nicholas Decl. ¶ 101.) Once Clarke became a consultant, Nicholas began to report to Marquis. (Tr. at 457) Marquis was based in France, and primarily communicated with Nicholas through email and by telephone. (Id. at 458.)

110.    In late 2020, SMS had begun its recruitment of a new Chief Commercial Officer to begin at the company at the start of the new year. (DX 50; Rambaud Decl. ¶ 104.) Rambaud testified that he and Marquis were of the view that "SMS was too dependent upon Steven Clarke and Jay Nicholas" and that "SMS needed some succession planning, but also some diversification in its business development efforts." (Rambaud Decl. ¶ 104.) Steffen Spell,

who had been working in the aerospace industry for over 30 years, most recently as Vice President, Business Development and Account Management at the U.S. aerospace and defense business Rantec Power Systems, was soon targeted by SMS's recruiting firm.  (Spell Decl. ¶¶ 3-7.)  Clarke and Nicholas expressed reservations about hiring Spell as Chief Commercial Officer to Rambaud and Marquis, including that he lacked quality management experience.  (PX 75; Tr. at 363-64.)  Nonetheless, SMS hired him in January 2021.  (Fact Stip. ¶ 89.)  Spell's addition to the SMS team proved to be a source of tension within the company.  TRIGO's decision to hire Spell was a lawful business decision made in good faith based upon its judgment that it was in the best interest of SMS and TRIGO.

111.    Spell began working at SMS as Chief Commercial Officer in mid-February 2021.  (Spell Decl. ¶ 8.)  Prior to Spell's start date, Nicholas communicated to Rambaud and Marquis that Spell should report to him as SMS's President, but Rambaud and Marquis rejected Nicholas's proposal.  (Nicholas Decl. ¶ 103.)  Nicholas testified that their decision "made no sense" to him and that he felt there were "ulterior motives" for Spell's hiring and not having him report to him.  (Id.)  Also in advance of his start date, Spell wrote to Eubanks at L3Harris, whom he had previously known, to inform her that he was joining SMS as Chief Commercial Officer.  (DX 63; Spell Decl. ¶ 10.)  Eubanks had initially been skeptical about the L3Harris Contract, but as of December 2020 supported moving forward with it.  (Jones Aff. ¶ 22.)  Spell told Eubanks that he was "aware that you have been engaged with SMS, and I look forward to supporting that activity as needed."  (DX 63.)  Eubanks responded, "We have been trying to get something in place just trying to jump a lot of hurdles with financing between defense budget cuts and COVID."  (Id.)  Spell also contacted Tammy Jaenicke, L3Harris's

Director of Supply Chain, around this time to inform her that he was joining SMS.  (Spell Decl. ¶ 11.)

112.    Jones resigned from L3Harris in February 2021 to pursue starting his own business.  (Jones Aff. ¶ 28.)

113.    On March 25, Nicholas, Spell, and Beecher had an introductory call with Jaenicke, for which Taliaferro took notes.  (Spell Decl. ¶ 11; PX 77.)  Jaenicke told SMS that she worked on L3Harris's F-35 fighter jet program, that there was "[a] lot of opportunity for improvement," and that she was "[a]ll for SMS support if it is the right fit."  (PX 77; Tr. at 77, 442.)  Taliaferro's notes also reflect that Jaenicke asked whether Spell had been in touch with anyone else at L3Harris, leading the SMS team to respond, "No, but SMS has had several conversations at the corporate level."  (PX 77.)  Nicholas then identified Green and Eubanks as L3Harris individuals "at president level."  (Id.)

114.    After Clarke was forwarded Taliaferro's notes of the meeting, he instructed Spell to stop his interactions with L3Harris because Clarke planned to reach out to Green.  (Id.)  Clarke wrote, "As a reminder the people you['re] talking to are not decision makers on this contract it's coming from the President level."  (Id.)  Clarke explained in his testimony that he disagreed with Spell's decision to reach out to Jaenicke, "a lower-level L3Harris employee," because he "felt it would undermine the relationships we had developed at the corporate level."  (Clarke Decl. ¶ 182.)  Nicholas followed up on Clarke's instruction to Spell by noting that there was an upcoming meeting being planned with Jaenicke's executive team and that another meeting was already scheduled with Eubanks.  (PX 77; Spell Decl. ¶ 12.)  Nicholas clarified, "[Clarke's] point below is that he just wants to reach out to [Green] before any more

contacts are made with [L3Harris]." (PX 77.) Spell agreed to do as Clarke and Nicholas were asking. (Id.; Spell Decl. ¶ 13.)

115. SMS's meeting with Eubanks was scheduled for April 6. (Spell Decl. ¶ 15; Fact Stip. ¶ 91.) Clarke testified that at this point he had learned that Eubanks "had been out on medical leave, but that she had returned now working at the segment level." (Clarke Decl. ¶ 184.) Nonetheless, ahead of the April 6 meeting, Clarke told Marquis that he was excited about the call with Eubanks. (Id.; PX 78.) Clarke also noted that L3Harris would be a "huge" opportunity for SMS to increase its revenue." (Clarke Decl. ¶ 184; PX 78.) On April 2, Spell emailed SMS's business development team, which included Clarke and Nicholas, to suggest a prep call in advance of the meeting with Eubanks. (DX 66; Spell Decl. ¶ 14.) Spell outlined several items for SMS to consider reviewing with Eubanks, including, "Request any updates from [Eubanks] regarding engagement with SMS." (DX 66; Spell Decl. ¶ 14.) Spell also noted that SMS should recommend kicking off an engagement with L3Harris for certain quality management work on its F-35 "TR3" program. (DX 66; Spell Decl. ¶ 14.)

116. On April 6, 2021, Clarke, Nicholas, and Spell had a call with L3Harris's Eubanks, among others. (Fact Stip. ¶ 91.) Taliaferro took notes of the meeting. (PX 80.) During the meeting, Eubanks presented SMS with the opportunity to work with one of L3Harris's segments on the "TR3" program. (Id.; Spell Decl. ¶ 15.) Eubanks stated that L3Harris would issue a Request for Proposal in the next two weeks and that it would be a competitive bid. (PX 80; Spell Decl. ¶ 15.) After Eubanks presented the "TR3" opportunity, Clarke brought up the L3Harris Contract. (PX 80; Clarke Decl. ¶ 185.) According to Taliaferro's notes, Clarke asked Eubanks, "so we'll be moving away from large agreement covering suppliers from all segments?" (PX 80.) Taliaferro wrote that Eubanks responded,

"yes." (Id.; Spell Decl. ¶ 17.)  Following Eubanks's response, Clarke noted that it was "much easier for SMS to understand dynamics of [L3Harris] by working with one segment at a time." (PX 80; Spell Decl. ¶ 17.)  He also told Eubanks that he was "excited about the ["TR3"] opportunity." (PX 80; Spell Decl. ¶ 17.)

117.    Clarke testified that Eubanks was "confused" about the L3Harris Contract and did not know that it had "merely been postponed until July 2021 when Bill Brown would step down as CEO." (Clarke Decl. ¶ 185.)  As Clarke explained, Eubanks "was no longer in the enterprise circle.  They had brought her down to a sector . . . She did not hear the news." (Tr. at 81.)  The Court does not credit Clarke's characterization of Eubank's knowledge and involvement.  As Jones testified, Eubanks was involved in discussions about the L3Harris Contract in December 2020, the same month that Jones communicated to SMS that L3Harris was postponing a final decision on whether to issue a purchase order.  (Jones Aff. ¶ 22.)  At that time, Eubanks had not yet taken medical leave and was, as Clarke testified, one of the "highest ranking executives" at L3Harris.  (Id. ¶ 30; Clarke Decl. ¶ 165.)  The Court finds that during the April 6 meeting Eubanks would have been aware of L3Harris's earlier postponement decision.

118.    Nicholas similarly testified that although Eubanks "seemed to suggest the enterprise contract was no longer a possibility" during the April 6 call, he and Clarke thought she was "just confused because we all knew the enterprise-wide contract had been pushed out to July 2021." (Nicholas Decl. ¶ 106.)  The Court does not place any significant weight on Nicholas's testimonial description of the status of deliberations at L3Harris.  The day after the meeting with Eubanks, Nicholas and Marquis acknowledged during a weekly check-in between them that the "workload to start [L3Harris] will be less than expected." (DX 69; Marquis Decl. ¶ 50.)  Then, on April 16, Nicholas provided his team with an update on L3Harris.  (Nicholas Decl. ¶ 106; PX

81.)  Contrary to his testimony, Nicholas reported to his team that SMS had a meeting with Eubanks and that "[e]nterprise we put together expecting to roll out in July when CEO transition was complete is now off the table."  (PX 81.)  It may have been Clarke's opinion that Eubanks was confused, but the Court finds the April 16 notes to have accurately reported Nicholas's understanding that an enterprise-wide engagement of SMS was off the table.

119.    Clarke and Nicholas also testified with respect to Eubanks's response during the April 6 call that she lacked the authority to make any decisions concerning the L3Harris Contract, including whether to kill it.  (Tr. at 81; Clarke Decl. ¶ 185; Nicholas Decl. ¶ 106.)  The Court credits Clarke's and Nicholas's testimony on this point given that higher-ranking L3Harris stakeholders like Kubasik and then-CEO Brown would have been involved in decisions of that nature.  Nonetheless, the Court finds that Eubanks's response reflected her own understanding from within L3Harris that as of April 2021 the L3Harris Contract was off the table and the company would initially seek to engage SMS through the single-segment "TR3" opportunity.

120.    Nicholas submitted SMS's response to L3Harris's Request for Proposal on April 23.  (DX 73; Spell Decl. ¶ 19.)  Shortly after, a member of Jaenicke's team at L3Harris, Kyla Aracena, reached out to SMS to request that it submit a proposal for work involving one of its suppliers in Australia as well.  (DX 73; Spell Decl. ¶ 21.)  SMS did so on April 30.  (Spell Decl. ¶ 21.)  L3Harris awarded both the single-segment "TR3" contract and the Australia contract to SMS on May 6.  (Id.; Fact Stip. ¶ 93.)  Upon learning of this, Nicholas wrote to Marquis to thank him for his support, calling the development "GREAT NEWS."  (DX 76.) Nicholas also noted that "[t]his will be a foot in the door for the bigger opportunity."  (Id.) Marquis congratulated the team and similarly stated, "let's put our feet in the door !"  (Id.)  The

"TR3" contract was small, totaling approximately $160,000.  (Fact Stip. ¶ 92; Clarke Decl. ¶ 187.)  The Australia contract ultimately did not move forward.  (Spell Decl. ¶ 21.)

121.    Despite SMS's success on the rather small "TR3" and Australia contracts, Nicholas was becoming increasingly dissatisfied with his relationships with Rambaud and Marquis.  During a business development meeting, Clarke made certain comments about Nicholas's capacity to oversee the expansion of a contract Nicholas was managing that Nicholas did not agree with.  (Nicholas Decl. ¶ 110.)  Rather than raise the issue with Clarke during the meeting, Nicholas later shared his opinion with Rambaud and asked that he keep it in confidence in order to avoid any strain to his relationship with Clarke.  (Id. ¶ 111.)  According to Nicholas, Rambaud instead called Clarke and "repeated verbatim" what Nicholas had said, leading to a confrontation with Clarke.  (Id.)  This incident caused Nicholas to lose "a tremendous amount of respect" for Rambaud.  (Id. ¶ 112.)  Nicholas also testified that he "adamantly disagreed" with a decision that Marquis made, together with Spell, to have Nicholas "relinquish and abandon all of [his] executive-level customer relationships and to turn them over to [Spell]."  (Id. ¶ 115.)

122.    Heading into the summer of 2021, Nicholas felt that his future with SMS was in question.  As Nicholas testified, "I knew I could not trust [Rambaud] or [Marquis].  I started to consider resigning altogether, knowing that I just could not work for [Rambaud] and [Marquis] given the way they operated."  (Id. ¶ 113.)  Nicholas further testified that this was not the first time that he had considered resigning following TRIGO's acquisition of SMS.  (Id. ¶ 114.)  Nicholas recalled that the "added stress of having to absorb all of that extra work" resulting from SMS's development of its quality management infrastructure had taken a professional and personal toll on him.  (Id.)

123.    In June 2021, Clarke wanted to hire Steve O'Bryan, a former L3Harris executive, as a consultant to SMS.  (Fact Stip. ¶ 94; Clarke Decl. ¶ 190.)  Clarke's understanding was that O'Bryan had connections at L3Harris, including with Kubasik.  (Clarke Decl. ¶ 190; Tr. at 85.)  Clarke wanted to hire O'Bryan to help SMS "continue to develop business with L3Harris," including "expand[ing] the L3Harris Contract even more."  (Clarke Decl. ¶ 190.)  At trial, Clarke denied that, in actuality, it was his view that SMS needed to hire O'Bryan in order to obtain the L3Harris Contract.  (Tr. at 85-86.)  The Court does not find Clarke's testimony to be credible.  Instead, as Clarke wrote to Rambaud on June 10, it was his "suggestion to contract Steve O'Bryan as a consultant to help secure the [L3Harris] contract . . . ."  (PX 89.)  In the same email, Clarke made clear that he was talking about the "contract of $8M annual for 5 years . . . ."  (Id.)  When presented at trial with his statement that it was his "suggestion" to hire O'Bryan "to help secure" the L3Harris Contract, Clarke testified that it did not refresh his recollection that it was his view that SMS needed to hire O'Bryan in order to obtain the L3Harris Contract.  (Tr. at 86.)  Clarke testified that while it was his statement, "it's not in character exactly what I meant when I was talking to [Rambaud]."  (Id.)  The Court finds no ambiguity in Clarke's statement in his email and in turn does not credit Clarke's trial testimony on this point.

124.    As a consultant to SMS, Clarke no longer had the authority to hire O'Bryan on his own.  (Rambaud Decl. ¶ 120; Marquis Decl. ¶ 54.)  As Marquis testified, certain decisions first needed to run through him, Nicholas, and Spell.  (Marquis Decl. ¶ 54.)  Spell was of the view that hiring O'Bryan was "misguided" because it would interfere with SMS's ability to grow its business with L3Harris through Eubanks by first performing well on the "TR3" contract.  (Spell Decl. ¶ 23; Tr. at 369; PX 88.)  Marquis agreed with Spell's view.  (Marquis Decl. ¶ 55; PX 88.)  Nicholas, on the other hand, appeared to lack a firm position on the issue,

simultaneously agreeing with Spell's view and supporting Clarke's approach.  (PX 88; Tr. at 500-01; Marquis Decl. ¶ 55; Clarke Decl. ¶ 190; Nicholas Decl. ¶ 116.)  Nonetheless, further underscoring that Clarke was pushing to hire O'Bryan in order to secure the L3Harris Contract, Marquis wrote to Rambaud on June 10 following a one-on-one meeting with Nicholas that "today, [Nicholas] has very little info from [L3Harris] on supplier management and so without a really big boost like this consultant, we will probably have no additional [L3Harris] business (preparing to put 0 in his forecast) . . . ."  (PX 88.)

125.    Marquis's reference to Nicholas's "forecast" was to the 52-week forecasts for SMS's projected revenue that Nicholas developed with SMS's controller, in which they recorded "weekly revenue by customer and performed more detailed periodic forecast reviews for future periods."  (Nicholas Decl. ¶ 108.)  As of June 11, Nicholas was projecting that SMS would begin earning weekly revenue from the L3Harris Contract the following month.  (Id. ¶¶ 108-09; PX 91.)

126.    Rambaud had a conversation with Clarke regarding, as Clarke described it in a June 10 email to Rambaud, "the team not wanting to follow my suggestion to contract Steve O'Bryan as a consultant to help secure the [L3Harris] contract . . . ."  (PX 89.)  Clarke noted that this "means that [L3Harris] opportunities for me to obtain my earnout have been sabotaged." (Id.)  Clarke also observed that "[w]ithout [L3Harris's] revenue, the capability of us hitting $750k in weekly billing is slim to none.  Contracts we just received, including GD, only bring us to $550k in weekly billing and nothing that is currently in the pipe has been confirmed as a solid opportunity."  (Id.)  That same day, Rambaud responded to Clarke, explaining that the team's "view is that engaging a consultant now, whereas we just started a project with [L3Harris], could negatively affect the relationship we are currently building with operational decision makers and

hence jeopardize not only this contract but the growth potential at [L3Harris]." (DX 77; Rambaud Decl. ¶ 121.) Rambaud added that "[t]he internal intelligence gathered by the team states that the large project which was considered last year was not planned anymore and that our best route to grow within [L3Harris] is to build on the success of current contract and the relationship we can develop from there." (DX 77.) Clarke appears to have drafted a response to Rambaud's June 10 email either that same day or the next. (Id.) In it he wrote that Nicholas "is going to remove the [L3Harris] projections now based on recent discussions which means we're going into the end of this year at $528k in weekly billing because Triumph will be out as well. Nothing in the pipe today is solid enough to give us a real opportunity for true projections any higher than that." (Id.)

127.    After Rambaud informed Clarke that the team did not want to hire O'Bryan, Clarke recognized that weekly revenues from the L3Harris Contract could no longer be included in Nicholas's 52-week forecast. Clarke's unsent draft email conceded that as of June 10 none of the opportunities in SMS's business development pipeline had reached the stage where they could be expected to generate additional weekly revenues for the company in 2021.

128.    Rambaud's email to Clarke (DX 77) is properly received as evidence. The Court concludes that Clarke waived any objection to the exhibit by not specifying the basis for the objection in the JPTO or at trial. If the Court were to generously overlook the waiver and consider the objection on the grounds set forth in Clarke's post-trial briefing, it would be overruled nevertheless and DX 77 would be received into evidence. Rule 26(a)(3)(B), Fed. R. Civ. P., provides that "[w]ithin 14 days after" a party identifies pursuant to Rule 26(a)(3)(A)(iii), Fed. R. Civ. P., the exhibits it expects to offer at trial "a party may serve and promptly file a list of the following objections . . . any objection, together with the grounds for it, that may be made

to the admissibility of materials identified under Rule 26(a)(3)(A)(iii)."  Rule 26(a)(3)(B) adds

that "[a]n objection not so made--except for one under Federal Rule of Evidence 402 or 403--is

waived unless excused by the court for good cause."  In the JPTO, TRIGO identified DX 77 as

an exhibit that it expected to offer at trial on its case in chief.  (ECF 106 at 59.)  Clarke and SSD

indicated in the JPTO that they objected to the exhibit, but did not provide the grounds for their

objection.  (Id.)  The parties requested "the Court's guidance as to the Court's preferred timing

and procedure for the assertion and resolution of the parties' objections to . . . (ii) the parties'

intended trial exhibits."  (Id. at 34.)  But Rule 26(a)(3)(B) made plain that the parties were

obligated to state their objections and the grounds for them within 14 days of the trial exhibits'

identification in the JPTO.  Clarke and SSD did not specify the grounds for their objection to DX

77 at any point prior to the start of trial on December 10.  At trial, Clarke and SSD lodged a

wholesale objection to 12 of TRIGO's exhibits in Rambaud's declaration, including DX 77, but

again failed to specify the grounds for their objection to DX 77.  (Tr. at 325.)  The Court

admitted DX 77 into evidence subject to Clarke's and SSD's objection.  (Id. at 326.)  Only in

their reply letter to TRIGO's proposed findings of fact and conclusions of law, which Clarke and

SSD filed after trial on February 5, 2025, did they finally specify that their objection to DX 77

was based on Rule 602, Fed. R. Evid., writing, "Rambaud lacks personal knowledge of DX77,

which he did not send or receive, such that TRIGO cannot admit DX77 based on Rambaud's

testimony."  (ECF 117 at 6.)  The Court concludes that Clarke's and SSD's repeated failure to

specify the grounds for their objection as required by Rule 26(a)(3)(B) waived that objection.

129.    In any event, as set out in Clarke's and SSD's reply letter of February 5,

the objection was only directed at the portion of DX 77 that appears to be a response by Clarke

to Rambaud's June 10 email that was drafted either that same day or the next and sent by

Taliaferro to Clarke.  Clarke's and SSD's objection did not encompass the contents of Rambaud's June 10 email to Clarke that Clarke was responding to.  As to Clarke's draft response, the Court further concludes that it qualifies as an opposing party's statement under Rule 801(d)(2)(A), Fed. R. Evid., because it was offered against Clarke and Clarke made it in his individual capacity.  Therefore, DX77 was properly received into evidence.  Even without consideration of DX 77, none of the Court's ultimate conclusions that TRIGO is not liable on Clarke's and SSD's breach of contract claims would be altered.

130.    SMS ultimately did not hire O'Bryan as a consultant.  (Tr. at 500.)

131.    The internal debate at SMS regarding O'Bryan's hiring also contributed to Nicholas's resignation as President.  (Nicholas Decl. ¶¶ 116-17; Marquis Decl. ¶ 57.)  Marquis had told Clarke that even Nicholas agreed that it was a bad idea to hire O'Bryan.  (Marquis Decl. ¶ 57.)  According to Nicholas's testimony, Marquis falsely told Rambaud, who then told Clarke, that Nicholas, Spell, and Marquis had collectively agreed during a conference call to not move forward with O'Bryan as a consultant.  (Nicholas Decl. ¶ 116.)  As Nicholas testified, "[t]hat really set me off" and was "what really prompted me to resign."  (Id. ¶¶ 116-17.)

132.    Nicholas resigned as President on June 15, 2021.  (Fact Stip. ¶ 96.)  In his resignation letter, Nicholas attributed his decision to, among other things, changes to the working environment in the previous six months, a "breakdown in confidentiality," "unrealistic financial pressures given the industry dynamics," and "[p]ressures for increased revenue, EBITDA, covenants, and the board . . . ."  (PX 93.)  Nicholas also testified that it was his view that Rambaud and Marquis were repeatedly pitting him against Clarke and that "the environment had become us ([Clarke] and [Nicholas]) against them ([Rambaud] and [Marquis])."  (Nicholas Decl. ¶ 117.)  Nicholas's resignation did not become effective until July 8.  (Fact Stip. ¶ 96.)

133.     The Court finds that at the time of Nicholas's resignation on June 15, SMS believed that the L3Harris Contract was no longer on the table.  The April 6 meeting with Eubanks—during which she made clear her view that L3Harris was moving away from the L3Harris Contract—and L3Harris's engagement with SMS through the single-segment "TR3" contract had led Rambaud, Marquis, and Spell to conclude that SMS would instead need to grow its business with L3Harris incrementally through its relationship with Eubanks.  Following the meeting with Eubanks, it also was Nicholas's position, as expressed in his internal communications, that the scope of SMS's initial work with L3Harris would be less than had been expected under the L3Harris Contract.  Clarke, for his part, resigned himself to the fact that the L3Harris Contract was off the table once it was decided that SMS would not hire O'Bryan as a consultant.

134.     The Court also finds that as of June 15 it remained uncertain within L3Harris itself whether the company would issue a purchase order pursuant to its MSA with SMS once Kubasik became CEO.  Following Jones's resignation in February 2021, SMS's only direct update from L3Harris regarding the L3Harris Contract was Eubanks's in April, telling SMS that the L3Harris Contract was off the table.  And the only work that L3Harris actually awarded to SMS during this span was not at the enterprise-wide level set out in the L3Harris Contract.  Jones testified that after his resignation he remained in contact with Green at L3Harris and that Green was still committed to moving forward with the L3Harris Contract into the summer of 2021.  (Jones Aff. ¶¶ 28-29.)  It was Kubasik, however, who would be the final decisionmaker once he became CEO.  Jones testified at trial that he never spoke directly with Kubasik about SMS between February 2021 and August 2021.  (Tr. at 172.)  Clarke similarly

testified that after his interactions with Kubasik in 2020 he never spoke to him about the L3Harris Contract. (Id. at 74.) Kubasik's intentions were therefore unconfirmed.

TRIGO Instructs Clarke to Temporarily Pause His Business Development Efforts.

135.     On June 16, 2021, Rambaud told Clarke to pause business development efforts for 90 days. (Fact Stip. ¶ 97; PX 98.) Rambaud and Marquis testified that this instruction to Clarke was prompted by Nicholas's resignation and the need to stabilize SMS's operations in light of the resulting leadership vacuum at the company. (Tr. at 316; Rambaud Decl. ¶ 125; Marquis Decl. ¶¶ 58-59.) Rambaud testified at trial as to the purpose of the pause that the company needed to re-group and re-focus on its short-term operations rather than pitch on new business opportunities that, without a leader, it would have been unable to manage and in turn would have caused long-term reputational harm to SMS. (Tr. at 312-13.) Rambaud added that he also wanted to avoid losing other key employees and any further destabilization at SMS. (Id.)

136.     The Court credits Rambaud's and Marquis's testimony regarding the purpose of the pause. As President, Nicholas ran the day-to-day operations of SMS. (Nicholas Decl. ¶ 101.) At the time of Nicholas's resignation, Clarke was no longer an employee of SMS and was serving as a consultant to the company and as its non-executive Chairman. Spell was still new to SMS, having only been at the company as its Chief Commercial Officer for a handful of months. (Rambaud Decl. ¶ 125; Marquis Decl. ¶ 58.) And Marquis, who was best-positioned to step in as a short-term CEO, was still in France and navigating COVID-19-related travel restrictions that made it difficult for him to travel to the U.S. on short notice. (Tr. at 313-14; Rambaud Decl. ¶ 125; Marquis Decl. ¶ 58.) As a result, there was a leadership vacuum at SMS following Nicholas's resignation. It is therefore credible that the resignation of SMS's President led Rambaud and Marquis to believe that a temporary pause on Clarke's business development efforts was necessary in order to stabilize the company's operations.

137.    Clarke testified that he offered to step in for Nicholas, but that Rambaud refused, even on a temporary basis.  (Clarke Decl. ¶ 217.)  Rambaud and Clarke did have a call shortly after Nicholas's resignation during which Clarke was willing to help SMS for the next two to three months.  (PX 98.)  Rambaud and Marquis welcomed his help, but it was not their intention that Clarke be involved in SMS's day-to-day operations, as Nicholas had been.  (Id.; Tr. at 382.)  Rambaud and Marquis both felt that Clarke had operated outside of the corporate structure they had established at SMS in trying to hire O'Bryan.  (Rambaud Decl. ¶ 125; Marquis Decl. ¶ 59.)  Moreover, they had begun to transition SMS away from Clarke's day-to-day influence, including by utilizing him as a consultant and by hiring Spell.  It is therefore credible that they were only willing to rely on Clarke in a limited capacity at this time.  Rather than return him to a day-to-day role, Clarke would principally be tasked with speaking to key employees and certain customers in order to assist with stabilizing the business.  (PX 98; Tr. at 381-83.)  Rambaud also testified that, as SMS's founder, Clarke would serve as a stabilizing presence inside and outside of the company.  (Tr. at 382-83.)  Clarke subsequently entered into a third amended consulting agreement with SMS that shortened his consulting term to the end of September 2021.  (DX 80.)

138.    On June 17, the day after Clarke was instructed to pause his business development efforts, L3Harris's Aracena sent an email to Nicholas with the subject line, "Possible Broader Enterprise SMS Support."  (PX 97.)  Aracena wrote that L3Harris's Green "would like to have a discussion with the SMS team regarding whether it may be beneficial to partner with SMS in a broader capacity with L3Harris."  (Id.)  Both Clarke and Rambaud agreed that SMS needed to take the call.  (Clarke Decl. ¶ 220; PX 99.)  Clarke also advised not telling L3Harris that SMS was not "ready to take on new business until September."  (PX 100; Clarke

Decl. ¶ 220.)  According to Clarke, it would "naturally take 30-60 days to ramp up given the way they move and you can delay or drag it out longer if needed." (PX 100.)  It became the plan for Clarke and Nicholas to handle the call with Green. (PX 101.)  During the call, Nicholas planned to update Green on the "TR3" project, while Clarke would "be there to listen to [Green's] idea on future opportunities for [L3Harris] and SMS to work together." (Id.)  Clarke also planned to explain to Green that Marquis would be taking over as SMS's President/CEO and that Marquis would contact him for an introduction. (Id.; Clarke Decl. ¶ 220.)

139.    Clarke and Nicholas had the call with Green on June 28, 2021. (Clarke Decl. ¶ 221; Fact Stip. ¶ 98.)  Clarke's and Nicholas's assistant, Taliaferro, as well as Nicholas himself, took notes of the call. (Clarke Decl. ¶ 221; Tr. at 447.)  After the call, Taliaferro sent her notes to Clarke and Nicholas. (DX 82.)  Clarke testified that he then "reviewed the call notes and gave direction to my assistant to prepare even more accurate and complete notes than the original draft . . . ." (Clarke Decl. ¶ 221.)  According to Clarke, he wanted to ensure that Marquis would have all the information he needed for his follow-up with Green. (Id.)  Nicholas testified at trial that he was also involved in revising Taliaferro's notes. (Tr. at 447.)  Clarke sent the final version of the meeting notes to Rambaud and Marquis. (PX 103.)

140.    At the start of the call, Clarke and Nicholas informed Green that Nicholas would be leaving SMS and that Clarke was no longer involved in SMS's day-to-day operations. (Id.)  Green expressed concerns about these changes at SMS. (Id.)  Green stated that his "level of trust is with both [Clarke] and [Nicholas]" and that "[w]hen changes like this happen, sometimes company is not the same after and this is his concern . . . ." (Id.)  As a result, Green also expressed uncertainty about engaging SMS on future opportunities with L3Harris. (Id.)  According to the meeting notes, Green "wanted to catch up on TR3 project and talk about future

opportunities and things he had planned for, but isn't sure now.  Spoke with [Clarke] and [Nicholas] for 'several, several' months last year.  Expresses concern."  (Id.)  Green also commented that he "doesn't want to be running out there trying to do some things with an entity he no longer knows."  (Id.)  At trial, Clarke confirmed that Green was concerned about moving forward with SMS in light of Nicholas's departure and Clarke no longer being involved in the day-to-day.  (Tr. at 89.)

141.    As to the future opportunities that Green referenced during the call, Clarke asked, "was it the same level we had on the original bid that included all segments?"  (PX 103.) Green explained that the "first piece" was to engage SMS on the single-segment "TR3" program and that he would then use that engagement to demonstrate SMS's value to the broader L3Harris team.  (Id.)  The meeting notes also stated, "Could expand support with other segments as things progress – maybe along the same lines if not **greater** than we discussed before – this is what [Green] was thinking."  (Id.)  Green added that "SMS must deliver on Part A (TR3)."  (Id.)

142.    While the final version of the meeting notes stated, "Could expand support with other segments as things progress – maybe along the same lines if not **greater** than we discussed before – this is what [Green] was thinking," (id.), Taliaferro's original notes of the meeting only stated, "Could maybe expand support with other segments as things progress." (DX 82.)  At trial, both TRIGO and the Court repeatedly asked Clarke whether he was the one who suggested including this additional language in the final version of the notes, but Clarke could not provide a clear or consistent answer.  (Tr. at 91-97.)  This was despite his unequivocal testimony that he "reviewed the call notes and gave direction to my assistant to prepare even more accurate and complete notes than the original draft . . . ."  (Clarke Decl. ¶ 221.)  Clarke also testified that it was outside the norm for him to review Taliaferro's call notes, as he did in this

lone instance.  (Id.)  The Court finds this self-serving revision, which attributes to Green a direct reference to the L3Harris Contract, to be of questionable veracity.

143.    In any event, the Court finds that during the June 28 call Green expressed both concern and uncertainty about engaging SMS on future opportunities with L3Harris in light of Nicholas's resignation and Clarke no longer being involved in SMS's day-to-day operations. Furthermore, the Court finds that when Clarke asked Green whether the future opportunities he had in mind were at the same level as the L3Harris Contract, Green informed Clarke that L3Harris was taking an incremental approach to potentially expanding its business with SMS. Rather than confirm that L3Harris would issue a purchase order pursuant to its MSA with SMS at the scale of the L3Harris Contract as soon as Kubasik became CEO, Green made clear that the company would first need to assess SMS's performance on the single-segment "TR3" contract before potentially expanding the engagement to other L3Harris segments.

144.    On or about June 29, 2021, Kubasik succeeded Brown as CEO of L3Harris.  (Fact. Stip. ¶ 99.)

145.    On July 16, Marquis had a follow up call with Green.  (Id. ¶ 101.)  Despite Kubasik having assumed the role of CEO by that time, the L3Harris Contract was not brought up during the call.  (Clarke Decl. ¶ 226.)  Marquis testified that the call "was largely informal – just an introduction – and there did not seem to be any eagerness on [Green's] part to expand L3Harris's work with SMS."  (Marquis Decl. ¶ 64.)

146.    Following Kubasik becoming L3Harris's CEO, L3Harris did not issue a purchase order to engage SMS on the L3Harris Contract.  (Tr. at 450; Spell Decl. ¶ 31.)

147.    Clarke testified that Rambaud's instruction to him to pause his business development efforts for 90 days was a "shock[]" because he "could not believe [Rambaud] was

telling me not to do the very thing that I had been doing since I started SMS in 2007—growing the business and bringing in new customers." (Clarke Decl. ¶ 216.) Clarke further testified that "the timing was absolutely brutal, because the L3Harris Contract was going to come in any day now . . . ." (Id.) Clarke's view was that Rambaud's instruction "would eliminate any opportunity to achieve my full earn-out." (Id.) Rambaud acknowledged that the pause made it more difficult for Clarke to hit his earnout. (Tr. at 304; PX 104.)

148.    The Court finds it pure speculation that, absent the temporary pause on Clarke's business development efforts, SMS would have obtained the L3Harris Contract or any other contracts that it did not ultimately secure.

149.    As to L3Harris, at the time that Rambaud gave the instruction to Clarke on June 16 the view inside SMS was that the L3Harris Contract was no longer on the table. To go along with this, since December 2020 it had remained uncertain within L3Harris itself whether the company would issue a purchase order pursuant to its MSA with SMS once Kubasik became CEO. The pause did not stop the June 28 call between Clarke, Nicholas, and Green from taking place. As was clear from the call, Nicholas's looming departure and Clarke no longer being involved in SMS's day-to-day operations only made it more uncertain that L3Harris would engage SMS on future opportunities. In addition, the call confirmed that L3Harris planned to take an incremental approach to engaging SMS on future opportunities, first needing to assess the company's performance on the single-segment "TR3" contract. Once Kubasik became CEO, and despite Clarke's belief that this was all that needed to happen for SMS to secure the L3Harris Contract, L3Harris did not issue a purchase order pursuant to the MSA to engage SMS on the L3Harris Contract.

150.    As to the other business opportunities that SMS was pursuing, Clarke himself conceded only days prior to the start of the pause that none of the opportunities in the company's business development pipeline had reached the stage where they could be expected to generate additional weekly revenues for SMS in 2021.  (DX 77.)  Clarke's own view was that "nothing that is currently in the pipe has been confirmed as a solid opportunity."  (Id.)  Clarke also recognized in his testimony that, as L3Harris's Green had expressed during the June 28 call, Nicholas's departure and himself being out of the day-to-day would be a source of concern for SMS's new and existing customers.  (Clarke Decl. ¶ 247.)

151.    The pause only impacted Clarke's individual business development activities.  (Spell Decl. ¶¶ 26-27, PX 94; PX 136; Tr. at 375, 501-02.)  That impact appears to have been very limited, with Clarke canceling a meeting with Raytheon regarding unspecified "future business opportunities" and pausing business development efforts with Crane Aerospace, which were still at an introductory stage.  (PX 98.)  Meanwhile, SMS continued to pursue existing business opportunities.  (Spell Decl. ¶¶ 26-27; PX 94; PX 136.)  Spell, who had not been told to stop his business development efforts, continued to seek out opportunities, including with General Dynamics Ordinance and Tactical Systems in late June.  (Spell Decl. ¶¶ 26-27; Tr. at 374-75.)  SMS, among other things, also submitted a proposal to Raytheon Technologies on June 16 and planned to present its proposal to the company the following week, submitted another proposal to Raytheon Intelligence and Space on July 19, and scheduled a follow up with Meggitt regarding two opportunities for July 28.  (PX 94; PX 136.)

152.    Clarke resigned from his consulting position with SMS on July 21, 2021.  (Fact Stip. ¶ 102; Clarke Decl. ¶ 233.)  His resignation was not effective until July 30.  (Fact Stip. ¶ 102.)  In his official notice of resignation, Clarke blamed Nicholas's resignation for his

inability to achieve his earnout, writing, "The recent resignation of [Nicholas], which I felt was unfortunate and unnecessary, also has made the fulfillment of my earnout impossible."  (DX 85; Tr. at 102.)  In his notice, Clarke did not mention the temporary pause on his business development efforts.  (DX 85; Tr. at 102-03.)

153.    While the June 16 pause on Clarke's business development efforts was intended to last 90 days, Clarke's resignation meant that the pause was only in effect for about a month and a half.  Moreover, as of July 30, there remained 11 months in Clarke's final earnout period pursuant to the fifth amendment to the PSA, which provided for a potential earnout payment based on SMS's EBITDA for the 12-month period ending June 30, 2022.  (Fact Stip. ¶ 73; DX 60; Rambaud Decl. ¶ 134.)

154.    SMS ultimately did not reach the EBITDA thresholds necessary to trigger any earnout payment pursuant to the fifth amendment to the PSA.  (Fact Stip. ¶ 109.)

155.    Neither Clarke nor SSD have paid back to TRIGO any portion of the $2 million advance that TRIGO paid to SSD under the fifth amendment.  (Tr. at 104.)

156.    Clarke and Nicholas now own and operate a company called OEM Logistics that is in the business of providing supplier management services to the aerospace industry.  (Id. at 397-98.)  OEM Logistics is a competitor to SMS.  (Id. at 399.)  The status of Clarke and Nicholas as competitors of SMS is a fact that the Court takes account of in assessing their trial testimony.

CONCLUSIONS OF LAW

157.    The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship.

158.    The PSA contains a New York choice of law provision, (PX 10), and New York substantive law controls the contract-based claims in this action.  See N.Y. Gen. Oblig. L. §

5-1401; Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) ("New York law gives full effect to parties' choice-of-law provisions . . . .").

Clarke's and SSD's Breach of Contract Claims Fail.

159.    Clarke and SSD assert two claims against TRIGO for breach of section 3.4(e) of the PSA, as amended under the fifth amendment.

160.    Clarke's and SSD's first claim contends that TRIGO forced SMS to build a quality management business, thereby breaching section 3.4(e)(vi)'s requirement that TRIGO "not adopt strategic, commercial or financial changes to the way the Company is managed which could have, in the aggregate, a materially negative impact on the EBITDA of the Company . . . ." (DX 60.)

161.    Clarke's and SSD's second claim contends that TRIGO's instruction to Clarke on June 16, 2021, that he pause his business development efforts for 90 days, which Clarke and SSD assert precluded SMS from obtaining the L3Harris Contract, breached section 3.4(e)(vi)'s requirements that TRIGO "operate the business of the Company consistent with past practice since Closing and not adopt strategic, commercial or financial changes to the way the Company is managed which could have, in the aggregate, a materially negative impact on the EBITDA of the Company," as well as section 3.4(e)(iii)'s requirement that TRIGO "operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment . . . ."  (Id.)

162.    Under New York law, "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused

by that defendant's breach." <u>Diesel Props S.r.l. v. Greystone Business Credit II LLC</u>, 631 F.3d 42, 52 (2d Cir. 2011).

163.    The Court concludes that Clarke and SSD have not established by a preponderance of the evidence that TRIGO forced SMS to build a quality management business. Clarke and SSD have therefore failed to establish on this basis that TRIGO breached section 3.4(e)(vi) by adopting a strategic, commercial, or financial change to the way SMS was managed that could have had a materially negative impact on SMS's EBITDA.

164.    As set forth in the Court's findings above, Clarke rejected TRIGO's existing quality management infrastructure in the U.S. after closing, including TRIGO's two managers for its quality contracts, Walston and Nevenhoven, who Clarke viewed as lacking sufficient expertise and experience.  It was also Clarke who first concluded that SMS would need to build a quality management business from the ground up.  Having reached that determination, Clarke was principally responsible for developing the plan for how to build SMS's quality management infrastructure and came up with the $1 million budget for the initiative.  Clarke then presented his plan and budget to Rambaud and others at an SMS board meeting on February 21, 2019.  Rather than TRIGO forcing SMS to build a quality management business internally, the evidence at trial showed that it was Clarke who initially recognized a need to build that infrastructure, took it upon himself to develop a plan and budget for doing so, and pushed for TRIGO to provide the necessary funds.

165.    Following the SMS board meeting, Rambaud's role in the decision to build the quality management infrastructure inside SMS was limited to seeking the TRIGO board's approval of the $1 million investment that Clarke had requested, which the TRIGO board subsequently granted.  The Court cannot conclude that Rambaud's support for, or the

TRIGO board's approval of, the $1 million investment, which was initially conceived of and then advocated for by Clarke, constituted an order by TRIGO to SMS to build a quality management business, let alone a breach of the PSA.

166.    As further set forth in the Court's findings above, the evidence at trial also failed to prove Clarke's and SSD's contention that due to TRIGO's misrepresentations SMS did not learn until February 2019 that TRIGO had a limited quality management infrastructure in the U.S., at which point SMS had no other choice but to build such infrastructure internally in order to respond to customers' requests for quality management services.  To the contrary, the evidence at trial showed that even prior to signing the PSA in August 2018 Clarke was informed by his investment banker that TRIGO's U.S. aerospace and defense business was limited in its size, including that TRIGO only had four customers.  Moreover, TRIGO itself informed both Clarke and Nicholas in November 2018 of the limited scope of its U.S. quality management infrastructure, communicating to them that it only had two project managers, Walston and Nevenhoven, and 20 inspectors for the small number of profitable quality management contracts in the U.S. aerospace and defense sector that TRIGO would be contributing toward Clarke's earnout.

167.    The Court attributes any misconceptions about the scope of TRIGO's U.S. quality management business that remained in February 2019 principally to Clarke's own lack of inquiry.  Clarke knew when he signed the PSA that he would be managing TRIGO's profitable quality management contracts, which formed part of a business that he had no prior knowledge of or experience in.  Yet, Clarke did not insist on performing due diligence on TRIGO's U.S. business prior to entering into the PSA or secure any representations or warranties in the PSA regarding that business.  In fact, as Clarke testified, TRIGO's quality management business in

the U.S. did not matter to him.  After signing the PSA, Clarke was entitled to be demanding in

seeking to learn more about TRIGO's U.S. business by, for instance, threatening not to close if

TRIGO did not allow him to first meet Walston and Nevenhoven or if TRIGO did not provide

him with more information about how it staffed its U.S. contracts.  Instead, Clarke agreed to

manage a business upon closing that he claims to have had little visibility into.

168.    In turn, it was entirely foreseeable that SMS would face some distraction

from its supplier management business while building the quality management infrastructure, as

Clarke and SSD now complain of.  Clarke, as well as Nicholas, set out to build a quality

management business that they knew they lacked both familiarity in and the necessary

qualifications for.  It was therefore to be expected that building that business from the ground up

would demand considerable resources and time from SMS.  Notwithstanding any distraction,

SMS's supplier management business continued to grow throughout 2019, leading to a 60%

increase in the company's revenue by October.  And once SMS's quality management

infrastructure was sufficiently established to take on three quality management contracts toward

the end of that year, revenue from those contracts contributed to Clarke's $4 million earnout

payment under the third amendment to the PSA.  TRIGO, despite being under no obligation to

do so, agreed under the same amendment to revise the PSA's earnout provision so that SMS's

quality management infrastructure could only have a positive impact on SMS's EBITDA.

TRIGO excluded from SMS's EBITDA calculation any negative EBITDA generated from the

quality business and also accounted for the up-front costs that SMS incurred in building the

business.

169.    Turning to Clarke's and SSD's second breach of contract claim, the Court

concludes that they have failed to establish by a preponderance of the evidence that TRIGO's

instruction to Clarke on June 16, 2021, to pause his business development efforts for 90 days was issued for the "primary purpose" of reducing or eliminating his earnout. Clarke and SSD have therefore failed to show that TRIGO's instruction breached section 3.4(e)(iii)'s requirement that TRIGO "operate the Company in good faith and refrain from taking any action with the primary purpose of reducing or eliminating the Earn-Out Payment . . . ." (DX 60.)

170. As the Court detailed in its findings above, Nicholas's resignation as SMS's President on June 15, 2021, resulted in an unprecedented leadership vacuum at SMS. SMS had already lost Clarke as its CEO at the start of the year and only months later stood to lose Nicholas, who had taken charge of the company's day-to-day operations, as its President. At the time of Nicholas's resignation, Spell was still new to his role as Chief Commercial Officer and Marquis faced COVID-19-related travel restrictions that made it difficult for him to travel from France to the U.S. on short notice. Given these circumstances, Rambaud and Marquis testified credibly that the purpose of the ensuing pause on Clarke's business development efforts was to stabilize SMS's operations. The evidence at trial did not prove that TRIGO instead acted with the primary purpose of thwarting Clarke's earnout.

171. To the contrary, the evidence showed that prior to Nicholas's resignation TRIGO repeatedly agreed to enter into amendments to the PSA's earnout provision that would help Clarke receive his earnout. At Clarke's urging, and despite being under no obligation to do so, TRIGO agreed to extend his earnout period by a total of two-and-a-half years through five amendments to the PSA. Those amendments also made it easier for Clarke to reach the EBITDA thresholds necessary to receive his earnout. The third amendment, for instance, changed the earnout provision to allow for a payment of up to $4 million based solely on SMS's average weekly revenue in December 2019, all but guaranteeing when the amendment was executed on

December 21 that Clarke would receive that $4 million payment. Moreover, TRIGO had its own economic interest in Clarke achieving his earnout, which is why it was ultimately willing to amend the PSA. Based on TRIGO's equity value, each additional dollar of EBITDA that Clarke was able to generate at SMS for TRIGO Group in pursuit of his earnout would result in $10 of additional equity value for TRIGO less the increase of the net financial debt. Simply put, TRIGO stood to gain from Clarke achieving his earnout. The Court finds that the direction to Clarke to temporarily pause his business development activities was a business judgment made in good faith. Clarke and SSD have failed to prove by a preponderance of the credible evidence that by this direction TRIGO aimed to thwart Clarke's earnout.

172.    Clarke's and SSD's second breach of contract claim also contends that TRIGO's instruction to Clarke to pause his business development efforts for 90 days breached section 3.4(e)(vi)'s requirements that TRIGO "operate the business of the Company consistent with past practice since Closing and not adopt strategic, commercial, or financial changes to the way the Company is managed which could have, in the aggregate, a materially negative impact on the EBITDA of the Company . . . ." (Id.) The Court need not reach the issue of whether the pause was a deviation from SMS's past practice since closing or constituted the sort of change to SMS's management prohibited by this provision because Clarke and SSD failed to prove the element of damages for their second claim by a preponderance of the evidence.

173.    "To prove general damages under New York law, the plaintiff must show (i) the fact or existence of damages to a reasonable certainty and, if the fact or existence of damages is proven, (ii) a stable foundation for a reasonable estimate of damages incurred as a result of the breach." Horowitz v. National Gas & Electric, LLC, 17-cv-7742 (JPO), 2021 WL 4478622, at *14 (S.D.N.Y. Sept. 30, 2021) (internal quotation marks, brackets, and citation

omitted).  "The first prong concerns causation, while the second prong speaks to the amount of

damages."  Id. (citation omitted).  "In other words, 'damages may not be merely speculative,

possible or imaginary, but must be reasonably certain and directly traceable to the breach, not

remote or the result of other intervening causes.'"  Id. (quoting Kenford Co., Inc. v. Erie County,

67 N.Y.2d 257, 261 (1986)).

174.    Clarke and SSD seek to recover general damages of $12,724,780, an

amount equal to the unpaid earnout compensation under the fifth amendment to the PSA that

they claim Clarke is entitled to.  On their second breach of contract claim, Clarke's and SSD's

theory of damages is almost entirely premised on SMS's failure to secure the L3Harris Contract,

which they claim was caused by TRIGO's instruction to Clarke to pause his business

development efforts.  The Court, however, concludes that Clarke and SSD failed to carry their

burden as to causation because based on the evidence adduced at trial it was purely speculative

that, absent the temporary pause on Clarke's business development efforts, SMS would have

obtained the L3Harris Contract.

175.    As set forth in the Court's findings above, through no fault of TRIGO's

L3Harris decided in December 2020 to postpone a final decision on whether to issue a purchase

order pursuant to its MSA with SMS, by which it could have engaged SMS on the L3Harris

Contract.  As Clarke testified at trial, as of the date of L3Harris's postponement decision the

L3Harris Contract was not a certainty.  Up to the date of TRIGO's instruction to Clarke in June

2021 regarding his business development efforts, the likelihood that SMS would be awarded the

L3Harris Contract only appeared to lessen.  On April 6, L3Harris's Eubanks, who Clarke

testified was previously one of the company's highest-ranking executives, communicated to

SMS her understanding from within L3Harris that the L3Harris Contract was off the table and

that the company would initially seek to engage SMS through the single-segment "TR3" opportunity.  Following this, it was Clarke's own view that SMS would not be able to obtain the L3Harris Contract if it did not hire O'Bryan as a consultant.  SMS ultimately did not hire O'Bryan, leading Clarke to resign himself to the fact that the L3Harris Contract was off the table and could not be forecasted to contribute to SMS's weekly revenues in 2021.  At the time of Nicholas's resignation on June 15, Clarke's view that the L3Harris Contract was off the table was shared by Rambaud, Marquis, Spell, and Nicholas.

176.    Clarke's hopes that SMS would eventually secure the L3Harris Contract rested on Kubasik, who would be the final decisionmaker once he became L3Harris's CEO.  However, his intentions as to the L3Harris Contract remained unconfirmed throughout the first half of 2021.  Clarke did not speak to Kubasik about the L3Harris Contract during that period.  Nor did Jones after he resigned from L3Harris in February 2021.

177.    When L3Harris's Green later sought to connect with SMS regarding future opportunities to partner together, TRIGO did not stop a call between Clarke, Nicholas, and Green from taking place on June 28.  That call made clear that Nicholas's resignation as President and Clarke no longer being involved in SMS's day-to-day operations, both of which were major changes to SMS's management following L3Harris's postponement in December 2020, were a source of concern to Green, who expressed uncertainty during the call about engaging SMS on future opportunities.  Moreover, when Clarke asked Green whether the future opportunities he had in mind were at the same level as the L3Harris Contract, Green did not simply state that L3Harris would issue the necessary purchase order as soon as Kubasik became CEO.  Rather, Green informed Clarke that L3Harris was taking an incremental approach to potentially expanding its business with SMS, with L3Harris first needing to assess SMS's

performance on the single-segment "TR3" contract. Green's stated approach was consistent with Eubanks's understanding back in April.

178. Finally, after Kubasik become L3Harris's CEO on or about June 29, 2021, L3Harris did not issue a purchase order to engage SMS on the L3Harris Contract. Indeed, Kubasik himself might have held Green's concerns about the recent leadership changes at SMS. The L3Harris Contract was not even brought up during a subsequent follow up call between Green and Marquis on July 16. It was plainly not so that all that needed to happen for SMS to secure the L3Harris Contract was for Kubasik to become CEO.

179. Clarke and SSD therefore failed to prove by a fair preponderance of the credible evidence that TRIGO's June 16 instruction to Clarke to temporarily pause his business development efforts affected SMS's ability to obtain the L3Harris Contract.

180. The Court also concludes that it was entirely speculative whether the pause, which due to Clarke's resignation as a consultant to SMS on July 21 only remained in effect for about a month and a half, caused SMS to miss out on any other contracts. Clarke's own assessment just days prior to the start of the pause was that none of the opportunities in the company's business development pipeline had reached the stage where they could be expected to generate additional weekly revenues for SMS in 2021. Clarke also recognized in his testimony that Nicholas's departure and himself being out of SMS's day-to-day would be a source of concern for SMS's new and existing customers, as it was for L3Harris. To go along with this, the pause appears to only have had a very limited impact on Clarke's engagements with customers, none of which were shown to be poised to generate additional business for SMS. Clarke cancelled a meeting with Raytheon regarding unspecified future business opportunities and paused his business development efforts with Crane Aerospace, which were still at an

introductory stage. Meanwhile, SMS continued to pursue several existing business opportunities, including with two Raytheon entities. Clarke and SSD failed to prove by a fair preponderance of the credible evidence that the instruction to Clarke hampered SMS's ability as a whole to generate new business.

181. Thus, Clarke and SSD have failed to prove their breach of contract claims.[2]

Clarke is Liable on TRIGO's Counterclaim.

182. TRIGO asserts a counterclaim against Clarke and SSD for breach of contract, seeking the return of TRIGO's $2 million advance payment to SSD under the fifth amendment to the PSA that Clarke personally guaranteed and has not repaid, plus statutory interest at a rate of nine percent per annum. TRIGO also seeks to recover its attorneys' fees and costs.

183. At the outset, Clarke and SSD contend that in its pleading (ECF 41) TRIGO failed to assert a counterclaim against Clarke for breach of the personal guaranty and instead only asserted a counterclaim against SSD for breach of the PSA. As is plain from TRIGO's pleading, however, TRIGO's breach of contract counterclaim was brought against both Clarke and SSD and alleged that Clarke breached his personal guaranty. TRIGO alleged, among other things, that "Counterclaim Defendant Clarke provided an 'absolute' and 'unconditional' guaranty of SSD's repayment obligation" and that "Despite due demand, Counterclaim Defendants have failed to honor their reimbursement obligations." (ECF 41, Counterclaim ¶¶ 7,

---

[2] Because Clarke and SSD have failed to prove that TRIGO forced SMS to build a quality management business in breach of the PSA, have failed to prove that TRIGO's instruction to Clarke breached section 3.4(e)(iii) of the PSA, and the Court does not reach the issue of whether TRIGO's instruction breached section 3.4(e)(vi)'s requirements, the Court concludes that Clarke and SSD are not entitled to nominal damages or the recovery of their attorneys' fees under the PSA. See, e.g., Hirsch Electric Co., Inc. v. Community Services, Inc., 145 A.D.2d 603, 605 (2nd Dept. 1988) (nominal damages are only recoverable upon a finding of breach of contract).

12.)  Accordingly, the Court concludes that TRIGO has asserted a counterclaim against Clarke for breach of his personal guaranty.

184.    "A guaranty is a promise to fulfill the obligations of another party, and is subject 'to the ordinary principles of contract construction.'" Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank International," N.Y. Branch v. Navarro, 25 N.Y.3d 485, 492 (2015) (quoting Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 34 (2d Cir. 1999)).  "Under those principles, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" Id. at 493 (quoting Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (2002)).

185.    Under the fifth amendment to the PSA, SSD (defined in the fifth amendment as "SMS Inc.," in reference to SSD's former name) was obligated to reimburse TRIGO for its advance payment in the amount of $2 million if SMS did not earn at least $2 million pursuant to the earnout mechanism contained therein.  (DX 60 at 3.)  As Clarke was obligated to do under the fifth amendment, he separately executed a personal guaranty in which he guaranteed SSD's reimbursement obligation as to the $2 million advance, and also agreed to pay TRIGO's reasonable attorneys' fees and expenses in enforcing its rights under the guaranty. (DX 58.)  In particular, the personal guaranty defines Clarke's "Obligations" as follows:

> The Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the punctual payment, when due, whether at stated maturity, by acceleration or otherwise, of all present and future obligations, liabilities, covenants and agreements required to be observed, performed, or paid by SMS Inc. with respect to the Reimbursement and agrees to pay any and all out-of-pocket costs, reasonable attorneys' fees and expenses incurred by Trigo in any way related to the enforcement or protection of Trigo's rights hereunder . . . .

(Id. at 1.)  The personal guaranty also states that Clarke's obligation as guarantor is "unlimited" and that "[t]his guarantee is a guarantee of payment and is absolute."  (Id.)  Furthermore, in the

guaranty Clarke "irrevocably" waived "any defenses" challenging "[a]ny lack of validity or enforceability of the Obligations or any agreement or instrument relating thereto." (Id. at 2.)

186.    There is no dispute that SMS did not reach the EBITDA thresholds necessary to trigger any earnout payment pursuant to the fifth amendment to the PSA and that Clarke has not paid back to TRIGO any portion of the $2 million advance.

187.    Guaranties such as Clarke's "that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims, i.e., guaranties that are 'absolute and unconditional,' have been consistently upheld by New York courts." Cooperatieve Centrale, 25 N.Y.3d at 493 (collecting cases). And "[i]t is well settled that '[w]here a guaranty states that it is 'absolute and unconditional,' guarantors are generally precluded from raising any affirmative defense." Gerber Finance, Inc. v. Volume Snacks, Inc., 21-cv-507 (JSR), 2021 WL 3038780, at *6 (S.D.N.Y. July 14, 2021) (quoting HSH Nordbank Ag New York Branch v. Swerdlow, 672 F. Supp. 2d 409, 418 (S.D.N.Y. 2009)).

188.    Nonetheless, Clarke and SSD advance the defense that TRIGO's alleged breaches of the PSA relieved SSD of its repayment obligation under the fifth amendment and in turn eliminated Clarke's corresponding obligation under the guaranty. In doing so, they rely on a narrow exception under New York law that even where, as here, a guaranty is "absolute and unconditional," the guarantor may still raise a "challenge that the creditor's wrongful post-execution conduct triggered the event that accelerates or causes the guarantor's liability." Cooperatieve Centrale, 25 N.Y.3d at 496 (citing Canterbury Realty & Equipment Corp. v. Poughkeepsie Savings Bank, 524 N.Y.S.2d 531 (3rd Dept. 1988)). As discussed, however, Clarke and SSD did not establish at trial that TRIGO forced SMS to build a quality management business in breach of the PSA. Nor did they establish that TRIGO's instruction to Clarke to

temporarily pause his business development efforts aimed to thwart Clarke's earnout. While the Court does not reach the issue of whether TRIGO's instruction to Clarke was in breach of section 3.4(e)(vi)'s requirements, Clarke and SSD also failed to show beyond mere speculation that TRIGO's instruction caused SMS to miss out on the L3Harris Contract or any other contracts that could have extinguished SSD's repayment obligation by enabling SMS to reach the necessary EBITDA thresholds under the fifth amendment. Accordingly, the Court concludes that Clarke's and SSD's challenge to Clarke's obligation under the personal guaranty is without merit.

189.    The Court concludes based on the unambiguous, absolute, unconditional, unlimited, and irrevocable personal guaranty that Clarke entered into, which also contained an irrevocable waiver of any defenses relating to validity and enforcement, that TRIGO is entitled to judgment on its counterclaim for $2 million, as well as the recovery of its reasonable expenses and attorneys' fees in enforcing its rights under the guaranty. TRIGO has proven its counterclaim against Clarke and SSD by a fair preponderance of the credible evidence.

190.    The Court also concludes that TRIGO, as the prevailing party on its breach of contract claim, is entitled to pre-judgment interest at a rate of nine percent per annum from the date its cause of action accrued. See N.Y. C.P.L.R. § 5001(a)-(b) (providing that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract" and that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed"). That date is the date on which Clarke's repayment of the $2 million advance under the personal guaranty was due to TRIGO. Post-judgment interest is available to TRIGO as a matter of law. See 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

CONCLUSION

The Court will award judgment against plaintiffs and in favor of TRIGO on plaintiffs' claims. The Court will award judgment in favor of TRIGO and against Clarke on TRIGO's counterclaim in the amount of $2 million, plus pre-judgment interest at a rate of nine percent per annum, calculated from the date on which Clarke's repayment of the $2 million advance under the personal guaranty was due to TRIGO through the date of the entry of the judgment. Post-judgment interest runs as a matter of law and will not be included in the judgment. TRIGO shall submit a proposed final judgment on notice within fourteen days hereof together with evidence and argument as to the date from which pre-judgment interest against Clarke should run. Plaintiffs may respond seven days thereafter.

TRIGO's motion for attorneys' fees shall be filed within twenty-one days of entry of judgment, Clarke and SSD shall respond fourteen days after the motion, and TRIGO may reply seven days after Clarke's and SSD's response. Final judgment need not await the award of attorneys' fees and costs. Rule 54(d)(2)(B), Fed. R. Civ. P.


SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 21, 2025